# EXHIBIT 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life       )
Term Parole Consideration       )        CDC Number C-66878
Hearing of:                     )
                                )
JERRY LEE SULLIVAN              )
_____ )

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

JULY 21, 2006

PANEL PRESENT:

Mr. Archie Joe Biggers, Presiding Commissioner
Ms. Deborah Star, Deputy Commissioner

OTHERS PRESENT:

Mr. Jerry Lee Sullivan, Inmate
Mr. John Stringer, Attorney for Inmate
Mr. Jack Waddell, Deputy District Attorney
Ms. Celeste Hernandez-Gerety, Attorney
Ms. Sonya Gonzales, Observer
Mr. Dave Hymas, Attorney
Correctional Officer, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No          See Review of Hearing
_____  Yes         Transcript Memorandum

**RECORDS
COPY**

Tracy Richardson        Vine, McKinnon & Hall

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 9 |
| Case Factors | 12 |
| Pre-Commitment Factors | 46 |
| Post-Commitment Factors | 53 |
| Parole Plans | 63 |
| Closing Statements | 77 |
| Recess | 89 |
| Decision | 90 |
| Adjournment | 98 |
| Transcriber Certification | 99 |

--oOo--

1

# P R O C E E D I N G S

1    **DEPUTY COMMISSIONER STAR:** We're on record.

2    **PRESIDING COMMISSIONER BIGGERS:** Okay, this is a

3    Subsequent Parole Consideration Hearing for Jerry Lee

4    Sullivan, S-U-L-L-I-V-A-N, CDC number C-66878. Today's

5    date is July the 21st, 2006, and we're located at the San

6    Quentin Prison. San Quentin State Prison, excuse me.

7    The inmate was received on May the 31st, 1983, from

8    Contra -- Contra Costa County. The life term began on

9    June the 1st, 1986, and the minimum eligible parole date

10    was June the 1st, 1993. The controlling offense which

11    the inmate has been committed for is violation of Penal

12    Code 209(b)/187/664. Case number is C-C, that's Charlie,

13    Charlie -- 26837. There were also some additional

14    counts. There was a Count Two -- excuse me, those counts

15    that I just mentioned under P209 and 187/664 was Counts

16    and One and Five. The additional Counts were Count Two

17    was Kidnap for Robbery which, was a violation of -- of

18    PC209(b) same case number and that offense was not

19    stayed. The Robbery which was a violation of Penal Code

20    PC211, same case number, was Count Three was -- was, in

21    fact, stayed. The Use of a Weapon which was a P12022.5,

22    same case number, Count Three was stayed. The -- there

23    was -- a Count Four was a violation of P211 Robbery, same

24    case number, and that was stayed. The Use of a Firearm

25    in Count Four, which was a violation of the P -- of Penal

26    Code 12022.5, same case number, was also stayed. And

2

1  then we had an Aggravated Assault, which was a violation

2  of Penal Code 245, same case number, in count five and

3  also the Use of a Firearm, P12055.5 in same case number

4  in Count Five.  Both of those were stayed as well.  The

5  inmate received a term of seven to life plus seven years.

6  And, as I said earlier, the minimum eligible parole date

7  was June the 1st, 1993.  Now, this hearing is being tape-

8  recorded and for the purpose of voice identification each

9  of us will state our first and last name, spelling our

10 last name.  When it's your turn, Mr. Sullivan, after

11 spelling your last name, please give us your CDC number.

12 I will start and move to my left.  We'll go around the

13 room and then we'll come back over to our observers.  My

14 name is Archie Joe Biggers, B-I-G-G-E-R-S, and I'm a

15 Commissioner with the Board of Parole Hearings.

16        **DEPUTY COMMISSIONER STAR:**  Deborah Star, S-T-A-R,

17 Deputy Commissioner, Board of Parole Hearings.

18        **DEPUTY DISTRICT ATTORNEY WADDELL:**  My name is

19 Jack Waddell, W-A-D-D-E-L-L, Deputy District Attorney of

20 Contra Costa County.

21        **ATTORNEY STRINGER:**  John Stringer, S-T-R-I-N-G-E-

22 R, Attorney.

23        **INMATE SULLIVAN:**  My name is Jerry Sullivan, C-

24 66878.

25        **PRESIDING COMMISSIONER BIGGERS:**  Spell your last

26 name.  Spell your last name, please.

27        **INMATE SULLIVAN:**  Sullivan, S-U-L-L-I-V-A-N.

3

1      **PRESIDING COMMISSIONER BIGGERS:** Thank you.

2      **MS. HERNANDEZ-GERETY:** Celeste Hernandez-Gerety,

3  H-E-R-N-A-N-D-E-Z -- G-E-R-E-T-Y.  I'm a summer associate

4  at Morrison and Forester.

5      **PRESIDING COMMISSIONER BIGGERS:** Okay.

6      **MS. GONZALES:** My name is Sonya Gonzales, G-O-N-

7  Z-A-L-E-S, observer.

8      **MR. HYMAS:** My name is Dave Hymas.  I'm an

9  attorney at Morrison and Forester.  Last name is

10  H-Y-M-A-S.

11      **PRESIDING COMMISSIONER BIGGERS:** Okay, thank you.

12  Thank you very much.  In front of you there, Mr.

13  Sullivan, you have an ADA statement.  Would you please

14  read that out loud for us?

15      **INMATE SULLIVAN:** The ADA statement.  "The

16      Americans Disabilities, ADA, is a law

17      to help people with disabilities.

18      Disabilities are problems that make

19      it harder for some people to see,

20      hear, breath, talk, walk, learn,

21      think, work - work, or take care of

22      themselves than it is for others.

23      Nobody can be kept out of public

24      places or activities because of a

25      disability."

26      **PRESIDING COMMISSIONER BIGGERS:** Keep your voice

27  up, please, sir, because we're taping this.

4

1        INMATE SULLIVAN:  "If you -- if you have

2          a disability you have the right to ask

3          for help to get ready for your BPT

4          hearing, get to the hearing, talk, read

5          forms and papers, and understand the

6          hearing process.  BPT will look at what

7          you ask for to make sure that you have

8          a disability that is covered by the ADA

9          and that you have asked for the right

10         kind of help.  If you do not get help

11         or if you don't think you got the kind

12         of help you need, ask for a BPT 1044 -"

13        PRESIDING COMMISSIONER BIGGERS:  1074.

14        INMATE SULLIVAN:  1074 -- what kind of form it

15  is?

16        PRESIDING COMMISSIONER BIGGERS:  1074.

17        INMATE SULLIVAN:  "1074 Grievance Form.  You can

18  also get help to file it out -- to fill it out."

19        PRESIDING COMMISSIONER BIGGERS:  Okay, what does

20  that mean to you in your own words?

21        INMATE SULLIVAN:  Well, what that means to me is

22  a person that don't understand how to read or write to

23  understand what's being said they can --

24        PRESIDING COMMISSIONER BIGGERS:  Actually, it's

25  mental health issues.  You know, I'm sorry, what it --

26  what it means is if you got an ADA problem, such as

27  seeing, hearing, not being able to get here mobile, you

5

1   know, whatever, then we have to make accommodations for

2   you to ensure that you get the help that you need.  If we

3   don't do that then that's why you can form -- you can

4   fill the -- the 1074 saying that this was not affording

5   you the opportunity to do that.  You understand that?

6          **INMATE SULLIVAN:**  I understand.

7          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I see

8   here that on -- that you -- you signed a form 1073 on

9   April the 20th, 2006, indicating that you had no ADA

10  issues.  Is that correct?

11         **INMATE SULLIVAN:**  No, I don't.  I -- I don't

12  think there's nothing.

13         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  So the

14  information that you -- when you signed it -- you signed

15  it on April the 20th indicating you didn't have any so is

16  -- is -- is that information still correct?

17         **INMATE SULLIVAN:**  Yeah.

18         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I see

19  you're wearing glasses, though.

20         **INMATE SULLIVAN:**  Well, I can, you know, I got

21  glasses problems.

22         **PRESIDING COMMISSIONER BIGGERS:**  Yeah, but do --

23         **INMATE SULLIVAN:**  But --

24         **PRESIDING COMMISSIONER BIGGERS:**  Let me finish

25  now.

26         **INMATE SULLIVAN:**  Okay, all right.

27         **PRESIDING COMMISSIONER BIGGERS:**  You're in such a

6

1  hurry.  Are you getting nervous or something?

2          INMATE SULLIVAN:  No, I'm not -- I'm not --

3          PRESIDING COMMISSIONER BIGGERS:  Relax.

4          INMATE SULLIVAN:  - in a hurry.

5          PRESIDING COMMISSIONER BIGGERS:  All right.

6  Okay.  Those are reading glasses I assume?

7          INMATE SULLIVAN:  Right.

8          PRESIDING COMMISSIONER BIGGERS:  Okay, did you

9  have them on when you reviewed your C-File?

10         INMATE SULLIVAN:  Yes.

11         PRESIDING COMMISSIONER BIGGERS:  You did --

12         INMATE SULLIVAN:  Those are reading glasses.  I -

13  - I need them to see, too.

14         PRESIDING COMMISSIONER BIGGERS:  Well, I would

15  hope so.

16         INMATE SULLIVAN:  But, you know.

17         PRESIDING COMMISSIONER BIGGERS:  I want to make

18  sure that you, in fact, used those glasses during the

19  time that you were using your C -- reading your C-File.

20  But if you need them to see, if you got your C-File in

21  front of you without your glasses on, it's not doing you

22  any good, you're not reviewing it.  So did you have those

23  glasses on during the time that you were reading your C-

24  File?

25         INMATE SULLIVAN:  No, I don't think I did.

26         PRESIDING COMMISSIONER BIGGERS:  You didn't,

27  well, were you able to read your C-File without them?

7

1          INMATE SULLIVAN:  Yes.

2          PRESIDING COMMISSIONER BIGGERS:  You were?  Okay.

3   So you don't need any help with a magnifying glass or

4   anything to help you read?

5          INMATE SULLIVAN:  Well, my glasses -- well, my --

6   my eye's cut real bad, so I need the glasses.

7          PRESIDING COMMISSIONER BIGGERS:  Okay.

8          INMATE SULLIVAN:  To see.

9          PRESIDING COMMISSIONER BIGGERS:  All right.

10         INMATE SULLIVAN:  But I don't really have to wear

11  them all the time.

12         PRESIDING COMMISSIONER BIGGERS:  Okay.

13         INMATE SULLIVAN:  When I --

14         PRESIDING COMMISSIONER BIGGERS:  So you're

15  telling me that you -- you were able to read your C-File

16  without the glasses?

17         INMATE SULLIVAN:  Right.

18         PRESIDING COMMISSIONER BIGGERS:  Okay.  Want to

19  be sure now.  Trying to make sure your rights are, in

20  fact, not being violated.

21         INMATE SULLIVAN:  I -- I don't think they're

22  being violated.

23         PRESIDING COMMISSIONER BIGGERS:  Okay.  Do you

24  have any hearing impairments?

25         INMATE SULLIVAN:  No, I can hear pretty -- I hear

26  good.

27         PRESIDING COMMISSIONER BIGGERS:  You ever been

8

1    involved in Triple CMS or EOP programs?

2         INMATE SULLIVAN:  No.

3         PRESIDING COMMISSIONER BIGGERS:  You know what

4    those are?

5         INMATE SULLIVAN:  For my -- if you have mental

6    problems?

7         PRESIDING COMMISSIONER BIGGERS:  No, with mental

8    health issues.

9         INMATE SULLIVAN:  Okay, yeah.

10        PRESIDING COMMISSIONER BIGGERS:  Mental health

11   issues.

12        INMATE SULLIVAN:  Okay.

13        PRESIDING COMMISSIONER BIGGERS:  So you don't

14   take any psychotropic medication either, do you?

15        INMATE SULLIVAN:  No.  I take high blood

16   pressure pills.

17        PRESIDING COMMISSIONER BIGGERS:  High blood

18   pressure pills, okay.

19        INMATE SULLIVAN:  That's just for my blood

20   pressure.

21        PRESIDING COMMISSIONER BIGGERS:  Do you suffer

22   from any disability that would prevent you from

23   participating in today's hearing?

24        INMATE SULLIVAN:  No.

25        PRESIDING COMMISSIONER BIGGERS:  Okay.  Counsel,

26   do you feel that your client's ADA rights have been met?

27        ATTORNEY STRINGER:  I do, Commissioner.  My

1    client can meaningfully participate in this hearing.  Any

2    event I'd stipulate on the reasonable accommodation under

3    Armstrong.

4         PRESIDING COMMISSIONER BIGGERS:  Thank you.  One

5    other question before I begin, how far did you get in

6    school?

7         INMATE SULLIVAN:  Graduated.

8         PRESIDING COMMISSIONER BIGGERS:  Graduated.

9         INMATE SULLIVAN:  Twelfth grade.

10        PRESIDING COMMISSIONER BIGGERS:  Twelfth grade?

11        INMATE SULLIVAN:  Should be in the C-File.

12        PRESIDING COMMISSIONER BIGGERS:  I know, it

13    probably is.  I just want to make sure that -- okay.

14    This hearing is being conducted pursuant to Penal Code

15    Sections 3041 and 3042 and the rules and regulations of

16    the Board of Prison Terms governing parole consideration

17    hearings for life inmates.  The purpose of today's

18    hearing is to once again consider the number and the

19    nature of the offenses that you were committed for, your

20    prior criminal and social history, and your behavior and

21    programming since your commitment.  We've had the

22    opportunity to review your Central File and your prior

23    transcript and you will be given the opportunity to

24    correct or clarify the record.  We will reach a decision

25    today and inform you whether or not we find you suitable

26    for parole and the reason for our decision.  If you are

27    found suitable for parole, that length of your

10

1  confinement will be explained to you.  Nothing that

2  happens here today will change the findings of the court.

3  This Panel is not here to re-try your case.  The Panel's

4  here for the sole purpose of determining your suitability

5  for parole.  Do you understand this?

6          **INMATE SULLIVAN:**  Yes.

7          **PRESIDING COMMISSIONER BIGGERS:**  Excuse me?

8          **INMATE SULLIVAN:**  Yes.

9          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Again,

10  you have to speak up because we're recording this.  I

11  will discuss with -- with you the crime for which you

12  were committed for, your prior criminal and social

13  history.  Deputy Commissioner Star will then discuss with

14  you your post-conviction factors to include your

15  psychological evaluation.  Then I will come back and talk

16  to you about parole plans and any letters in support or

17  opposition that may be in your file.  Once that is

18  concluded both Commissioners, the District Attorney, and

19  your attorney will be given the opportunity to ask you

20  questions.  Questions from the District Attorney shall be

21  asked through the Chair and you should direct your answer

22  to the Panel and not to the District Attorney.  Next, the

23  District Attorney, then your attorney, then you will be

24  given the opportunity to make a final statement regarding

25  your parole suitability.  That statement should address

26  why you feel you are suitable for parole.  The Panel will

27  then recess, clear the room and deliberate.  Once the

11

1    deliberations are complete the Panel will resume the

2    hearing and announce its decision.  Now, the California

3    Code of Regulations states that regardless of time

4    served, a life inmate shall be found unsuitable for and

5    denied parole if, in the judgment of the panel, the

6    inmate would pose an unreasonable risk of danger to

7    society if released from prison.  You have certain

8    rights.  Those rights include the right to a timely

9    notice of this hearing, the right to review your C-File,

10   which you indicated to me that you had reviewed your C-

11   File, and the right to present relevant documents.  I'm

12   going to ask your attorney if he feels your rights have

13   been met.

14        **ATTORNEY STRINGER:**  As to those rights, yes,

15   Commissioner.

16        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.  You

17   have an additional right to be heard by an impartial

18   panel.  Do you have any objection to the Panel members?

19        **INMATE SULLIVAN:**  No.

20        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Do you,

21   Mr. Stringer?

22        **ATTORNEY STRINGER:**  I do not.

23        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.  I'm

24   going to ask the Deputy Commissioner Star if any

25   confidential information -- material will be used.

26        **DEPUTY COMMISSIONER STAR:**  No.

27        **PRESIDING COMMISSIONER BIGGERS:**  Okay, thank you.

12

1    You should have a copy of a checklist but, I don't see --

2         **DEPUTY COMMISSIONER STAR:**  I have one on my file.

3         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

4         **DEPUTY COMMISSIONER STAR:**  Let me hand it to you.

5         **PRESIDING COMMISSIONER BIGGERS:**  I'm going to

6    pass a copy of the checklist, which I will mark as

7    Exhibit 1, to your attorney, as well as to the District

8    Attorney, to ensure that we're all working off the same

9    set of documents.

10        **ATTORNEY STRINGER:**  Defense has those documents,

11   Commissioner.

12        **PRESIDING COMMISSIONER BIGGERS:**  They sent this

13   back to us yesterday, too.

14        **DEPUTY COMMISSIONER STAR:**  Okay.

15        **DEPUTY DISTRICT ATTORNEY WADDELL:**  As do the

16   People.

17        **PRESIDING COMMISSIONER BIGGERS:**  All right.

18   Thank you both.  Are there any additional documents to be

19   submitted?

20        **ATTORNEY STRINGER:**  Not at this time,

21   Commissioner.  We would reserve the right to supplement

22   the record if the occasion arises.

23        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.  Are

24   there any preliminary objections?

25        **ATTORNEY STRINGER:**  We are ready to proceed.

26        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.  Will

27   the inmate be speaking to us today?

13

1    **ATTORNEY STRINGER:** Commissioner, this is his

2    tenth subsequent hearing. Actually, it is his 11th

3    hearing. It would be my inclination to invoke Penal Code

4    Section 5011(b). However, Mr. Sullivan has indicated to

5    me he wants to respond to all questions of the Panel.

6    **PRESIDING COMMISSIONER BIGGERS:** Okay. Is that

7    correct, Mr. Sullivan?

8    **INMATE SULLIVAN:** Yes.

9    **PRESIDING COMMISSIONER BIGGERS:** Okay, for the

10   record then, I'm going to read into the record from the

11   Board report a summary of the crime.

12            "Jerry Sullivan and co-defendant

13            William Buford, B-U-F-O-R-D, made an

14            appointment with -- with William Reily

15            -- Reily, R-E-I-L-Y, a Reily relative,

16            to be shown a home that Reily had

17            listed. The meeting was to take place

18            in the -- at the home which is located

19            in the town of Tracy, California, on

20            the next day July the 2nd at 10 a.m.  On

21            the morning of July the 2nd around 9

22            a.m., an unidentified person called Mr.

23            Reily and cancelled the appointment for

24            10 a.m.  However, this same individual

25            telephoned later the same afternoon and

26            arranged to be at the property at 2

27            p.m. the same afternoon. Sullivan and

14

1      a companion arrived for the appointment

2      in a car driven by a third unidentified

3      person.  Mr. and Mrs. Reily met them

4      and showed them the house.  After

5      approximately 20 minutes, Sullivan and

6      his companion left the home and the

7      Reily's began to lock up the house.  As

8      they were exiting the back of the house

9      Sullivan and his companion approached

10     and separated the Reily's.  Sullivan's

11     companion directed Mrs. Reily into the

12     -- the Reily car.  He told the third

13     person, the unidentified driver of the

14     vehicle in which they had arrived, to

15     leave.  Sullivan told the Reily's that

16     he had a gun and would use it so as to

17     in -- ensure they - their compliance.

18     Sullivan directed Mrs. Reily into the

19     car.  They drove to the Reily home in

20     Walnut Creek.  Once there, a pre-

21     recorded message demanded that the

22     Reily's give them $150,000 was played.

23     The message also indicated threats to

24     rape and murder Mrs. Reily and -- and

25     then kill Mr. Reily if they did not

26     cooperate.  The Reily's explained that

27     they did not have the kind -- that kind

1    of money and eventually Sullivan and

2    his companion decided to take the

3    Reily's to their bank and withdraw as

4    much money as they could.  The Reily's

5    were driven to their bank and Mrs.

6    Reily was instructed to enter the bank

7    and make a withdrawal of all the money

8    she could access.  Mr. Reily was to be

9    held hostage until she returned with

10    the money.  She was to be picked up in

11    front of the bank and - when she had

12    finished the transaction.  Mrs. Reily

13    went to a teller and withdrew money

14    from her account and was able to give

15    the teller a note explaining what was

16    going on and asked to have the police

17    called.  Officers arrived and verified

18    the situation.  As the backup officers

19    were called, Sullivan and his companion

20    made the decision to leave.  As they

21    tried to leave a police unit made an

22    attempt to stop the car and a pursuit

23    ensured -- ensued.  It ended when

24    Sullivan lost control of the car and

25    crashed into a fence.  Mr. Reily later

26    stated after the car crashed, Sullivan

27    fell on top of him and a struggle for

16

1          the gun occurred.  Mr. Reily said

2          Sullivan stuck the gun into his ribs

3          and pulled the trigger but the gun did

4          not fire.  Sullivan pulled Reily out of

5          the car at gunpoint and tried to make a

6          getaway.  As they went through some

7          brushes, they both fell and were

8          immediately surrounded by police

9          officers.  Sullivan was taken under

10          arrest."

11    Is that pretty well what happened, Mr. Sullivan?

12          **INMATE SULLIVAN:**  Yes, sir.

13          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  You know,

14    you could've been in deeper trouble if that gun had gone

15    off.  Is that correct?

16          **INMATE SULLIVAN:**  Yes.

17          **PRESIDING COMMISSIONER BIGGERS:**  What made you

18    pick out the -- this -- this couple to commit this

19    offense?

20          **INMATE SULLIVAN:**  Well, I didn't pick this couple

21    out.

22          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Tell me

23    how -- how did -- how -- well, how did they get involved?

24          **INMATE SULLIVAN:**  Well, the third party, they

25    picked this couple out.

26          **PRESIDING COMMISSIONER BIGGERS:**  A third party?

27          **INMATE SULLIVAN:**  Yeah.

17

1        PRESIDING COMMISSIONER BIGGERS:  Who was the

2   third party?

3        INMATE SULLIVAN:  This guy, his name was Davis.

4        PRESIDING COMMISSIONER BIGGERS:  Okay.  Did he

5   get any time?

6        INMATE SULLIVAN:  I'm sure he's in jail right

7   now.

8        PRESIDING COMMISSIONER BIGGERS:  In jail right

9   now.  Well, how'd you get involved?

10       INMATE SULLIVAN:  Well, I met Mr. Davis at -- at

11  a furniture store.

12       PRESIDING COMMISSIONER BIGGERS:  Okay.

13       INMATE SULLIVAN:  I was buying some furniture for

14  an apartment I just moved in and me and my mom went there

15  looking for furniture.  That's where I met Mr. Davis.

16       PRESIDING COMMISSIONER BIGGERS:  Well, when did

17  this guy start talking to you about kidnapping some

18  people for money?

19       INMATE SULLIVAN:  Maybe about -- maybe about two

20  or three weeks later.

21       PRESIDING COMMISSIONER BIGGERS:  Two or three

22  what?

23       INMATE SULLIVAN:  Two or three weeks later.

24       PRESIDING COMMISSIONER BIGGERS:  Two or three

25  weeks later.  You met him at a furniture store.  You all

26  exchanged phone numbers or something?

27       INMATE SULLIVAN:  I met him at a furniture store

18

1    -- how it all started, I met him at the furniture store

2    when me and my mom -- we went there looking for furniture

3    and this guy was the furniture salesman.  So I go there

4    and he tells me I can't get the furniture.  I need a co-

5    signer and I need some other kind of stuff.  So -- so at

6    this time, I feel like the guy was going to help me get

7    the furniture.  That's how I met the guy.  So, eventually

8    I got the furniture.  Some -- somebody gave -- eventually

9    I got the furniture.  So after that I seen the guy maybe

10    about two or three weeks later.  I was working, he almost

11    flagged me down.  So after that I met him later on that

12    night.  And we met a couple more times.  And this guy

13    asked me to -- you want -- how -- do you want to make

14    some quick money?  I said sure.  That's how I got

15    involved.

16         **PRESIDING COMMISSIONER BIGGERS:**  Okay, but when

17    he -- when he explained to you about making this quick

18    money, did he explain to you the fact that it was going

19    to be involving kidnapping some people and then holding

20    them for ransom?

21         **INMATE SULLIVAN:**  No, he didn't tell me that.

22         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  When did

23    he -- when did you eventually find out about that?

24         **INMATE SULLIVAN:**  We met maybe about two days

25    prior to that --

26         **PRESIDING COMMISSIONER BIGGERS:**  Okay.

27         **INMATE SULLIVAN:**  -- and we rode around talking

19

1    about we might kidnapping somebody. And I really didn't

2    really trip on it that much cause he said it wouldn't no

3    more than about 30 minutes. So, you know, it -- it

4    really didn't dawn on me how serious it was.

5         PRESIDING COMMISSIONER BIGGERS: Well, the fact

6    that you're going to kidnap somebody is going to be

7    serious, you know.

8         INMATE SULLIVAN: Well, to me it -- it wasn't

9    like a kidnap. I didn't, you know, I --

10        PRESIDING COMMISSIONER BIGGERS: All right, all

11   right. You're going to have to clarify that for me.

12        INMATE SULLIVAN: Okay, how can I explain this?

13   Well, the guy said that we could make some quick, easy

14   money. It won't even take more than 30 minutes. I

15   really didn't trip on the kidnapping. I didn't really

16   understand the seriousness of what I was doing.

17        PRESIDING COMMISSIONER BIGGERS: Well, that's

18   what I'm trying to find out. I mean, if somebody tell me

19   you can make quick money, but it's going to involve me

20   taking somebody from what they were doing --

21        INMATE SULLIVAN: Well, it -- it wasn't like

22   taking them. It was like -- it wasn't take -- my -- my

23   thing was it wouldn't take long and I didn't really

24   seriously understand the kidnapping part.

25        PRESIDING COMMISSIONER BIGGERS: Well, then why'd

26   you get involved?

27        INMATE SULLIVAN: Well, I thought I needed the

20

1    money and --

2         PRESIDING COMMISSIONER BIGGERS:  So if I tell you

3    right now I'm going to give you $2,000 to go out there

4    and do something on the yard, are you going to do it?

5         INMATE SULLIVAN:  No, I wouldn't do it.

6         PRESIDING COMMISSIONER BIGGERS:  Okay.  Well,

7    that's what it sounded like to me.

8         INMATE SULLIVAN:  Well, I -

9         PRESIDING COMMISSIONER BIGGERS:  If somebody tell

10   you that you can make some quick money and you're saying

11   you don't understand -- you didn't understand the

12   seriousness of the kidnapping -- first of all, nothing's

13   really easy.

14        INMATE SULLIVAN:  Right.

15        PRESIDING COMMISSIONER BIGGERS:  But the fact

16   that it was going to be -- well, you're going to have to

17   take a couple people, to get a couple other people

18   involved for quick money.

19        INMATE SULLIVAN:  Well, I didn't really think

20   that far.

21        PRESIDING COMMISSIONER BIGGERS:  You didn't?

22        INMATE SULLIVAN:  No, I really didn't.

23        PRESIDING COMMISSIONER BIGGERS:  How much did he

24   promise you?

25        INMATE SULLIVAN:  About $20,000.

26        PRESIDING COMMISSIONER BIGGERS:  Twenty thousand

27   dollars?

21

1    INMATE SULLIVAN:  Yes, it was just a joke.

2    PRESIDING COMMISSIONER BIGGERS:  Okay, $20,000.

3    Okay.  But, again, okay, tell me how more.  How did that

4    family get chosen?

5    INMATE SULLIVAN:  I really -- I really don't know

6    how they got chosen, to be honest with you.

7    PRESIDING COMMISSIONER BIGGERS:  So the guy told

8    you he's going to give you $20,000 if you go with him,

9    you all were going to be able to make some quick money.

10   Did he describe how you're going to make this quick

11   money?

12   INMATE SULLIVAN:  Well, he told me -- he gave me

13   the address and he gave the - the phone number and stuff

14   to do.

15   PRESIDING COMMISSIONER BIGGERS:  And told you

16   what to do?

17   INMATE SULLIVAN:  What to do.

18   PRESIDING COMMISSIONER BIGGERS:  All right, now,

19   you knew that you weren't going to buy that house anyway?

20   INMATE SULLIVAN:  No, I -- I knew I -- I didn't

21   have the money to buy a house.

22   PRESIDING COMMISSIONER BIGGERS:  Then why you

23   going over looking for a house?

24   INMATE SULLIVAN:  Well, that's what he told me to

25   do.

26   PRESIDING COMMISSIONER BIGGERS:  All right.  If

27   somebody tell you to jump off that tower you going to do

22

1    it?

2         INMATE SULLIVAN:  No.

3         PRESIDING COMMISSIONER BIGGERS:  Would you have

4    done it then?

5         INMATE SULLIVAN:  No.

6         PRESIDING COMMISSIONER BIGGERS:  Okay, then why

7    would you accept that --

8         INMATE SULLIVAN:  Well --

9         PRESIDING COMMISSIONER BIGGERS:  I'm having a

10   hard time understanding how you got involved.

11        INMATE SULLIVAN:  Okay, well, I -- well, you

12   know, the only way I can explain it is back then I was

13   drinking and having a lot of problems and -- and wrecking

14   cars and partying and I wasn't managing my money.  And I

15   was just doing way too much.

16        PRESIDING COMMISSIONER BIGGERS:  Yeah, but you

17   had a gun, right?

18        INMATE SULLIVAN:  (inaudible).

19        PRESIDING COMMISSIONER BIGGERS:  Where'd you get

20   the gun?

21        INMATE SULLIVAN:  Well, a friend of mine got the

22   gun.

23        PRESIDING COMMISSIONER BIGGERS:  Did you have to

24   buy it?

25        INMATE SULLIVAN:  Well, I didn't know how he got

26   it.

27        PRESIDING COMMISSIONER BIGGERS:  But you got it.

23

1    You didn't have to pay any money for it?

2        INMATE SULLIVAN:  I -- all I knew he come up with

3    it.

4        PRESIDING COMMISSIONER BIGGERS:  But you had one

5    with you.  You had a gun.

6        INMATE SULLIVAN:  No, I -- I didn't have -- okay,

7    my friend, Winslow, went and got the gun.  He had the

8    gun.  Somehow I wound up with the gun.  I still don't

9    understand how I got the gun today, but I wound up with

10   the gun.

11       PRESIDING COMMISSIONER BIGGERS:  All right,

12   that's -- let me go back and see if I can piece this all

13   together.  You met this guy at a furniture store?

14       INMATE SULLIVAN:  Right.

15       PRESIDING COMMISSIONER BIGGERS:  You all got to

16   be friends?

17       INMATE SULLIVAN:  Right.

18       PRESIDING COMMISSIONER BIGGERS:  Okay.  And

19   again, I'm not re-trying your case.  I'm just trying to

20   get a feel for what --

21       INMATE SULLIVAN:  I know.  I'm -- I'm -- I'm want

22   to --

23       PRESIDING COMMISSIONER BIGGERS:  Okay.

24       INMATE SULLIVAN:  -- try to get it out there so

25   you can understand.

26       PRESIDING COMMISSIONER BIGGERS:  You -- he

27   approached you about making some quick money to the tune

24

1    of about $20,000?

2          INMATE SULLIVAN:  Yeah, about a couple weeks

3    later.

4          PRESIDING COMMISSIONER BIGGERS:  Couple weeks

5    later.  You did not anticipate what you all were going to

6    do other than he told you to call this -- these -- your

7    victims?

8          INMATE SULLIVAN:  Right.

9          PRESIDING COMMISSIONER BIGGERS:  And so are you

10   telling me you didn't know what was going to transpire

11   until such time as you went up to the house?

12         INMATE SULLIVAN:  Well, he basically told me what

13   we was going to do, but I really didn't understand the

14   whole concept of all what was involved in it.

15         PRESIDING COMMISSIONER BIGGERS:  But he told --

16         INMATE SULLIVAN:  All I --

17         PRESIDING COMMISSIONER BIGGERS:  -- he told you

18   he was going to hold those people for $150,000?

19         INMATE SULLIVAN:  No, he told me -- I -- he said

20   okay, we go -- he -- well, to be honest with you, he

21   wasn't no where around when I was at this place.

22         PRESIDING COMMISSIONER BIGGERS:  Well, I -- I --

23   I wouldn't stay around either if I knew I was getting

24   myself in trouble when I got somebody like you, I can say

25   hey --

26         INMATE SULLIVAN:  That's right.

27         PRESIDING COMMISSIONER BIGGERS:  -- you go do it.

25

1    INMATE SULLIVAN:  That's right.  You know, well,

2    I'm still, you know, I'm looking at all that today, too.

3    PRESIDING COMMISSIONER BIGGERS:  You should.

4    INMATE SULLIVAN:  Well, I -- believe me, I have

5    looked at it over and over and over as how I got myself

6    involved in something --

7    PRESIDING COMMISSIONER BIGGERS:  Uh-huh.

8    INMATE SULLIVAN:  -- that I'm doing for somebody

9    else --

10    PRESIDING COMMISSIONER BIGGERS:  Yeah.

11    INMATE SULLIVAN:  -- that me, myself, never

12    would've even come up with an idea like that.  I was -- I

13    got involved in something that I really didn't understand

14    what I was getting myself into until it was too late.

15    PRESIDING COMMISSIONER BIGGERS:  Well, you're a

16    high school graduate aren't you?

17    INMATE SULLIVAN:  Yes.

18    PRESIDING COMMISSIONER BIGGERS:  Okay.  That

19    means you got something up here.

20    INMATE SULLIVAN:  That's true.

21    PRESIDING COMMISSIONER BIGGERS:  Okay.  Do you

22    use it all the time?

23    INMATE SULLIVAN:  All -- all the time until that

24    day.

25    PRESIDING COMMISSIONER BIGGERS:  Yeah, I would

26    think so.  I mean, you are smart enough to know that when

27    somebody starts talking about going over there to some --

1   have some people show you a house and you're going to

2   take them from there and that's going to be easy money

3   you should've had enough G-2 to understand that's going

4   to be a kidnap.

5       INMATE SULLIVAN:  I -- I understand now.  I --

6   well, see, to -- kidnapping is something I never even

7   heard of or really seriously knew I would be getting

8   involved in anyway.

9       PRESIDING COMMISSIONER BIGGERS:  What'd you think

10  that you were just going to get the people and they're

11  going to hand you over $150,000?

12      INMATE SULLIVAN:  Well, in -- in my mind at the

13  time the way -- they way he put it, it seemed like it was

14  real simple.

15      PRESIDING COMMISSIONER BIGGERS:  Real simple?

16      INMATE SULLIVAN:  It sounded -- it sounded like

17  something that would be over with in a matter of seconds.

18      PRESIDING COMMISSIONER BIGGERS:  Well, you keep

19  emphasizing the timeframe.  I'm not concerned about the

20  timeframe as much as I'm worried about why you got

21  involved.

22      INMATE SULLIVAN:  Well, I -- I been trying to

23  explain why I got involved.  I was --

24      PRESIDING COMMISSIONER BIGGERS:  You're telling

25  me how.  But you're not giving me the causative factors

26  as to why you did that.

27      INMATE SULLIVAN:  Oh, okay.  The reason I did it

27

1   cause at the time I thought I could get away with it.

2        PRESIDING COMMISSIONER BIGGERS:  Okay.

3        INMATE SULLIVAN:  I really thought I could get

4   away with.  It wouldn't take -- it wouldn't take no time

5   to do what I was going to do.

6        PRESIDING COMMISSIONER BIGGERS:  Thirty minutes

7   and you're free?

8        INMATE SULLIVAN:  And I was going to be gone.

9        PRESIDING COMMISSIONER BIGGERS:  Before anybody

10  figured out what had taken place?

11       INMATE SULLIVAN:  Right, before anybody figured

12  it out.

13       PRESIDING COMMISSIONER BIGGERS:  How do you feel

14  about the victims?

15       INMATE SULLIVAN:  Well, today I feel really sick

16  about it.

17       PRESIDING COMMISSIONER BIGGERS:  Feel sick about

18  it.  What do you mean you feel sick about it?

19       INMATE SULLIVAN:  I feel that that's something I

20  should've never did to these people.  And I know that

21  today that I've sent these people through a lot of harm.

22  I hurt these people.  I really -- I really did.  And I --

23  I know in my heart that it should've never happened to

24  them and I shouldn't have been the one that did this to

25  these people.

26       PRESIDING COMMISSIONER BIGGERS:  So you're saying

27  that you traumatized them and you take full

28

1    responsibility is what you're telling me?

2         **INMATE SULLIVAN:**  I take full responsibility for

3    the part I played in this, because it was like a decision

4    that I made -- it was a bad one cause I never made -- I

5    never did anything like this in my life and it was a bad

6    decision I made that day.  And I take full responsibility

7    in the part I played cause if it weren't for me it

8    wouldn't never happened.  That's -- that's way I look at

9    it.  If it wasn't for me it would've never happened cause

10   I wouldn't have been there and it would've never happened

11   to these people.

12        **PRESIDING COMMISSIONER BIGGERS:**  Tell me about

13   the gun incident because in the probation officer's

14   report it talked a little bit about the fact that you had

15   a gun and you pointed it at the -- at Mr. Reily and at

16   one time -- we'll get to you pulling the trigger a little

17   later, but at one time you told him -- either you or your

18   co-defendant told them that you were going to rape the

19   wife and do some other things if they didn't get the

20   money.  Is that correct?

21        **INMATE SULLIVAN:**  No, that not it.  I -- I didn't

22   say that.  I played the tape.

23        **PRESIDING COMMISSIONER BIGGERS:**  You played the

24   tape?

25        **INMATE SULLIVAN:**  I played the tape.

26        **PRESIDING COMMISSIONER BIGGERS:**  Was that on the

27   tape?

29

1    INMATE SULLIVAN:  Yeah, it was on the tape.

2    PRESIDING COMMISSIONER BIGGERS:  Okay.  But you

3    didn't say it?  You weren't the one that did that?

4    INMATE SULLIVAN:  No, I didn't -- I didn't do the

5    tape.

6    PRESIDING COMMISSIONER BIGGERS:  Did you -- once

7    you got up there and you figured out what was going on

8    and you -- and as this was proceeding, did you make any

9    additional threats to the family?

10   INMATE SULLIVAN:  Not -- not -- not that I can

11   recall.

12   PRESIDING COMMISSIONER BIGGERS:  Not that you can

13   recall.

14   INMATE SULLIVAN:  I played the tape.

15   PRESIDING COMMISSIONER BIGGERS:  All right.  When

16   you tried to get away, and I believe that it's in the

17   probation officer's report there and they indicated and

18   please correct me if I'm wrong, Deputy Commissioner Star,

19   but you indicated to them -- to him -- well, he said that

20   you pulled the trigger on the weapon.

21   INMATE SULLIVAN:  Yes see -- I -- I --

22   PRESIDING COMMISSIONER BIGGERS:  Now hold on, let

23   me finish.

24   INMATE SULLIVAN:  Okay.

25   PRESIDING COMMISSIONER BIGGERS:  Did you -- did

26   you, in fact, pull the --

27   INMATE SULLIVAN:  No, no, I didn't do it.

30

1    PRESIDING COMMISSIONER BIGGERS: You didn't pull

2    the trigger? Well, it was also in the probation

3    officer's report, too, and I could get -- something to

4    the effect that you made a statement to the police. Do

5    you remember the statement you made to the police? I

6    could go ahead and find it.

7        INMATE SULLIVAN: Well, I made a statement to

8    the police the gun didn't work.

9        PRESIDING COMMISSIONER BIGGERS: Right, that's

10   the one I'm talking about. Okay. Well, if you -- how

11   did you know the gun didn't work?

12       INMATE SULLIVAN: Because the pin wasn't in the

13   gun.

14       PRESIDING COMMISSIONER BIGGERS: Okay. So, you

15   mean, you did this without a pin in the gun?

16       INMATE SULLIVAN: Okay. When -- when me and Mr.

17   Reily went to the backyard, I showed him the gun, and

18   when I pulled the gun out of my pants, the pin stayed in

19   my pants. The -- the cylinder where this --

20       PRESIDING COMMISSIONER BIGGERS: The cylinder.

21       INMATE SULLIVAN: There's a cylinder that goes

22   into the --

23       PRESIDING COMMISSIONER BIGGERS: The cylinder and

24   a pin that goes to hold it on, yeah.

25       INMATE SULLIVAN: Right, to hold the gun in

26   there, to hold the cylinder in there.

27       PRESIDING COMMISSIONER BIGGERS: Cylinder in

31

1   there, to keep it from sliding in and out.

2       **INMATE SULLIVAN:** When I pulled it -- when I

3   pulled the gun out the -- the pin stayed in my pants.

4       **PRESIDING COMMISSIONER BIGGERS:** But see you told

5   me earlier though that your partner had the gun --

6       **INMATE SULLIVAN:** No.

7       **PRESIDING COMMISSIONER BIGGERS:** -- and you ended

8   up with it.

9       **INMATE SULLIVAN:** Right, my part -- that's right.

10  My partner had the gun and I went and wound up with the

11  gun.

12      **PRESIDING COMMISSIONER BIGGERS:** Okay. But how'd

13  the gun get down your pants?

14      **INMATE SULLIVAN:** When my partner gave it to me.

15      **PRESIDING COMMISSIONER BIGGERS:** Oh, so there we

16  go. So you accepted the gun from your partner?

17      **INMATE SULLIVAN:** I must have cause when he --

18      **PRESIDING COMMISSIONER BIGGERS:** Must have?

19      **INMATE SULLIVAN:** I -- I -

20      **PRESIDING COMMISSIONER BIGGERS:** Unless you let

21  him put it in your pants.

22      **INMATE SULLIVAN:** No, no.

23      **PRESIDING COMMISSIONER BIGGERS:** I don't think

24  you'd do that.

25      **INMATE SULLIVAN:** No, we not -- we not -- we not

26  -- I wound up with the gun.

27      **PRESIDING COMMISSIONER BIGGERS:** All right.

32

1        INMATE SULLIVAN:  My partner didn't -- I must've

2    got the gun from him, he gave me the gun.  But anyway, I

3    wound up with the gun.

4        PRESIDING COMMISSIONER BIGGERS:  Okay.

5        INMATE SULLIVAN:  I'm not going to deny that.

6        PRESIDING COMMISSIONER BIGGERS:  You accepted the

7    gun --

8        INMATE SULLIVAN:  All right.

9        PRESIDING COMMISSIONER BIGGERS:  -- from your

10   partner.

11       INMATE SULLIVAN:  All right, I accepted the gun -

12   - from my partner.

13       PRESIDING COMMISSIONER BIGGERS:  All right.

14   Okay.

15       INMATE SULLIVAN:  And I wound up with the gun.

16       PRESIDING COMMISSIONER BIGGERS:  Okay.

17       INMATE SULLIVAN:  And I wound up with the -- when

18   -- when I had the gun we -- we went outside in the

19   backyard.

20       PRESIDING COMMISSIONER BIGGERS:  Okay.

21       INMATE SULLIVAN:  And when I showed him the gun,

22   like I say, I pulled it out and the pin stayed in my

23   pants.  The cylinder was holding it from doing it and it

24   stayed in my pants.

25       PRESIDING COMMISSIONER BIGGERS:  And the cylinder

26   was just doing one of these numbers?

27       INMATE SULLIVAN:  And the cylinder was just in

33

1    and out.

2        PRESIDING COMMISSIONER BIGGERS:    Okay.

3        INMATE SULLIVAN:    In and out.

4        PRESIDING COMMISSIONER BIGGERS:    Well, how did

5    you hold that cylinder in place when you were wrestling

6    or tussling with Mr. Reily?

7        INMATE SULLIVAN:    I just had it.    The way I had

8    the gun, I had the gun -- like the cylinder -- I had the

9    gun where the gun wouldn't go off or anything like that.

10   But I had the gun in my hand.    I knew the gun wouldn't go

11   off.

12       PRESIDING COMMISSIONER BIGGERS:    Okay.

13       INMATE SULLIVAN:    But that's what I had -- that's

14   what I did.

15       PRESIDING COMMISSIONER BIGGERS:    And, you know,

16   what's really amazing is that this is the only crime that

17   you have been involved with.

18       INMATE SULLIVAN:    You know -- you know, I'm --

19   you know, I -- I been -- I been fighting with this

20   myself.    I -- I think that after 29 years of my life, I

21   had a few problems, but nothing -- nothing like this.    I

22   feel -- can't understand how I got myself into this.    I

23   really don't.

24       PRESIDING COMMISSIONER BIGGERS:    How old were you

25   at that time?

26       INMATE SULLIVAN:    I was 29-years-old.

27       PRESIDING COMMISSIONER BIGGERS:    29-years-old

34

1    when you did that.

2           **INMATE SULLIVAN:**  I was working.  I -- I was

3    working and drinking a lot, but I was working.  I worked

4    every day.

5           **PRESIDING COMMISSIONER BIGGERS:**  Think that

6    alcohol or narcotics played a part in this?

7           **INMATE SULLIVAN:**  No.  No, I can't -- I can't say

8    that.  What -- if you want to say that as long as I've

9    been drinking alcohol and the type of life I was living

10    led up to what I -- what I did, I -- I don't think

11    alcohol played a part in it cause I wasn't drinking that

12    day.

13           **PRESIDING COMMISSIONER BIGGERS:**  Okay.  So no

14    alcohol involved that day.  But how about drugs?

15           **INMATE SULLIVAN:**  I don't -- I don't do drugs.

16           **PRESIDING COMMISSIONER BIGGERS:**  You don't do

17    drugs?

18           **INMATE SULLIVAN:**  No, I didn't do drugs.

19           **PRESIDING COMMISSIONER BIGGERS:**  But you said

20    kind of life you were living.  What kind of life were you

21    living at that time?  You were living a little higher

22    than what your paycheck was allowing?

23           **INMATE SULLIVAN:**  Well, I wasn't managing my

24    money.  I was making the money; I just wasn't managing it

25    right.

26           **PRESIDING COMMISSIONER BIGGERS:**  What were you

27    doing with it?

35

1       INMATE SULLIVAN:  I was drinking and partying

2   and --

3       PRESIDING COMMISSIONER BIGGERS:  But you just

4   said --

5       INMATE SULLIVAN:  -- wrecking cars.

6       PRESIDING COMMISSIONER BIGGERS:  -- now you're

7   not drinking that much.

8       INMATE SULLIVAN:  Well, I say -- I said --

9       PRESIDING COMMISSIONER BIGGERS:  See, something's

10  not jiving with me here.

11      INMATE SULLIVAN:  All right, what -- what do you

12  want -- what can I tell --

13      PRESIDING COMMISSIONER BIGGERS:' I want to know -

14  - you said you're not managing your money very well.

15      INMATE SULLIVAN:  Okay.

16      PRESIDING COMMISSIONER BIGGERS:  You were making

17  good money.

18      INMATE SULLIVAN:  All right.

19      PRESIDING COMMISSIONER BIGGERS:  Then why did you

20  need additional money?  We all need additional money.

21  That's --

22      INMATE SULLIVAN:  Right.

23      PRESIDING COMMISSIONER BIGGERS:  -- probably a

24  leading question, but --

25      INMATE SULLIVAN:  At -- at that time -- at that

26  time, like I said, I was -- I was making money, but I

27  wasn't managing it and I was wrecking cars and I'd tore

36

1  up a couple of my cars, so at that time it was just a bad

2  time where I felt that I needed more money and -- and --

3  and -- and that was the solution I'd come up with at the

4  time when he offered that.

5      PRESIDING COMMISSIONER BIGGERS:  Well, again,

6  like I said, I'm not here to re-try your case.

7      INMATE SULLIVAN:  I understand.

8      PRESIDING COMMISSIONER BIGGERS:  I'm -- I'm just

9  trying to figure out what -- what would make you go up in

10  here to do this kind of stuff that would cause you to

11  give us so much of time of your life --

12      INMATE SULLIVAN:  Right.

13      PRESIDING COMMISSIONER BIGGERS:  -- because with

14  a high school education --

15      INMATE SULLIVAN:  I made a mistake.

16      PRESIDING COMMISSIONER BIGGERS:  -- high school

17  education, you had a job, yet you go do something like

18  that.

19      INMATE SULLIVAN:  I made a bad decision.

20      PRESIDING COMMISSIONER BIGGERS:  Okay.  All

21  right, I'm going to ask the Deputy Commissioner if she's

22  got any questions about the crime.

23      DEPUTY COMMISSIONER STAR:  I do.

24      PRESIDING COMMISSIONER BIGGERS:  Okay.

25      DEPUTY COMMISSIONER STAR:  The gun -- well, no,

26  let's go back to the motivation and you'd thought you'd

27  get $20,000.  Where did you believe from Mr. Davis this

37

1    money was located?  Where did he tell you would -- the

2    money would be found?

3            INMATE SULLIVAN:  He said they had it in the

4    bank.

5            DEPUTY COMMISSIONER STAR:  In the back of the

6    house?

7            INMATE SULLIVAN:  In the bank.

8            DEPUTY COMMISSIONER STAR:  In the bank.

9            INMATE SULLIVAN:  In the bank.  It was in the

10   bank.

11           DEPUTY COMMISSIONER STAR:  Why then did you go to

12   a house in Tracy first?

13           INMATE SULLIVAN:  I don't -- I'm not really sure.

14   I guess we went to rob the house to be able to -- well,

15   we went to -- we went to -- I'm not trying to make this

16   up.  We went to the house to play the tape.  We wanted

17   them to hear the tape.

18           DEPUTY COMMISSIONER STAR:  Okay.  Why then did

19   you stop at the house in Walnut Creek second?  Why not go

20   from Tracy and play the tape, which you didn't do, is

21   that correct?  Did you play the tape -- the tape in

22   Tracy?

23           INMATE SULLIVAN:  No, we -- we -- we played the -

24   - the tape -- tape at their house.

25           DEPUTY COMMISSIONER STAR:  Okay.

26           PRESIDING COMMISSIONER BIGGERS:  Walnut Creek.

27           INMATE SULLIVAN:  Yeah, at their house.

38

1          **DEPUTY COMMISSIONER STAR:**  In Walnut Creek.

2          **INMATE SULLIVAN:**  Yeah, at their house in Walnut

3     Creek.

4          **DEPUTY COMMISSIONER STAR:**  But you went to the --

5     all the way out to Tracy because you wanted to play the

6     tape to them in Tracy?

7          **INMATE SULLIVAN:**  Right.

8          **DEPUTY COMMISSIONER STAR:**  The --

9          **INMATE SULLIVAN:**  No, we went to Tracy to meet

10    them in Tracy.

11         **DEPUTY COMMISSIONER STAR:**  Uh-huh.

12         **INMATE SULLIVAN:**  And once we -- once we got to

13    Tracy, we took them to their house to play the tape.

14         **DEPUTY COMMISSIONER STAR:**  Okay.  So you knew

15    when you started this that the money wasn't on their

16    person nor at their house in Walnut Creek and at some

17    point you were going to have to go with them to the bank?

18         **INMATE SULLIVAN:**  Yes.

19         **DEPUTY COMMISSIONER STAR:**  Did you believe they

20    would freely go with you to their bank or that you would

21    have to --

22         **INMATE SULLIVAN:**  Well, in my mind I -- I really

23    believed they would at the time.  That's the way, you

24    know, that's the way -- that's the way the planned story

25    went.

26         **DEPUTY COMMISSIONER STAR:**  Why would they freely

27    go to their bank and withdraw money for you?

39

1    INMATE SULLIVAN:  I, you know, to be honest with

2    you, I -- I -- I really -- I really can't answer that.

3    DEPUTY COMMISSIONER STAR:  You -- let's talk

4    about the gun.  At what point did your partner hand it to

5    you in the events?  The day before, the day of?

6    INMATE SULLIVAN:  The day of.  It had to be when

7    I got to their house.

8    DEPUTY COMMISSIONER STAR:  In Tracy?

9    INMATE SULLIVAN:  Yes.

10   DEPUTY COMMISSIONER STAR:  Why did you show him

11   the gun?  Mr. Reily.

12   INMATE SULLIVAN:  Well, when I -- when I -- I --

13   when I took him outside, I showed him the gun to let him

14   know that we were serious about -- about robbing.

15   DEPUTY COMMISSIONER STAR:  Okay.  Did Mr. Reily,

16   however it's pronounced, did he -

17   INMATE SULLIVAN:  I think it's Reily.

18   DEPUTY COMMISSIONER STAR:  Is it Reily?

19   INMATE SULLIVAN:  Yes.

20   PRESIDING COMMISSIONER BIGGERS:  It's spelled

21   Reily, though.

22   DEPUTY COMMISSIONER STAR:  Yeah.  Did he see that

23   the pin was out of the --

24   INMATE SULLIVAN:  No.

25   DEPUTY COMMISSIONER STAR:  -- gun?

26   INMATE SULLIVAN:  No, he didn't.

27   DEPUTY COMMISSIONER STAR:  Did you tell him the

40

1   pin was out of the gun?

2           INMATE SULLIVAN:  No, I don't think I did, no.

3           DEPUTY COMMISSIONER STAR:  When the pin came out

4   did the drum open up and fall to the side?

5           INMATE SULLIVAN:  Yeah, when -- when -- when the

6   pin -- when -- when I pulled the gun out -- out of my

7   pants -- when I pulled it out of my pants -- when I -- I

8   know when -- when I pulled it out of my pants, a couple

9   bullets fell out of the gun.  That -- that's how I know -

10          DEPUTY COMMISSIONER STAR:  Well, that was my next

11  question.

12          INMATE SULLIVAN:  Yeah.

13          DEPUTY COMMISSIONER STAR:  So you knew it was

14  loaded?

15          INMATE SULLIVAN:  I --

16          DEPUTY COMMISSIONER STAR:  It was --

17          INMATE SULLIVAN:  Yeah, I knew the gun was

18  loaded.

19          DEPUTY COMMISSIONER STAR:  Two bullets fell out?

20  What'd you do with those?

21          INMATE SULLIVAN:  I -- I left them.

22          DEPUTY COMMISSIONER STAR:  And some remained?

23          INMATE SULLIVAN:  Yeah.

24          DEPUTY COMMISSIONER STAR:  Did you --

25          INMATE SULLIVAN:  There was like, I think like

26  two or three still in there, I guess.

27          DEPUTY COMMISSIONER STAR:  Did you push the drum

41

1   back into the --

2           INMATE SULLIVAN:  Yeah, I just pushed it back in.

3           DEPUTY COMMISSIONER STAR:  Okay.  Now, what makes

4   you believe that because the pin is out, you have a

5   loaded firearm, and the drum is back in that it would not

6   fire?

7           INMATE SULLIVAN:  Well, the -- I wasn't initially

8   going to fire the gun anyway.  My intentions were never

9   to shoot the man.

10          DEPUTY COMMISSIONER STAR:  Okay, did your

11  intentions change once you took off and the car crashed?

12          INMATE SULLIVAN:  No.

13          DEPUTY COMMISSIONER STAR:  Did you at any time

14  put the gun in the Mr. Reily's ribs?

15          INMATE SULLIVAN:  Not that I remember it, no.  We

16  were scrabbling for the gun.  It might -- it -- it more

17  likely went to his ribs.  I'm not going to deny that it

18  did or it didn't.  But we was struggling --

19          DEPUTY COMMISSIONER STAR:  Did you put the gun up

20  to his ear?

21          INMATE SULLIVAN:  Yeah, I did that.

22          DEPUTY COMMISSIONER STAR:  Or his neck?

23          INMATE SULLIVAN:  Yeah, I did that.

24          DEPUTY COMMISSIONER STAR:  And for what purpose

25  did you do that?

26          INMATE SULLIVAN:  I panicked and just put it to

27  his head.  I don't even know why I did it.

42

1    **DEPUTY COMMISSIONER STAR:**  Okay.  Was the drum of

2    the gun closed or was it hanging out at the time you did

3    this?

4    **INMATE SULLIVAN:**  I'm not sure.  It could've been

5    closed.

6    **DEPUTY COMMISSIONER STAR:**  Because you have -- it

7    was -- it could've been closed.  It's loaded.  Did you

8    not think if you --

9    **INMATE SULLIVAN:**  No, I -- no, at the time I

10   didn't think.

11   **DEPUTY COMMISSIONER STAR:**  Did you, after the

12   crash or at any time, insert another cartridge into the

13   cylinder?

14   **INMATE SULLIVAN:**  No.

15   **DEPUTY COMMISSIONER STAR:**  So other than the two

16   bullets falling out you never at any time put another

17   cartridge in?

18   **INMATE SULLIVAN:**  No.

19   **DEPUTY COMMISSIONER STAR:**  Mr. Reily made a

20   statement to police that you inserted a cartridge in the

21   cylinder before closing it.  You don't recall that?

22   **INMATE SULLIVAN:**  No, I don't recall that.

23   That's the first I ever heard of that.

24   **DEPUTY COMMISSIONER STAR:**  Now, the police say --

25   **ATTORNEY STRINGER:**  Can we get a reference to

26   that, Commissioner?

27   **DEPUTY COMMISSIONER STAR:**  Oh, I'm sorry, thank

43

1   you.  It's probation officer's report, page 9.  "As -- as

2   Mr. Reily was making his statement to police he indicated

3   that" -- I'm sorry, page -- line 21.  "As Mr. Reily was

4   making his statement to police, he indicated that when

5   the defendant pulled the revolver from his waistband, the

6   cylinder opened, the defendant inserted one cartridge

7   into the cylinder before closing it."  I admit it's not

8   clear at what timeframe that occurred, but it's an

9   observation.  Now, when the police inspected this gun

10  they -- and I'm now referring to page 10 of the probation

11  officer's report, line 9.  It says he noted it appeared

12  to be completely intact but there were no cartridges in

13  it and later two .32 caliber Smith and Wesson bullets

14  were found in the general area where the defendant was

15  taken into custody and the gun discarded.  Do you

16  remember how many bullets were in the gun?

17        INMATE SULLIVAN:  About two or three I guess.

18  I'm not sure really how many was in it.

19        DEPUTY COMMISSIONER STAR:  Did you -- did you

20  tell the doctor that you put your hand over the hammer?

21        INMATE SULLIVAN:  Yeah.

22        DEPUTY COMMISSIONER STAR:  To block it?

23        INMATE SULLIVAN:  Yes.

24        DEPUTY COMMISSIONER STAR:  And I'm referring to

25  the September 23rd, 2005 report by Dr. Inaba.

26        INMATE SULLIVAN:  Well, yeah, I -- I remember

27  telling him that because that -- [alarm sound]

44

1    **DEPUTY COMMISSIONER STAR:** Hold on, sir. Could

2    you hold on a second?

3         [Thereupon, the tape was turned over.]

4    **DEPUTY COMMISSIONER STAR:** Okay, we're back on

5    record. My question was do you remember telling the

6    doctor you put your -- your hand on the hammer of the

7    gun?

8    **INMATE SULLIVAN:** I put my hand over the hammer

9    of the gun.

10   **DEPUTY COMMISSIONER STAR:** Okay. For what -- was

11   this when the car crashed? Or when? When do you recall

12   doing that?

13   **INMATE SULLIVAN:** Well, when we started

14   struggling for the gun.

15   **DEPUTY COMMISSIONER STAR:** Okay. And how -- how

16   and why do you remember that?

17   **INMATE SULLIVAN:** Because at the time he tried to

18   take the gun from me, I put my hand over the whole gun

19   and cylinder where I know the gun wouldn't go off cause

20   he was really trying to take the gun from me and I didn't

21   want the gun to go off or anything like that, so I knew

22   it wouldn't go off by my hand being over the hammer.

23   **DEPUTY COMMISSIONER STAR:** Okay. Let me go back

24   to something you said earlier to Commissioner Biggers.

25   You said that you thought the whole thing would happen in

26   ten or 15 minutes and this incident would be done.

27   **INMATE SULLIVAN:** Right.

1    DEPUTY COMMISSIONER STAR:  But you've told me

2  that the intent was to meet him in Tracy, play the tape

3  at their home in Walnut Creek, and then to go to a bank.

4  So I'm unclear as to why you would think this whole

5  thing, when it sounds to me very elaborate, sir, to meet

6  them in another town, take them to their home, and then

7  arrange to go to the bank, would be done in ten minutes.

8    INMATE SULLIVAN:  Okay.  Well, see, when I, you

9  know, that part I -- I really don't know how we -- I

10  don't really know how it -- to be honest with you, I

11  don't know how we got from Tracy to his house.  I, you

12  know, I'm not making this up.  I really don't know how we

13  got to the man's house, you know.  All I knew that we was

14  going to kidnap the person and the guy was supposed to

15  give us the money.  That -- that -- that's all I knew.

16    DEPUTY COMMISSIONER STAR:  Why did Davis believe

17  this couple had that much money?  What did he tell you?

18    INMATE SULLIVAN:  Well, he told me -- I'm not --

19  I'm not sure he told me.  They were real estate agents or

20  what -- what they were, but he said they had the money

21  and this is what we're going to do and this is what I

22  want you to do and this is -- and I did what he asked me

23  to do.

24    DEPUTY COMMISSIONER STAR:  Did you stop and make

25  calls to anybody along the way?

26    INMATE SULLIVAN:  I -- I called him once.

27    DEPUTY COMMISSIONER STAR:  Once?

46

1    INMATE SULLIVAN:  Yeah.

2    DEPUTY COMMISSIONER STAR:  For what purpose?

3    INMATE SULLIVAN:  What to do after -- after we

4    get the money, stuff, something like -- something in that

5    nature.

6    DEPUTY COMMISSIONER STAR:  Okay.  Mr. Biggers,

7    I'll turn it back to you.  Thank you.

8    PRESIDING COMMISSIONER BIGGERS:  Okay.  Again,

9    we're just trying to get down to figure out what your --

10   your mindset was.  I'm going to move on to your -- your

11   social history.  You're the seventh child of Sullivan

12   that was born to George Collins, C-O-L-L-I-N-S, and is

13   that Dorothy?

14   INMATE SULLIVAN:  Dorthea.

15   PRESIDING COMMISSIONER BIGGERS:  Dorthea.

16   Sullivan-Sims.  And Dorthea's spelled D-O-R-T-H-E-A.

17   INMATE SULLIVAN:  Yeah.

18   PRESIDING COMMISSIONER BIGGERS:  Sullivan-Sims,

19   S-I-M-S.  And you don't know if your parents were married

20   or not so we'll assume they were married.  Your -- you

21   were reared primarily by your grandmother?

22   INMATE SULLIVAN:  Yes.

23   PRESIDING COMMISSIONER BIGGERS:  And her name was

24   Virginia Dames?

25   INMATE SULLIVAN:  Dames.

26   PRESIDING COMMISSIONER BIGGERS:  D-E or D-A-M-A-

27   S?

47

1          INMATE SULLIVAN:  D-A-M-E-S.

2          PRESIDING COMMISSIONER BIGGERS:  Dames, okay.

3   You traveled between two homes as you were growing up?

4          INMATE SULLIVAN:  Yes.

5          PRESIDING COMMISSIONER BIGGERS:  You graduated

6   from Northwood High School in 1971.  Where's that high

7   school?

8          INMATE SULLIVAN:  In Shreveport.

9          PRESIDING COMMISSIONER BIGGERS:  Shreveport,

10  Louisiana?

11         INMATE SULLIVAN:  Yes.

12         PRESIDING COMMISSIONER BIGGERS:  You had an -- an

13  old injury to your eye you received while playing

14  football when you were younger.

15         INMATE SULLIVAN:  Yeah.

16         PRESIDING COMMISSIONER BIGGERS:  What -- what

17  happened?

18         INMATE SULLIVAN:  I was out in the field and I

19  was playing catch with my cousin and ran into the -- to

20  the garden fence.

21         PRESIDING COMMISSIONER BIGGERS:  Ran into the

22  fence?

23         INMATE SULLIVAN:  Yeah, at the garden.

24         PRESIDING COMMISSIONER BIGGERS:  Did you have any

25  permanent damage other than your eye?  Did you have any

26  head damage or anything?

27         INMATE SULLIVAN:  No, I just cut my eyeball.

48

1          PRESIDING COMMISSIONER BIGGERS:  Okay.  You

2   married a Jessie Sullivan in '83 and you were divorced in

3   '91?

4          INMATE SULLIVAN:  Yes.

5          PRESIDING COMMISSIONER BIGGERS:  Did you get re-

6   married?

7          INMATE SULLIVAN:  No.

8          PRESIDING COMMISSIONER BIGGERS:  So I see you had

9   one child by a Ms. Vivian Ferguson.  You didn't have any

10  children by Jessie Sullivan?

11         INMATE SULLIVAN:  No.

12         PRESIDING COMMISSIONER BIGGERS:  So you had one

13  child out of wedlock is what you're saying?  Okay.  Is it

14  a boy or girl?

15         INMATE SULLIVAN:  It's a girl.

16         PRESIDING COMMISSIONER BIGGERS:  It's a girl.

17  Does she come to see you?

18         INMATE SULLIVAN:  Yes.

19         PRESIDING COMMISSIONER BIGGERS:  So how long have

20  you all been corresponding?  Where is she now?

21         INMATE SULLIVAN:  She's in Oakland -- in Hayward.

22         PRESIDING COMMISSIONER BIGGERS:  In Oakland?

23  Okay.  How old is she at this point?

24         INMATE SULLIVAN:  Twenty-six.

25         PRESIDING COMMISSIONER BIGGERS:  Twenty-six.

26  Okay, and she comes to see you quite often?

27         INMATE SULLIVAN:  Yeah.

49

1          PRESIDING COMMISSIONER BIGGERS:  Okay.  So you

2    worked as a foreman in tree cleaning -- tree clearing

3    business and as a car parking attendant.  Is that

4    correct?

5          INMATE SULLIVAN:  Yeah.

6          PRESIDING COMMISSIONER BIGGERS:  Is that the kind

7    of work you were doing when this -- when this thing --

8          INMATE SULLIVAN:  I was a tree -- a tree foreman.

9          PRESIDING COMMISSIONER BIGGERS:  Okay.  Pretty

10   good money in that though, isn't it?

11         INMATE SULLIVAN:  Yeah, it was.  I just didn't

12   know how to deal with it.

13         PRESIDING COMMISSIONER BIGGERS:  So it shows here

14   that you deny any substance abuse, but you claim to have

15   been -- have a heavy drinking problem in the early 80s.

16   But after you got a drunk driving you stopped -- you

17   discontinued drinking alcohol?

18         INMATE SULLIVAN:  Yes.

19         PRESIDING COMMISSIONER BIGGERS:  Okay.  Did I --

20   is there anything on your social that I want to -- that

21   you want me -- let me just check one other spot here.

22   You said that you only saw your father one time and you

23   two didn't get along at that meeting.  Is that correct?

24         INMATE SULLIVAN:  I remember -- I remember my dad

25   when I was young.  We -- I met him a couple times.  We

26   hung out with him a couple times.  We got along as far as

27   dads got along.  But I didn't see him that much.  I

1    didn't know that much about him.

2         PRESIDING COMMISSIONER BIGGERS:  Have you ever

3    found out where your older brother is?

4         INMATE SULLIVAN:  My older brother lives in

5    California now somewhere.

6         PRESIDING COMMISSIONER BIGGERS:  Somewhere, but

7    you don't know exactly where?

8         INMATE SULLIVAN:  No.

9         PRESIDING COMMISSIONER BIGGERS:  Okay.  And

10   you've got a younger brother that resides in Berkeley.

11   Is that still correct?

12        INMATE SULLIVAN:  No.  I think he's in Sacramento

13   now.

14        PRESIDING COMMISSIONER BIGGERS:  Sacramento.

15   Does he come to see you?

16        INMATE SULLIVAN:  Well, he used to.  But he stay

17   in Sacramento so he don't come as much as he used to.

18        PRESIDING COMMISSIONER BIGGERS:  That's only 80

19   miles away.

20        INMATE SULLIVAN:  Yeah, but he's -- he's -- he

21   having problems also.

22        PRESIDING COMMISSIONER BIGGERS:  Okay, have any

23   of your siblings been involved with law enforcement?

24        INMATE SULLIVAN:  No.

25        PRESIDING COMMISSIONER BIGGERS:  What kind of

26   problems is he having?

27        INMATE SULLIVAN:  Well, he drink a lot.  I talk

51

1    to him all the time.

2        PRESIDING COMMISSIONER BIGGERS:  Oh, you do talk

3    to him?

4        INMATE SULLIVAN:  Yeah, I talk to him.  I say

5    man, you need go to AA, you need to get somewhere.

6    You're doing too much right now.

7        PRESIDING COMMISSIONER BIGGERS:  Okay.  You never

8    served in the military.  Is that correct?

9        INMATE SULLIVAN:  No.

10       PRESIDING COMMISSIONER BIGGERS:  I see here when

11   you were working for Davey Trees you were terminated

12   because you didn't call for three consecutive days.  Is

13   that because you were incarcerated?

14       INMATE SULLIVAN:  Yeah, that's because I was in

15   jail.

16       PRESIDING COMMISSIONER BIGGERS:  And, again,

17   prior to your arrest you owned a 1972 Lincoln Mark IV.

18   That -- that's a big car.  And you sold your Chrysler,

19   but the papers are in the jail and he's unsure of the

20   title.  So your routine monthly expenses were close to

21   $1,000 per month, but yet you only netted approximately

22   900 a month.  That right?  Sound about right?  So you

23   were a negative $100 every month.

24       INMATE SULLIVAN:  Yeah, I didn't -- I -- I didn't

25   keep track of what I was making.

26       PRESIDING COMMISSIONER BIGGERS:  Okay.  Then I

27   have one last question I'll ask you, then I'll move onto

52

1   something else.  If you had expenses of $1,000 and you

2   were only making $900, why would you be driving a 1972

3   Lincoln Mark IV?

4         INMATE SULLIVAN:  I -- at that time I bought it

5   with my income tax money.

6         PRESIDING COMMISSIONER BIGGERS:  You made the

7   down payment.

8         INMATE SULLIVAN:  No, I bought it.

9         PRESIDING COMMISSIONER BIGGERS:  Bought it

10  straight out?

11        INMATE SULLIVAN:  Yeah.

12        PRESIDING COMMISSIONER BIGGERS:  Okay.  Do you

13  have anything on the social aspect?

14        DEPUTY COMMISSIONER STAR:  No.

15        PRESIDING COMMISSIONER BIGGERS:  Okay.  Well, you

16  had no priors from what I -- it looks like the only prior

17  that you had, even though one part said that you were

18  stopped for drunk driving and -- did you get arrested for

19  that?

20        INMATE SULLIVAN:  I went to jail that night.

21        PRESIDING COMMISSIONER BIGGERS:  That night and

22  then they didn't file charges?

23        INMATE SULLIVAN:  I had a fine.

24        PRESIDING COMMISSIONER BIGGERS:  Just a fine.

25        INMATE SULLIVAN:  Yes.

26        PRESIDING COMMISSIONER BIGGERS:  How old were you

27  when that took place?

53

1    **INMATE SULLIVAN:** I'm not sure. Probably about

2    27, 28. Right in there because --

3    **PRESIDING COMMISSIONER BIGGERS:** Because

4    according to you --

5    **INMATE SULLIVAN:** -- it was probably about the

6    same time.

7    **PRESIDING COMMISSIONER BIGGERS:** -- according to

8    the record that I have, you had none as a juvenile and

9    the incident offense is the only criminal activity noted,

10   so maybe they just -- how -- how much was your fine?

11   **INMATE SULLIVAN:** It was $500.

12   **PRESIDING COMMISSIONER BIGGERS:** All right, at

13   this point, I'm going to ask Deputy Commissioner Star to

14   go over your post-conviction factors.

15   **DEPUTY COMMISSIONER STAR:** Okay, Mr. Sullivan, I

16   reviewed your counselor's report for this part of the

17   hearing, as well as reviewed the Central File. I'll

18   primarily be focusing on your post-conviction activities

19   since your last hearing, which was subsequent number nine

20   hearing held on June 29, 2005, where you received a one-

21   year denial. At that time the Board said remain

22   disciplinary-free, earn positive chronos, and participate

23   in self-help. Since that last hearing you have had no

24   disciplinaries. Your classification score is 19. Your

25   custody level is -- thank you, is Medium-A. In fact, I

26   need to commend you because since your life-term started

27   you've had zero 115s and zero counseling chronos and

54

1    that's a -- a remarkable and outstanding record.  You

2    have upgraded since your life-term started with a

3    vocation.  You've completed vocational Upholstery in 1992

4    at DVI.  Is that correct?

5            INMATE SULLIVAN:  Yes.  It's -- it's in that

6    file.

7            DEPUTY COMMISSIONER STAR:  Okay.  Mr. --

8    Commissioner Biggers referenced your roofer work skills

9    that you had prior to prison and -- and you have now have

10   this upholstery skills.  Did you obtain any other skills

11   while you've been incarcerated doing this life-term?

12           INMATE SULLIVAN:  Forklift Operator.

13           DEPUTY COMMISSIONER STAR:  Forklift Operator.

14   Did you work in PIA doing that?

15           INMATE SULLIVAN:  Yes.

16           DEPUTY COMMISSIONER STAR:  Okay.  And how long

17   did you do that?

18           INMATE SULLIVAN:  I'm still doing it.

19           DEPUTY COMMISSIONER STAR:  Oh, you're still doing

20   it?

21           INMATE SULLIVAN:  Yes.

22           DEPUTY COMMISSIONER STAR:  Cause I -- I see

23   you're the lead man but that includes operating the

24   forklift?  Okay.  All right.  Educationally, again,

25   Commissioner Biggers covered the prior to beginning the

26   life term you were a high school graduate, having

27   graduated in 1971 from Northwood High.  I didn't see any

55

1    references to any further -- furtherance of your

2    education level.  I'm going to cover your self-help group

3    activities, but I want to make sure I didn't miss

4    anything.  Anything else you did, Mr. Sullivan?

5         INMATE SULLIVAN:  No.

6         DEPUTY COMMISSIONER STAR:  Okay.  In terms of

7    your self-help participation, I'm -- I'm going to refer

8    to the counselor's report because he did a -- a very

9    thorough review of numerous groups and workshops that you

10   have participated in.  Since your last hearing, I noted

11   that you completed three different Impact courses.  One

12   in Successful Relationships, one on Specific

13   Relationships, and one -- and another one called Module

14   IV.  You also completed 32 hours of Nonviolent

15   Communication self-help group participation.  Prior to,

16   of course, your last hearing there have been -- oh, and I

17   should say and commend you for, the record shows since

18   1992 to the present, your -- you've been participating in

19   AA.  Is that correct?

20        INMATE SULLIVAN:  Yes.

21        DEPUTY COMMISSIONER STAR:  Good.  Good for you,

22   sir.  How often do you go?  Once a week or twice now?

23        INMATE SULLIVAN:  I go every Wednesday.

24        DEPUTY COMMISSIONER STAR:  Wednesday.  Very good.

25   Of course prior to you were -- you've been continuously -

26   - the record at least since -- the record I have shows a

27   regular pattern since 1992 of self-help group

56

1   participation, including AA from the beginning.  But that

2   included, and I'm just going to highlight a few of them,

3   Hooked on Phonics, Alternatives to Violence, Self-Esteem

4   Group workshops, Chiros participation, Gavel Club

5   participation, Literacy program participation,

6   Toastmasters, some numerous other -- numerous violence

7   prevention workshops.  So, again, I commend you, sir, for

8   a -- a full and ongoing participation in your self-help

9   groups.  Working -- work-wise you've -- you've also

10  received some exceptional work performance reports.

11  There were most recently, supervisor -- the mattress and

12  bedding supervisor, I noted, Mr. Jenkins, commended you

13  on March 2006 for exceptional work performance.  It looks

14  like you've been in PIA for a number of years.  Lead man

15  in the sewing machine –

16          INMATE SULLIVAN:  yes.

17          DEPUTY COMMISSIONER STAR:  – and that's where

18  you've been driving the forklift, as well.  Is that

19  correct?

20          INMATE SULLIVAN:  Yes.

21          DEPUTY COMMISSIONER STAR:  Okay.  How many -- how

22  many years exactly have you worked in the PIA?

23          INMATE SULLIVAN:  Maybe four.

24          DEPUTY COMMISSIONER STAR:  Okay.  How long have

25  you been a lead man?

26          INMATE SULLIVAN:  Since last year.

27          DEPUTY COMMISSIONER STAR:  Okay.  All right.

57

1      **INMATE SULLIVAN:**  I was -- I was a lead man in

2  Sanding, too, before that?

3      **DEPUTY COMMISSIONER STAR:**  Where?

4      **INMATE SULLIVAN:**  In Sanding.

5      **DEPUTY COMMISSIONER STAR:**  Okay.

6      **INMATE SULLIVAN:**  That was back in -- it been a

7  while.

8      **DEPUTY COMMISSIONER STAR:**  Were you -- it's

9  really apparent from the supervisors' reports and chronos

10  here that you're an outstanding worker and they didn't

11  hesitate to recognize you for that.  So, again, I -- I

12  commend you, sir, on that.  In terms of the -- I'm going

13  to move on to the psychiatric report.  Before I do, let

14  me ask you, any other activities, particularly since your

15  hearing, or anything that you wanted the Board to hear

16  about your accomplishments that I may not have covered

17  that you'd like to tell the Board about?

18      **INMATE SULLIVAN:**  I pretty much -- that pretty

19  much cover everything.

20      **DEPUTY COMMISSIONER STAR:**  We have some

21  certificates or something that I didn't highlight, Mr.

22  Stringer?

23      **ATTORNEY STRINGER:**  Well, attached to a

24  supplemental packet I have is some information from the

25  Impact program.

26      **DEPUTY COMMISSIONER STAR:**  Okay.  I did -- I

27  think I had the certificates in my file.  Oh, I -- I

58

1  noticed he participated in a mediation or meditation --

2  mediation -- meditation group, that was in his file?

3       ATTORNEY STRINGER:  I believe there's a picture

4  from, is it Time magazine --

5       DEPUTY COMMISSIONER STAR:  Yeah --

6       ATTORNEY STRINGER:  -- with a --

7       DEPUTY COMMISSIONER STAR:  -- but that was back

8  in --

9       ATTORNEY STRINGER:  Yes.

10       DEPUTY COMMISSIONER STAR:  -- back away.  Is that

11  correct?  And I know Commissioner Biggers was going to

12  cover some of these commendations.  And I think I saw all

13  the Impact certificates.  Is that what you wanted to

14  highlight?

15       ATTORNEY STRINGER:  Yes, I -- I saw it as you

16  flipped through it there, so I'm --

17       DEPUTY COMMISSIONER STAR:  Okay.  Okay.  And I

18  did mention his --

19       ATTORNEY STRINGER:  Yes.

20       DEPUTY COMMISSIONER STAR:  -- completion of the

21  three Impact courses.  Anything else, Mr. Sullivan?

22       INMATE SULLIVAN:  That pretty much cover it.

23       DEPUTY COMMISSIONER STAR:  Okay.  Well, let's

24  move on to the psychiatric report.  The Board, at the

25  last hearing, specifically requested a -- a new psych

26  report and asked that -- that the report address the

27  prisoner's violence potential in the free community, the

59

1   significance of alcohol or drugs relative to the

2   commitment offense, the extent to which the prisoner has

3   explored the commitment offense, and any need for any

4   further therapy.  So reviewing the report with that in

5   mind, we have a September 23rd, 2005 report completed by

6   Dr. Inaba, PhD, and Inaba is spelled I-N-A-B-A.  She --

7   she does address those issues in her report.  First she

8   gives a diagnosis -- diagnostic impression of Mr.

9   Sullivan.  On Axis I there's the History of Alcohol

10  Abuse.  On Axis II she says there's No Diagnosis for any

11  Mental Illness.  Axis III which is the medical issues

12  refers to his Hypertension and Hyper -- High Cholesterol

13  which he's also reported to us earlier.  Axis IV is just

14  the Stressors from the life sentence.  And Axis V is a

15  GAF score of 85.  Now, in terms of those items that the

16  Board asked the doctor to address in the report, I'm

17  going to refer to page 3 of the doctor's report and if --

18  if released to the community the doctor says -- well, in

19  terms of his -- how he feels about the crime, the doctor

20  said "he acknowledges the harm he did to the victims and

21  expresses sincere regret about his involvement in the

22  crime.  He recognizes the victims as individuals who did

23  not deserve to be victimized by criminal act -- actions.

24  Mr. Sullivan takes direct responsibility for his actions

25  in regard to the crime."  Now, Mr. Sullivan, one of the

26  Steps in AA is to make amends.  Is that correct?

27          INMATE SULLIVAN:  Yes.

60

1    DEPUTY COMMISSIONER STAR:  What Step is that?

2    INMATE SULLIVAN:  That's Step 9.

3    DEPUTY COMMISSIONER STAR:  Okay.  And what kind

4    of amends would you feel is appropriate in your -- given

5    your crime to the Reily's, however it's pronounced?

6    INMATE SULLIVAN:  The -- the best amends I can

7    make to Mr. and Mrs. Reily is to continue to participate

8    in AA, because what I did I -- I can't take it back and

9    I'm truly sorry for it.

10    DEPUTY COMMISSIONER STAR:  Okay.  Did you tell

11    the doctor "I would work for the man a year to pay him

12    back some way?"

13    INMATE SULLIVAN:  Yeah, I would work for the man

14    for nothing.

15    DEPUTY COMMISSIONER STAR:  Uh-huh.

16    INMATE SULLIVAN:  For a whole year.  I would

17    actually do that.

18    DEPUTY COMMISSIONER STAR:  Do you feel that's an

19    appropriate amends to -- for your crime?

20    INMATE SULLIVAN:  Well, to me it was my way of

21    showing him how -- how truly sorry I am for what I did to

22    him.

23    DEPUTY COMMISSIONER STAR:  Okay.

24    INMATE SULLIVAN:  I don't -- I don't know any

25    other way to do that.  I really don't.

26    DEPUTY COMMISSIONER STAR:  Okay.  All right, the

27    doctor goes on to say that alcohol, in addition to -- to

61

1    address the question raised by the Board whether alcohol

2    played a part, the doctor says, and again, I'm quoting or

3    paraphrasing from page 3 of the doctor's report, that

4    "alcohol did not play a direct role in the commission of

5    the crime.  It is more likely that Mr. Sullivan's abuse

6    of alcohol contributed to an overall lack of judgment and

7    erosion of values with which he was raised.  He clearly

8    stated a commitment to lifelong participation in AA."

9    Mr. Sullivan, Commissioner Biggers asked you about your

10   livelihood and your -- how much you were making.  Do you

11   -- do you believe in looking back on this you were living

12   outside your means and wanting more than you could live

13   on -- could -- could support yourself on?

14        INMATE SULLIVAN:  You know, when I look back on

15   that it -- it's -- it wasn't -- it really wasn't the

16   money.  It was like I really wasn't -- didn't really

17   understand how much money I was making and how to manage

18   the money.  But if I knew I, you know, if I had knew what

19   I was making I probably would've did something different.

20   But I really didn't understand the concept of making

21   money as far as how much and how to manage it and --

22   there's no -- you know, I don't want to make excuses.

23        DEPUTY COMMISSIONER STAR:  You bought some

24   furniture you said but how did you believe you were going

25   to pay for that?

26        INMATE SULLIVAN:  Well, by me working.

27        DEPUTY COMMISSIONER STAR:  What --

1          **INMATE SULLIVAN:**  I think I paid for it -- I paid

2    for it.

3          **DEPUTY COMMISSIONER STAR:**  You did?

4          **INMATE SULLIVAN:**  Yes.

5          **DEPUTY COMMISSIONER STAR:**  Okay.  All right.

6    Then the doctor, I'm -- again conclude here with the

7    doctor's comments on his risk assessment.  The doctor

8    states that,

9               "The factors that would come into play

10              to determine risk would be lack of

11              insight, negative attitudes, lack of

12              empathy, impulsivity, symptoms of major

13              mental ill -- illness, or failure at

14              treatment would be considered as

15              possible sources of increased risk.

16              But on -- based on review of Mr.

17              Sullivan's present institutional record

18              and the clinical interview conducted

19              for this report, it would appear that

20              none of these risk factors is currently

21              present."

22    And then just -- the doctor concludes with some comments

23    that,

24              "he was not known to be a violent

25              person before the crime.  He has not

26              engaged in violence subsequent to the

27              crime.  His criminal actions seem to

1        reflect a dramatic but failed attempt

2        to solve his financial problems by

3        criminal means.  Given Mr. Sullivan's

4        history, institutional adjustment, and

5        present clinical presentation, there

6        are no psychological factors that would

7        suggest an increased risk for violent

8        behavior in either the community or a

9        controlled setting at the present time.

10       Whether it is not possible -- while it

11       is not possible to accurately predict

12       future violent behavior given Mr.

13       Sullivan's age, commitment to ongoing

14       substance abuse treatment, and limited

15       criminal history, he would be expected

16       to be able to continue to live a

17       positive, nonviolent life when released

18       to the community."

19  All right, any comments you want to make on what the

20  doctor said that I covered or highlighted?

21        INMATE SULLIVAN:  That's pretty much how I feel

22  today.  I -- I know what I did was wrong.  I understand

23  that.  And I wish I could take that day back, but I -- I

24  can't and I'm truly sorry for that.  I really am.  I

25  really don't know what else to say or do.

26        DEPUTY COMMISSIONER STAR:  Okay.

27        INMATE SULLIVAN:  All right.

64

1        **DEPUTY COMMISSIONER STAR:**  Turn your attention

2    then back to Commissioner Biggers.

3        **PRESIDING COMMISSIONER BIGGERS:**  Okay, I'm going

4    to talk to you about parole plans.  You had indicated

5    that -- that the family support had not changed, that you

6    plan to -- who do you plan to live with?

7        **INMATE SULLIVAN:**  My mother.

8        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  And that

9    you were going to request some updated letters and hope

10    to have them prior to your 2006 hearing.  I see that

11    there's one letter from your mother.  Are there any

12    letters that you have since your last hearing?

13        **INMATE SULLIVAN:**  I should have one from my

14    niece.

15        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  She -- in

16    the letter dated 1/31/06, she reaffirms the commitment to

17    provide you with whatever you need in the way of shelter,

18    clothes, transportation, and money.  And your niece,

19    Tanya, sent one in -- in '05 and said she would dedicate

20    her time and help him locate a job.  Okay, on the -- so

21    in other words, you would stay with your mother.  You

22    don't have any firm job offers yet, do you?

23        **INMATE SULLIVAN:**  I have one firm job offer

24    there.

25        **ATTORNEY STRINGER:**  There should be a letter in

26    the file from '05, Commissioner.

27        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Let me

1    just go to that and see if I can find that.

2        **MALE:**  Is that the one from the -- the industrial

3    roofing?

4        **INMATE SULLIVAN:**  Yes.

5        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

6        **MALE:**  Of course that's an undated letter that we

7    have.  And it was never –

8        **PRESIDING COMMISSIONER BIGGERS:**  It's undated?

9        **INMATE SULLIVAN:**  That's -- that's the job offer

10   that I received.

11       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Let's see

12   if I can find that.  This is one from your mother again

13   in '06, did you find that?

14       **DEPUTY COMMISSIONER STAR:**  It's right here?

15       **PRESIDING COMMISSIONER BIGGERS:**  You got the good

16   file there.  From Mike Farrell (phonetic), "I will

17   guarantee a job for Mr. Jerry Sullivan."  Is this the

18   same guy you were working for before?

19       **INMATE SULLIVAN:**  No, this is another guy.

20       **PRESIDING COMMISSIONER BIGGERS:**  Indicated it

21   will be $14 an hour and possibly raised to (inaudible)

22   after three months.  But, again, it's not -- that's in

23   Sausalito right down the street here.  But it is un --

24   doesn't have a date on it.  Okay.  Do you recall when you

25   first got that letter?

26       **INMATE SULLIVAN:**  It might've been last year or

27   the year before.  I'm not sure.

66

1        **PRESIDING COMMISSIONER BIGGERS:**  So, again,

2    that's what really bothers the Board then if you -- it

3    was 2004, you know, that's –

4        **INMATE SULLIVAN:**  Yeah, I -- I -- I understand.

5        **PRESIDING COMMISSIONER BIGGERS:**  You understand

6    that situation?  All right.  Let's go to your mother's

7    letter.  That's -- this is the one January 31st, 2006.

8    Is that correct?

9        **INMATE SULLIVAN:**  Yes.

10       **PRESIDING COMMISSIONER BIGGERS:**  And she says

11    she's your mom and that she's confirmed that she'll

12    provide the shelter and a home for you and she loves you

13    very much.  She would give anything to have you home.

14    And she says how much you've changed.  And she talks

15    about your work and what you -- how you plan to do with

16    your time here at -- at the prison.  Then there's one

17    from your niece, Tanya.  And it's dated February the

18    20th, 2005?

19       **INMATE SULLIVAN:**  Yes.

20       **PRESIDING COMMISSIONER BIGGERS:**  Okay, you

21    haven't got one from 2006 yet?

22       **INMATE SULLIVAN:**  Yes.

23       **PRESIDING COMMISSIONER BIGGERS:**  You have a 2006

24    one in your file?

25       **DEPUTY COMMISSIONER STAR:**  From who?

26       **PRESIDING COMMISSIONER BIGGERS:**  Tanya.

27       **DEPUTY COMMISSIONER STAR:**  Okay.

1        **PRESIDING COMMISSIONER BIGGERS:** Tanya Sims.  I

2    have a 2005, but not --

3        **DEPUTY COMMISSIONER STAR:** I don't recall looking

4    at it.  Dorthea Sims.

5        **PRESIDING COMMISSIONER BIGGERS:** No, that's the

6    mother.

7        **DEPUTY COMMISSIONER STAR:** Okay.

8        **PRESIDING COMMISSIONER BIGGERS:** The next letter

9    I got is in 2005.  Do you have a copy of it in your file,

10   sir?  Okay.

11       **DEPUTY COMMISSIONER STAR:** I do not see it.

12       **PRESIDING COMMISSIONER BIGGERS:** All right.  So

13   you're sure you didn't get it confused with 2005 letter?

14   Did you get one recently since then?

15       **INMATE SULLIVAN:** I -- I had one recently.  I put

16   it -- I gave it to my counselor.

17       **PRESIDING COMMISSIONER BIGGERS:** Okay.  Well,

18   we'll take that in advisement then.  But, basically, what

19   she was telling you in '05 is probably the same as that -

20   - that she puts her faith in God and -- and you and

21   undoubtedly it's working, because you haven't had any

22   115's or anything so.

23       **INMATE SULLIVAN:** Yeah.

24       **PRESIDING COMMISSIONER BIGGERS:** As you know, we

25   send 3042 notices out to -- this is law enforcement or

26   anyone else in law enforcement that may be interested in

27   -- in the outcome of your case.

68

1          INMATE SULLIVAN:  Yes.

2          PRESIDING COMMISSIONER BIGGERS:  I didn't see any

3    letters of opposition in your file.  However, we do have

4    the District Attorney here who will be speaking to us a

5    little bit later on about their concerns as well.  Did I

6    leave out, counselor, any letters that you may have in

7    your file?

8          ATTORNEY STRINGER:  Well, I notice in the -- in

9    the packet I have, Commissioner, there's at least one

10   letter from a San Quentin -- either correctional officer

11   or a superintendent --

12         PRESIDING COMMISSIONER BIGGERS:  Okay.  And

13   what -

14         DEPUTY COMMISSIONER STAR:  -- in PIA.

15         PRESIDING COMMISSIONER BIGGERS:  All right, what

16   -- when was that --

17         ATTORNEY STRINGER:  That's in November 13th of

18   '04.

19         PRESIDING COMMISSIONER BIGGERS:  Okay.

20         ATTORNEY STRINGER:  I believe the superintendent

21   of the sewing machine --

22         DEPUTY COMMISSIONER STAR:  I have that.

23         PRESIDING COMMISSIONER BIGGERS:  You have that.

24         ATTORNEY STRINGER:  -- industry and also one from

25   Mr. Jenkins who's involved in mattress and bedding.

26         PRESIDING COMMISSIONER BIGGERS:  Yeah, I -- I'm

27   only going back from the last hearing.  So --

69

1          ATTORNEY STRINGER:  Well, they were included in

2     the file so I --

3          PRESIDING COMMISSIONER BIGGERS:  All right, and,

4     you know, it is a favorable letter from the

5     superintendent of San Quentin -- the mattress.  I have

6     that one, too, which is November 13, 2004.  However, I

7     only went back to the -- the first -- went back from the

8     last hearing, which was 2005 because you should try to

9     get updated letters.

10         INMATE SULLIVAN:  2006?

11    PRESIDING COMMISSIONER BIGGERS:  Well, this letter that I

12    got from -- from the Lock-Stitch Sewing Machine

13    Superintendent II was November 13, 2004.  Well, here's

14    one from March 8, 2006.  See, I didn't have this.  Do you

15    have this one, counselor?

16         ATTORNEY STRINGER:  No.

17         PRESIDING COMMISSIONER BIGGERS:  From a

18    Supervisor I Jenkins?

19         ATTORNEY STRINGER:  Well, I have Mr. Jenkins'

20    letter.  I can't --

21         PRESIDING COMMISSIONER BIGGERS:  This one -- no,

22    this is the one that is probably different.  This is one

23    from 2006.

24         ATTORNEY STRINGER:  No.

25         PRESIDING COMMISSIONER BIGGERS:  Well --

26         DEPUTY COMMISSIONER STAR:  My file does have that

27    one.

70

1          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I've got
2    to talk to them about these files, you know.  All right,
3    I'm going to accept as -- I'll give it back to you there,
4    Mr. -- Mr. Sullivan.  But, anyway, there is a letter,
5    March -- dated March the 8th, 2006, from a Mr. I.T.
6    Jenkins, J-E-N-K-I-N-S.  And it's a letter of
7    recommendation for inmate Sullivan and he's with the PIA
8    industry.  Okay.  And it basically says he is the current
9    lead man in the pillow factory and has filled the
10   position admirably for the past year.  You were involved
11   in the conception of a new department in -- in PIA
12   complex.  And he said before you were transferred to the
13   pillow factory you were employed as a lead man in the
14   finishing department for a year.  And that you
15   continually prove yourself to be a reliable,
16   conscientious and hard-working individual.  Should be
17   commended for continuing hard work.  Definitely an asset
18   to this department.  Upon his released would prove --
19   would prove equity value to any company or business
20   venture he might become associated with.  This is very
21   favorable.  Make sure you get that to your counselor --
22         **INMATE SULLIVAN:**  Okay.
23         **PRESIDING COMMISSIONER BIGGERS:**  -- if you don't
24   get a date today to get into your files.
25         **INMATE SULLIVAN:**  All right.
26         **PRESIDING COMMISSIONER BIGGERS:**  Even if you do,
27   I would still get it to my counselor so I could get it

71

1    into the file.

2        INMATE SULLIVAN:  All right.

3        PRESIDING COMMISSIONER BIGGERS:  Okay, and any

4    other letters that I may have missed?  All right, at this

5    point then, I'm going to ask the District Attorney if he

6    has any questions for the --

7        DEPUTY DISTRICT ATTORNEY WADDELL:  I have no

8    questions.

9        PRESIDING COMMISSIONER BIGGERS:  All right, thank

10    you.  All right, counselor, Mr. Stringer?

11        ATTORNEY STRINGER:  I do, Commissioner, thank

12    you.  Mr. Sullivan, if you were granted a parole date and

13    the Board imposed a number of conditions on you, i.e.,

14    attend AA on a regular basis, do drug tests, you attend

15    an outpatient program, would you comply with each and

16    every one of those conditions?

17        INMATE SULLIVAN:  Yes.

18        ATTORNEY STRINGER:  And as a person that's been

19    in AA, you realize you can never drink again?

20        INMATE SULLIVAN:  Yes.

21        ATTORNEY STRINGER:  If you were given a parole

22    date would you acquire a sponsor?

23        INMATE SULLIVAN:  Yes.

24        ATTORNEY STRINGER:  Would you try to participate

25    in some 12 Step work assisting other people that --

26        INMATE SULLIVAN:  Yes.

27        ATTORNEY STRINGER:  Now, in your self-help and

72

1    therapy activities, do you realize that you've obtained

2    37 separate certificates, including AA, throughout the

3    years?

4        INMATE SULLIVAN:  I know (inaudible).

5        ATTORNEY STRINGER:  What -- what caused you to

6    program so extensively in self-help and therapy area?

7    program so extensively in self-help and therapy?  Why did

8    you do that?

9        INMATE SULLIVAN:  Well, I'm still having problems

10   figuring out how I got in prison, but I know the act that

11   I did put me here.  And being in all these programs

12   really opened me up to understand how I got here and how

13   I got myself involved in this stuff that I shouldn't have

14   got involved in.  But being in all these different

15   programs really helped me see myself and see who I am.  I

16   made a mistake.

17       ATTORNEY STRINGER:  Now, we all know there's

18   drugs all alcohol in prison.  You've resisted the

19   temptation for all these years?

20       INMATE SULLIVAN:  Yes, I -- I don't use drugs and

21   I don't use alcohol anymore.

22       ATTORNEY STRINGER:  How long have you been

23   incarcerated?

24       INMATE SULLIVAN:  I think it's 24 years.

25       ATTORNEY STRINGER:  And how old are you?

26       INMATE SULLIVAN:  Fifty-three.

27       ATTORNEY STRINGER:  You've obtained skills in PIA

73

1    sewing machine --

2            INMATE SULLIVAN:  Yes.

3            ATTORNEY STRINGER:  -- program here in San

4    Quentin?

5            INMATE SULLIVAN:  Yes.

6            ATTORNEY STRINGER:  What does that involve?

7            INMATE SULLIVAN:  That involves process of

8    mattress, pillows.  You start from scratch.  You have to

9    cut it, you have to sew it, and you have to stuff it,

10   it's a process that -- it goes through a complete whole

11   mattress and pillow really.

12           ATTORNEY STRINGER:  So if you were given a date

13   you could obtain employment in that field?  You feel

14   confident you --

15           INMATE SULLIVAN:  Yeah.  I -- I'm sure I can.

16           ATTORNEY STRINGER:  And as a forklift operator,

17   would you be able to get a job say on the docks or at a

18   warehouse or something of that --

19           INMATE SULLIVAN:  I believe I can.  I'm sure I

20   can.

21           ATTORNEY STRINGER:  Can you operate all types

22   of -- [alarm sound]

23           DEPUTY COMMISSIONER STAR:  Would you hang on, Mr.

24   Stringer?

25                  [Thereupon, the tape was changed.]

26           ATTORNEY STRINGER:  -- and questioning Mr.

27   Sullivan about job skills.  Do you feel you could operate

1    all types of forklifts?

2           **INMATE SULLIVAN:**  Yeah, I believe I can.

3           **ATTORNEY STRINGER:**  Now, supposing you were given

4    a date and you're out on the street and someone comes up

5    to you and says look, Mr. Sullivan, you've been in prison

6    a long time, you don't have any money, let's go out and

7    rob a grocery store.  How -- how have you changed?  How

8    has your thinking changed regarding that?

9           **INMATE SULLIVAN:**  You know, I -- I smile because

10   I still look at how I got into prison.  You know, there's

11   good people out in society.  I know that.  And there

12   still people that will help you.  All you have to do is

13   ask for help.  I -- I don't see myself breaking the law

14   anymore.  I did like a one-time thing that I got myself

15   involved in.  I really didn't understand what it was, but

16   I know this ain't where I want to be and I know that if

17   I'm given an opportunity to go back into society, I won't

18   break the law.  I know that in my heart, you know.  It

19   hasn't been easy me being in prison, but I've learned a

20   lot in prison and it's -- to me it's like there's two

21   ways you can live in society.  You can live honest in

22   society and go out and work hard all your life or you can

23   go out in society and be a crook or thief or a person

24   that's always looking for something -- some angle to beat

25   somebody out of something.  I wasn't that kind of person

26   at first.  But I -- I got involved in something that I

27   got involved in and I'm not that kind of person now.  I

75

1   do a lot of things in prison for other people and I know

2   that being locked up over these years have confirmed who

3   I am. I'm a good, caring person. I made a mistake. And

4   I don't know what else I could possibly do to get out of

5   prison other than what I'm doing. And I'm going to

6   continue to do what I'm doing until I get out. I'm not

7   going to break no laws. I gave half my life away in

8   prison already and I -- I -- I -- I don't know -- I don't

9   know what to say -- I don't know what else I could

10  possibly say or do.

11       **ATTORNEY STRINGER:** Thank you. Thank you,

12  Commissioners. That's all I have.

13       **PRESIDING COMMISSIONER BIGGERS:** Okay. Do you

14  know what your TABE score is?

15       **INMATE SULLIVAN:** My -- the last time I -- I took

16  the TABE test (inaudible).

17       **PRESIDING COMMISSIONER BIGGERS:** Right.

18       **INMATE SULLIVAN:** I think it was four minus or

19  something.

20       **PRESIDING COMMISSIONER BIGGERS:** Four minus

21  something. Okay.

22       **DEPUTY COMMISSIONER STAR:** I didn't see it in

23  here.

24       **PRESIDING COMMISSIONER BIGGERS:** I didn't see it

25  in there. It wasn't on the - on the 1073.

26       **INMATE SULLIVAN:** It was like when they -- I

27  don't know, it was like when I took that test, I didn't

76

1   want to take it, and it was like they was making me do

2   something.

3       PRESIDING COMMISSIONER BIGGERS:  So you just

4   screwed it up?

5       INMATE SULLIVAN:  I just didn't -- I really

6   didn't concentrate on the test.  I just --

7       PRESIDING COMMISSIONER BIGGERS:  You know how

8   important that is?

9       INMATE SULLIVAN:  I understand now but, you know,

10  at the time I had my GED and it was like you got to take

11  this test and I'm saying no, I got a GED, I don't need to

12  take the test.

13      PRESIDING COMMISSIONER BIGGERS:  That helps to

14  classify you.

15      INMATE SULLIVAN:  I understand now that I

16  should've went on and took the test cause I already had a

17  GED anyway, but at the time I was like --

18      DEPUTY COMMISSIONER STAR:  They never tested you

19  after that?  After you first started did they ever test

20  you again?

21      INMATE SULLIVAN:  Well, I -- no, I didn't -- I

22  didn't feel I needed to be tested.

23      PRESIDING COMMISSIONER BIGGERS:  I see.  You said

24  you made one mistake.

25      INMATE SULLIVAN:  Well, you know, it --

26      PRESIDING COMMISSIONER BIGGERS:  Sounds like a

27  couple more.

77

1       INMATE SULLIVAN:  -- was like a rebellious thing

2   where why I do need to take a test, I got a GED.

3       PRESIDING COMMISSIONER BIGGERS:  Uh-huh.  Some

4   times, you know --

5       INMATE SULLIVAN:  But that was back in --

6       PRESIDING COMMISSIONER BIGGERS:  It don't matter

7   when.

8       INMATE SULLIVAN:  I know, but that was back in --

9   when I first come to prison.

10      PRESIDING COMMISSIONER BIGGERS:  Okay.  Well, all

11  right, let's --

12      ATTORNEY STRINGER:  Speaking of that,

13  Commissioner, did we establish for the Board that his

14  custody score was 19?

15      PRESIDING COMMISSIONER BIGGERS:  Yes.

16      DEPUTY COMMISSIONER STAR:  Yes, I got it on the

17  record.

18      PRESIDING COMMISSIONER BIGGERS:  Yes, you did.

19  Okay.  All right, I'm going to ask the District Attorney

20  to close at this point, please.

21      DEPUTY DISTRICT ATTORNEY WADDELL:  Well, to be

22  truly fair to Mr. Sullivan, he's done reasonably well, I

23  think, as the years have gone on.  However, we're

24  opposing a grant of parole and we ask for another one-

25  year denial for the following reasons.  First of all,

26  regarding the commitment offense.  We have two counts of

27  209, the kidnapping.  They were concurrent sentences.

78

1   Could've been consecutive, but they were concurrent

2   sentences.  In addition to that, in the other -- this was

3   by plea where he came before the court and admitted his

4   guilt, and I think it's significant there was also a plea

5   in there which got him an additional seven years for the

6   attempted murder.  Now, I think you have to reflect on

7   that for a moment given the fact that he has consistently

8   denied any intent -- intent to kill.  But when he was in

9   court he actually entered a plea after one year by the --

10  under the DA that -- being guilty for the attempted

11  murder.  Two victims, Mr. and Mrs. Reily, clearly they

12  were abused and terrorized during the course of this

13  event which lasted over a number of hours, not just a

14  half hour or ten minutes.  I takes longer than that to

15  get to -- it takes more than an hour to get from Tracy to

16  Walnut Creek.  They were threatened with rape and death

17  and held at gunpoint by the inmate.  And, again, there is

18  still some attempt I think here to minimize the -- his

19  role in the offense, in spite of the fact that he claims

20  he's taking responsibility, because in the probation

21  officer's report on page 7, line 5, we find that the

22  victim said that in addition to the tape, the -- they

23  personally threatened the wife with rape and death if

24  there was not compliance.  They also played the tape, but

25  they also made personal threats, which he has now denied.

26  The motive really -- was really trivially in the --

27  trivial in the -- given the consequences that were

79

1  contemplated here and the offense really was rather

2  sophisticated. Acknowledging that Mr. Davis was the --

3  was the leader and he -- I think he died in prison

4  (inaudible) crazy as a matter of fact not too long ago.

5  He may still be alive. I thought that he passed away.

6  But, in any event, the three of them, Mr. Sullivan and

7  Buford, and Mr. Davis, all plotted and they devised a

8  rather elaborate scheme tape-recording threats, cars and

9  transportation, and -- and all that to -- to get this

10  money from the victim. And while perhaps not the

11  mastermind, if you want to use that sent -- term, of this

12  crime, he clearly was a -- a leader. He had the gun. He

13  was age 29 when he committed this offense, so this was

14  not a rash act of impetuous youth. To his credit, he did

15  not have the significant substantial criminal history

16  prior to that. But other crimes were integral parts of

17  the kidnapping and they've been gone over again and I

18  emphasize the attempted murder, but we have the robbery,

19  the false imprisonment, the auto theft. All the things

20  that are part and parcel of this crime. Clearly there

21  were potential for injuries to persons other than the

22  victims. We recall that Mr. Sullivan attempted to evade

23  the police and went on the reckless drive, crashed the

24  car on the freeway, I think right -- right outside of

25  Caldecott Tunnel. And, you know, obviously the manner of

26  the chase put the lives of other members of the public,

27  the driving public certainly, at risk, as well as his own

80

1   and Mr. Reily's.  Not to mention the fact that he tried

2   to shoot him.  And clearly he also declined to take an

3   opportunity to cease or withdraw from the crime.  This

4   crime took a substantial period of time to plan and to

5   perform.  Again, it was not a rash, impetuous act.  It

6   was planned, premeditated, and the inmate had numerous

7   opportunities to back out of this conspiracy and say,

8   hey, enough is enough.  I'm not going to do this.  So,

9   again, he had these opportunities.  It wasn't one of

10  these things that went on and, like a steamroller, he

11  couldn't get out of it.  It took a long time to complete

12  and he could've gotten out of this if he'd wanted to.  As

13  far as the victim is concerned, I don't know if there was

14  (inaudible) on this, but I'm sure the victim has written

15  the Board constantly over the years opposing parole.

16  There's got to be letters in the file as early as his

17  last hearing.  And if there's not one in for this one

18  it's just because after a while, you know, you run out of

19  steam on these things.  But clearly the file shows that

20  the victim has continued to write the Board opposing

21  release.  They were vulnerable.  Business people showing

22  a house, no reason to suspect the pending 209.  They were

23  -- there's no way implicit or in no way brought on this

24  conduct by the inmate himself.  Also the -- there was a

25  personally use of a handgun involved in the crime.  The

26  prior record, to his credit, is -- is insignificant

27  relative to, you know, other people that we've seen.

1    That's a positive thing.  He does have somewhat of an

2    unstable social history.  Raised by his grandmother.  He

3    is a high graduate.  But there's no really significant

4    work history in that the alcohol abuse was admitted at

5    early age.  And that seemed to be the genesis of -- of

6    his problem.  Again, the institutional behavior, quite

7    good.  And he's to be congratulated on that.  He does

8    have a vocation in Upholstery, Forklift Operator.  I

9    would suggest that the jobs he seek should be based on

10   his qualifications that he has obtained in prison.  He's

11   got one undated and outdated letter in the roofing field,

12   but it's got to be tough work for a guy that's getting

13   into his 50s and he's certainly got the credentials and

14   I'd like to see him pursue that eventual work for job

15   offers.  He does have I feel adequate programming in

16   self-help.  Involved in AA.  He's averaged about three

17   programs a year in self-help and that's -- recently and

18   that's -- that's -- that's good.  A little bit of a

19   problem with the psychiatric issues here, which is

20   probably one of the main reasons outside of the just the

21   outrageous nature of the crime we'd be opposing parole.

22   Again, he says he didn't intend to kill anyone but pled

23   guilty to attempted murder.  The gun was loaded.  It was

24   fully loaded.  Whether it was fully loaded or two shells

25   or three shells, we don't know but it was loaded at

26   several points (inaudible) and there was no indication to

27   indicate that it was not capable of operation with or

82

1    without a cylinder pin.  The 2002 psychiatric report
2    talks about a moderate to mild risk.  What we look for
3    where we feel comfortable in moving on with parole is
4    words like negligible, low, minimal, insignificant.  Not
5    moderate or below average.  Psychiatrists and
6    psychologists do use terms like that to designate low-
7    risk people.  In the 2005 assessment while there is no
8    direct answer to the question, I think in all fairness
9    taken as a whole, you can probably say the 2005 report
10   indicates a low-risk, essentially, in view of the writer.
11   However, this is a relatively recent prognosis and we
12   feel that a longer period of time having reached this
13   level of risk in the view of the psychiatrist after
14   rather lengthy road, that we feel a longer period of
15   observation is necessary.  Not real long, but a little
16   longer observation is necessary to insure that this low-
17   risk status is maintained.  Parole plans, I guess the
18   problem would be that, you know, his mother, of course,
19   is quite elderly at this point and there's some question
20   whether or not she has the capability to provide the
21   guidance and support to, you know, help him if he goes
22   live with her or whether, you know, she'll be just a
23   burden on him rather than a -- a support system.  But he
24   does have marketable skills, but hasn't chosen to seek
25   job offers from companies in that particular field.  And
26   the only letter we have now is this undated letter in the
27   roofing industry.  There's been no contact with outside

83

1   agencies for re-entry support, which I think is important

2   for Mr. Sullivan.  There's talk about he will do this, he

3   will do that but, again, there's most -- most -- many

4   people who are in his situation have letters from re-

5   entry programs, assistance groups, living situations who

6   will -- will be identified as persons will -- and groups

7   who will help him in his return to the community.  I

8   think he needs to do this.  He does have manifest support

9   from friends and -- and family members.  So, all in all,

10  while he has done pretty well, particularly in the area

11  of lack of disciplinaries and in the self-help, there are

12  a few areas here as I've indicated that cause us some

13  concern.  Just to reiterate that, we have the crime which

14  is aggravated due to the multiple victims.

15          **PRESIDING COMMISSIONER BIGGERS:**  All right, are

16  you finished, sir?

17          **DEPUTY DISTRICT ATTORNEY WADDELL:**  Almost.

18          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

19          **DEPUTY DISTRICT ATTORNEY WADDELL:**  The attempted

20  187 and the psychiatric reports of recent -- recent

21  vintage which I think is good, but we need to sit on it

22  for another year.  Thank you.

23          **PRESIDING COMMISSIONER BIGGERS:**  Okay, thank you.

24  All right, I'm going to ask your attorney now.  Mr.

25  Stringer, do you have -- close, of course, please?

26          **ATTORNEY STRINGER:**  Thank you.  Commissioner, the

27  relative standard the Board must use in assessing Mr.

84

 1    Sullivan for a date is does he present an unreasonable

 2    risk of danger to society or a threat to public safety as

 3    he sits before you now.  There must be some evidence

 4    before the Board, as indicated in the *Powell* and

 5    *Rosenkrantz* decisions, that would show Mr. Sullivan is an

 6    unreasonable risk of danger to society.  I would submit

 7    there is absolutely no evidence before this Board that

 8    would comport with that standard.  Certainly, the

 9    commitment offense was obviously very difficult for the

10    Reily family.  But to try to suggest that this was the

11    Dalton gang I think flies in the face of the facts.  This

12    certainly was not.  This is Mr. Sullivan being caught up

13    in an event that even he, at this point, struggles with.

14    He had no juvenile record prior to this.  A very, very

15    minimal adult record.  No tendencies at all towards

16    criminal conduct.  His conduct within the institutions

17    has been exemplary.  He comes to you disciplinary-free.

18    That in itself is a remarkable achievement within the

19    California prison system.  So certainly you can

20    characterize Mr. Sullivan's crime as a one-time

21    aberration in his life.  I want to point out that in the

22    probation report, there was first a reference to a -- a

23    police officer examining the weapon in question and

24    saying that it was fully functional.  Now, I don't know

25    where he received his training in weapons at, but on page

26    10 of the probation officer's report, it says at the

27    police station the defendants were strip-searched and a

85

1    small piece of metal resembling a bent piece of coat

2    hanger fell from the underwear of the defendant.  This

3    metal was later determined to be the cylinder pin to the

4    revolver.  And it would -- it is a factual impossibility

5    for a weapon to fire, at least in my experience, without

6    a firing pin.  Mr. Sullivan also indicated further on on

7    page 13 of the probation report, that he'd lost some of

8    the bullets.  He went on to explain that when he pulled

9    the gun out from his waste-band the cylinder opened up

10   and he thought he dropped two bullets on the ground.  He

11   further explained he had lost the cylinder pin and that

12   was why it had opened which substantiates what my client

13   has testified to today.  In the current Board report

14   under Factors and Mitigation, the counselor says quote

15   "there is a possibility that Sullivan had no apparent

16   disposition to commit this crime and it was induced by

17   others."  I think his answers support that particular

18   conclusion.  In the area of self-help and therapy he has

19   37 different certificates which is remarkable.  That does

20   include AA.  He has a minimum eligible parole date of

21   5/22/93 which he means he is well over the matrix for

22   this particular crime.  He has many marketable skills

23   within the definition of Title 15 Section 2402 Sub D8.

24   So there is no evidence before the Board that he has any

25   type of escalating pattern of violence.  His social

26   history was relatively stable.  Dr. Inaba and others have

27   indicated that he has spent his time while incarcerated

1   changing himself.  And I know there's been some concern

2   about Dr. Inaba's report, but for Dr. Inaba even reaching

3   the conclusions that she did is remarkable for her in my

4   view.  She does indicate under assessments of

5   dangerousness,

6             "Mr. Sullivan does not have a history

7             of institutional violence.  He

8             demonstrates respect for authority and

9             a mature outlook on his incarceration

10            and life in general.  He identifies

11            himself as a nonviolent person who

12            strives to get along with others."

13   I think that is supported by the letters in the file from

14   the superintendents that have -- of the PIA industry at

15   San Quentin that have worked with Mr. Sullivan.  The

16   doctor also says "other than continuing in AA there would

17   be no recommendation for necessary therapeutic

18   interventions prior to parole.  Now, certainly, if the

19   State of California is concerned about Mr. Sullivan

20   within the parole process they have the ability to

21   investigate all of his parole plans.  They can go to the

22   job that he has and find out if that job is still

23   current.  They can make sure that he goes to AA on a

24   regular basis.  They can test him for alcohol consumption

25   on a regular basis.  For five years they would have

26   complete control of Mr. Sullivan and know exactly where

27   he is.  If he violates any conditions of his parole he

87

1    could be immediately brought back to prison.  So I would

2    submit that under the law, unless there is some evidence

3    before this Board that would show that Mr. Sullivan is an

4    unreasonable, and that's a legal term of art, an

5    unreasonable risk of danger to society that under the law

6    the Board is compelled to grant Mr. Sullivan a date.  We

7    would ask and request that date.  Thank you.

8    **PRESIDING COMMISSIONER BIGGERS:**  Okay, thank you.

9    Now, Mr. Sullivan, you have the opportunity to tell this

10    Panel why you feel you are suitable for parole.

11    **INMATE SULLIVAN:**  I am very sorry.  I feel that

12    I'm suitable for parole because I've tried to do

13    everything that I was asked to do in here and I'm truly

14    sorry for what I did.  There's nothing that I can

15    actually really say today that could change what I've

16    done.  But over the years it hasn't been easy for me and

17    I know it hasn't been easy for the victims that I've -- I

18    -- stuff that I did to them.  And I regret that day and I

19    probably will always regret that day.  But I know there's

20    nothing that I could say today that could change that

21    other than I done changed myself as far as -- I

22    understand now what it means to be in society, to live

23    right.  And I've heard the words above your means and all

24    that but at the time I don't think I was doing that.  I

25    was -- I was just working and partying and having fun and

26    drinking and that kind of stuff but this -- this is what

27    I got myself involved in.  Way over my head and I

88

1    understand that.  And I'm sorry for it.  And I could say

2    that until I get old and die in here and I'm truly sorry

3    for that and I -- I did every possible thing that I could

4    possibly do to get back to my family.  Now, the pain and

5    suffering that I've created and caused for Mr. and Mrs.

6    Reily, I just don't know what possibly I could do to

7    change that.  I wish it was something actually I could

8    really do for them, for him.  I heard his wife died.  I

9    don't know if that's true or not, but I'm sorry to hear

10   that.  And like I said I made a mistake.  I'm asking for

11   a second chance.  And I know if I get a second chance I

12   will not break any laws, I will not get involved with

13   anybody breaking laws.  You know, I laid in my cell one

14   night and I say, you know, you're going in front of the

15   Board and if you don't tell the Board what they want to

16   hear, they know you -- you on -- you on one side of the -

17   - you got to be on the right side.  If a crime has

18   occurred, would you tell?  And I asked myself that.  I

19   said, you know what, if I didn't tell, it's just as bad

20   as if I'm on the side of the crooks.  And I don't think

21   I'm a crook.  I'm an honest person.  I made a mistake.

22   And I -- I -- and I'd do anything to get back to society.

23   And I will not break any laws.  And even if I seen

24   anybody in society, and maybe I will, that's the wrong

25   way.  I feel like I'm in prison and I can't get out.  And

26   I don't know what else that I could possibly do to get

27   out.  I'm going to keep striving though cause I think

89

1  that day's going to come.  And I'm truly sorry for what I

2  did to Mr. and Mrs. Reily.  I will never forget them.

3  And I don't know what else to say.

4          PRESIDING COMMISSIONER BIGGERS:  Okay, sir, thank

5  you.

6          INMATE SULLIVAN:  Thank you.

7          PRESIDING COMMISSIONER BIGGERS:  Okay, we're

8  going to recess at this -- at this time and go into

9  deliberations.

10                    R E C E S S

11                    --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

90

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER STAR:**  We're back on record.

4    **PRESIDING COMMISSIONER BIGGERS:**  Okay, let the

5    record reflect that everyone that was in the room prior

6    to us going into deliberations are now back in the room.

7    Before I do the formal decision, Mr. Sullivan, there's a

8    couple things I want to point out to you.  This was a

9    truly difficult situation for us.  And -- but there are

10   some things that we do have some concerns about.  And

11   once go through the entire process, you'll understand why

12   I have some concerns about this.  But I want to make sure

13   that you understand --

14   **INMATE SULLIVAN:**  Right.

15   **PRESIDING COMMISSIONER BIGGERS:**  -- and don't get

16   discouraged because you are extremely close to being let

17   go out of here.  But there are some things that just need

18   to be firmed up.  And that would be -- you did -- you did

19   an excellent job of going through everything with us

20   today and that's appreciated because too many times we

21   don't get that.  But you seem to be very sincere.

22   However, we have reviewed all the information received

23   from the public and relied on the following circumstances

24   in concluding that the prisoner is not suitable for

25   parole and would pose an unreasonable risk of danger to

26   society or a threat to public safety if released from

27   **J. SULLIVAN C-66878 DECISION PAGE 1   7/21/06**

91

1    prison.  We looked at the offense.  It was calculated.

2    It was especially cruel and it did create human suffering

3    in that you and a co-defendant, Jerry Sullivan [sic],

4    made an appointment with the -- the Reily realtors.  You

5    -- at a home that you had no intentions of buying.  You

6    led them there for the sole purpose of getting them alone

7    and then at that point you and your crime partners

8    decided -- had already calculated that you were going to

9    kidnap them for the purpose of money, for ransom.  After

10   you got them there you -- you and your crime partners

11   elected to take them to their home, that was in Walnut --

12   Walnut Creek, where there were some threats made which --

13   and just to show them by your own admission that you all

14   meant business.  And a gun was used which created an

15   especially -- disregard for human suffering.  The gun

16   was, in fact, pointed at Mr. Reily's head which, to me,

17   would make an especially callous disregard for human

18   suffering.  Can you imagine the -- the trauma that you

19   put these people through the fact that you put a gun to

20   their head.  The motive for this crime was very trivial

21   in relation to the offense in that those people are

22   traumatized now because you needed money, because you

23   were living beyond your means.  And even though you had a

24   job that really created even -- even more trivial because

25   all you had to do was just back up on your personal

26   living style.  And all that information was taken

27   **J. SULLIVAN C-66878 DECISION PAGE 2    7/21/06**

92

1    primarily from the probation officer's report.  The Panel

2    took notice that you had no previous history of -- and

3    this is your -- this offense was your first time being

4    involved.  Although the District Attorney brought out the

5    fact about social history.  I think that -- I don't think

6    your history was that bad.  I don't think it was that

7    unstable because you did have a job and you were able to,

8    you know, maintain up until such time that you met this -

9    - this character and then he -- enticed you with big sums

10   of money to -- to do what you did.  Your institutional

11   behavior has been -- I would say pretty close to being

12   exceptional.  You've had no 115s.  You've had no 128s.

13   And that's remarkable.  You had one 128?

14        **INMATE SULLIVAN:**  Yeah.

15        **PRESIDING COMMISSIONER BIGGERS:**  And that's

16   remarkable in itself.  You know, one 128 over 24 years.

17   Especially in a -- in an institution, you know, any

18   institution.  You have upgraded yourself vocationally in

19   that you have Forklift Driver.  You also have a -- a

20   certificate in Upholstery.  The -- and prior to coming in

21   you had some skills as a roofer.  But I was impressed

22   when your attorney indicated 30 -- 37, sir, 37

23   certificates that you've received over this time which is

24   an indication to us that you are -- you've continued on.

25   You know, you're not just stopping at 37 that you have.

26   That every -- every year you come in here you seem to

27   **J. SULLIVAN C-66878 DECISION PAGE 3 7/21/06**

93

1   have increased yourself even more and you should be --

2   and you will be commended for that at -- at a later time.

3   You've also had some outstanding work performances which

4   is also good especially in the PIA to the point that

5   you're now a lead man.  And being a lead man in an

6   institution is something in itself that shows your --

7   your capabilities, because a lot of times you got people

8   here don't want to work.  So -- and we -- we recognize

9   that.  Again, with no 115s and only one 128 is

10   remarkable.  Your psychological evaluation, and I'll read

11   that, was favorable and I'll go page 3.  And the

12   psychiatrist, Dr. Inaba, I-N-A-B-A, indicated that one

13   "it is most likely that Mr. Sullivan's abuse of alcohol

14   contributed to the overall lack of judgment and erosion

15   of the values with which he was raised."  Which goes back

16   to why I said I didn't think that you were -- had an

17   unstable social history, because I think that this is --

18   and you've -- the other one is -- another -- I wrote

19   three down here.  It said -- okay, I -- I know what else

20   I can do.  I would work for the man for a year to pay him

21   off.  Back -- I don't think a year's long enough to pay

22   him back.  You may have to work longer.  But the fact

23   that you would want to go and do something like that is

24   an indication to us that you do have remorse.  But -- and

25   the last statement that I want to quote directly from the

26   psychiatrist report, it's also -- and she's stating and I

27   J. SULLIVAN C-66878 DECISION PAGE 4 7/21/06

94

1    said quote "he's also clear about his remorse for his

2    actions and his willingness to continue his participation

3    in self-help and rehabilitation activities." And bottom-

4    line that's an indication to us that you will be a low

5    risk on the outside. The area that I really -- that we

6    had some concern about is parole plans. You actually --

7    you have -- you can go and stay with your mother. You do

8    have a job offer from an undated letter. You -- you had

9    -- it would benefit you to identify what NA/AA programs

10   are available in the area that you're going to go to.

11   It's also -- would benefit you to identify a possible

12   sponsor when you come back before the Board next year.

13   It would also benefit you to have a letter of employment

14   up front as much as you -- you've got a niece out there

15   and you've got your mother. Your mother may be -- would

16   not be able to help you as much, but you've got a young

17   niece out there than can run a little interference for

18   you going out there looking for your position. Roofing

19   may be a little bit much for you at this point right now,

20   but you do have marketable skills.

21       **INMATE SULLIVAN:** Yeah.

22       **PRESIDING COMMISSIONER BIGGERS:** You've got the

23   upholstery, you can drive a forklift. And as your

24   counselor brought out, there are a lot of jobs around

25   here that you can do that and you need to start looking

26   at that to try to better -- what we don't want to do is

27   **J. SULLIVAN C-66878 DECISION PAGE 5 7/21/06**

1  put you back out on the street with the possibility of

2  you having a job and then you go and you find yourself in

3  the same situation that you had prior to coming in.

4      **INMATE SULLIVAN:**  I understand.

5      **PRESIDING COMMISSIONER BIGGERS:**  Well, you can say

6  that, but I won't feel comfortable --

7      **INMATE SULLIVAN:**  I understand.

8      **PRESIDING COMMISSIONER BIGGERS:**  -- with putting you

9  back out there and you have no money and you look over

10  and you want a doughnut or something and you don't have

11  the money to get it.  So I think you do have some

12  marketable skills that you need to focus on.  And, as I

13  said before, you need to get your sponsor out there.  The

14  parole plans are definitely something that we felt that -

15  - that was lacking here.  On the 3042 letters we did

16  notice a letter from the DA -- not a letter from the DA.

17  The DA did speak of his opposition and then we went back

18  in the file and I know for the record that we stated that

19  there was no confidential information that was going to

20  be used, but we did find that letter which was a mistake

21  on our part.  And it was from the victim.  I also want to

22  tell you I think your attitude's good.  You know, I think

23  that, as I said before, I think you are very genuine with

24  your remorse.  You -- it's obvious that it does bother

25  you and a lot of times we don't see that.  There are a

26  couple of areas that I think you need to really focus

27  **J. SULLIVAN C-66878 DECISION PAGE 6 7/21/06**

96

1    yourself on prior to next year and that's the incident

2    with the gun.  Now, I may have made a joke about it by

3    the way of the pin falling down in your pants and all the

4    other stuff but, you know, you got to look at it that

5    it's hard to believe that you would even try to use a gun

6    like that that has lost a pin because, I mean, I'm no gun

7    expert, but I know that when you lose the pin that

8    cylinder turns just a little bit and if the firing pin

9    don't hit directly on that bullet and it hits on the side

10   that gun can explode.

11       **INMATE SULLIVAN:**  I didn't know that.

12       **PRESIDING COMMISSIONER BIGGERS:**  Which would create

13   some problem not only for you, but problems for everybody

14   else because that cylinder just don't stay there.  That's

15   what hold it into place for the firing pin to go

16   straight.  That's just something that you need to keep in

17   mind.  The -- I don't want you -- well, we, and I keep

18   saying I because I'm doing this and I -- we don't want

19   you to feel discouraged because of this denial and it's

20   going to be one year.  But that'll give you a chance to

21   firm up your parole plans and get some more letters of

22   support in your file so that the Panel can feel

23   comfortable that you're able to go out there and really

24   get the feet running.  Now, I'm going to ask Deputy

25   Commissioner Star to make some comments and also commend

26   you on the --

27   **J. SULLIVAN C-66878 DECISION PAGE 7 7/21/06**

97

1      **DEPUTY COMMISSIONER STAR:**  Well, I think Mr. --

2   Commissioner Biggers has actually said it.  I -- I -- I

3   appreciated, too, your forthrightness today.  I felt it

4   was honest and sincere.  That's a plus.  Your

5   institutional adjustment's been exceptional.  Commend you

6   for that.  You do need to tighten up the parole plans.

7   And Commissioner's given you, I think -- which we can

8   only give our recommendations, but they're good

9   recommendations.  Hopefully, you take them to heart.  You

10   know, discuss with your attorney prior to a hearing if

11   you're going to discuss the life term, you know, what

12   happened and what's in the record and how to address

13   what's in the record.  And I think that'll continue to

14   help you.  But good luck to you, sir.  Okay?

15      **PRESIDING COMMISSIONER BIGGERS:**  You want to commend

16   him on his —

17      **DEPUTY COMMISSIONER STAR:**  I -- I commended him on

18   his -- your work performance, your supervisors' reports.

19   Outstanding.  Your self-help group performance and

20   participation.  Continue it, don't let it lapse over this

21   year.  Outstanding.  Your disciplinary record,

22   outstanding.

23      **INMATE SULLIVAN:**  Thank you.

24      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  However,

25   again, those positive aspects don't -- do not change the

26   fact -- outweigh the factors of unsuitability.  And this

27   **J. SULLIVAN C-66878 DECISION PAGE 8 7/21/06**

98

1    is going to be a one-year denial.  And the Panel wants to

2    recommend the following.  That one, you remain -- remain

3    disciplinary-free.  Continue to upgrade yourself, either

4    vocationally or education as best as you can.  Continue

5    to participate in self-help.  And I, like I say, I think

6    you're very, very close.  Just remind you to tighten up a

7    few things.

8            INMATE SULLIVAN:  All right.

9            PRESIDING COMMISSIONER BIGGERS:  All right, the time

10   is now 11:35.  That concludes the hearing.  Good luck to

11   you, sir.

12           INMATE SULLIVAN:  Thank you.

13           DEPUTY COMMISSIONER STAR:  Officer, would you hand

14   this to -- thank you.

15                        --oOo--

16

17

18

19

20

21

22

23   PAROLE DENIED ONE YEAR

24   THIS DECISION WILL BE FINAL ON:____NOV 1 8 2006_____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   J. SULLIVAN C-66878 DECISION PAGE 9   7/21/06

99

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, TRACY RICHARDSON, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 98, and which recording was duly recorded at SAN QUENTIN STATE PRISON at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JERRY LEE SULLIVAN, CDC No. C-66878, on JULY 21, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 17, 2006, at Sacramento County, California.

TRACY RICHARDSON
Transcriber
VINE, MCKINNON & HALL