# EXHIBIT 3

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
LIFE PRISONER HEARING DECISION FACE SHEET

( ) PAROLE GRANTED – (YES)
    CDC: Do not release prisoner before
        Governor's review.

| Records Use Only |
|---|
| Parole Release Date _____ |
| YR    MO    DAY |
| Attach Prison Calculation Sheet |

(X) PAROLE DENIED – (NO)   *1 year*

( ) AGREED UNSUITABLE (Attach 1001A Form)  FOR: _____ YEAR(S)

( ) HEARING POSTPONED/REASON:_____

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

( ) No more 115's or 128A's     (X) Stay discipline free
( ) Work to reduce custody level  ( ) Learn a trade*       (X) Earn positive chronos
( ) Get self-help*              ( ) Get therapy          ( ) Get a GED*

( ) Recommend transfer to _____
(X) Other ___*Update mama & solidify parole plans*___

- These programs are recommended if they are offered at your prison and you are eligible/able to participate

**Penal Code 3042 Notices** (X) Sent   Date: _____5-13-05_____

| Commitment Offense(s) | 209(B)/12022.5/187/664 | KIDNAPPIN TO COMMIT ROBBERY W/USE OF DEADLY WEAPON/ATTEMPTED MURDER |
|---|---|---|
| | Code(s) | Crime(s) |
| | CC-26837 | 1,2 AND 5 |
| | Case #(s) | Count #(s) |

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 05-31-83 | 05-23-86 | 06-01-93 |

( ) Initial Hearing     (X) Subsequent (Hearing No) _10_     ( ) Date of Last Hearing

| CDC Representative | | |
|---|---|---|
| Attorney for Prisoner | JOHN STRINGER | **Address** |
| D.A. Representative | JACK WADDELL | County   CONTRA COSTA |

This form and the Board's decision at the end of the hearing is only proposed and **NOT FINAL. It will not become final until it is reviewed.**

| Chair | Date |
|---|---|
| | 07 |
| Panel Member | Date |
| *Deborah* | 2 |
| Panel Member | Date |
| | 06 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SULLIVAN, JERRY LEE | C-66878 | SAN QUENTIN | SUB 10 | 07-21-2006 |

BPT 1001 (Rev. 08-03)

# EXHIBIT 4

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF CONTRA COSTA

FILED
APR 20 1983
J. R. OLSSON, County Clerk
By _____
                                              Deputy

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA) <br> Plaintiff,) <br><br> vs. ) <br><br> JERRY LEE SULLIVAN (29) ) <br><br> DOB: 3/19/53                    Defendant ) | Department No. ___2___ <br><br> Docket No. ___26837___ |

PROBATION OFFICER'S REPORT AND RECOMMENDATION

| CHARGED WITH: | Counts 1 and 2: | 209(b) PC(Kidnapping to Commit Robbery) with use of a firearm within the meaning of Penal Code Section 12022.5; |
|---|---|---|
| | Counts 3 and 4: | 211 PC(Robbery) with use of a firearm within the meaning of Penal Code Section 12022.5; |
| | Count      5: | 187-664 PC(Attempted Murder); |
| | Count      6: | 245(a) PC(Aggravated Assault) with use of a firearm within the meaning of Penal Code Section 12022.5. |

| | |
|---|---|
| GUILTY OF: | No Conviction - referred pursuant to 131.3 CCP (pre-plea report) |
| DATE OF OFFENSE: | July 2, 1982 (All Counts) |
| DATE OF ARREST: | July 2, 1982 |
| CUSTODIAL STATUS: | Jail(In custody 153 days to Court date) |
| DATE REFERRED TO PROBATION OFFICER: | November 2, 1982 |
| PROBATION REPORT DUE: | December 2, 1982 |
| ATTORNEY FOR DEFENDANT: | Marcus Peppard, 3615 Bissell Ave. Richmond, California |

RECOMMENDATION:

It is respectfully recommended that, should guilt be established in this matter, probation be denied.

JERRY LEE SULLIVAN                    -2-

1   PRIOR RECORD:

2   CII NUMBER:     06746959

3   FBI NUMBER:     41794W3

4   Sources of Information:

5   Alameda County CIB
    Walnut Creek Police Department
6   California Department of Motor Vehicles
    Livermore Police Department
7   Shreveport(Louisiana)Police Department
    Fremont Police Department

8

9   Adult Record:

10      No current CII criminal history has been received on this

11  defendant.  According to the Alameda County CIB, where the defendant

12  has resided for the past eleven years, it indicates the following

13  conviction:

14  12/19/81   CHP          23102a VC(Drunk      1/19/82: Pled guilty;
                            driving)             $355 fine plus penalty
15                                               assessment, 12 months
                                                 Court probation.
16
        The defendant claims that he still owes money on this
17
    particular fine.  It is noted that the defendant has failed to
18
    pay his fine and his probation is in the revoked status.
19
        Contacts were made with the police departments in the various
20
    cities in which the defendant has resided.  According to all
21
    information available, this is the defendant's only conviction.
22

23  Juvenile Record:

24      No prior juvenile criminal history is reported.

25  Driving Record:

26      Driver's license number:  N4558039.

JERRY LEE SULLIVAN        -3-

| | | | |
|---|---|---|---|
| 12/11/79 | Oakland | 4454 VC(Failure to carry registra- tion card in vehicle) | 3/21/80: Forfeit bail $85. |
| 8/8/80 | Oakland | 4454 VC | 8/20/80: Forfeit bail $10. |
| 3/12/82 | Oakland | 22350 VC (Speed) | 4/1/82: Forfeit bail $76. |

No revocations or suspensions are reported.  The defendant's driver's license expires in 1986.

INVESTIGATION:

According to reports from the Walnut Creek Police Department, the following appear to be the circumstances of this offense:

The victims, Mr. and Mrs. Reiley, are partners in Reiley Realty, with a business address at the time of the incident of 6900 Village Parkway in Dublin.

On July 1, 1982 Mr. Reiley made an appointment with the defendant and codefendant, William Buford, to meet at 34779 South Brichetto Court in Tracy which was listed for sale by the Reiley Realtor.  The agreement was to meet at 10:00 a.m. on July 2nd. At approximately 9:00 a.m. on July 2nd Mrs. Reiley received a phone call from one of the defendants indicating that he had a dental appointment he had forgotten and he needed to cancel the 10:00 a.m. appointment.  He would call back later to make another appointment. At approximately ten minutes to one Mrs. Reiley received another phone call from one of the defendants asking to talk to Mr. Reiley. After a brief conversation, Mr. Reiley told Mrs. Reiley that the appointment was now rescheduled for 2:00 p.m. that day.  Mr. and

JERRY LEE SULLIVAN          -4-

1   Mrs. Reiley then drove to the residence on Brichetto Court in

2   Tracy.  They arrived at approximately 2:05 p.m.  They waited in

3   the residence until approximately 2:30, at which time Mrs. Reiley

4   looked out the window and saw an older model white Lincoln pull

5   into the driveway of the residence.  She noted that the vehicle was

6   occupied by two persons.  They came into the residence and one

7   person identified himself as "Dennis Turner".  The Reileys showed

8   the residence, and after ten to fifteen minutes the two left.  The

9   Reileys then locked up the residence and left via the rear door.

10  Upon exiting, Mrs. Reiley observed the two standing in a back

11  field area.  They walked toward the Reileys and the codefendant

12  walked with Mrs. Reiley to her vehicle.  The defendant stayed

13  behind with Mr. Reiley.  Mrs. Reiley became suspicious that somethin

14  was wrong, and her husband told her to "stay there".  She got into

15  her vehicle and attempted to roll up the window and lock the

16  door when the codefendant stopped her from closing the door.  He

17  then ordered her out of the car.

18      Mr. Reiley then told his wife to do what they said as they had

19  a gun.  They were requested to get into their vehicle, and Mrs.

20  Reiley got into the right rear seat position with the codefendant.

21  Mr. Reiley got into the right front seat with the defendant.

22  The codefendant then went back to the white Continental and brought

23  a large cassette player into the victims' vehicle.  At that time,

24  Mrs. Reiley realized that a third person was in the driver's

25  position of the white Continental.  She then heard the engine of

26  that vehicle start up, and she did not see the white Lincoln again.

JERRY LEE SULLIVAN                    -5-

1      The defendant and codefendant took Mrs. Reiley's driver's

2  license, apparently to get her home address.  They got directions

3  from the victims on how to get to their (the victims') home.

4      While en route to Walnut Creek, they first stopped at a gas

5  station in Livermore.  They indicated they wished to use the

6  pay telephone, but someone else was using the phone at that

7  time.  They seemed to be noticeably upset because they could not

8  use the phone.  They then got off the freeway again in Dublin.

9  They drove a short distance, and asked where a telephone could be

10 located and what time it was.  They finally got back onto the

11 freeway.

12     They arrived at the victims' residence, located at 40 Sara

13 Lane in Walnut Creek.  The defendant entered the residence with Mr.

14 Reiley.  Mrs. Reiley and the codefendant then entered.  One of the

15 two brought the tape player into the residence.  They were made

16 to listen to the tape recording.  They indicated the voice sounded

17 as if it was modified.  Basically, the voice made the following

18 statements:

19     "Listen closely.  Because, this will not be repeated

20     and your life depends on your full cooperation, as

21     well as your wife's life.  Our organization has had

22     you under close surveillance for the past two years.

23     We know who and what you are, who you bank with, and

24     we know when you went to the bathroom last.  So, to

25     eliminate any time being wasted, we will not tolerate

26     any excuses or alibis at all.

1    "We want two things today, Mr. Reiley.  We want

2    $150,000 in cash delivered here to your home

3    quick, or our man has orders to first — rape your

4    wife, then kill her, and then kill you.  If you

5    cooperate quickly no one will be harmed.  If you

6    do not cooperate, you both die quickly.  The

7    choice is entirely up to you."

8        The tape went on to indicate that the victims were allowed one

9    phone call to a qualified person who had access to the cash and who

10   could bring it to their home immediately.  The tape suggested

11   several ways which would allow them to obtain the cash and have

12   it delivered.  The tape also cautioned that "their" men were

13   intelligent and would be listening to every word that was spoken,

14   and their lives depended on their full cooperation. The tape

15   indicated that if they were to comply no one would be hurt; the

16   third party bringing the money and Mr. Reiley and his wife would

17   simply be tied up loosely and the men would leave.  It went on to

18   state that they were collecting a total of ten million dollars and

19   that Valley Realty of California had given $300,000 the day before.

20   No one was harmed.  Once again, caution was advised and refusal

21   to cooperate would mean death.

22       The victims attempted to explain that they were in no way

23   able to obtain that amount of money under any circumstances.  The

24   defendants indicated they did not believe the victims despite the

25   fact that the victims continued to explain they could not get that

26   amount of money.  The defendant stayed with the victims, continually

1  displaying a handgun, while the codefendant went to another portion

2  of the house and appeared to be talking on the telephone. Various

3  telephone conversations followed, in which it appeared that the

4  defendants were taking orders or decisions were being made by

5  another person.  The defendant and codefendant repeated the threats

6  that were made on the tape with regard to raping Mrs. Reiley,

7  killing her and then killing Mr. Reiley.  They indicated they were

8  following orders and that they had to do what they had to do.

9      Eventually, the Reileys were able to convince the two that

10  they were unable to get $150,000 cash, but they would try to get

11  whatever money they could at their bank.  Then all four got into

12  the victims' vehicle and drove to the Crocker Bank, Broadway Plaza,

13  Walnut Creek.  The defendant drove the vehicle.  The vehicle was

14  parked in the front parking lot to Capwell's, which was next to

15  the Crocker Bank.  Mrs. Reiley was instructed to go into the bank

16  and withdraw all the money that she could.  She would then be

17  picked up when she came out of the bank.  She walked into the

18  bank, leaving her husband sitting with the two defendants.

19      Inside the bank, Mrs. Reiley asked to cash three paychecks

20  that she had received from the Murray School District totalling

21  $4,000.  She asked to withdraw all the money that she had in

22  savings, which was $354.65.  She also wrote a check for $10,000,

23  which she requested to cash, to be covered by what she called a

24  "prime line account"; an account which allowed her to withdraw

25  that amount of money on demand.  She also wrote a brief note which

26  said, "Please give me the money without hassle, my husband is

1  being held by a gunman; Help me! Call police". She handed the

2  note to the teller who, in turn, called police.

3      Officer Soberanes was the first to arrive, and he contacted

4  the bank manager who gave him the handwritten note. Within a short

5  period of time Officer Perry arrived. They carefully concealed

6  themselves so any other persons in the area would be unable to

7  tell that they were in the bank. The bank manager pointed out the

8  victim, and one officer motioned for her to walk over to them.

9  She indicated she did not want to leave the teller's window. The

10  bank manager contacted her and confirmed what had been stated in

11  the note. He also received a description of the vehicle, which

12  Officer Soberanes broadcast. The victim was then moved down to

13  a teller's window which was out of view of the outside windows.

14  Mrs. Reiley again told police that her husband was being held at

15  gunpoint by the defendants who had demanded that they give them

16  $150,000 cash.

17      Meanwhile, the two defendants observed police coming to

18  the area. They began driving away, and a police unit attempted to

19  stop them. A pursuit began, during which the two asked Mr.

20  Reiley for directions to the freeway. During the pursuit, the

21  codefendant asked Mr. Reiley if he was going out the door, and the

22  defendant said "I'll shoot him". The defendant became very hostile

23  toward Mr. Reiley indicating that he had "blown it" and he was

24  going to shoot him. The defendant then lost control of the

25  vehicle, and collided with a raised wood framed sidewalk at

26  1335 Treat Boulevard. The vehicle then slid into a wood fence,

1    finally coming to rest against a tree.  The impact caused the

2    defendant to be thrown on top of Mr. Reiley.  Mr. Reiley reached

3    for the gun but missed it.  The defendant then pushed the gun into

4    Mr. Reiley's ribs and Mr. Reiley heard the distinct sound of the

5    hammer of the gun falling down as if the trigger had been pulled.

6    However, the gun did not discharge.  Mr. Reiley opened his door,

7    and he and the defendant tumbled out on the ground beside the

8    vehicle.  The defendant then grabbed Mr. Reiley around the neck

9    and put the gun beside his ear.  He dragged Mr. Reiley approximately

10    40 to 50 feet away from the vehicle through the bushes.  They

11    slipped and fell to the ground, and were immediately surrounded

12    by several police officers who were shouting commands at the

13    defendant.  The defendant continued to hold the gun to Mr. Reiley's

14    head and did not comply with the orders to drop it.  However, he

15    eventually dropped the gun, which Mr. Reiley grabbed and threw

16    away from them.  The defendant was then taken into custody.

17       Mr. Reiley sustained a possible broken nose, moderate abrasions

18    on both elbows and pain in the ankles.  He had sustained these

19    injuries during the time that he was being dragged by the

20    defendant into through the bushes.

21       As Mr. Reiley was making his statement to police, he indicated

22    that, when the defendant pulled the revolver from his waistband,

23    the cylinder opened.  The defendant inserted one cartridge into

24    the cylinder before closing it.

25       Police noted that neither of the defendants appeared to be

26    under the influence of alcohol or drugs.  The victims indicated that

1   both defendants appeared fully aware of their actions throughout

2   the entire incident.  Blood samples were taken from the two which

3   indicated no intoxicants.

4       When the defendant was being handcuffed he stated, "The gun

5   didn't work".  Once again, while being driven to the police

6   station he voluntarily stated that the gun didn't work.  While the

7   defendant was being taken into custody, one officer obtained the

8   chrome plated .32 caliber Smith and Wesson which had been

9   discarded.  He noted that it appeared to be completely intact but

10  there were no cartridges in it.  Later, two .32 caliber Smith and

11  Wesson bullets were found in the general area where the defendant

12  was taken into custody and the gun discarded.

13      At the police station, the defendants were strip-searched, and

14  a small piece of metal, resembling a bent piece of coat hanger,

15  fell from the underwear of the defendant.  This metal was later

16  determined to be the cylinder pin to the revolver.  The defendant's

17  wallet was searched, and a small handwritten note with two phone

18  numbers on it was obtained.  The note read "Call me at 4:30".  In

19  a search of the codefendant, a second note was found in which the

20  victims' name, two phone numbers and the address in Tracy was

21  written.  On the reverse of that note another phone number was

22  written.

23      Police ran a DMV check on the two.  They found that the

24  defendant had a Lincoln Contintental registered to him.  It was

25  registered to the same address which was on his driver's license.

26  The defendant's brother was later contacted at that address and

1  indicated that he had taken the defendant to Tracy, but had no

2  knowledge of what was to happen.

3      The defendant's girlfriend, Ms. Jessie Daniels, was contacted.

4  She was cooperative and indicated that the defendant had called

5  her from jail the previous evening asking her to get his car from

6  his brother, store it at her place and not let anyone else use it.

7  However, before she could comply with these directions, the

8  defendant's brother was arrested by Oakland Police Department.

9  She indicated that the defendant and codefendant had been seeing a

10  white guy in the past three or four weeks. They had been very

11  secretive about meeting with him and what they were doing.

12      In later investigation, police found that four phone calls

13  had been made from the victims' residence during the time that the

14  defendants were at that residence. One phone number was listed to

15  a pay phone near the Orchard Supply in Dublin, and a second phone

16  number was listed to a pay phone near Jim's Texaco in Dublin.

17      A search warrant was prepared on the defendant's home. Within

18  the residence, a 3" x 5" notebook with a spiral ring binding

19  having papers similar in appearance to the note paper found in

20  the two defendants' possession was found. The defendant's

21  vehicle was impounded and searched. Police located a combination

22  address and calendar book. Inside that book two pieces of paper

23  were torn out of a newspaper. One of those pieces of paper had a

24  phone number and Mr. Reiley's name written across it in blue ink.

25  Then there was a message indicating to call at 0900 about

26  0830 have a dentist, make a twelve noon. The other piece of

1  newspaper had an address and street directions to number 14927

2  Corcoran Avenue. Police also found a brown bag containing four

3  new appearing rubber gloves in the vehicle. In the trunk of the

4  vehicle they located two packages of rubber gloves which still had

5  the price tags on them.

6      On July 4, 1982 the defendant was interviewed. He was asked

7  why he had picked the Reileys as opposed to any other persons.

8  He was evasive and indicated that he did not wish to answer the

9  question. He admitted that his car was used to go to the house

10  in Tracy. He admitted that his brother had gone with them, but

11  that he had not told his brother anything about what they were

12  going to do. He and the codefendant went into the house while his

13  brother stayed in the car. When they came out of the house he asked

14  his brother to drive his car home for him. He was asked if he

15  intended to have his brother follow him and the defendant indicated

16  that he did, but after they got too far ahead of his brother they

17  did not see him. He indicated he had no reason for stopping off

18  at the motel in Livermore and wanting to use the telephone. When

19  asked if he intended to talk to another person on the phone, he

20  indicated that it was only a "front" in an attempt to make the

21  victims believe that there were other people involved. He was

22  asked if he actually talked to anybody on the telephone, and he

23  stated they did not. They made several phone calls to make it

24  appear that they were taking orders from someone else. Police

25  indicated that the phone rang and it appeared that those calls were

26  being answered. The defendant indicated he did not know who was

1    on the phone those times because the codefendant was handling the

2    calls.  The defendant claimed that he made the cassette recording.

     He was asked how he disguised his voice, and he became evasive,

     indicating that he would rather not say.  He was asked who had the

5    idea for committing the crime, and he indicated that it was both

6    their ideas.  He stated there was no one else involved.  He did not

7    wish to say how he got the gun.  He was asked if the gun had been

8    loaded.  Without hesitation he indicated it had been and had five

9    bullets in it.  He, indicated he had lost some of the bullets.  He

10   went on to explain that when he pulled the gun out from his

11   waistband the cylinder opened up, and he thought he dropped two

12   bullets on the ground.  He further explained he had lost the

13   cylinder pin, and that was why it had opened.  He indicated the

14   cylinder pin found in his underwear was the one belonging in the

15   gun.  He went on to state that he believed he dropped two more

16   bullets out of the gun while at the Reileys' home.  He was asked

17   if he thought the gun had some bullets in it when he had it at

18   the arrest.  He indicated he thought it had bullets in it.  When

19   asked if he intended to use the gun, the defendant replied that he

20   would not use the gun no matter what happened and had not intended

21   to hurt anybody.  He denied having put the gun against the victim's

22   side and pulling the trigger after they had crashed.  He felt the

23   victim was mistaken in his belief that the trigger had been

24   pulled. When asked if the two had actually been watching the

25   Reileys as the tape had indicated, the defendant stated they had not

26   It was explained to the defendant that his brother and a neighbor

1    had seen a white male in a black Continental come to his home

2    earlier that day and bring a tape recorder.  The defendant indicated

3    he did not know what the officer was talking about.

4        Laboratory work was done on the gun.  It was found that the

5    cylinder-pin was missing, the side plate screw was missing, the

6    cylinder advance hand and spring was not in the gun and the stud

7    that the hammer pivots on was broken off but still in its

8    location.  The gun was found to be inoperable.

9        The defendant and codefendant were held to answer out of

10   Walnut Creek-Danville Judicial District on August 5, 1982.  On

11   November 2, 1982 the defendant was referred to the Probation

12   Department for a pre-plea report to be submitted December 2, 1982.

13   On November 23, 1982 the codefendant was referred to the Probation

14   Department.  It has been learned that a third person, Mr. Robert

15   Davison, was held to answer on November 4, 1982.  Court files note

16   that the defendant and codefendant's trial is set for December 6,

17   1982.

18   DEFENDANT'S STATEMENT:

19       The defendant declined to submit a written statement indicating

20   that he would rather discuss the elements of this case personally.

21   He indicates that he did not understand what he was doing.  He

22   knows he will be punished and he reiterates what he indicated

23   to police, in that he did not intend to hurt anyone.  He realizes

24   that he had the gun, and during the course of the chase it wasn't

25   his intention to shoot.  The victim grabbed the gun and it scared

26   him.  He grabbed the victim and began dragging him.  He was not

1   going to shoot him but he figured that he would have been killed

2   (by police) if the victim was not close to him. The defendant did

3   not wish to discuss his initial involvement, and expressed a fear

4   for his life should he discuss many elements of this offense.  He

5   indicates that he cannot change his part in the crime and that that

6   part was wrong.  If he tells anymore he feels he would get a

7   snitch jacket and he does not wish to live with that in prison.  He

8   indicates that he and the codefendant, William Buford, were friends

9   on the street in Oakland.  They used to play ball together.  With

10  regard to the gun, he claims that the pin came out before they

11  left the house. He knew that the pin was not in the gun because the

12  bullets fell out.  He states that he had never heard the tape

13  before.  He didn't know what was wanted until after he himself

14  heard the tape.  He reports that the incident was planned, but he

15  was not the one that planned it.  The gun wasn't his, and he

16  didn't find it as he told police.  He simply had it.  He states

17  that many things that he told police were not true.  He was confused

18  at the time and didn't want to tell on anyone.  He reiterated

19  several times that he was the one that got himself involved, and will

20  have to do the time.  He can't change what he's done.  He knows

21  he will be punished, and then hopes to put his life back together.

22  He reiterates that he is not a violent person, and really didn't

23  try to kill or hurt anyone.  He reports that he was having

24  financial problems, and many things in his life were going wrong

25  at the time.  His baby's mother was hassling him about seeing his

26  child, and he had to fight to see the child, even though he was

1  paying child support for her. He speculates that the incident

2  was planned from three days to a week to his knowledge. He

3  indicates his only qualms about the police report was that he is

4  unsure about the gun having been thrown just prior to his arrest.

5  He felt that he was the one that threw the gun.

6  VICTIMS' STATEMENT:

7      Mr. Reiley was initially contacted by phone. He indicated that

8  he wished to make his statement to the Court. He reports that he

9  received a letter from the defendant on Saturday (November 20th)

10  asking forgiveness. It is Mr. Reiley's feeling that, while the two

11  were with them, it was the defendant who was the ringleader.

12  Initially, he was frightened but when he regained his composure,

13  he seemed willing to go ahead with what he had to do.

14      Mr. and Mrs. Reiley submitted a letter which is quoted here

15  verbatim:

16      "On July 2, 1982, my wife and I were subjected to the criminal

17  activities of William Buford and Jerry Lee Sullivan.

18      "The individuals kidnapped us at gunpoint, held us prisoners

19  in our own home while they robbed us and made ransom demands under

20  threat of immediate death. Their eventual capture came only after

21  a multi-car police chase at very high speeds through downtown

22  Walnut Creek, CA., which terminated when they wrecked our car and

23  tried to shoot me. Their actual surrender came as they had a gun

24  to my head.

25      "Fortunately our physical injuries are apparently minor, however

26  the emotional trauma associated with these terrorists acts will and

1  has had a continuing and far reaching effect on us.

2      "As citizens we want to insure that the responsible individuals

3  are punished to the fullest extent of the law.

4      "As victims we demand that they be imprisoned for as long as

5  possible without any possibility of their being released to resume

6  their terrorism." Signed/William S. Reiley and Patricia C. Reiley.

7  SOCIAL DATA:

8      This defendant currently resides in the Contra Costa County

9  Jail at Martinez.  He lists his residence address as 9418 Birch

10  Street in Oakland where he would live with his mother.

11      He was born on March 19, 1953 to George Collins and Dorthea

12  Sullivan Sims at Shreveport, Louisiana.  He does not know if his

13  parents were married.  He saw his father one time, and they did not

14  get along at that meeting.

15      His mother is employed as a hotel housekeeper.  She married Mr.

16  Cornell Sims when the defendant was quite young.  However, the

17  defendant was reared principally by his maternal grandmother, Jeanie

18  Limas.  He travelled back and forth between her home in Shreveport,

19  Louisiana and his mother's home in Oakland, California.  The

20  defendant is the second of seven children.  He has an older brother

21  whose whereabouts are unknown.  His younger brother resides in

22  Berkeley.  Most of his other siblings reside with his mother or

23  in the Oakland area.  He reports that his older brother had some

24  police contact because of fighting.

25      As was reported earlier, the defendant travelled back and

26  forth between Shreveport, Louisiana and Oakland, California.  He

1  reports that he finally settled in the Oakland area in 1971. He

2  states that he graduated from Norfolk High School in 1971.

3  Verification of the defendant's schooling has been received. It is

4  noted that his grade point average fell generally below the average

5  range. The defendant claims that he has had no further education,

6  and is not interested in future educational endeavors.

7      Generally, the defendant claims that his health is fine. He

8  cut his eye while playing football at a very young age, and cannot

9  see out of that eye.

10     He enjoys drawing, shooting pool, running, fishing and bowling

11 in his leisure time.

12     The defendant claims that in 1971 he began having a heavy

13 drinking problem in which he drank as much beer as he could get.

14 When he was arrested for his drunk driving incident in late 1981 he

15 quit drinking. He denies the use of all other illegal intoxicants.

16 MARITAL STATUS:

17     This defendant has never been married. He has a three year old

18 child by Ms. Muriel Ferguson, who he was helping support.

19 MILITARY RECORD:

20     The defendant has never been involved with the military.

21 EMPLOYMENT RECORD:

22     The defendant worked for Davey Tree from 1979 to his arrest

23 as a foreman clearing trees for power lines. That company verifies

24 the defendant's employment with them from February of 1980 through

25 June of 1982. He was terminated because he did not call for

26 over three consecutive days. He was considered a suitable

1 employee who they would not now consider for rehire.

2     The defendant worked for Ruppert's Auto Park, parking cars

3 from 1975 through 1979. Prior experience was as selling cars.

4 FINANCIAL STATUS:

5     This defendant has no current source of income. Prior to

6 his arrest he was netting approximately $900 per month. He owns a

7 1972 Lincoln Mark IV. He claims that he sold his 1965 Chrysler,

8 but the papers are in the jail, and he is unsure if the title has

9 changed. His routine monthly expenses were close to $1,000 per

10 month.

11 RESTITUTION:

12     Restitution is not a factor in the disposition of this case.

13 COLLATERAL CONTACTS:

14     The defendant submitted the names of five personal references.

15 However, at least two persons' addresses were incorrect, and have

16 not yet responded to requests for telephone contact.

17     However, Mr. Samuel Tarver responded to inquiries, indicating

18 that he has known the defendant for the past ten years as a good

19 family friend. He describes the defendant as a quiet young man

20 who was never known to be involved in anything illegal. He seemed

21 very family-oriented and would work and keep a job. After he got

22 his own apartment, the defendant would come and take his mother to

23 work in the morning and shopping on Saturdays. Mr. Tarver was

24 shocked by this arrest and the charges. He has never known the

25 defendant to have any problems or run with any gang or group of

26 people. He feels that if he was released it would help because he

1   could go back to work and repay his debts.

2       Mr. James Harris responded by phone. He indicates he has known
3   the defendant for the past seven years in business contacts. He
4   describes the defendant as a respectable, dependable person. The
5   defendant worked for him for a long time in his garage, parking
6   cars. They experienced no problems with him. He feels that the
7   defendant is not the type to get involved in any wrongdoing. He
8   stayed away from trouble when he was working for him. He was
9   surprised about these charges as they do not fit his character.

10      Mr. Jerry George has known the defendant for the past two and
11  a half years as his landlord. He indicates that the defendant should
12  receive one of the highest ratings possible. If the defendant
13  anticipated he would be late with his rent he would contact Mr.
14  George well in advance, showing a high responsibility level. He
15  got along well with the other tenants. He feels that the
16  defendant's biggest problem is that he is in jail. He feels that
17  if released, and after finding housing and a job, the defendant
18  could manage things well.

19      Ms. Thelma Lee has known the defendant since he was in grade
20  school with her sons. He is a responsible young man who is kind
21  and tries to help in any way he can. She has never known him to
22  be in any type of trouble before. Further, she has never heard
23  of anybody saying he took anything from anyone. She indicates that
24  it would be helpful if he could get medical help.

25      Mr. Marcus Peppard, the defendant's attorney, wrote a note to
26  this deputy indicating that the defendant had written an

1   autobiography which he hoped this deputy would get at the

2   interview.  This deputy was unaware of such a document at the time

3   of the interview, and the defendant made no offers of such

4   biographical material.

5   EVALUATION:

6       This defendant is statutorily ineligible for probation by virtue

7   of the charges.  He initially impressed this deputy as being very

8   slow, possibly even retarded.  However, as the interview progressed

9   and the defendant became more relaxed, it became apparent that that

10  initial impression was simply the result of his fear and reticence.

11  This defendant is deeply concerned about his future in prison

12  and the possibility of being killed, should he say too much.  This

13  defendant also impresses this deputy as a person who got himself

14  into a predicament that was far beyond his sophistication.  It is

15  doubtful that Mr. Sullivan had any conception of how far this

16  situation would go when he initially became involved.  Since the

17  defendant is reticent to discuss his initial motivations, little

18  comment can be made as to how he became involved.  The only thing

19  this deputy can base her opinions on are impressions and innuendos,

20  rather than any type of facts.  On the other hand, this defendant

21  was the one that held the gun, and whether out of fear or

22  deliberation, apparently attempted to kill the victim at one point.

23  While he is relatively unsophisticated and less than generally

24  criminally oriented, he commenced his criminal behavior with one

25  of the most serious of crimes.

26      In this deputy's opinion, the criteria affecting concurrent and

1  consecutive sentencing with regard to these charges appears to be:

2      With regard to the two counts of 209(b) PC, those charges

3  were independent of each other.  It is felt that there was no

4  necessity for both victims to have been involved in this situation.

5  With regard to the two counts of 211 PC, once again it appears

6  that the crime on the two different victims were independent of

7  each other, and the similar argument is used.  On the other hand,

8  it is felt that the charge of 209(b) PC includes the charge of

9  211 PC.  With regard to Counts Five and Six, it appears to this

10  deputy that, if the attempted murder centers around the incident

11  in which the gun did not discharge, but does not include the

12  subsequent action just prior to the defendant's arrest, it is,

13  indeed, separate from the aggravated assault.  On the other hand,

14  if the attempted murder applies to both incidents it appears to

15  include the aggravated assault.  On the other hand, if the

16  aggravated assault refers to the defendant's act of dragging the

17  victim through the bushes at gunpoint, it again is a separate act.

18      In this deputy's opinion, the circumstances in aggravation

19  and mitigation appear to be:

20  Circumstances in Mitigation(Rule 423):

21  A.  Facts relating to the crime:

22          There is a possibility that the

23          defendant had no apparent predisposition

24          to commit this crime and was induced by

25          others.

26  ///

B.  Facts relating to the defendant:

The defendant has an insignificant prior record.  The defendant voluntarily acknowledged wrongdoing at an early stage in the criminal process.

Circumstances in Aggravation(Rule 421):

A.  Facts relating to the crime:

The crime involved the threat of great bodily harm.  The crime involved multiple victims.  The crime indicates premeditation. The crime involved the attempted taking of great monetary value.

B.  Facts relating to the defendant:

There do not appear to be any factors in aggravation with regard to the defendant.

Respectfully submitted,

GERALD S. BUCK, COUNTY PROBATION OFFICER

BY: _____

KAY HLAVKA, DEPUTY PROBATION OFFICER
ADULT DIVISION, MARTINEZ


APPROVED: _____

RICHARD A. CALICURA, UNIT SUPERVISOR
ADULT DIVISION, MARTINEZ

KH:al
Dictated:11/24/82
Typed:11/30/82

READ AND CONSIDERED _____
                    JUDGE

# EXHIBIT 5

# MENTAL HEALTH EVALUATION
## FOR THE BOARD OF PRISON TERMS
## OCTOBER 2005 LIFER HEARING
## SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

I.  Identifying Information: Mr. Sullivan is a 52-year old, African American male who is serving a Life plus 7 year sentence for PC 209 (b) Kidnapping for Robbery, and PC187, Attempted 1st degree Murder, committed July 2, 1982. There is also a non-controlling case for PC209, Kidnapping for Robbery and PC211, Robbery committed on the same date. This report is based on a review of the inmate's central files, medical record and a face to face interview conducted in the North Block offices of San Quentin State Prison. Mr. Sullivan was informed that the information obtained during the interview was not confidential in that it would be included in a report to the Board of Prison Terms. He stated that he understood this and was voluntarily participating in the interview. Mr. Sullivan denied that he needed any assistance to participate in the interview and he appeared to understand the purpose of the interview and the limits of confidentiality. For reasons not limited to the possibility that an inmate may have a mental disability or other mentally handicapping condition, the interview was conducted by a licensed psychologist. It was the conclusion of the examiner that Mr. Sullivan did not require auxiliary aids or assistance to achieve effective communication.

Mr. Sullivan's psychosocial history including developmental history, family history, psychosexual development and sexual orientation, marital history, military history, employment and income history and substance abuse history have been thoroughly reviewed and presented in previous reports to the Board and will not be restated in this report. The reader should refer to earlier evaluations for this information.

II. Psychiatric and Medical History:
Mr. Sullivan has no history of mental disorder and has not undergone psychiatric treatment in the past. He has hypertension and elevated cholesterol and takes medication to control these conditions.

III. Plans if Granted Release:
When asked what his plans for parole were, Mr. Sullivan stated that he planned to "stay out of trouble and help people." When asked for specific details, Mr. Sullivan stated that he plans to stay with his mother at her home. She has made it clear that he is welcome to stay with her for as long as he needs to. Mr. Sullivan believes that his mother is 70 or 71 years old. He describes his relationship with her as being very close. She visits him every other weekend and has done so throughout his incarceration. He has tried to encourage her to stay home and take care of herself, but has not been able to deter her from traveling around the state to visit him. He feels a deep sense of gratitude toward her for her unwavering support. Being able to help his mother is a primary factor in Mr. Smith's desire to be released to the community.

Mr. Sullivan has extended family in many communities in the Bay Area. He has a 26-year-old daughter with whom he is in contact. She visited him about a month ago.

Mr. Sullivan describes himself as a good worker, who would be willing to take any job in the community. He would be most likely to return to his previous employment as a roofer. Mr. Sullivan has done this type of work successfully in the past and believes that he would be hired again. He has also worked as a tree

SULLIVAN, JERRY  C-66878                                      September 23, 2005

trimmer and parking lot attendant with positive evaluations from his previous employers.    While incarcerated, he has gained additional skills and experience as an upholsterer, truck driver, and forklift operator.

Mr. Sullivan would continue his participation in AA as he states that "AA is a part of my life everyday." He would plan to attend meetings as soon as he leaves prison, and has gotten a list of AA meeting locations near his mother's home.  Mr. Sullivan's mother is also active in her church and Mr. Sullivan has promised her that he would regularly attend services with her.

Mr. Sullivan has been married once and is divorced.  He is not presently engaged in a relationship.  He looks forward to develop a positive circle of friends, in the future, as he states "There are a lot of people out there who are doing good things.  I know I made a bad decision and I see my life getting better.  I know I got life left in me.  I still enjoy working."

# CLINICAL ASSESSMENT

IV. Current Mental Status/Treatment Needs:

Mr. Sullivan presented as a pleasant, relaxed, mature African American male. He appeared to be his stated age.  He was well groomed and dressed in standard CDC inmate clothing. He appeared to be fully alert, and was oriented in all spheres. His thought was coherent, linear and logical with no evidence of thought disorder.  His intellectual functioning appeared to be in the low average range.  His fund of information was within normal limits.  He reported that he reads the newspaper, novels and AA materials.  He was knowledgeable about current events.   Thought was somewhat concrete in that he was not able to conceptually relate how an apple and an orange, or a table and a chair were alike.  Speech, flow of thought and affect were all within normal range.  There was no evidence of mood instability or depressed mood. He denied suicidal or homicidal ideation.  His judgement appeared to be adequate for most situations.  He demonstrated capacity for insight, especially knowledge of the ways he has benefited from incarceration. Mr. Sullivan stated that he has learned from all of the components of the IMPACT program.  He has improved his reading ability through the study of phonics at San Quentin and states that he was a very poor reader before being sent to prison.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:       305.00  Alcohol Abuse (by history)
AXIS II:      V. 71.09 No Diagnosis
AXIS III:     Hypertension, Hypercholesterolemia
AXIS IV:      Stressors: Life Sentence
AXIS V:       GAF = 85

Mr. Sullivan has no current symptoms of a recognized mental disorder.  He is functioning well in most areas of his life in that he is programming well, has supportive family relationships, is positive about his life and his ability to make a contribution to society.  He is aware of the needs of others and actively looks for ways to solve problems by constructive means.  He is not receiving any mental health services at this time and does not have a need for therapeutic intervention.

V: Inmate's Version of the Crime

Mr. Sullivan's version of the crime did not differ from his statements in previous evaluations.  He stated that he had met a guy who made him a proposition that would earn him a lot of money.  Mr. Sullivan was living with his girlfriend at the time and was experiencing financial problems.  Mr. Sullivan stated that he had never owned a gun and used a friend's gun for the intended crime.

Mr. Sullivan and his crime partners held a couple hostage in a home that the couple was showing for sale. The couple was taken to a bank where they had accessible funds.  While the woman was in the bank, she alerted the bank staff to the crime in progress.  Mr. Sullivan attempted to escape with the male victim, and

SULLIVAN, JERRY C-66878                                    September 23, 2005

engaged in a high-speed chase with the police. The chase ended when Mr. Sullivan crashed the car. Mr. Sullivan attempted to flee on foot with the victim, but was apprehended by the police before he could get away from the area. The victim claimed that Mr. Sullivan attempted to fire the gun at him, at close range. Mr. Sullivan denies this, stating that he had his hand blocking the hammer of the gun while he held it on the victim. He denies that he ever intended to shoot or harm the victims. He contends that the gun was inoperable and was used in the crime in order to intimidate the victims.

Mr. Sullivan is aware that the victim has stated that he heard the gun being fired at him, by Mr. Sullivan. Mr. Sullivan stated that he understands that the victim sincerely believes that he heard this. Mr. Sullivan is equally sure that he did not attempt to shoot the victim. He stated that the gun was inoperable.

Mr. Sullivan is remorseful for his crime. He expresses sincere empathy for Mr. Riley, the victim. He stated that he was informed that Mr. Riley's wife had died and that he feels especially sorry now that Mr. Riley is alone and has been deprived of the company of his wife. Mr. Sullivan stated, "I don't know what to tell you. I wish I could change what I did. ..I don't know what else to do. I would work for the man for a year to pay him back some way. I can understand his pain. He probably hates me. I can understand that, too."

VI. Assessment of Dangerousness
A. In a Controlled Environment
Mr. Sullivan does not have a history of institutional violence. He demonstrates respect for authority and a mature outlook on his incarceration and life in general. He identifies himself as a non-violent person who strives to get along well with others.

B. If Released to the Community
Mr. Sullivan has a good understanding of the factors that led to his commitment offense. He stated that he was raised with good values and did not get into trouble as an adolescent. He was employed at the time of the crime and living independently in the community. He stated that he used to drink on the weekends and got a DUI conviction in prior to the instant offense. He was associating with individuals who were engaged in criminal activity. He yielded to temptation when presented with a scheme to come up with a lot of money. As stated by Mr. Sullivan, "The plan was to take the money and run; there never was any intent to hurt anyone." He acknowledges the harm he did to the victims and expresses sincere regret about his involvement in the crime. He recognizes the victims as individuals who did not deserve to be victimized by criminal actions. Mr. Sullivan takes direct responsibility for his actions in regard to the crime.

While Mr. Sullivan's crime was one that placed his victims at direct risk of harm, everyone was fortunate in that there was no loss of life. Mr. Sullivan has received a very long sentence for his crimes and acknowledges that he did wrong and deserves punishment by the court. His criminal actions did not seem to be the result of an antisocial personality or criminal lifestyle. At the time of the crime, Mr. Sullivan was not supporting himself through criminal activity. He also does not have a criminal record from a young age. These factors would suggest that Mr. Sullivan would be an inmate who could benefit greatly from rehabilitation, in that he has a foundation of socially conforming behavior prior to incarceration.

There is the question of the contribution of alcohol to Mr. Sullivan's crime. Mr. Sullivan admits to inappropriate use of alcohol around the time of his offense. He denies that he was intoxicated at the time of the offense and it would appear that alcohol did not play a direct role in the commission of the crime. It is more likely that Mr. Sullivan's abuse of alcohol contributed to an overall lack of judgement and an erosion of the values with which he was raised. He has clearly stated a commitment to lifelong participation in AA.

Given Mr. Sullivan's lack of an early or extensive history of criminal behavior, and active recovery from alcohol abuse, the greatest risk would be likely to come from any clinical factors associated with violent behavior. Any recognized factors such as lack of insight, negative attitudes, lack of empathy, impulsivity, symptoms of major mental illness, or failure at treatment would be considered as possible sources of

Sullivan , Jerry  C-66878              3        San Quentin                September 23, 2005

SULLIVAN, JERRY C-66878                                            September 23, 2005

increased risk. Based on review of Mr. Sullivan's present institutional record and the clinical interview conducted for this report, it would appear that none of these risk factors is currently present.

Mr. Sullivan also has a number of protective factors such as a feasible plan for parole and substantial social support. He also is clear about his remorse for his actions and his willingness to continue his participation in self-help and rehabilitation activities. He has reflected on his crime and is willing to do whatever would be appropriate to make amends to those who have been harmed by his actions.

### VII. Conclusion and Recommendations:

Other than continuing in AA, there would be no recommendation for necessary therapeutic interventions prior to parole. Mr. Sullivan is an individual whose crime was extreme in its complexity and recklessness. Mr. Sullivan's sentence reflects this. There is not, in my opinion a direct relationship between the extreme actions of the crime and Mr. Sullivan's criminality. He was not known to be a violent person before the crime, and has not engaged in violence subsequent to the crime. His criminal action seemed to reflect a dramatic, but failed attempt to solve his financial problems by criminal means.

Given Mr. Sullivan's history, institutional adjustment, and present clinical presentation there are no psychological factors that would suggest an increased risk for violent behavior, in either the community, or a controlled setting at the present time. While it is not possible to accurately predict future violent behavior, given Mr. Sullivan's age, commitment to ongoing substance abuse treatment, and limited criminal history, he would be expected to be able to continue to live a positive, non-violent life when released to the community.

Michel Lynn Inaba, Ph.D.
Contract Psychologist

Sullivan, Jerry   C-66878                4        San Quentin                September 23, 2005