**EXHIBIT 7**



Superior Court of the State of California

In and For the County of Contra Costa

In re Jerry L. Sullivan,  
On Petition for Writ of Habeas Corpus

No. 070053-4  
Order Denying Petition

_____/

In Contra Costa Superior Court Docket 26837, Petitioner Jerry L. Sullivan was convicted of crimes including kidnap, attempted murder and attempted robbery. In April 1983, Petitioner was sentenced to a term of seven years to life. See Petition, paragraph 3.

On July 21, 2006, Petitioner was found unsuitable for parole by a two-person panel of the Board of Parole Hearings ("the Panel"). It was a one-year denial. Petitioner contends that the Panel's decision was not supported by the requisite evidence and is otherwise arbitrary and capricious.

**A. The July 2006 Hearing and Decision:**

The Panel considered the July 2, 1982, commitment offense, as set forth in a Board report. Petitioner's Exhibit A, page 13.

This report summarized the commitment offense as follows:

"Jerry Sullivan and co-defendant William Buford made an appointment with William Reily of Reily Reality to be shown a home that Reily had listed.[1] The meeting was to take place at the home, which was located in the town of Tracy, California, on the next day, July 2nd at 10:00 a.m. On the morning of the July 2nd, around 9:00 A.M., an unidentified person called Mr. Reily and cancelled the appointment for 10:00 A.M.; however, the same individual telephoned later the same morning and arranged to view the property at 2:00 P.M., the same afternoon.

Sullivan and a companion arrived for the appointment in a car driven by a third identified person. Mr. and Mrs. Reily met them and showed them the house. After approximately 20 minutes, Sullivan and his companion left the home and the Reily's began to lock up the house. As they were exiting the back of the house, Sullivan and his companion approached and separated the Reily's. Sullivan's companion directed Mrs. Reily into the Reily's car. He told the third person, the unidentified driver of the vehicle in which they arrived, to leave. Sullivan told the Reilys that he had a gun and would use it so as to ensure their compliance.

Sullivan directed Mr. Reily into the car. They drove to the Reily's home in Walnut Creek. Once there, a pre-recorded message demanding that the Reily's give them $150,00.00 was played. The message also included threats to rape and murder Mrs. Reily and then kill Mr. Reily if they did not cooperate. The Reily's explained that they did not have that kind of money and eventually Sullivan and his companion decided to take the Reily's to their bank and withdraw as much money as they could get.

The Reily's were driven to their bank and Mrs. Reily was instructed to enter the bank and make a withdrawal of all the money she could access. Mr. Reily was to be held hostage until she returned with the money. She was to be picked up in front of the bank when she had finished the transaction. Mrs. Reily went to a teller and withdrew monies from her accounts and was able to give the teller a note explaining what was going on and asked to have the police called. Officers arrived and verified the situation.

As the back-up officers were called Sullivan and his companion made the decision to leave. As they tried to leave, a police unit made an attempt to

---

[1] The record contains various spellings for "William Reily." For purposes of consistency, the court will use the spelling found in the Petitioner's Exhibit A.

stop the car and a pursuit ensued. It ended when Sullivan lost control of the car and crashed into a fence. Mr. Reily later stated after the car crashed, Sullivan stuck the gun into his ribs and pulled the trigger, but the gun did not fire. Sullivan pulled Reily out of the car at gunpoint and tried to make a getaway. As they went through some bushes, they both fell and were immediately surrounded by police officers and Sullivan was taken under arrest."

See Petitioner's Exhibit B.

The probation report for Petitioner, also before the Panel, provides additional detail about the commitment offense.

For example, the probation report sets forth that the voice on the tape played to the Reilys while the Reilys were captive in their home, made the following statements:

*"Listen closely. Because, this will not be repeated and your life depends on your full cooperation, as well as your wife's life. Our organization has had you under close surveillance for the past two years. We know who and what you are, who you bank with, and we know when you went to the bathroom last. So, to eliminate any time being wasted, we will not tolerate any excuses or alibis at all.*
*We want two things today, Mr. Reily. We want $150,00.00 in cash delivered here to your home quick, or our man has orders to first-rape your wife, then kill her, and then kill you. If you cooperate quickly no one will be harmed. If you do not cooperate, you both die quickly. The choice is entirely up to you."*

The voice on the tape set forth that the victims were allowed one phone call to a qualified person who had access to cash and who could bring it to their home immediately. The voice suggested several ways which would allow the Reilys to obtain the cash and have it delivered.

The probation report sets forth that while holding the victims captive in their residence, the Petitioner continually displayed a handgun and repeated the threats to rape Mrs. Reily, kill her, and thereafter to kill Mr. Reily.

Regarding Petitioner's flight from the bank after the police had arrived and the subsequent police pursuit, the probation report states, "The defendant became very hostile toward Mr. Reiley indicating that he had "blown it" and he was going to shoot him. The defendant then lost control over the vehicle, and collided with a raised wood framed sidewalk at 1335 Treat Boulevard. The vehicle then slid into a wood fence, finally coming to rest against a tree. The impact caused the defendant to be thrown on top of Mr. Reiley. Mr. Reiley reached for the gun but missed it. The defendant then pushed the gun into Mr. Reiley's ribs and Mr. Reiley heard the distinct sound of the hammer of the gun falling down as if the trigger had been pulled. However, the gun did not discharge. Mr. Reiley opened his door, and he and the defendant tumbled out on the ground beside the vehicle. The defendant then grabbed Mr. Reiley around the neck and put the gun beside his ear. He dragged Mr. Reiley approximately 40 to 50 feet away from the vehicle through some bushes. They slipped and fell to the ground, and were immediately surrounded by several police officers who were shouting commands at the defendant. The defendant continued to hold the gun to Mr. Reiley's head and did not comply with the orders to drop it. However, he eventually dropped the gun, which Mr. Reiley grabbed and threw away from them. The defendant was then taken into custody."[2]

Petitioner told the Panel that he got involved in the commitment offense through somebody he met at a furniture store and that he did so to make some quick money. Exhibit A, pages 22-27. Petitioner told the Panel that although he was making money, he wasn't managing money because he was partying and wrecking cars. Exhibit A, page 34-35.

The Panel addressed Petitioner's social history. The Panel's observations included that Petitioner is a high school graduate and that Petitioner has a daughter who visits him often. Exhibit A, pages 46-48.

The Panel observed that Petitioner had no prior criminal history, other than a drunk driving matter that was resolved by paying a fine. Exhibit A, pages 52-53.

The Panel observed and assessed that Petitioner's post-conviction history was commendable, indeed, virtually disciplinary free. Exhibit A, page 53.

---

[2] See Petitioner's Exhibit C, pages 5-9.

The Panel observed that Petitioner's participation in self-help programs was also exemplary and that Petitioner is an outstanding worker. Exhibit A, pages 53-57.

The Panel considered the positive September 23, 2005 report completed by Dr. Inaba for Petitioner. As the Panel observed, Dr. Inaba opined that Petitioner would be expected to be able to continue to live a positive, nonviolent life when released to the community. Exhibit A, page 63.

The Panel considered Petitioner's parole plans. Although Petitioner's file contained two letters conveying job offers, neither of these letters was dated. Exhibit A, pages 64-66. Regarding when Petitioner received one of the letters, Petitioner stated, "It might have been last year or the year before. I'm not sure." Exhibit A, page 65.

The Panel heard from Contra Costa County Deputy District Attorney Waddell. Mr. Waddell acknowledged that Petitioner has done "reasonably well" but nevertheless opposed a grant of parole. Mr. Waddell observed that Petitioner had pled guilty to attempted murder, that the victims were abused and terrified over a number of hours, threatened with rape and gunpoint and that Petitioner still attempted to minimize his responsibility for the offense.

Mr. Waddell observed that although the 2005 psychiatric report indicated that the Petitioner would present a low risk if released upon a grant of parole, the 2002 psychiatric report assessed that Petitioner would present a moderate to mild risk. Mr. Waddell believed that "a longer period of time having reached this level of risk in the view of the psychiatrist after a rather lengthy road, we feel a longer period of observation is necessary." Exhibit A, page 82.

The Petitioner addressed the Panel and expressed deep remorse for the commitment offense. Exhibit A, pages 87-89.

*The Decision:*

The Panel assessed that Petitioner would pose an unreasonable risk or danger to society or a threat to public safety if released from prison.

The Panel assessed that the commitment offense was calculated and especially cruel, and that the motive for the crime was trivial in that Petitioner needed money because he was living beyond his means.

The Panel also assessed that Petitioner's parole plans were wanting, as he had no documented, current employment offer or an NA/AA sponsor. Presiding Commissioner Biggers explained to Petitioner that "what we don't want to do is put you back on the street with the possibility of you having a job and then you go and find yourself in the same situation that you had prior to coming in." Exhibit A, page 94-95.

The Panel commended Petitioner for his forthrightness, his exceptional institutional adjustment, his work performance and his outstandingly admirable disciplinary record.

The Panel assessed that the aforementioned positive aspects did not outweigh the factors of unsuitability. Exhibit A, page 97.

B. The Statutory Framework and Judicial Review:

Under Penal Code Section 3041(b), the parole authority "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offenses is such that consideration of the public safety requires a more lengthy period of incarceration for this individual...."

Parole considerations applicable to life prisoners such as Petitioner are contained in Title 15 of the California Code of Regulations, section 2281.

Circumstances tending to show unsuitability include that the commitment offense was committed in an especially heinous, atrocious or cruel manner. In assessing whether the crime was committed in an especially heinous, atrocious or cruel manner, the Board is to consider whether multiple victims were attacked, the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder,

whether the victim was abused, defiled or mutilated during the crime, whether the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and whether the motive for the crime was inexplicable or very trivial in relation to the offense. Section 2281(c).

Other circumstances tending to indicate unsuitability are that the inmate possesses a previous record of violence, an unstable social history, committed previous sadistic sexual offenses, has a lengthy history of mental problems related to the offense or has engaged in serious misconduct in prison or jail.

Circumstances tending to show suitability include that the inmate does not have a juvenile record, possesses a stable social history, shows signs of remorse, committed the commitment offense as the result of significant stress, lacks a significant criminal history, is of an age that reduces the probability of recidivism, has realistic parole plans and positive institutional behavior. See Section 2281.

The specified unsuitability and suitability factors are general guidelines only, as the parole authority is to consider all relevant, reliable information. Section 2281.

"Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Section 2281(a).

In the case of In re Rosenkrantz (2002) 29 Cal. 4th 616, the Supreme Court explained that parole release decisions "entail the Board's attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." Such a prediction requires analysis of individualized factors on a case-by-case basis and the Board's discretion is almost unlimited, albeit limited by the California Constitution's requirement of procedural due process. Rosenkrantz at p. 655, citations omitted.

Given the Board's broad discretion, judicial review of the Board's parole decisions is very limited. Specifically, a court may inquire only whether some evidence in the record before the Board supports the decision

to deny parole, based upon the factors specified by statute and regulation. Rosenkrantz at p. 658. Only a modicum of evidence is required. Rosenkrantz at p. 677.

The nature of the prisoner's offense alone, can constitute a sufficient basis for the denying parole. Rosenkrantz at p. 682, citations omitted. However, the Supreme Court cautioned that sole reliance on the commitment offense might, in a particular case, violate Penal Code Section 3041(a)'s provision that a parole date "shall normally be set" and thus might contravene the inmate's constitutionally protected expectation of parole. Rosenkrantz explains that such a violation could occur, "for example [,] where no circumstances of the offense could be considered more aggravated than the minimum necessary to sustain the conviction for that offense." Rosenkrantz at p. 683. The Supreme Court suggested that the commitment offense must be "particularly egregious" to justify the denial of parole. Rosenkrantz at p. 683.

In the case of In re Dannenberg (2005) 34 Cal. 4th 1061, 1095, the Supreme Court clarified that for a commitment offense to be "particularly egregious," thereby warranting a finding of unsuitability, all that is required is that "the violence or the viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." Dannenberg at 1095, emphasis in the original, citing Rosenkrantz at p. 683.

In the case of In re Scott (2005) 133 Cal. App. 4th 573, the Court admonished that the proposition that a commitment offense alone can negate suitability must be properly understood. Scott instructs: "The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." Scott at pp. 594-595.

**C. Some Evidence Supports the Panel's Decision and the Decision Was Not Arbitrary or Capricious:**

Petitioner's argument that there is no evidence to support the Panel's determination that nature of the commitment offense supported a finding of unsuitability is not prevailing.

The Panel's finding that the commitment offense was committed in an especially heinous, atrocious or cruel manner within the meaning of Section 2281 is amply supported by the evidence.

There were multiple victims. The motive for the crime, that Petitioner needed money because he was living beyond his means, was trivial. The taped message played to the victims, in which the female victim was threatened with rape, and both victims were threatened with death, demonstrated an exceptionally callous disregard for human suffering. There is also ample reason to believe that the commitment offense was carried out in a dispassionate and calculated manner.

The violence and viciousness of the commitment offense also exceeded that minimally necessary to convict Petitioner. For example, as set forth in the probation report, while holding the victims captive, after subjecting the victims to the chilling tape, the Petitioner reiterated the threats to kill both victims and to rape the female victim. The egregiousness of the commitment offense is exacerbated by Petitioner's flight from Crocker Bank in which the Petitioner, while still holding Mr. Reily hostage, engaged the police in a pursuit, lost control of the victims' vehicle, crashed into a fence, pushed the gun into Mr. Reily's ribs, grabbed Mr. Reily around the neck, put the gun beside Mr. Reily's ear, dragged Mr. Reily 40 to 50 feet, and continued to hold the gun to Mr. Reily's head as the two were surrounded by the police, notwithstanding the police commands to drop the gun.

The court recognizes that some appellate court decisions require "some evidence" that the inmate will present an unreasonable risk to public safety if released from prison whereas other decisions suggest that there need only be "some evidence" of the regulatory factors which contraindicate parole suitability. See <u>In re Lee</u> (2006) 143 Cal. App. 4th 1400.

It is not for this court to resolve this legal uncertainty. Because Petitioner's commitment offense was for financial gain, premeditated, and not committed as the result of significant stress in Petitioner's life, the commitment offense does provide some evidence that the Petitioner would present an unreasonable risk to public safety if released from prison. The Panel could properly assess that Petitioner's uncertain parole plans, with their attendant financial uncertainty, exacerbated the risk to public safety.

    The Panel's decision reflects an individualized consideration of the relevant factors. As noted above, the Panel commended the Petitioner on his numerous gains and exemplary institutional record. While the Panel's exercise of its discretion did not favor Petitioner, it did not violate due process.

    The Petition is denied.

DATED: 6-5-07

_____
Judge of the Superior Court

cc: Petitioner
Docket 26837

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF CONTRA COSTA

PEOPLE OF THE STATE OF CALIFORNIA

CASE NO. 05-070053-4

VS.

Jerry L. Sullivan,
    Defendant



FILED
JUN 05 2007
SUPERIOR COURT
By _____
Deputy Clerk

CERTIFICATE OF MAILING

I, the undersigned, certify under penalty of perjury that I am a citizen of the United States, over 18 years of age, employed in Contra Costa County, and not a party to the within action; that my business address is Court House, Martinez, California; that I served the attached Notice, Order or Paper by causing to be placed a true copy thereof in an envelope addressed to the parties or attorneys for the parties, as shown below; which envelope was then sealed and postage fully prepaid thereon, and thereafter was deposited in the United States Mail at Martinez, California, on the date shown below; that there is delivery service by the United States Mail between the place of mailing and the place so addressed.

Jerry Sullivan C66878
San Quentin State Prison 3-N-17
San Quentin, CA 94964

I declare under penalty of perjury that the foregoing is true and correct. Executed at Martinez, California on June 5, 2007.

CLERK OF THE SUPERIOR COURT

*A. Williams* (signature)

A. Williams