# EXHIBIT 8
# part 1 of 2

MC-275

Name    JERRY L. SULLIVAN

Address    SAN QUENTIN STATE PRISON 3-N- 17

SAN QUENTIN, CA  94964

**FILED**

CDC or ID Number    C-66878    **DIVISION FOUR**

JUN 1 3 2007

Court of Appeal - First App. Dist.
By DIANA HERBERT
DEPUTY

CALIFORNIA COURT OF APPEALS

FIRST APPELLATE DISTRICT
*(Court)*

PETITION FOR WRIT OF HABEAS CORPUS

| JERRY L. SULLIVAN | |
|---|---|
| Petitioner | No. _____ |
| vs. | *(To be supplied by the Clerk of the Court)* |
| ROBERT AYERS JR. | |
| Respondent | |

**A118064**

## INSTRUCTIONS – READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

6.  GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED PAGES

_____

_____

_____

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel, you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED PAGES

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED PAGES

_____

_____

_____

8.   Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☒ No. If yes, give the following information:

a.   Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

b.   Result: _____   c.   Date of decision: _____

d.   Case number or citation of opinion, if known: _____

e.   Issues raised: (1) _____

(2) _____

(3) _____

f.   Were you represented by counsel on appeal? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_____

9.   Did you seek review in the California Supreme Court? ☐ Yes. ☐ No. If yes, give the following information:

a.   Result: _____   b.   Date of decision: _____

c.   Case number or citation of opinion, if known: _____

d.   Issues raised: (1) _____

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_____

_____

11. Administrative Review:

a.   If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

N/A _____

_____

_____

_____

_____

_____

_____

b.   Did you seek the highest level of administrative review available? ☐ Yes. ☒ No. NONE NEEDED
*Attach documents that show you have exhausted your administrative remedies.*

MC-275 [Rev. January 1, 1999]        **PETITION FOR WRIT OF HABEAS CORPUS**        Page five of six

I.

**THE BOARD OF PAROLE HEARINGS (BOARD) VIOLATED
PETITIONER'S STATE AND FEDERAL DUE PROCESS WHEN IT
FAILED TO CONSIDER RELEVANT AND RELIABLE INFORMATION
FAVORABLE TO PETITIONER'S SUITABILITY; AND RATHER
MADE AN ARBITRARY AND CAPRICIOUS DECISION TO DENY
PETITIONER PAROLE BASED ON THE NATURE AND CIRCUMSTANCES
OF PETITIONER'S CRIME WITHOUT "SOME EVIDENCE"**

Petitioner submits that the Board of parole Hearings

(Board) made an arbitrary and capricious decision to deny

Petitioner at his July 21, 2006 hearing, because the record

did not contain any evidence that the Petitioner presently

poses a danger to society. Furthermore the panel violated

Petitioner's due process rights by failing to consider all

relevant and reliable information demonstrating Petitioner's

parole suitability and lack of dangerousness, including the

mitigating circumstances of his crime. At the 2006 hearing,

the Board denied Petitioner a parole date stating:

> "However, we have reviewed all the information
> received from the public and relied on the
> following circumstances in concluding that the
> prisoner is not suitable for parole and would
> pose an unreasonable risk of danger to society
> or a threat to public safety if released from
> prison .. It was calculated. It was especially
> cruel and it did create human suffering... And
> a gun was used which created an especially --
> disregard for human suffering.... The gun was,
> in fact, pointed at Mr. Reily's head which, to
> me wold make an especially callous disregard
> for human suffering.. . The motive for this
> crime was very trivial in relation to the
> offense in that those people are traumatized
> now because you needed money because you were
> living beyond your means."

(Exhibit "A" p. 90-91).

The Board found Petitioner would pose an unreasonable

risk of danger to society or a threat to public safety if

released from The panel drew this conclusion primarily from

1

the nature and circumstances of Petitioner's commitment offense, finding three out of the five factors, comprising an "especially heinous atrocious, or cruel" crime as identified in the California Code of Regulation Title 15 (CCR Title 15) § 2281 (c) "Circumstances Tending to Show Unsuitability", subsections (1), (B), (D), and (E), which state as follows:

> (1). "Commitment Offense. The Prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

> (B). The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

> (D). The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

> (E). The motive for the crime is inexplicable or very trivial in relation to the offense."

The Board especially relied on factors subsections (B), (D), and (E) section (c) (1). The Board described the crime as "calculated", and that the crime was carried out with "an especially callous disregard for human suffering because Petitioner and co-defendant "made an appointment with the [victims]... [they] had already calculated that [they] were going to kidnap them for the purpose of money for ransom", (15 CCR § 2281 (c) (1) (D)) and that "the motive for the crime was very trivial in relation to the offense" (15 CCR § 2281 (c) (1) (E)). As will be shown below none of these claims were supported by any evidence, nor "some evidence" in the record.[1]

---

1. See also Exhibits "B" and "C" for record of the crime.

2

### A. Petitioner's crime was not carried out in a dispassionate and calculated manner.

First, the Board claims that the crime was "calculated" because when /Petitioner and co-defendant "made an appointment with the [victims]... [they] had already calculated that [they] were going to kidnap them for the purpose of money for ransom" Exhibit "A" p. 91, § (15 CRR §2281 (c) (1) (B). However, in light of the recent decision in In re Elkins, (2006) Cal. (First Appellate District, filed 10/30/06, Case No. A111925), the record demonstrates that the crime was not so "calculated" that it would prohibit parole. Petitioner and his co-defendant did kidnap the victims for the purpose of money for ransom. However, by presiding commissioner's own admission Petitioner had a stable social and work history and was able to "maintain up until the such time that [he] did." Exhibit "A" p. 92 This fact has substantial support in the record. Petitioner was twenty nine years old ad had no criminal record prior to meeting co-defendant and had supported himself as a roofer and tree trimmer. Unfortunately, Petitioner was drinking heavily and having financial problems when he first came in to contact with co-defendant (Exhibit "A" p.22). Co-defendant informed Petitioner that he had a way for him to make some "quick money" and influenced by his current life stressors - e.g. financial and alcohol problems Petitioner was unwisely excepted the offer. Exhibit "A" p.18

There is no evidence in the record that shows that Petitioner planned out this crime. Although Petitioner does

3

not deny the seriousness of his role in the crime, if falls
short of being quite calculated." Petitioner was naive and
ignorant to the workings of the criminal world and failed to
recognize the gravity of such an offense is kidnapping.
Exhibit "A" p. 19 A calculated crime is one which involves
premeditation. In re George Scott,119 Cal.App 4th 871 890
(2004) Premeditation is defied as "Conscious consideration
and planning that proceeds some act (such as committing a
crime)" or "deliberation before a contemplated act." Black
law Dictionary, Sixth Edition 1990. To the categorize
Petitioner's role in this crime as "quite calculated, would
require that Petitioner planned out the crime or, at the
very least, sought out the victims. There is no evidence in
the record to suggest that either of the aforementioned
occurred.

Furthermore even if one excepts Commissioner Biggers
conflicting determination of Petitioner's role in the
kidnapping, it would still constitute an unchanging factor
of the crime, and it would not be supported by "some
vidence" pertinent to "relevant standard" promulgated by
Board of Parole Hearings to comply with constitutional due
process (In re Rosenkrantz, 29 Cal.4th at p. 657-658,
675-677). This is a classic case where, putting aside the
commitment offense "all other factors clearly indicate
[Petitioner] is suitable for release on parole." (Scott II,
supra at 594) In Biggs, the Ninth Circuit explained that
"[a] continued reliance in the future on an unchanging
factor,, the circumstances of the offense and conduct prior

4

to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in due rocess violation." (Biggs, 334 F.3d at 917.)

Thus, the record clearly shows Petitioner's role in this crime was not one of a sophisticated criminal master mind, but one of an average citizen who's financial problems and "abuse of alcohol continued to the overall lack of judgement and erosion of the values with which he was raised." Exhibit "A" p. 93. Upon consideration of this extensive evidence, it is quite clear Petitioner's rule in this crime could not be even remotely calculated. The Board erroneously characterized Petitioner's crime as "calculated" by failing to consider, eve there own suggestion, which demonstrates that the crime was not "calculated" at all.

**B.  Petitioner's crime was not carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.**

Contrary to the panel's conclusion that the crime showed an "especially cruel... [and] callous disregard for human suffering." the record does not show that Petitioner's involvement in the crime was exceptionally callous. Had the Board truly considered the relevant facts of Petitioner's case, it could not have drawn the conclusion that Petitioner's crime was exceptionally callous. First, commissioner Biggers characterizes Petitioner's crime as "especially callous." because a gun was used and pointed at the head of the victim. Biggers gives no other explanation as to why Petitioner's crime was "especially callous." The commissioner simply states "imagine the trauma you put these

5

people through the fact that you put a gun to their head."
Exhibit "A" p.91 Perhaps it is Commissioner Biggers belief
that he can simply speak his own facts of the crime into
existence. Petitioner does not deny the fact that his
victims were traumatized. Petitioner does not deny the fact
that his victims were traumatized. However, Petitioner's
commitment offense does not meet the 'particularly egregious
standard' as set forth by Rosenkrantz. Of course the victims
were traumatized, they were kidnapped for ransom by gun
point and had threats of injury and death made to them if
they did not comply. The threats of violence cannot support
unsuitability because kidnap for robbery always involves
either physical force or threats instilling fear and, thus
such threats are no more than what is minimally necessary
part of the crime. In order to demonstrate an "exceptionally
callous disregard for human suffering" the crime must have
been committed in a more aggravated or violent manner than
that ordinarily shown..." CCR Title 15 § 2282 Subd. (b) sets
forth examples of aggravated conduct reflecting an
exceptionally callous disregard for human suffering." (See
also In re Scott, 119 Cal.App.4th at 892.) These examples
include "torture" where the [V]ictim was subjected to the
prolonged infliction of physical pain through the use of
no-deadly force prior to [the] act resulting in death" and
severe trauma" as where "[d]eath resulted from severe trauma
inflicted with deadly intensity; e.g. beating, clubbing,
stabbing, strangulation, suffocation, burning, multiple
wounds inflicted with a weapon not resulting in immediate

6

death or actions calculated to induce terror in the victim."
None of these factors were present in Petitioner's crime.
Moreover, in order to support a parole denial, the Board
"must cite "some evidence" of aggravating facts beyond the
minimum elements of the offense.' In re Dannenberg, 34
Cal.4th at 1095 (citing Rosenkrantz). The facts of
Petitioner's crime which were discussed above do not contain
the type of violence or viciousness contemplated by § 2282
(b) that would covert Petitioner's crime into a
"particularly egregious" offense. In fact the Board lacks
any evidence of aggravating facts beyond the minimum
elements of the crime to support its parole denial. Id. By
these standards all crimes committed with a gun could be
considered "especially callous" and every "lifer" prisoner
convicted of using a gun in their case would have o hope of
ever getting out.

    Furthermore, according to the Board's own matrix
guidelines for setting terms, CCR 15 section 22833 (c),
Petitioner has served as much time, with custody credit, as
the time in the matrix for kidnap/first degree murder and
"[I]t should be self evident that after an inmate has served
the equivalent of 25 years whether his actions were more
than minimal necessary for a [kidnapping] conviction... is
no longer the appropriate question. [The Board's] position
that inmates who were only convicted of [kidnapping] may
forever be denied parole based on some modicum of evidence
that their acts rose to the level of a first degree murder,
without acknowledging the fact that they have already served

7

the time for a first, should be seen as so ridiculous that simply to state it is to refute it." <u>In re Bernard John Weider</u>, 2006 DJDAR 15795 at 15798.

### C. Petitioner's motive for the crime was not very trivial in relation to the offense.

The Board characterized Petitioner's crime as "very trivial because Petitioner committed the crime simply because he "needed money [and] was living beyond [his means]. Exhibit "A" p. 91 Commissioner Bigger goes on to state that Petitioner's crime is "even more trivial" because Petitioner had a full time job when he committed the offense which is a standard that Petitioner is unfamiliar with. It is improper for the Board to have relied on the factor of triviality of the motive in relation to Petitioner's offense – the crime having been committed to obtain money– because material gain is always the motive for Kidnap Robbery. To obtain money, is not, in and of itself, trivial in relation to the Petitioner's offense, such that the offense can be said to have been committed in an "especially heincus, atrocious or cruel manner." (CCR Title 15 § 2281 subd. (c) (1).) This motive therefore does not elevate Petitioner's actions beyond what is minimally necessary to sustain a conviction for this offense.

### D. Petitioner Does not "pose a Current Threat to Public Safety."

The parole process by its nature looks to the current condition of the prisoner to determine the present risk of danger he or she poses. It is a dynamic process meant to protect the public from potentially dangerous criminals by

assessing potential parolees' continual progress and **current** psychological and mental health and propensity for violent behavior. In the instant cause of action commissioner Star read into the record a psychological evaluation conducted by Dr. Inaba, a Licensed Psychologist, who found the following diagnosis:

> "The factors that would come into play to determine risk would be lack of insight, negative attitudes, lack of mental ill -- illness, or failure at treatment wold be considered as possible sources of increased risk. But on -- based on review of Mr. Sullivan's present institutional record and clinical interview conducted for this report it would appear that none of these risk factors is currently present."

Exhibit "A" p. 62. Exhibit "D" p. 3-4. Dr. Inaba further states:

> "Mr. Sullivan's age, commitment to on going substance abuse treatment, and limited criminal history, he would be expected to be able to continue to live a positive, nonviolent life when released to the community."

(Exhibit "A" p. 63. Exhibit "D" p. 4)

Furthermore, the Board also found factors favorable to Petitioner being suitable for parole, stating the following:

> "The Panel took notice that you had no previous history of -- and this is your -- this offense was your first time being involved... I think that -- I don't think your history was that bad. I don't think it was unstable because you did have a job,... Your institutional behavior has be -- I would say pretty close to being exceptional. You've had no 115's. You've had no 128's. ad that's remarkable...That every -- year you come in here you seem to have increased yourself even more and you should be -- and you will be commended for that at -- at a later time... But -- and the last statement that I want to quote directly from the psychiatrist report, it's also -- and she's stating and I said quote "he's also clear about his remorse for his actions and his willingness to continue his participation in self-help and rehabilitation activities." <u>And bottom-line that's an indication to us that you will be a low risk on the outside.</u>"

The Board clearly contradicts itself by making the above stated positive findings, after stating that Petitioner is a threat to public safety. It is a clear indication that the Board's decision was not based on "some evidence" in the record and was rather an arbitrary and capricious decision.

**CONTENTION**

**II.**

**THE SUPERIOR COURT VIOLATED PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS WHEN IT MADE AN UNREASONABLE DETERMINATION OF LAW AND FACTS, REGARDING THE BOARD'S DENIAL OF PETITIONER'S SUITABILITY FOR PAROLE**

The Superior Court made an unreasonable determination of the law and the facts. The Superior Court stated that it "recognizes that some appellate court decisions require "some evidence" that the inmate will present an un reasonable risk to public safety from prison whereas other decision suggest that there need only be "some evidence" of the regulatory factors which contraindicate parole suitability." Exhibit "D" The Superior Court is incorrect, the Appellate Courts have applied the state constitution's due process "some evidence" standard as declared by the California Supreme Court In re Rosenkrantz, (2002) 29 Cal.App.4th, 616, 667.

The Superior Court relied on factors that do not equate with Petitioner being an unreasonable risk of danger to society. The Second Appellate District gave an example in f. 3 of its order stating:

> For example, a seriously troubled adolescence, even for an 80-year-old inmate, might constitute "some evidence" of "a history of unstable or tumultuous relationships with others." (Cal.Code Regs., tit 15, 2402, subd. (3)) It would not necessarily be

10

some evidence of an unreasonable danger to public safety.

(In re Wen Lee (2006) 143 Cal.App.4th 1400 1408 fn.3)

The Superior Court as the Board found Petitioner's record exhibited all positive factors. Petitioner also has consistently had realistic goals for parole. Denial of parole is not to be based on whether a prisoner has a place to stay or job offer. Rather a prisoner must have realistic goals for parole. Viable skills for employment (which Petitioner has), and family support and a place to stay. After about 25 years of incarceration, a prisoner would be really fortunate to have any family support whatsoever.

### CONCLUSION

The Legislative intent in parole consideration hearings according to California Penal Code 3041 (a), (b) is perfectly plain. The setting of parole "shall normally" be set at the initial parole consideration hearing 13 months before the prisoner is eligible for parole. Such a statute cannot be enlarged by judicial interpretation; there is no room for construction. It cannot be twisted, turned, lengthened or shortened to meet the exigencies of each particular case. If it is to be effective, all interested person must understand that it means what it says. A parole date is to normally be set, not normally be denied.

Petitioner has been to the Board for parole consideration over ten times, yet he is continuously being denied parole Petitioner did not even kill anyone. Furthermore, and even after he has consistently met all the Board's requirements year after

11

year.

For the reasons stated above, this Court should grant petition for writ of habeas corpus and order Petitioner released forthwith. The Court should order the Board to follow its own rules which state "If any custody credits remains after deducting it from the offense to which it applies the remaining credits shall be deducted from the parole period." (Cal.Code of Regs. Titl 15 § 2345.)


Dated this _11_, of June 2007.


Jerry L. Sullivan
**In Pro Se**

12

EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )    CDC Number C-66878
Hearing of:                )
                           )
JERRY LEE SULLIVAN         )
_____)

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

JULY 21, 2006

PANEL PRESENT:

Mr. Archie Joe Biggers, Presiding Commissioner
Ms. Deborah Star, Deputy Commissioner

OTHERS PRESENT:

Mr. Jerry Lee Sullivan, Inmate
Mr. John Stringer, Attorney for Inmate
Mr. Jack Waddell, Deputy District Attorney
Ms. Celeste Hernandez-Gerety, Attorney
Ms. Sonya Gonzales, Observer
Mr. Dave Hymas, Attorney
Correctional Officer, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No        See Review of Hearing
_____  Yes       Transcript Memorandum

INMATE
COPY

Tracy Richardson        Vine, McKinnon & Hall

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 9 |
| Case Factors | 12 |
| Pre-Commitment Factors | 46 |
| Post-Commitment Factors | 53 |
| Parole Plans | 63 |
| Closing Statements | 77 |
| Recess | 89 |
| Decision | 90 |
| Adjournment | 98 |
| Transcriber Certification | 99 |

--oOo--

1

# P R O C E E D I N G S

1

2      **DEPUTY COMMISSIONER STAR:**  We're on record.

3      **PRESIDING COMMISSIONER BIGGERS:**  Okay, this is a

4  Subsequent Parole Consideration Hearing for Jerry Lee

5  Sullivan, S-U-L-L-I-V-A-N, CDC number C-66878.  Today's

6  date is July the 21st, 2006, and we're located at the San

7  Quentin Prison.  San Quentin State Prison, excuse me.

8  The inmate was received on May the 31st, 1983, from

9  Contra -- Contra Costa County.  The life term began on

10  June the 1st, 1986, and the minimum eligible parole date

11  was June the 1st, 1993.  The controlling offense which

12  the inmate has been committed for is violation of Penal

13  Code 209(b)/187/664.  Case number is C-C, that's Charlie,

14  Charlie -- 26837.  There were also some additional

15  counts.  There was a Count Two -- excuse me, those counts

16  that I just mentioned under P209 and 187/664 was Counts

17  and One and Five.  The additional Counts were Count Two

18  was Kidnap for Robbery which, was a violation of -- of

19  PC209(b) same case number and that offense was not

20  stayed.  The Robbery which was a violation of Penal Code

21  PC211, same case number, was Count Three was -- was, in

22  fact, stayed.  The Use of a Weapon which was a P12022.5,

23  same case number, Count Three was stayed.  The -- there

24  was -- a Count Four was a violation of P211 Robbery, same

25  case number, and that was stayed.  The Use of a Firearm

26  in Count Four, which was a violation of the P -- of Penal

27  Code 12022.5, same case number, was also stayed.  And

2

1    then we had an Aggravated Assault, which was a violation

2    of Penal Code 245, same case number, in count five and

3    also the Use of a Firearm, P12055.5 in same case number

4    in Count Five.  Both of those were stayed as well.  The

5    inmate received a term of seven to life plus seven years.

6    And, as I said earlier, the minimum eligible parole date

7    was June the 1st, 1993.  Now, this hearing is being tape-

8    recorded and for the purpose of voice identification each

9    of us will state our first and last name, spelling our

10   last name.  When it's your turn, Mr. Sullivan, after

11   spelling your last name, please give us your CDC number.

12   I will start and move to my left.  We'll go around the

13   room and then we'll come back over to our observers.  My

14   name is Archie Joe Biggers, B-I-G-G-E-R-S, and I'm a

15   Commissioner with the Board of Parole Hearings.

16         **DEPUTY COMMISSIONER STAR:**  Deborah Star, S-T-A-R,

17   Deputy Commissioner, Board of Parole Hearings.

18         **DEPUTY DISTRICT ATTORNEY WADDELL:**  My name is

19   Jack Waddell, W-A-D-D-E-L-L, Deputy District Attorney of

20   Contra Costa County.

21         **ATTORNEY STRINGER:**  John Stringer, S-T-R-I-N-G-E-

22   R, Attorney.

23         **INMATE SULLIVAN:**  My name is Jerry Sullivan, C-

24   66878.

25         **PRESIDING COMMISSIONER BIGGERS:**  Spell your last

26   name.  Spell your last name, please.

27         **INMATE SULLIVAN:**  Sullivan, S-U-L-L-I-V-A-N.

3

1        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.

2        **MS. HERNANDEZ-GERETY:**  Celeste Hernandez-Gerety,

3   H-E-R-N-A-N-D-E-Z -- G-E-R-E-T-Y.   I'm a summer associate

4   at Morrison and Forester.

5        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

6        **MS. GONZALES:**  My name is Sonya Gonzales, G-O-N-

7   Z-A-L-E-S, observer.

8        **MR. HYMAS:**  My name is Dave Hymas.   I'm an

9   attorney at Morrison and Forester.   Last name is

10  H-Y-M-A-S.

11       **PRESIDING COMMISSIONER BIGGERS:**  Okay, thank you.

12  Thank you very much.   In front of you there, Mr.

13  Sullivan, you have an ADA statement.   Would you please

14  read that out loud for us?

15       **INMATE SULLIVAN:**  The ADA statement.   "The

16          Americans Disabilities, ADA, is a law

17          to help people with disabilities.

18          Disabilities are problems that make

19          it harder for some people to see,

20          hear, breath, talk, walk, learn,

21          think, work - work, or take care of

22          themselves than it is for others.

23          Nobody can be kept out of public

24          places or activities because of a

25          disability."

26       **PRESIDING COMMISSIONER BIGGERS:**  Keep your voice

27  up, please, sir, because we're taping this.

4

1      **INMATE SULLIVAN:**  "If you -- if you have

2           a disability you have the right to ask

3           for help to get ready for your BPT

4           hearing, get to the hearing, talk, read

5           forms and papers, and understand the

6           hearing process.  BPT will look at what

7           you ask for to make sure that you have

8           a disability that is covered by the ADA

9           and that you have asked for the right

10          kind of help.  If you do not get help

11          or if you don't think you got the kind

12          of help you need, ask for a BPT 1044 -"

13      **PRESIDING COMMISSIONER BIGGERS:**  1074.

14      **INMATE SULLIVAN:**  1074 -- what kind of form it

15  is?

16      **PRESIDING COMMISSIONER BIGGERS:**  1074.

17      **INMATE SULLIVAN:**  "1074 Grievance Form.  You can

18  also get help to file it out -- to fill it out."

19      **PRESIDING COMMISSIONER BIGGERS:**  Okay, what does

20  that mean to you in your own words?

21      **INMATE SULLIVAN:**  Well, what that means to me is

22  a person that don't understand how to read or write to

23  understand what's being said they can --

24      **PRESIDING COMMISSIONER BIGGERS:**  Actually, it's

25  mental health issues.  You know, I'm sorry, what it --

26  what it means is if you got an ADA problem, such as

27  seeing, hearing, not being able to get here mobile, you

5

1   know, whatever, then we have to make accommodations for

2   you to ensure that you get the help that you need.  If we

3   don't do that then that's why you can form -- you can

4   fill the -- the 1074 saying that this was not affording

5   you the opportunity to do that.  You understand that?

6           INMATE SULLIVAN:  I understand.

7           PRESIDING COMMISSIONER BIGGERS:  Okay.  I see

8   here that on -- that you -- you signed a form 1073 on

9   April the 20th, 2006, indicating that you had no ADA

10  issues.  Is that correct?

11          INMATE SULLIVAN:  No, I don't.  I -- I don't

12  think there's nothing.

13          PRESIDING COMMISSIONER BIGGERS:  Okay.  So the

14  information that you -- when you signed it -- you signed

15  it on April the 20th indicating you didn't have any so is

16  -- is -- is that information still correct?

17          INMATE SULLIVAN:  Yeah.

18          PRESIDING COMMISSIONER BIGGERS:  Okay.  I see

19  you're wearing glasses, though.

20          INMATE SULLIVAN:  Well, I can, you know, I got

21  glasses problems.

22          PRESIDING COMMISSIONER BIGGERS:  Yeah, but do --

23          INMATE SULLIVAN:  But --

24          PRESIDING COMMISSIONER BIGGERS:  Let me finish

25  now.

26          INMATE SULLIVAN:  Okay, all right.

27          PRESIDING COMMISSIONER BIGGERS:  You're in such a

1   hurry.  Are you getting nervous or something?

2          **INMATE SULLIVAN:**  No, I'm not -- I'm not --

3          **PRESIDING COMMISSIONER BIGGERS:**  Relax.

4          **INMATE SULLIVAN:**  - in a hurry.

5          **PRESIDING COMMISSIONER BIGGERS:**  All right.

6   Okay.  Those are reading glasses I assume?

7          **INMATE SULLIVAN:**  Right.

8          **PRESIDING COMMISSIONER BIGGERS:**  Okay, did you

9   have them on when you reviewed your C-File?

10         **INMATE SULLIVAN:**  Yes.

11         **PRESIDING COMMISSIONER BIGGERS:**  You did --

12         **INMATE SULLIVAN:**  Those are reading glasses.  I -

13  - I need them to see, too.

14         **PRESIDING COMMISSIONER BIGGERS:**  Well, I would

15  hope so.

16         **INMATE SULLIVAN:**  But, you know.

17         **PRESIDING COMMISSIONER BIGGERS:**  I want to make

18  sure that you, in fact, used those glasses during the

19  time that you were using your C -- reading your C-File.

20  But if you need them to see, if you got your C-File in

21  front of you without your glasses on, it's not doing you

22  any good, you're not reviewing it.  So did you have those

23  glasses on during the time that you were reading your C-

24  File?

25         **INMATE SULLIVAN:**  No, I don't think I did.

26         **PRESIDING COMMISSIONER BIGGERS:**  You didn't,

27  well, were you able to read your C-File without them?

7

1          INMATE SULLIVAN: Yes.

2          PRESIDING COMMISSIONER BIGGERS: You were? Okay.

3  So you don't need any help with a magnifying glass or

4  anything to help you read?

5          INMATE SULLIVAN: Well, my glasses -- well, my --

6  my eye's cut real bad, so I need the glasses.

7          PRESIDING COMMISSIONER BIGGERS: Okay.

8          INMATE SULLIVAN: To see.

9          PRESIDING COMMISSIONER BIGGERS: All right.

10          INMATE SULLIVAN: But I don't really have to wear

11  them all the time.

12          PRESIDING COMMISSIONER BIGGERS: Okay.

13          INMATE SULLIVAN: When I --

14          PRESIDING COMMISSIONER BIGGERS: So you're

15  telling me that you -- you were able to read your C-File

16  without the glasses?

17          INMATE SULLIVAN: Right.

18          PRESIDING COMMISSIONER BIGGERS: Okay. Want to

19  be sure now. Trying to make sure your rights are, in

20  fact, not being violated.

21          INMATE SULLIVAN: I -- I don't think they're

22  being violated.

23          PRESIDING COMMISSIONER BIGGERS: Okay. Do you

24  have any hearing impairments?

25          INMATE SULLIVAN: No, I can hear pretty -- I hear

26  good.

27          PRESIDING COMMISSIONER BIGGERS: You ever been

8

1  involved in Triple CMS or EOP programs?

2  　　　　INMATE SULLIVAN:  No.

3  　　　　PRESIDING COMMISSIONER BIGGERS:  You know what

4  those are?

5  　　　　INMATE SULLIVAN:  For my -- if you have mental

6  problems?

7  　　　　PRESIDING COMMISSIONER BIGGERS:  No, with mental

8  health issues.

9  　　　　INMATE SULLIVAN:  Okay, yeah.

10  　　　　PRESIDING COMMISSIONER BIGGERS:  Mental health

11  issues.

12  　　　　INMATE SULLIVAN:  Okay.

13  　　　　PRESIDING COMMISSIONER BIGGERS:  So you don't

14  take any psychotropic medication either, do you?

15  　　　　INMATE SULLIVAN:  No.  I take high blood

16  pressure pills.

17  　　　　PRESIDING COMMISSIONER BIGGERS:  High blood

18  pressure pills, okay.

19  　　　　INMATE SULLIVAN:  That's just for my blood

20  pressure.

21  　　　　PRESIDING COMMISSIONER BIGGERS:  Do you suffer

22  from any disability that would prevent you from

23  participating in today's hearing?

24  　　　　INMATE SULLIVAN:  No.

25  　　　　PRESIDING COMMISSIONER BIGGERS:  Okay.  Counsel,

26  do you feel that your client's ADA rights have been met?

27  　　　　ATTORNEY STRINGER:  I do, Commissioner.  My

9

1    client can meaningfully participate in this hearing.  Any

2    event I'd stipulate on the reasonable accommodation under

3    Armstrong.

4        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.  One

5    other question before I begin, how far did you get in

6    school?

7        **INMATE SULLIVAN:**  Graduated.

8        **PRESIDING COMMISSIONER BIGGERS:**  Graduated.

9        **INMATE SULLIVAN:**  Twelfth grade.

10       **PRESIDING COMMISSIONER BIGGERS:**  Twelfth grade?

11       **INMATE SULLIVAN:**  Should be in the C-File.

12       **PRESIDING COMMISSIONER BIGGERS:**  I know, it

13   probably is.  I just want to make sure that -- okay.

14   This hearing is being conducted pursuant to Penal Code

15   Sections 3041 and 3042 and the rules and regulations of

16   the Board of Prison Terms governing parole consideration

17   hearings for life inmates.  The purpose of today's

18   hearing is to once again consider the number and the

19   nature of the offenses that you were committed for, your

20   prior criminal and social history, and your behavior and

21   programming since your commitment.  We've had the

22   opportunity to review your Central File and your prior

23   transcript and you will be given the opportunity to

24   correct or clarify the record.  We will reach a decision

25   today and inform you whether or not we find you suitable

26   for parole and the reason for our decision.  If you are

27   found suitable for parole, that length of your

10

1    confinement will be explained to you.  Nothing that

2    happens here today will change the findings of the court.

3    This Panel is not here to re-try your case.  The Panel's

4    here for the sole purpose of determining your suitability

5    for parole.  Do you understand this?

6              **INMATE SULLIVAN:**  Yes.

7              **PRESIDING COMMISSIONER BIGGERS:**  Excuse me?

8              **INMATE SULLIVAN:**  Yes.

9              **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Again,

10   you have to speak up because we're recording this.  I

11   will discuss with -- with you the crime for which you

12   were committed for, your prior criminal and social

13   history.  Deputy Commissioner Star will then discuss with

14   you your post-conviction factors to include your

15   psychological evaluation.  Then I will come back and talk

16   to you about parole plans and any letters in support or

17   opposition that may be in your file.  Once that is

18   concluded both Commissioners, the District Attorney, and

19   your attorney will be given the opportunity to ask you

20   questions.  Questions from the District Attorney shall be

21   asked through the Chair and you should direct your answer

22   to the Panel and not to the District Attorney.  Next, the

23   District Attorney, then your attorney, then you will be

24   given the opportunity to make a final statement regarding

25   your parole suitability.  That statement should address

26   why you feel you are suitable for parole.  The Panel will

27   then recess, clear the room and deliberate.  Once the

11

1    deliberations are complete the Panel will resume the

2    hearing and announce its decision.   Now, the California

3    Code of Regulations states that regardless of time

4    served, a life inmate shall be found unsuitable for and

5    denied parole if, in the judgment of the panel, the

6    inmate would pose an unreasonable risk of danger to

7    society if released from prison.   You have certain

8    rights.   Those rights include the right to a timely

9    notice of this hearing, the right to review your C-File,

10   which you indicated to me that you had reviewed your C-

11   File, and the right to present relevant documents.   I'm

12   going to ask your attorney if he feels your rights have

13   been met.

14          **ATTORNEY STRINGER:**   As to those rights, yes,

15   Commissioner.

16          **PRESIDING COMMISSIONER BIGGERS:**   Thank you.   You

17   have an additional right to be heard by an impartial

18   panel.   Do you have any objection to the Panel members?

19          **INMATE SULLIVAN:**   No.

20          **PRESIDING COMMISSIONER BIGGERS:**   Okay.   Do you,

21   Mr. Stringer?

22          **ATTORNEY STRINGER:**   I do not.

23          **PRESIDING COMMISSIONER BIGGERS:**   Thank you.   I'm

24   going to ask the Deputy Commissioner Star if any

25   confidential information -- material will be used.

26          **DEPUTY COMMISSIONER STAR:**   No.

27          **PRESIDING COMMISSIONER BIGGERS:**   Okay, thank you.

12

1    You should have a copy of a checklist but, I don't see --

2          **DEPUTY COMMISSIONER STAR:**  I have one on my file.

3          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

4          **DEPUTY COMMISSIONER STAR:**  Let me hand it to you.

5          **PRESIDING COMMISSIONER BIGGERS:**  I'm going to

6    pass a copy of the checklist, which I will mark as

7    Exhibit 1, to your attorney, as well as to the District

8    Attorney, to ensure that we're all working off the same

9    set of documents.

10          **ATTORNEY STRINGER:**  Defense has those documents,

11   Commissioner.

12          **PRESIDING COMMISSIONER BIGGERS:**  They sent this

13   back to us yesterday, too.

14          **DEPUTY COMMISSIONER STAR:**  Okay.

15          **DEPUTY DISTRICT ATTORNEY WADDELL:**  As do the

16   People.

17          **PRESIDING COMMISSIONER BIGGERS:**  All right.

18   Thank you both.  Are there any additional documents to be

19   submitted?

20          **ATTORNEY STRINGER:**  Not at this time,

21   Commissioner.  We would reserve the right to supplement

22   the record if the occasion arises.

23          **PRESIDING COMMISSIONER BIGGERS:**  Thank you.  Are

24   there any preliminary objections?

25          **ATTORNEY STRINGER:**  We are ready to proceed.

26          **PRESIDING COMMISSIONER BIGGERS:**  Thank you.  Will

27   the inmate be speaking to us today?

13

1     **ATTORNEY STRINGER:** Commissioner, this is his

2    tenth subsequent hearing. Actually, it is his 11th

3    hearing. It would be my inclination to invoke Penal Code

4    Section 5011(b). However, Mr. Sullivan has indicated to

5    me he wants to respond to all questions of the Panel.

6     **PRESIDING COMMISSIONER BIGGERS:** Okay. Is that

7    correct, Mr. Sullivan?

8     **INMATE SULLIVAN:** Yes.

9     **PRESIDING COMMISSIONER BIGGERS:** Okay, for the

10    record then, I'm going to read into the record from the

11    Board report a summary of the crime.

12             "Jerry Sullivan and co-defendant

13             William Buford, B-U-F-O-R-D, made an

14             appointment with -- with William Reily

15             -- Reily, R-E-I-L-Y, a Reily relative,

16             to be shown a home that Reily had

17             listed. The meeting was to take place

18             in the -- at the home which is located

19             in the town of Tracy, California, on

20             the next day July the 2nd at 10 a.m. On

21             the morning of July the 2nd around 9

22             a.m., an unidentified person called Mr.

23             Reily and cancelled the appointment for

24             10 a.m. However, this same individual

25             telephoned later the same afternoon and

26             arranged to be at the property at 2

27             p.m. the same afternoon. Sullivan and

14

1    a companion arrived for the appointment

2    in a car driven by a third unidentified

3    person.  Mr. and Mrs. Reily met them

4    and showed them the house.  After

5    approximately 20 minutes, Sullivan and

6    his companion left the home and the

7    Reily's began to lock up the house.  As

8    they were exiting the back of the house

9    Sullivan and his companion approached

10   and separated the Reily's.  Sullivan's

11   companion directed Mrs. Reily into the

12   -- the Reily car.  He told the third

13   person, the unidentified driver of the

14   vehicle in which they had arrived, to

15   leave.  Sullivan told the Reily's that

16   he had a gun and would use it so as to

17   in -- ensure they - their compliance.

18   Sullivan directed Mrs. Reily into the

19   car.  They drove to the Reily home in

20   Walnut Creek.  Once there, a pre-

21   recorded message demanded that the

22   Reily's give them $150,000 was played.

23   The message also indicated threats to

24   rape and murder Mrs. Reily and -- and

25   then kill Mr. Reily if they did not

26   cooperate.  The Reily's explained that

27   they did not have the kind -- that kind

15

1    of money and eventually Sullivan and

2    his companion decided to take the

3    Reily's to their bank and withdraw as

4    much money as they could.  The Reily's

5    were driven to their bank and Mrs.

6    Reily was instructed to enter the bank

7    and make a withdrawal of all the money

8    she could access.  Mr. Reily was to be

9    held hostage until she returned with

10   the money.  She was to be picked up in

11   front of the bank and – when she had

12   finished the transaction.  Mrs. Reily

13   went to a teller and withdrew money

14   from her account and was able to give

15   the teller a note explaining what was

16   going on and asked to have the police

17   called.  Officers arrived and verified

18   the situation.  As the backup officers

19   were called, Sullivan and his companion

20   made the decision to leave.  As they

21   tried to leave a police unit made an

22   attempt to stop the car and a pursuit

23   ensured -- ensued.  It ended when

24   Sullivan lost control of the car and

25   crashed into a fence.  Mr. Reily later

26   stated after the car crashed, Sullivan

27   fell on top of him and a struggle for

16

1        the gun occurred.  Mr. Reily said

2        Sullivan stuck the gun into his ribs

3        and pulled the trigger but the gun did

4        not fire.  Sullivan pulled Reily out of

5        the car at gunpoint and tried to make a

6        getaway.  As they went through some

7        brushes, they both fell and were

8        immediately surrounded by police

9        officers.  Sullivan was taken under

10       arrest."

11 Is that pretty well what happened, Mr. Sullivan?

12       INMATE SULLIVAN:  Yes, sir.

13       PRESIDING COMMISSIONER BIGGERS:  Okay.  You know,

14 you could've been in deeper trouble if that gun had gone

15 off.  Is that correct?

16       INMATE SULLIVAN:  Yes.

17       PRESIDING COMMISSIONER BIGGERS:  What made you

18 pick out the -- this -- this couple to commit this

19 offense?

20       INMATE SULLIVAN:  Well, I didn't pick this couple

21 out.

22       PRESIDING COMMISSIONER BIGGERS:  Okay.  Tell me

23 how -- how did -- how -- well, how did they get involved?

24       INMATE SULLIVAN:  Well, the third party, they

25 picked this couple out.

26       PRESIDING COMMISSIONER BIGGERS:  A third party?

27       INMATE SULLIVAN:  Yeah.

17

1      **PRESIDING COMMISSIONER BIGGERS:** Who was the

2  third party?

3      **INMATE SULLIVAN:** This guy, his name was Davis.

4      **PRESIDING COMMISSIONER BIGGERS:** Okay. Did he

5  get any time?

6      **INMATE SULLIVAN:** I'm sure he's in jail right

7  now.

8      **PRESIDING COMMISSIONER BIGGERS:** In jail right

9  now. Well, how'd you get involved?

10      **INMATE SULLIVAN:** Well, I met Mr. Davis at -- at

11  a furniture store.

12      **PRESIDING COMMISSIONER BIGGERS:** Okay.

13      **INMATE SULLIVAN:** I was buying some furniture for

14  an apartment I just moved in and me and my mom went there

15  looking for furniture. That's where I met Mr. Davis.

16      **PRESIDING COMMISSIONER BIGGERS:** Well, when did

17  this guy start talking to you about kidnapping some

18  people for money?

19      **INMATE SULLIVAN:** Maybe about -- maybe about two

20  or three weeks later.

21      **PRESIDING COMMISSIONER BIGGERS:** Two or three

22  what?

23      **INMATE SULLIVAN:** Two or three weeks later.

24      **PRESIDING COMMISSIONER BIGGERS:** Two or three

25  weeks later. You met him at a furniture store. You all

26  exchanged phone numbers or something?

27      **INMATE SULLIVAN:** I met him at a furniture store

18

1    -- how it all started, I met him at the furniture store

2    when me and my mom -- we went there looking for furniture

3    and this guy was the furniture salesman. So I go there

4    and he tells me I can't get the furniture. I need a co-

5    signer and I need some other kind of stuff. So -- so at

6    this time, I feel like the guy was going to help me get

7    the furniture. That's how I met the guy. So, eventually

8    I got the furniture. Some -- somebody gave -- eventually

9    I got the furniture. So after that I seen the guy maybe

10    about two or three weeks later. I was working, he almost

11    flagged me down. So after that I met him later on that

12    night. And we met a couple more times. And this guy

13    asked me to -- you want -- how -- do you want to make

14    some quick money? I said sure. That's how I got

15    involved.

16    PRESIDING COMMISSIONER BIGGERS: Okay, but when

17    he -- when he explained to you about making this quick

18    money, did he explain to you the fact that it was going

19    to be involving kidnapping some people and then holding

20    them for ransom?

21    INMATE SULLIVAN: No, he didn't tell me that.

22    PRESIDING COMMISSIONER BIGGERS: Okay. When did

23    he -- when did you eventually find out about that?

24    INMATE SULLIVAN: We met maybe about two days

25    prior to that --

26    PRESIDING COMMISSIONER BIGGERS: Okay.

27    INMATE SULLIVAN: -- and we rode around talking

19

1    about we might kidnapping somebody.  And I really didn't

2    really trip on it that much cause he said it wouldn't no

3    more than about 30 minutes.  So, you know, it -- it

4    really didn't dawn on me how serious it was.

5         PRESIDING COMMISSIONER BIGGERS:  Well, the fact

6    that you're going to kidnap somebody is going to be

7    serious, you know.

8         INMATE SULLIVAN:  Well, to me it -- it wasn't

9    like a kidnap.  I didn't, you know, I --

10        PRESIDING COMMISSIONER BIGGERS:  All right, all

11   right.  You're going to have to clarify that for me.

12        INMATE SULLIVAN:  Okay, how can I explain this?

13   Well, the guy said that we could make some quick, easy

14   money.  It won't even take more than 30 minutes.  I

15   really didn't trip on the kidnapping.  I didn't really

16   understand the seriousness of what I was doing.

17        PRESIDING COMMISSIONER BIGGERS:  Well, that's

18   what I'm trying to find out.  I mean, if somebody tell me

19   you can make quick money, but it's going to involve me

20   taking somebody from what they were doing --

21        INMATE SULLIVAN:  Well, it -- it wasn't like

22   taking them.  It was like -- it wasn't take -- my -- my

23   thing was it wouldn't take long and I didn't really

24   seriously understand the kidnapping part.

25        PRESIDING COMMISSIONER BIGGERS:  Well, then why'd

26   you get involved?

27        INMATE SULLIVAN:  Well, I thought I needed the

20

1    money and --

2           PRESIDING COMMISSIONER BIGGERS:  So if I tell you

3    right now I'm going to give you $2,000 to go out there

4    and do something on the yard, are you going to do it?

5           INMATE SULLIVAN:  No, I wouldn't do it.

6           PRESIDING COMMISSIONER BIGGERS:  Okay.  Well,

7    that's what it sounded like to me.

8           INMATE SULLIVAN:  Well, I –

9           PRESIDING COMMISSIONER BIGGERS:  If somebody tell

10   you that you can make some quick money and you're saying

11   you don't understand -- you didn't understand the

12   seriousness of the kidnapping -- first of all, nothing's

13   really easy.

14          INMATE SULLIVAN:  Right.

15          PRESIDING COMMISSIONER BIGGERS:  But the fact

16   that it was going to be -- well, you're going to have to

17   take a couple people, to get a couple other people

18   involved for quick money.

19          INMATE SULLIVAN:  Well, I didn't really think

20   that far.

21          PRESIDING COMMISSIONER BIGGERS:  You didn't?

22          INMATE SULLIVAN:  No, I really didn't.

23          PRESIDING COMMISSIONER BIGGERS:  How much did he

24   promise you?

25          INMATE SULLIVAN:  About $20,000.

26          PRESIDING COMMISSIONER BIGGERS:  Twenty thousand

27   dollars?

21

1          INMATE SULLIVAN: Yes, it was just a joke.

2          PRESIDING COMMISSIONER BIGGERS: Okay, $20,000.

3     Okay. But, again, okay, tell me how more. How did that

4     family get chosen?

5          INMATE SULLIVAN: I really -- I really don't know

6     how they got chosen, to be honest with you.

7          PRESIDING COMMISSIONER BIGGERS: So the guy told

8     you he's going to give you $20,000 if you go with him,

9     you all were going to be able to make some quick money.

10    Did he describe how you're going to make this quick

11    money?

12          INMATE SULLIVAN: Well, he told me -- he gave me

13    the address and he gave the - the phone number and stuff

14    to do.

15          PRESIDING COMMISSIONER BIGGERS: And told you

16    what to do?

17          INMATE SULLIVAN: What to do.

18          PRESIDING COMMISSIONER BIGGERS: All right, now,

19    you knew that you weren't going to buy that house anyway?

20          INMATE SULLIVAN: No, I -- I knew I -- I didn't

21    have the money to buy a house.

22          PRESIDING COMMISSIONER BIGGERS: Then why you

23    going over looking for a house?

24          INMATE SULLIVAN: Well, that's what he told me to

25    do.

26          PRESIDING COMMISSIONER BIGGERS: All right. If

27    somebody tell you to jump off that tower you going to do

22

1    it?

2         INMATE SULLIVAN:  No.

3         PRESIDING COMMISSIONER BIGGERS:  Would you have

4    done it then?

5         INMATE SULLIVAN:  No.

6         PRESIDING COMMISSIONER BIGGERS:  Okay, then why

7    would you accept that --

8         INMATE SULLIVAN:  Well --

9         PRESIDING COMMISSIONER BIGGERS:  I'm having a

10   hard time understanding how you got involved.

11        INMATE SULLIVAN:  Okay, well, I -- well, you

12   know, the only way I can explain it is back then I was

13   drinking and having a lot of problems and -- and wrecking

14   cars and partying and I wasn't managing my money.  And I

15   was just doing way too much.

16        PRESIDING COMMISSIONER BIGGERS:  Yeah, but you

17   had a gun, right?

18        INMATE SULLIVAN:  (inaudible).

19        PRESIDING COMMISSIONER BIGGERS:  Where'd you get

20   the gun?

21        INMATE SULLIVAN:  Well, a friend of mine got the

22   gun.

23        PRESIDING COMMISSIONER BIGGERS:  Did you have to

24   buy it?

25        INMATE SULLIVAN:  Well, I didn't know how he got

26   it.

27        PRESIDING COMMISSIONER BIGGERS:  But you got it.

23

1   You didn't have to pay any money for it?

2           **INMATE SULLIVAN:**  I -- all I knew he come up with

3   it.

4           **PRESIDING COMMISSIONER BIGGERS:**  But you had one

5   with you.  You had a gun.

6           **INMATE SULLIVAN:**  No, I -- I didn't have -- okay,

7   my friend, Winslow, went and got the gun.  He had the

8   gun.  Somehow I wound up with the gun.  I still don't

9   understand how I got the gun today, but I wound up with

10  the gun.

11          **PRESIDING COMMISSIONER BIGGERS:**  All right,

12  that's -- let me go back and see if I can piece this all

13  together.  You met this guy at a furniture store?

14          **INMATE SULLIVAN:**  Right.

15          **PRESIDING COMMISSIONER BIGGERS:**  You all got to

16  be friends?

17          **INMATE SULLIVAN:**  Right.

18          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  And

19  again, I'm not re-trying your case.  I'm just trying to

20  get a feel for what --

21          **INMATE SULLIVAN:**  I know.  I'm -- I'm -- I'm want

22  to --

23          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

24          **INMATE SULLIVAN:**  -- try to get it out there so

25  you can understand.

26          **PRESIDING COMMISSIONER BIGGERS:**  You -- he

27  approached you about making some quick money to the tune

24

1    of about $20,000?

2              INMATE SULLIVAN:  Yeah, about a couple weeks

3    later.

4              PRESIDING COMMISSIONER BIGGERS:  Couple weeks

5    later.  You did not anticipate what you all were going to

6    do other than he told you to call this -- these -- your

7    victims?

8              INMATE SULLIVAN:  Right.

9              PRESIDING COMMISSIONER BIGGERS:  And so are you

10   telling me you didn't know what was going to transpire

11   until such time as you went up to the house?

12             INMATE SULLIVAN:  Well, he basically told me what

13   we was going to do, but I really didn't understand the

14   whole concept of all what was involved in it.

15             PRESIDING COMMISSIONER BIGGERS:  But he told --

16             INMATE SULLIVAN:  All I --

17             PRESIDING COMMISSIONER BIGGERS:  -- he told you

18   he was going to hold those people for $150,000?

19             INMATE SULLIVAN:  No, he told me -- I -- he said

20   okay, we go -- he -- well, to be honest with you, he

21   wasn't no where around when I was at this place.

22             PRESIDING COMMISSIONER BIGGERS:  Well, I -- I --

23   I wouldn't stay around either if I knew I was getting

24   myself in trouble when I got somebody like you, I can say

25   hey --

26             INMATE SULLIVAN:  That's right.

27             PRESIDING COMMISSIONER BIGGERS:  -- you go do it.

25

1   INMATE SULLIVAN:  That's right.  You know, well,

2   I'm still, you know, I'm looking at all that today, too.

3   PRESIDING COMMISSIONER BIGGERS:  You should.

4   INMATE SULLIVAN:  Well, I -- believe me, I have

5   looked at it over and over and over as how I got myself

6   involved in something --

7   PRESIDING COMMISSIONER BIGGERS:  Uh-huh.

8   INMATE SULLIVAN:  -- that I'm doing for somebody

9   else --

10   PRESIDING COMMISSIONER BIGGERS:  Yeah.

11   INMATE SULLIVAN:  -- that me, myself, never

12   would've even come up with an idea like that.  I was -- I

13   got involved in something that I really didn't understand

14   what I was getting myself into until it was too late.

15   PRESIDING COMMISSIONER BIGGERS:  Well, you're a

16   high school graduate aren't you?

17   INMATE SULLIVAN:  Yes.

18   PRESIDING COMMISSIONER BIGGERS:  Okay.  That

19   means you got something up here.

20   INMATE SULLIVAN:  That's true.

21   PRESIDING COMMISSIONER BIGGERS:  Okay.  Do you

22   use it all the time?

23   INMATE SULLIVAN:  All -- all the time until that

24   day.

25   PRESIDING COMMISSIONER BIGGERS:  Yeah, I would

26   think so.  I mean, you are smart enough to know that when

27   somebody starts talking about going over there to some --

26

1    have some people show you a house and you're going to

2    take them from there and that's going to be easy money

3    you should've had enough G-2 to understand that's going

4    to be a kidnap.

5         INMATE SULLIVAN:  I -- I understand now.  I --

6    well, see, to -- kidnapping is something I never even

7    heard of or really seriously knew I would be getting

8    involved in anyway.

9         PRESIDING COMMISSIONER BIGGERS:  What'd you think

10   that you were just going to get the people and they're

11   going to hand you over $150,000?

12        INMATE SULLIVAN:  Well, in -- in my mind at the

13   time the way -- they way he put it, it seemed like it was

14   real simple.

15        PRESIDING COMMISSIONER BIGGERS:  Real simple?

16        INMATE SULLIVAN:  It sounded -- it sounded like

17   something that would be over with in a matter of seconds.

18        PRESIDING COMMISSIONER BIGGERS:  Well, you keep

19   emphasizing the timeframe.  I'm not concerned about the

20   timeframe as much as I'm worried about why you got

21   involved.

22        INMATE SULLIVAN:  Well, I -- I been trying to

23   explain why I got involved.  I was --

24        PRESIDING COMMISSIONER BIGGERS:  You're telling

25   me how.  But you're not giving me the causative factors

26   as to why you did that.

27        INMATE SULLIVAN:  Oh, okay.  The reason I did it

27

1   cause at the time I thought I could get away with it.

2        PRESIDING COMMISSIONER BIGGERS:  Okay.

3        INMATE SULLIVAN:  I really thought I could get

4   away with.  It wouldn't take -- it wouldn't take no time

5   to do what I was going to do.

6        PRESIDING COMMISSIONER BIGGERS:  Thirty minutes

7   and you're free?

8        INMATE SULLIVAN:  And I was going to be gone.

9        PRESIDING COMMISSIONER BIGGERS:  Before anybody

10  figured out what had taken place?

11       INMATE SULLIVAN:  Right, before anybody figured

12  it out.

13       PRESIDING COMMISSIONER BIGGERS:  How do you feel

14  about the victims?

15       INMATE SULLIVAN:  Well, today I feel really sick

16  about it.

17       PRESIDING COMMISSIONER BIGGERS:  Feel sick about

18  it.  What do you mean you feel sick about it?

19       INMATE SULLIVAN:  I feel that that's something I

20  should've never did to these people.  And I know that

21  today that I've sent these people through a lot of harm.

22  I hurt these people.  I really -- I really did.  And I --

23  I know in my heart that it should've never happened to

24  them and I shouldn't have been the one that did this to

25  these people.

26       PRESIDING COMMISSIONER BIGGERS:  So you're saying

27  that you traumatized them and you take full

28

1    responsibility is what you're telling me?

2        INMATE SULLIVAN:  I take full responsibility for

3    the part I played in this, because it was like a decision

4    that I made -- it was a bad one cause I never made -- I

5    never did anything like this in my life and it was a bad

6    decision I made that day.  And I take full responsibility

7    in the part I played cause if it weren't for me it

8    wouldn't never happened.  That's -- that's way I look at

9    it.  If it wasn't for me it would've never happened cause

10   I wouldn't have been there and it would've never happened

11   to these people.

12       PRESIDING COMMISSIONER BIGGERS:  Tell me about

13   the gun incident because in the probation officer's

14   report it talked a little bit about the fact that you had

15   a gun and you pointed it at the -- at Mr. Reily and at

16   one time -- we'll get to you pulling the trigger a little

17   later, but at one time you told him -- either you or your

18   co-defendant told them that you were going to rape the

19   wife and do some other things if they didn't get the

20   money.  Is that correct?

21       INMATE SULLIVAN:  No, that not it.  I -- I didn't

22   say that.  I played the tape.

23       PRESIDING COMMISSIONER BIGGERS:  You played the

24   tape?

25       INMATE SULLIVAN:  I played the tape.

26       PRESIDING COMMISSIONER BIGGERS:  Was that on the

27   tape?

29

1    **INMATE SULLIVAN:** Yeah, it was on the tape.

2    **PRESIDING COMMISSIONER BIGGERS:** Okay. But you

3    didn't say it? You weren't the one that did that?

4    **INMATE SULLIVAN:** No, I didn't -- I didn't do the

5    tape.

6    **PRESIDING COMMISSIONER BIGGERS:** Did you -- once

7    you got up there and you figured out what was going on

8    and you -- and as this was proceeding, did you make any

9    additional threats to the family?

10    **INMATE SULLIVAN:** Not -- not -- not that I can

11    recall.

12    **PRESIDING COMMISSIONER BIGGERS:** Not that you can

13    recall.

14    **INMATE SULLIVAN:** I played the tape.

15    **PRESIDING COMMISSIONER BIGGERS:** All right. When

16    you tried to get away, and I believe that it's in the

17    probation officer's report there and they indicated and

18    please correct me if I'm wrong, Deputy Commissioner Star,

19    but you indicated to them -- to him -- well, he said that

20    you pulled the trigger on the weapon.

21    **INMATE SULLIVAN:** Yes see -- I -- I --

22    **PRESIDING COMMISSIONER BIGGERS:** Now hold on, let

23    me finish.

24    **INMATE SULLIVAN:** Okay.

25    **PRESIDING COMMISSIONER BIGGERS:** Did you -- did

26    you, in fact, pull the --

27    **INMATE SULLIVAN:** No, no, I didn't do it.

30

1          PRESIDING COMMISSIONER BIGGERS:  You didn't pull

2    the trigger?  Well, it was also in the probation

3    officer's report, too, and I could get -- something to

4    the effect that you made a statement to the police.  Do

5    you remember the statement you made to the police?  I

6    could go ahead and find it.

7          INMATE SULLIVAN:   Well, I made a statement to

8    the police the gun didn't work.

9          PRESIDING COMMISSIONER BIGGERS:  Right, that's

10   the one I'm talking about.  Okay.  Well, if you -- how

11   did you know the gun didn't work?

12         INMATE SULLIVAN:  Because the pin wasn't in the

13   gun.

14         PRESIDING COMMISSIONER BIGGERS:  Okay.  So, you

15   mean, you did this without a pin in the gun?

16         INMATE SULLIVAN:  Okay.  When -- when me and Mr.

17   Reily went to the backyard, I showed him the gun, and

18   when I pulled the gun out of my pants, the pin stayed in

19   my pants.  The -- the cylinder where this --

20         PRESIDING COMMISSIONER BIGGERS:  The cylinder.

21         INMATE SULLIVAN:  There's a cylinder that goes

22   into the --

23         PRESIDING COMMISSIONER BIGGERS:  The cylinder and

24   a pin that goes to hold it on, yeah.

25         INMATE SULLIVAN:  Right, to hold the gun in

26   there, to hold the cylinder in there.

27         PRESIDING COMMISSIONER BIGGERS:  Cylinder in

31

1    there, to keep it from sliding in and out.

2        INMATE SULLIVAN:  When I pulled it -- when I

3    pulled the gun out the -- the pin stayed in my pants.

4        PRESIDING COMMISSIONER BIGGERS:  But see you told

5    me earlier though that your partner had the gun --

6        INMATE SULLIVAN:  No.

7        PRESIDING COMMISSIONER BIGGERS:  -- and you ended

8    up with it.

9        INMATE SULLIVAN:  Right, my part -- that's right.

10   My partner had the gun and I went and wound up with the

11   gun.

12       PRESIDING COMMISSIONER BIGGERS:  Okay.  But how'd

13   the gun get down your pants?

14       INMATE SULLIVAN:  When my partner gave it to me.

15       PRESIDING COMMISSIONER BIGGERS:  Oh, so there we

16   go.  So you accepted the gun from your partner?

17       INMATE SULLIVAN:  I must have cause when he --

18       PRESIDING COMMISSIONER BIGGERS:  Must have?

19       INMATE SULLIVAN:  I -- I -

20       PRESIDING COMMISSIONER BIGGERS:  Unless you let

21   him put it in your pants.

22       INMATE SULLIVAN:  No, no.

23       PRESIDING COMMISSIONER BIGGERS:  I don't think

24   you'd do that.

25       INMATE SULLIVAN:  No, we not -- we not -- we not

26   -- I wound up with the gun.

27       PRESIDING COMMISSIONER BIGGERS:  All right.

32

1          INMATE SULLIVAN:  My partner didn't -- I must've

2    got the gun from him, he gave me the gun.  But anyway, I

3    wound up with the gun.

4          PRESIDING COMMISSIONER BIGGERS:  Okay.

5          INMATE SULLIVAN:  I'm not going to deny that.

6          PRESIDING COMMISSIONER BIGGERS:  You accepted the

7    gun --

8          INMATE SULLIVAN:  All right.

9          PRESIDING COMMISSIONER BIGGERS:  -- from your

10   partner.

11         INMATE SULLIVAN:  All right, I accepted the gun -

12   - from my partner.

13         PRESIDING COMMISSIONER BIGGERS:  All right.

14   Okay.

15         INMATE SULLIVAN:  And I wound up with the gun.

16         PRESIDING COMMISSIONER BIGGERS:  Okay.

17         INMATE SULLIVAN:  And I wound up with the -- when

18   -- when I had the gun we -- we went outside in the

19   backyard.

20         PRESIDING COMMISSIONER BIGGERS:  Okay.

21         INMATE SULLIVAN:  And when I showed him the gun,

22   like I say, I pulled it out and the pin stayed in my

23   pants.  The cylinder was holding it from doing it and it

24   stayed in my pants.

25         PRESIDING COMMISSIONER BIGGERS:  And the cylinder

26   was just doing one of these numbers?

27         INMATE SULLIVAN:  And the cylinder was just in

33

1    and out.

2            PRESIDING COMMISSIONER BIGGERS:  Okay.

3            INMATE SULLIVAN:  In and out.

4            PRESIDING COMMISSIONER BIGGERS:  Well, how did

5    you hold that cylinder in place when you were wrestling

6    or tussling with Mr. Reily?

7            INMATE SULLIVAN:  I just had it.  The way I had

8    the gun, I had the gun -- like the cylinder -- I had the

9    gun where the gun wouldn't go off or anything like that.

10   But I had the gun in my hand.  I knew the gun wouldn't go

11   off.

12           PRESIDING COMMISSIONER BIGGERS:  Okay.

13           INMATE SULLIVAN:  But that's what I had -- that's

14   what I did.

15           PRESIDING COMMISSIONER BIGGERS:  And, you know,

16   what's really amazing is that this is the only crime that

17   you have been involved with.

18           INMATE SULLIVAN:  You know -- you know, I'm --

19   you know, I -- I been -- I been fighting with this

20   myself.  I -- I think that after 29 years of my life, I

21   had a few problems, but nothing -- nothing like this.  I

22   feel -- can't understand how I got myself into this.  I

23   really don't.

24           PRESIDING COMMISSIONER BIGGERS:  How old were you

25   at that time?

26           INMATE SULLIVAN:  I was 29-years-old.

27           PRESIDING COMMISSIONER BIGGERS:  29-years-old

34

1    when you did that.

2          INMATE SULLIVAN: I was working.  I -- I was

3    working and drinking a lot, but I was working.  I worked

4    every day.

5          PRESIDING COMMISSIONER BIGGERS:  Think that

6    alcohol or narcotics played a part in this?

7          INMATE SULLIVAN: No.  No, I can't -- I can't say

8    that.  What -- if you want to say that as long as I've

9    been drinking alcohol and the type of life I was living

10   led up to what I -- what I did, I -- I don't think

11   alcohol played a part in it cause I wasn't drinking that

12   day.

13         PRESIDING COMMISSIONER BIGGERS:  Okay.  So no

14   alcohol involved that day.  But how about drugs?

15         INMATE SULLIVAN: I don't -- I don't do drugs.

16         PRESIDING COMMISSIONER BIGGERS:  You don't do

17   drugs?

18         INMATE SULLIVAN: No, I didn't do drugs.

19         PRESIDING COMMISSIONER BIGGERS:  But you said

20   kind of life you were living.  What kind of life were you

21   living at that time?  You were living a little higher

22   than what your paycheck was allowing?

23         INMATE SULLIVAN: Well, I wasn't managing my

24   money.  I was making the money; I just wasn't managing it

25   right.

26         PRESIDING COMMISSIONER BIGGERS:  What were you

27   doing with it?

35

1        INMATE SULLIVAN:  I was drinking and partying

2  and --

3        PRESIDING COMMISSIONER BIGGERS:  But you just

4  said --

5        INMATE SULLIVAN:  -- wrecking cars.

6        PRESIDING COMMISSIONER BIGGERS:  -- now you're

7  not drinking that much.

8        INMATE SULLIVAN:  Well, I say -- I said --

9        PRESIDING COMMISSIONER BIGGERS:  See, something's

10  not jiving with me here.

11        INMATE SULLIVAN:  All right, what -- what do you

12  want -- what can I tell --

13        PRESIDING COMMISSIONER BIGGERS:  I want to know -

14  - you said you're not managing your money very well.

15        INMATE SULLIVAN:  Okay.

16        PRESIDING COMMISSIONER BIGGERS:  You were making

17  good money.

18        INMATE SULLIVAN:  All right.

19        PRESIDING COMMISSIONER BIGGERS:  Then why did you

20  need additional money?  We all need additional money.

21  That's --

22        INMATE SULLIVAN:  Right.

23        PRESIDING COMMISSIONER BIGGERS:  -- probably a

24  leading question, but --

25        INMATE SULLIVAN:  At -- at that time -- at that

26  time, like I said, I was -- I was making money, but I

27  wasn't managing it and I was wrecking cars and I'd tore

36

1    up a couple of my cars, so at that time it was just a bad

2    time where I felt that I needed more money and -- and --

3    and -- and that was the solution I'd come up with at the

4    time when he offered that.

5         PRESIDING COMMISSIONER BIGGERS:  Well, again,

6    like I said, I'm not here to re-try your case.

7         INMATE SULLIVAN:  I understand.

8         PRESIDING COMMISSIONER BIGGERS:  I'm -- I'm just

9    trying to figure out what -- what would make you go up in

10   here to do this kind of stuff that would cause you to

11   give us so much of time of your life --

12        INMATE SULLIVAN:  Right.

13        PRESIDING COMMISSIONER BIGGERS:  -- because with

14   a high school education --

15        INMATE SULLIVAN:  I made a mistake.

16        PRESIDING COMMISSIONER BIGGERS:  -- high school

17   education, you had a job, yet you go do something like

18   that.

19        INMATE SULLIVAN:  I made a bad decision.

20        PRESIDING COMMISSIONER BIGGERS:  Okay.  All

21   right, I'm going to ask the Deputy Commissioner if she's

22   got any questions about the crime.

23        DEPUTY COMMISSIONER STAR:  I do.

24        PRESIDING COMMISSIONER BIGGERS:  Okay.

25        DEPUTY COMMISSIONER STAR:  The gun -- well, no,

26   let's go back to the motivation and you'd thought you'd

27   get $20,000.  Where did you believe from Mr. Davis this

37

1    money was located?  Where did he tell you would -- the

2    money would be found?

3              INMATE SULLIVAN:  He said they had it in the

4    bank.

5              DEPUTY COMMISSIONER STAR:  In the back of the

6    house?

7              INMATE SULLIVAN:  In the bank.

8              DEPUTY COMMISSIONER STAR:  In the bank.

9              INMATE SULLIVAN:  In the bank.  It was in the

10   bank.

11             DEPUTY COMMISSIONER STAR:  Why then did you go to

12   a house in Tracy first?

13             INMATE SULLIVAN:  I don't -- I'm not really sure.

14   I guess we went to rob the house to be able to -- well,

15   we went to -- we went to -- I'm not trying to make this

16   up.  We went to the house to play the tape.  We wanted

17   them to hear the tape.

18             DEPUTY COMMISSIONER STAR:  Okay.  Why then did

19   you stop at the house in Walnut Creek second?  Why not go

20   from Tracy and play the tape, which you didn't do, is

21   that correct?  Did you play the tape -- the tape in

22   Tracy?

23             INMATE SULLIVAN:  No, we -- we -- we played the -

24   - the tape -- tape at their house.

25             DEPUTY COMMISSIONER STAR:  Okay.

26             PRESIDING COMMISSIONER BIGGERS:  Walnut Creek.

27             INMATE SULLIVAN:  Yeah, at their house.

38

1           **DEPUTY COMMISSIONER STAR:**  In Walnut Creek.

2           **INMATE SULLIVAN:**  Yeah, at their house in Walnut

3    Creek.

4           **DEPUTY COMMISSIONER STAR:**  But you went to the --

5    all the way out to Tracy because you wanted to play the

6    tape to them in Tracy?

7           **INMATE SULLIVAN:**  Right.

8           **DEPUTY COMMISSIONER STAR:**  The --

9           **INMATE SULLIVAN:**  No, we went to Tracy to meet

10   them in Tracy.

11          **DEPUTY COMMISSIONER STAR:**  Uh-huh.

12          **INMATE SULLIVAN:**  And once we -- once we got to

13   Tracy, we took them to their house to play the tape.

14          **DEPUTY COMMISSIONER STAR:**  Okay.  So you knew

15   when you started this that the money wasn't on their

16   person nor at their house in Walnut Creek and at some

17   point you were going to have to go with them to the bank?

18          **INMATE SULLIVAN:**  Yes.

19          **DEPUTY COMMISSIONER STAR:**  Did you believe they

20   would freely go with you to their bank or that you would

21   have to --

22          **INMATE SULLIVAN:**  Well, in my mind I -- I really

23   believed they would at the time.  That's the way, you

24   know, that's the way -- that's the way the planned story

25   went.

26          **DEPUTY COMMISSIONER STAR:**  Why would they freely

27   go to their bank and withdraw money for you?

39

1        INMATE SULLIVAN:  I, you know, to be honest with

2   you, I -- I -- I really -- I really can't answer that.

3        DEPUTY COMMISSIONER STAR:  You -- let's talk

4   about the gun.  At what point did your partner hand it to

5   you in the events?  The day before, the day of?

6        INMATE SULLIVAN:  The day of.  It had to be when

7   I got to their house.

8        DEPUTY COMMISSIONER STAR:  In Tracy?

9        INMATE SULLIVAN:  Yes.

10       DEPUTY COMMISSIONER STAR:  Why did you show him

11  the gun?  Mr. Reily.

12       INMATE SULLIVAN:  Well, when I -- when I -- I --

13  when I took him outside, I showed him the gun to let him

14  know that we were serious about -- about robbing.

15       DEPUTY COMMISSIONER STAR:  Okay.  Did Mr. Reily,

16  however it's pronounced, did he -

17       INMATE SULLIVAN:  I think it's Reily.

18       DEPUTY COMMISSIONER STAR:  Is it Reily?

19       INMATE SULLIVAN:  Yes.

20       PRESIDING COMMISSIONER BIGGERS:  It's spelled

21  Reily, though.

22       DEPUTY COMMISSIONER STAR:  Yeah.  Did he see that

23  the pin was out of the --

24       INMATE SULLIVAN:  No.

25       DEPUTY COMMISSIONER STAR:  -- gun?

26       INMATE SULLIVAN:  No, he didn't.

27       DEPUTY COMMISSIONER STAR:  Did you tell him the

40

1    pin was out of the gun?

2            INMATE SULLIVAN:  No, I don't think I did, no.

3            DEPUTY COMMISSIONER STAR:  When the pin came out

4    did the drum open up and fall to the side?

5            INMATE SULLIVAN:  Yeah, when -- when -- when the

6    pin -- when -- when I pulled the gun out -- out of my

7    pants -- when I pulled it out of my pants -- when I -- I

8    know when -- when I pulled it out of my pants, a couple

9    bullets fell out of the gun.  That -- that's how I know -

10           DEPUTY COMMISSIONER STAR:  Well, that was my next

11   question.

12           INMATE SULLIVAN:  Yeah.

13           DEPUTY COMMISSIONER STAR:  So you knew it was

14   loaded?

15           INMATE SULLIVAN:  I --

16           DEPUTY COMMISSIONER STAR:  It was --

17           INMATE SULLIVAN:  Yeah, I knew the gun was

18   loaded.

19           DEPUTY COMMISSIONER STAR:  Two bullets fell out?

20   What'd you do with those?

21           INMATE SULLIVAN:  I -- I left them.

22           DEPUTY COMMISSIONER STAR:  And some remained?

23           INMATE SULLIVAN:  Yeah.

24           DEPUTY COMMISSIONER STAR:  Did you --

25           INMATE SULLIVAN:  There was like, I think like

26   two or three still in there, I guess.

27           DEPUTY COMMISSIONER STAR:  Did you push the drum

41

1   back into the --

2          INMATE SULLIVAN:  Yeah, I just pushed it back in.

3          DEPUTY COMMISSIONER STAR:  Okay.  Now, what makes

4   you believe that because the pin is out, you have a

5   loaded firearm, and the drum is back in that it would not

6   fire?

7          INMATE SULLIVAN:  Well, the -- I wasn't initially

8   going to fire the gun anyway.  My intentions were never

9   to shoot the man.

10         DEPUTY COMMISSIONER STAR:  Okay, did your

11  intentions change once you took off and the car crashed?

12         INMATE SULLIVAN:  No.

13         DEPUTY COMMISSIONER STAR:  Did you at any time

14  put the gun in the Mr. Reily's ribs?

15         INMATE SULLIVAN:  Not that I remember it, no.  We

16  were scrabbling for the gun.  It might -- it -- it more

17  likely went to his ribs.  I'm not going to deny that it

18  did or it didn't.  But we was struggling --

19         DEPUTY COMMISSIONER STAR:  Did you put the gun up

20  to his ear?

21         INMATE SULLIVAN:  Yeah, I did that.

22         DEPUTY COMMISSIONER STAR:  Or his neck?

23         INMATE SULLIVAN:  Yeah, I did that.

24         DEPUTY COMMISSIONER STAR:  And for what purpose

25  did you do that?

26         INMATE SULLIVAN:  I panicked and just put it to

27  his head.  I don't even know why I did it.

42

1      **DEPUTY COMMISSIONER STAR:**   Okay.   Was the drum of

2    the gun closed or was it hanging out at the time you did

3    this?

4      **INMATE SULLIVAN:**   I'm not sure.   It could've been

5    closed.

6      **DEPUTY COMMISSIONER STAR:**   Because you have -- it

7    was -- it could've been closed.   It's loaded.   Did you

8    not think if you --

9      **INMATE SULLIVAN:**   No, I -- no, at the time I

10    didn't think.

11      **DEPUTY COMMISSIONER STAR:**   Did you, after the

12    crash or at any time, insert another cartridge into the

13    cylinder?

14      **INMATE SULLIVAN:**   No.

15      **DEPUTY COMMISSIONER STAR:**   So other than the two

16    bullets falling out you never at any time put another

17    cartridge in?

18      **INMATE SULLIVAN:**   No.

19      **DEPUTY COMMISSIONER STAR:**   Mr. Reily made a

20    statement to police that you inserted a cartridge in the

21    cylinder before closing it.   You don't recall that?

22      **INMATE SULLIVAN:**   No, I don't recall that.

23    That's the first I ever heard of that.

24      **DEPUTY COMMISSIONER STAR:**   Now, the police say --

25      **ATTORNEY STRINGER:**   Can we get a reference to

26    that, Commissioner?

27      **DEPUTY COMMISSIONER STAR:**   Oh, I'm sorry, thank

43

1    you.  It's probation officer's report, page 9.  "As -- as

2    Mr. Reily was making his statement to police he indicated

3    that" -- I'm sorry, page -- line 21.  "As Mr. Reily was

4    making his statement to police, he indicated that when

5    the defendant pulled the revolver from his waistband, the

6    cylinder opened, the defendant inserted one cartridge

7    into the cylinder before closing it."  I admit it's not

8    clear at what timeframe that occurred, but it's an

9    observation.  Now, when the police inspected this gun

10   they -- and I'm now referring to page 10 of the probation

11   officer's report, line 9.  It says he noted it appeared

12   to be completely intact but there were no cartridges in

13   it and later two .32 caliber Smith and Wesson bullets

14   were found in the general area where the defendant was

15   taken into custody and the gun discarded.  Do you

16   remember how many bullets were in the gun?

17           INMATE SULLIVAN:  About two or three I guess.

18   I'm not sure really how many was in it.

19           DEPUTY COMMISSIONER STAR:  Did you -- did you

20   tell the doctor that you put your hand over the hammer?

21           INMATE SULLIVAN:  Yeah.

22           DEPUTY COMMISSIONER STAR:  To block it?

23           INMATE SULLIVAN:  Yes.

24           DEPUTY COMMISSIONER STAR:  And I'm referring to

25   the September 23rd, 2005 report by Dr. Inaba.

26           INMATE SULLIVAN:  Well, yeah, I -- I remember

27   telling him that because that -- [alarm sound]

44

1      **DEPUTY COMMISSIONER STAR:**  Hold on, sir.  Could

2      you hold on a second?

3             [Thereupon, the tape was turned over.]

4      **DEPUTY COMMISSIONER STAR:**  Okay, we're back on

5      record.  My question was do you remember telling the

6      doctor you put your -- your hand on the hammer of the

7      gun?

8      **INMATE SULLIVAN:**  I put my hand over the hammer

9      of the gun.

10     **DEPUTY COMMISSIONER STAR:**  Okay.  For what -- was

11     this when the car crashed?  Or when?  When do you recall

12     doing that?

13     **INMATE SULLIVAN:**  Well, when we started

14     struggling for the gun.

15     **DEPUTY COMMISSIONER STAR:**  Okay.  And how -- how

16     and why do you remember that?

17     **INMATE SULLIVAN:**  Because at the time he tried to

18     take the gun from me, I put my hand over the whole gun

19     and cylinder where I know the gun wouldn't go off cause

20     he was really trying to take the gun from me and I didn't

21     want the gun to go off or anything like that, so I knew

22     it wouldn't go off by my hand being over the hammer.

23     **DEPUTY COMMISSIONER STAR:**  Okay.  Let me go back

24     to something you said earlier to Commissioner Biggers.

25     You said that you thought the whole thing would happen in

26     ten or 15 minutes and this incident would be done.

27     **INMATE SULLIVAN:**  Right.

45

1    **DEPUTY COMMISSIONER STAR:** But you've told me

2    that the intent was to meet him in Tracy, play the tape

3    at their home in Walnut Creek, and then to go to a bank.

4    So I'm unclear as to why you would think this whole

5    thing, when it sounds to me very elaborate, sir, to meet

6    them in another town, take them to their home, and then

7    arrange to go to the bank, would be done in ten minutes.

8    **INMATE SULLIVAN:** Okay. Well, see, when I, you

9    know, that part I -- I really don't know how we -- I

10   don't really know how it -- to be honest with you, I

11   don't know how we got from Tracy to his house. I, you

12   know, I'm not making this up. I really don't know how we

13   got to the man's house, you know. All I knew that we was

14   going to kidnap the person and the guy was supposed to

15   give us the money. That -- that -- that's all I knew.

16   **DEPUTY COMMISSIONER STAR:** Why did Davis believe

17   this couple had that much money? What did he tell you?

18   **INMATE SULLIVAN:** Well, he told me -- I'm not --

19   I'm not sure he told me. They were real estate agents or

20   what -- what they were, but he said they had the money

21   and this is what we're going to do and this is what I

22   want you to do and this is -- and I did what he asked me

23   to do.

24   **DEPUTY COMMISSIONER STAR:** Did you stop and make

25   calls to anybody along the way?

26   **INMATE SULLIVAN:** I -- I called him once.

27   **DEPUTY COMMISSIONER STAR:** Once?

46

1        **INMATE SULLIVAN:** Yeah.

2        **DEPUTY COMMISSIONER STAR:** For what purpose?

3        **INMATE SULLIVAN:** What to do after -- after we

4  get the money, stuff, something like -- something in that

5  nature.

6        **DEPUTY COMMISSIONER STAR:** Okay. Mr. Biggers,

7  I'll turn it back to you. Thank you.

8        **PRESIDING COMMISSIONER BIGGERS:** Okay. Again,

9  we're just trying to get down to figure out what your --

10  your mindset was. I'm going to move on to your -- your

11  social history. You're the seventh child of Sullivan

12  that was born to George Collins, C-O-L-L-I-N-S, and is

13  that Dorothy?

14        **INMATE SULLIVAN:** Dorthea.

15        **PRESIDING COMMISSIONER BIGGERS:** Dorthea.

16  Sullivan-Sims. And Dorthea's spelled D-O-R-T-H-E-A.

17        **INMATE SULLIVAN:** Yeah.

18        **PRESIDING COMMISSIONER BIGGERS:** Sullivan-Sims,

19  S-I-M-S. And you don't know if your parents were married

20  or not so we'll assume they were married. Your -- you

21  were reared primarily by your grandmother?

22        **INMATE SULLIVAN:** Yes.

23        **PRESIDING COMMISSIONER BIGGERS:** And her name was

24  Virginia Dames?

25        **INMATE SULLIVAN:** Dames.

26        **PRESIDING COMMISSIONER BIGGERS:** D-E or D-A-M-A-

27  S?

47

1          INMATE SULLIVAN:  D-A-M-E-S.

2          PRESIDING COMMISSIONER BIGGERS:  Dames, okay.

3     You traveled between two homes as you were growing up?

4          INMATE SULLIVAN:  Yes.

5          PRESIDING COMMISSIONER BIGGERS:  You graduated

6     from Northwood High School in 1971.  Where's that high

7     school?

8          INMATE SULLIVAN:  In Shreveport.

9          PRESIDING COMMISSIONER BIGGERS:  Shreveport,

10    Louisiana?

11         INMATE SULLIVAN:  Yes.

12         PRESIDING COMMISSIONER BIGGERS:  You had an -- an

13    old injury to your eye you received while playing

14    football when you were younger.

15         INMATE SULLIVAN:  Yeah.

16         PRESIDING COMMISSIONER BIGGERS:  What -- what

17    happened?

18         INMATE SULLIVAN:  I was out in the field and I

19    was playing catch with my cousin and ran into the -- to

20    the garden fence.

21         PRESIDING COMMISSIONER BIGGERS:  Ran into the

22    fence?

23         INMATE SULLIVAN:  Yeah, at the garden.

24         PRESIDING COMMISSIONER BIGGERS:  Did you have any

25    permanent damage other than your eye?  Did you have any

26    head damage or anything?

27         INMATE SULLIVAN:  No, I just cut my eyeball.

48

1          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  You

2      married a Jessie Sullivan in '83 and you were divorced in

3      '91?

4          **INMATE SULLIVAN:**  Yes.

5          **PRESIDING COMMISSIONER BIGGERS:**  Did you get re-

6      married?

7          **INMATE SULLIVAN:**  No.

8          **PRESIDING COMMISSIONER BIGGERS:**  So I see you had

9      one child by a Ms. Vivian Ferguson.  You didn't have any

10     children by Jessie Sullivan?

11         **INMATE SULLIVAN:**  No.

12         **PRESIDING COMMISSIONER BIGGERS:**  So you had one

13     child out of wedlock is what you're saying?  Okay.  Is it

14     a boy or girl?

15         **INMATE SULLIVAN:**  It's a girl.

16         **PRESIDING COMMISSIONER BIGGERS:**  It's a girl.

17     Does she come to see you?

18         **INMATE SULLIVAN:**  Yes.

19         **PRESIDING COMMISSIONER BIGGERS:**  So how long have

20     you all been corresponding?  Where is she now?

21         **INMATE SULLIVAN:**  She's in Oakland -- in Hayward.

22         **PRESIDING COMMISSIONER BIGGERS:**  In Oakland?

23     Okay.  How old is she at this point?

24         **INMATE SULLIVAN:**  Twenty-six.

25         **PRESIDING COMMISSIONER BIGGERS:**  Twenty-six.

26     Okay, and she comes to see you quite often?

27         **INMATE SULLIVAN:**  Yeah.

49

1          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  So you

2    worked as a foreman in tree cleaning -- tree clearing

3    business and as a car parking attendant.  Is that

4    correct?

5          **INMATE SULLIVAN:**  Yeah.

6          **PRESIDING COMMISSIONER BIGGERS:**  Is that the kind

7    of work you were doing when this -- when this thing --

8          **INMATE SULLIVAN:**  I was a tree -- a tree foreman.

9          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Pretty

10   good money in that though, isn't it?

11         **INMATE SULLIVAN:**  Yeah, it was.  I just didn't

12   know how to deal with it.

13         **PRESIDING COMMISSIONER BIGGERS:**  So it shows here

14   that you deny any substance abuse, but you claim to have

15   been -- have a heavy drinking problem in the early 80s.

16   But after you got a drunk driving you stopped -- you

17   discontinued drinking alcohol?

18         **INMATE SULLIVAN:**  Yes.

19         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Did I --

20   is there anything on your social that I want to -- that

21   you want me -- let me just check one other spot here.

22   You said that you only saw your father one time and you

23   two didn't get along at that meeting.  Is that correct?

24         **INMATE SULLIVAN:**  I remember -- I remember my dad

25   when I was young.  We -- I met him a couple times.  We

26   hung out with him a couple times.  We got along as far as

27   dads got along.  But I didn't see him that much.  I

50

1    didn't know that much about him.

2              PRESIDING COMMISSIONER BIGGERS:  Have you ever

3    found out where your older brother is?

4              INMATE SULLIVAN:  My older brother lives in

5    California now somewhere.

6              PRESIDING COMMISSIONER BIGGERS:  Somewhere, but

7    you don't know exactly where?

8              INMATE SULLIVAN:  No.

9              PRESIDING COMMISSIONER BIGGERS:  Okay.  And

10   you've got a younger brother that resides in Berkeley.

11   Is that still correct?

12             INMATE SULLIVAN:  No.  I think he's in Sacramento

13   now.

14             PRESIDING COMMISSIONER BIGGERS:  Sacramento.

15   Does he come to see you?

16             INMATE SULLIVAN:  Well, he used to.  But he stay

17   in Sacramento so he don't come as much as he used to.

18             PRESIDING COMMISSIONER BIGGERS:  That's only 80

19   miles away.

20             INMATE SULLIVAN:  Yeah, but he's -- he's -- he

21   having problems also.

22             PRESIDING COMMISSIONER BIGGERS:  Okay, have any

23   of your siblings been involved with law enforcement?

24             INMATE SULLIVAN:  No.

25             PRESIDING COMMISSIONER BIGGERS:  What kind of

26   problems is he having?

27             INMATE SULLIVAN:  Well, he drink a lot.  I talk

51

1    to him all the time.

2         PRESIDING COMMISSIONER BIGGERS:  Oh, you do talk

3    to him?

4         INMATE SULLIVAN:  Yeah, I talk to him.  I say

5    man, you need go to AA, you need to get somewhere.

6    You're doing too much right now.

7         PRESIDING COMMISSIONER BIGGERS:  Okay.  You never

8    served in the military.  Is that correct?

9         INMATE SULLIVAN:  No.

10        PRESIDING COMMISSIONER BIGGERS:  I see here when

11   you were working for Davey Trees you were terminated

12   because you didn't call for three consecutive days.  Is

13   that because you were incarcerated?

14        INMATE SULLIVAN:  Yeah, that's because I was in

15   jail.

16        PRESIDING COMMISSIONER BIGGERS:  And, again,

17   prior to your arrest you owned a 1972 Lincoln Mark IV.

18   That -- that's a big car.  And you sold your Chrysler,

19   but the papers are in the jail and he's unsure of the

20   title.  So your routine monthly expenses were close to

21   $1,000 per month, but yet you only netted approximately

22   900 a month.  That right?  Sound about right?  So you

23   were a negative $100 every month.

24        INMATE SULLIVAN:  Yeah, I didn't -- I -- I didn't

25   keep track of what I was making.

26        PRESIDING COMMISSIONER BIGGERS:  Okay.  Then I

27   have one last question I'll ask you, then I'll move onto

52

1    something else. If you had expenses of $1,000 and you

2    were only making $900, why would you be driving a 1972

3    Lincoln Mark IV?

4             INMATE SULLIVAN: I -- at that time I bought it

5    with my income tax money.

6             PRESIDING COMMISSIONER BIGGERS: You made the

7    down payment.

8             INMATE SULLIVAN: No, I bought it.

9             PRESIDING COMMISSIONER BIGGERS: Bought it

10    straight out?

11             INMATE SULLIVAN: Yeah.

12             PRESIDING COMMISSIONER BIGGERS: Okay. Do you

13    have anything on the social aspect?

14             DEPUTY COMMISSIONER STAR: No.

15             PRESIDING COMMISSIONER BIGGERS: Okay. Well, you

16    had no priors from what I -- it looks like the only prior

17    that you had, even though one part said that you were

18    stopped for drunk driving and -- did you get arrested for

19    that?

20             INMATE SULLIVAN: I went to jail that night.

21             PRESIDING COMMISSIONER BIGGERS: That night and

22    then they didn't file charges?

23             INMATE SULLIVAN: I had a fine.

24             PRESIDING COMMISSIONER BIGGERS: Just a fine.

25             INMATE SULLIVAN: Yes.

26             PRESIDING COMMISSIONER BIGGERS: How old were you

27    when that took place?

53

1       INMATE SULLIVAN:  I'm not sure.  Probably about

2  27, 28.  Right in there because --

3       PRESIDING COMMISSIONER BIGGERS:  Because

4  according to you --

5       INMATE SULLIVAN:  -- it was probably about the

6  same time.

7       PRESIDING COMMISSIONER BIGGERS:  -- according to

8  the record that I have, you had none as a juvenile and

9  the incident offense is the only criminal activity noted,

10  so maybe they just -- how -- how much was your fine?

11       INMATE SULLIVAN:  It was $500.

12       PRESIDING COMMISSIONER BIGGERS:  All right, at

13  this point, I'm going to ask Deputy Commissioner Star to

14  go over your post-conviction factors.

15       DEPUTY COMMISSIONER STAR:  Okay, Mr. Sullivan, I

16  reviewed your counselor's report for this part of the

17  hearing, as well as reviewed the Central File.  I'll

18  primarily be focusing on your post-conviction activities

19  since your last hearing, which was subsequent number nine

20  hearing held on June 29, 2005, where you received a one-

21  year denial.  At that time the Board said remain

22  disciplinary-free, earn positive chronos, and participate

23  in self-help.  Since that last hearing you have had no

24  disciplinaries.  Your classification score is 19.  Your

25  custody level is -- thank you, is Medium-A.  In fact, I

26  need to commend you because since your life-term started

27  you've had zero 115s and zero counseling chronos and

54

1   that's a -- a remarkable and outstanding record.  You

2   have upgraded since your life-term started with a

3   vocation.  You've completed vocational Upholstery in 1992

4   at DVI.  Is that correct?

5           INMATE SULLIVAN:  Yes.  It's -- it's in that

6   file.

7           DEPUTY COMMISSIONER STAR:  Okay.  Mr. --

8   Commissioner Biggers referenced your roofer work skills

9   that you had prior to prison and -- and you have now have

10  this upholstery skills.  Did you obtain any other skills

11  while you've been incarcerated doing this life-term?

12          INMATE SULLIVAN:  Forklift Operator.

13          DEPUTY COMMISSIONER STAR:  Forklift Operator.

14  Did you work in PIA doing that?

15          INMATE SULLIVAN:  Yes.

16          DEPUTY COMMISSIONER STAR:  Okay.  And how long

17  did you do that?

18          INMATE SULLIVAN:  I'm still doing it.

19          DEPUTY COMMISSIONER STAR:  Oh, you're still doing

20  it?

21          INMATE SULLIVAN:  Yes.

22          DEPUTY COMMISSIONER STAR:  Cause I -- I see

23  you're the lead man but that includes operating the

24  forklift?  Okay.  All right.  Educationally, again,

25  Commissioner Biggers covered the prior to beginning the

26  life term you were a high school graduate, having

27  graduated in 1971 from Northwood High.  I didn't see any

55

1   references to any further -- furtherance of your

2   education level.  I'm going to cover your self-help group

3   activities, but I want to make sure I didn't miss

4   anything.  Anything else you did, Mr. Sullivan?

5           INMATE SULLIVAN:  No.

6           DEPUTY COMMISSIONER STAR:  Okay.  In terms of

7   your self-help participation, I'm -- I'm going to refer

8   to the counselor's report because he did a -- a very

9   thorough review of numerous groups and workshops that you

10  have participated in.  Since your last hearing, I noted

11  that you completed three different Impact courses.  One

12  in Successful Relationships, one on Specific

13  Relationships, and one -- and another one called Module

14  IV.  You also completed 32 hours of Nonviolent

15  Communication self-help group participation.  Prior to,

16  of course, your last hearing there have been -- oh, and I

17  should say and commend you for, the record shows since

18  1992 to the present, your -- you've been participating in

19  AA.  Is that correct?

20          INMATE SULLIVAN:  Yes.

21          DEPUTY COMMISSIONER STAR:  Good.  Good for you,

22  sir.  How often do you go?  Once a week or twice now?

23          INMATE SULLIVAN:  I go every Wednesday.

24          DEPUTY COMMISSIONER STAR:  Wednesday.  Very good.

25  Of course prior to you were -- you've been continuously -

26  - the record at least since -- the record I have shows a

27  regular pattern since 1992 of self-help group

56

1  participation, including AA from the beginning.  But that

2  included, and I'm just going to highlight a few of them,

3  Hooked on Phonics, Alternatives to Violence, Self-Esteem

4  Group workshops, Chiros participation, Gavel Club

5  participation, Literacy program participation,

6  Toastmasters, some numerous other -- numerous violence

7  prevention workshops.  So, again, I commend you, sir, for

8  a -- a full and ongoing participation in your self-help

9  groups.  Working -- work-wise you've -- you've also

10  received some exceptional work performance reports.

11  There were most recently, supervisor -- the mattress and

12  bedding supervisor, I noted, Mr. Jenkins, commended you

13  on March 2006 for exceptional work performance.  It looks

14  like you've been in PIA for a number of years.  Lead man

15  in the sewing machine -

16          INMATE SULLIVAN:  yes.

17          DEPUTY COMMISSIONER STAR:  - and that's where

18  you've been driving the forklift, as well.  Is that

19  correct?

20          INMATE SULLIVAN:  Yes.

21          DEPUTY COMMISSIONER STAR:  Okay.  How many -- how

22  many years exactly have you worked in the PIA?

23          INMATE SULLIVAN:  Maybe four.

24          DEPUTY COMMISSIONER STAR:  Okay.  How long have

25  you been a lead man?

26          INMATE SULLIVAN:  Since last year.

27          DEPUTY COMMISSIONER STAR:  Okay.  All right.

57

1      INMATE SULLIVAN:  I was -- I was a lead man in

2  Sanding, too, before that?

3      DEPUTY COMMISSIONER STAR:  Where?

4      INMATE SULLIVAN:  In Sanding.

5      DEPUTY COMMISSIONER STAR:  Okay.

6      INMATE SULLIVAN:  That was back in -- it been a

7  while.

8      DEPUTY COMMISSIONER STAR:  Were you -- it's

9  really apparent from the supervisors' reports and chronos

10  here that you're an outstanding worker and they didn't

11  hesitate to recognize you for that.  So, again, I -- I

12  commend you, sir, on that.  In terms of the -- I'm going

13  to move on to the psychiatric report.  Before I do, let

14  me ask you, any other activities, particularly since your

15  hearing, or anything that you wanted the Board to hear

16  about your accomplishments that I may not have covered

17  that you'd like to tell the Board about?

18      INMATE SULLIVAN:  I pretty much -- that pretty

19  much cover everything.

20      DEPUTY COMMISSIONER STAR:  We have some

21  certificates or something that I didn't highlight, Mr.

22  Stringer?

23      ATTORNEY STRINGER:  Well, attached to a

24  supplemental packet I have is some information from the

25  Impact program.

26      DEPUTY COMMISSIONER STAR:  Okay.  I did -- I

27  think I had the certificates in my file.  Oh, I -- I

58

1   noticed he participated in a mediation or meditation --

2   mediation -- meditation group, that was in his file?

3           ATTORNEY STRINGER:  I believe there's a picture

4   from, is it Time magazine --

5           DEPUTY COMMISSIONER STAR:  Yeah --

6           ATTORNEY STRINGER:  -- with a --

7           DEPUTY COMMISSIONER STAR:  -- but that was back

8   in --

9           ATTORNEY STRINGER:  Yes.

10          DEPUTY COMMISSIONER STAR:  -- back away.  Is that

11  correct?  And I know Commissioner Biggers was going to

12  cover some of these commendations.  And I think I saw all

13  the Impact certificates.  Is that what you wanted to

14  highlight?

15          ATTORNEY STRINGER:  Yes, I -- I saw it as you

16  flipped through it there, so I'm --

17          DEPUTY COMMISSIONER STAR:  Okay.  Okay.  And I

18  did mention his --

19          ATTORNEY STRINGER:  Yes.

20          DEPUTY COMMISSIONER STAR:  -- completion of the

21  three Impact courses.  Anything else, Mr. Sullivan?

22          INMATE SULLIVAN:  That pretty much cover it.

23          DEPUTY COMMISSIONER STAR:  Okay.  Well, let's

24  move on to the psychiatric report.  The Board, at the

25  last hearing, specifically requested a -- a new psych

26  report and asked that -- that the report address the

27  prisoner's violence potential in the free community, the

59

1   significance of alcohol or drugs relative to the

2   commitment offense, the extent to which the prisoner has

3   explored the commitment offense, and any need for any

4   further therapy.  So reviewing the report with that in

5   mind, we have a September 23rd, 2005 report completed by

6   Dr. Inaba, PhD, and Inaba is spelled I-N-A-B-A.  She --

7   she does address those issues in her report.  First she

8   gives a diagnosis -- diagnostic impression of Mr.

9   Sullivan.  On Axis I there's the History of Alcohol

10  Abuse.  On Axis II she says there's No Diagnosis for any

11  Mental Illness.  Axis III which is the medical issues

12  refers to his Hypertension and Hyper -- High Cholesterol

13  which he's also reported to us earlier.  Axis IV is just

14  the Stressors from the life sentence.  And Axis V is a

15  GAF score of 85.  Now, in terms of those items that the

16  Board asked the doctor to address in the report, I'm

17  going to refer to page 3 of the doctor's report and if --

18  if released to the community the doctor says -- well, in

19  terms of his -- how he feels about the crime, the doctor

20  said "he acknowledges the harm he did to the victims and

21  expresses sincere regret about his involvement in the

22  crime.  He recognizes the victims as individuals who did

23  not deserve to be victimized by criminal act -- actions.

24  Mr. Sullivan takes direct responsibility for his actions

25  in regard to the crime."  Now, Mr. Sullivan, one of the

26  Steps in AA is to make amends.  Is that correct?

27           INMATE SULLIVAN:  Yes.

60

1    **DEPUTY COMMISSIONER STAR:**  What Step is that?

2    **INMATE SULLIVAN:**  That's Step 9.

3    **DEPUTY COMMISSIONER STAR:**  Okay.  And what kind

4    of amends would you feel is appropriate in your -- given

5    your crime to the Reily's, however it's pronounced?

6    **INMATE SULLIVAN:**  The -- the best amends I can

7    make to Mr. and Mrs. Reily is to continue to participate

8    in AA, because what I did I -- I can't take it back and

9    I'm truly sorry for it.

10    **DEPUTY COMMISSIONER STAR:**  Okay.  Did you tell

11    the doctor "I would work for the man a year to pay him

12    back some way?"

13    **INMATE SULLIVAN:**  Yeah, I would work for the man

14    for nothing.

15    **DEPUTY COMMISSIONER STAR:**  Uh-huh.

16    **INMATE SULLIVAN:**  For a whole year.  I would

17    actually do that.

18    **DEPUTY COMMISSIONER STAR:**  Do you feel that's an

19    appropriate amends to -- for your crime?

20    **INMATE SULLIVAN:**  Well, to me it was my way of

21    showing him how -- how truly sorry I am for what I did to

22    him.

23    **DEPUTY COMMISSIONER STAR:**  Okay.

24    **INMATE SULLIVAN:**  I don't -- I don't know any

25    other way to do that.  I really don't.

26    **DEPUTY COMMISSIONER STAR:**  Okay.  All right, the

27    doctor goes on to say that alcohol, in addition to -- to

61

1    address the question raised by the Board whether alcohol

2    played a part, the doctor says, and again, I'm quoting or

3    paraphrasing from page 3 of the doctor's report, that

4    "alcohol did not play a direct role in the commission of

5    the crime.  It is more likely that Mr. Sullivan's abuse

6    of alcohol contributed to an overall lack of judgment and

7    erosion of values with which he was raised.  He clearly

8    stated a commitment to lifelong participation in AA."

9    Mr. Sullivan, Commissioner Biggers asked you about your

10   livelihood and your -- how much you were making.  Do you

11   -- do you believe in looking back on this you were living

12   outside your means and wanting more than you could live

13   on -- could -- could support yourself on?

14        INMATE SULLIVAN:  You know, when I look back on

15   that it -- it's -- it wasn't -- it really wasn't the

16   money.  It was like I really wasn't -- didn't really

17   understand how much money I was making and how to manage

18   the money.  But if I knew I, you know, if I had knew what

19   I was making I probably would've did something different.

20   But I really didn't understand the concept of making

21   money as far as how much and how to manage it and --

22   there's no -- you know, I don't want to make excuses.

23        DEPUTY COMMISSIONER STAR:  You bought some

24   furniture you said but how did you believe you were going

25   to pay for that?

26        INMATE SULLIVAN:  Well, by me working.

27        DEPUTY COMMISSIONER STAR:  What --

62

1              INMATE SULLIVAN:  I think I paid for it -- I paid
2      for it.
3              DEPUTY COMMISSIONER STAR:  You did?
4              INMATE SULLIVAN:  Yes.
5              DEPUTY COMMISSIONER STAR:  Okay.  All right.
6      Then the doctor, I'm -- again conclude here with the
7      doctor's comments on his risk assessment.  The doctor
8      states that,
9                       "The factors that would come into play
10                      to determine risk would be lack of
11                      insight, negative attitudes, lack of
12                      empathy, impulsivity, symptoms of major
13                      mental ill -- illness, or failure at
14                      treatment would be considered as
15                      possible sources of increased risk.
16                      But on -- based on review of Mr.
17                      Sullivan's present institutional record
18                      and the clinical interview conducted
19                      for this report, it would appear that
20                      none of these risk factors is currently
21                      present."
22     And then just -- the doctor concludes with some comments
23     that,
24                      "he was not known to be a violent
25                      person before the crime.  He has not
26                      engaged in violence subsequent to the
27                      crime.  His criminal actions seem to

63

1      reflect a dramatic but failed attempt

2      to solve his financial problems by

3      criminal means.  Given Mr. Sullivan's

4      history, institutional adjustment, and

5      present clinical presentation, there

6      are no psychological factors that would

7      suggest an increased risk for violent

8      behavior in either the community or a

9      controlled setting at the present time.

10     Whether it is not possible -- while it

11     is not possible to accurately predict

12     future violent behavior given Mr.

13     Sullivan's age, commitment to ongoing

14     substance abuse treatment, and limited

15     criminal history, he would be expected

16     to be able to continue to live a

17     positive, nonviolent life when released

18     to the community."

19  All right, any comments you want to make on what the

20  doctor said that I covered or highlighted?

21          INMATE SULLIVAN:  That's pretty much how I feel

22  today.  I -- I know what I did was wrong.  I understand

23  that.  And I wish I could take that day back, but I -- I

24  can't and I'm truly sorry for that.  I really am.  I

25  really don't know what else to say or do.

26          DEPUTY COMMISSIONER STAR:  Okay.

27          INMATE SULLIVAN:  All right.

64

1          DEPUTY COMMISSIONER STAR:  Turn your attention

2    then back to Commissioner Biggers.

3          PRESIDING COMMISSIONER BIGGERS:  Okay, I'm going

4    to talk to you about parole plans.  You had indicated

5    that -- that the family support had not changed, that you

6    plan to -- who do you plan to live with?

7          INMATE SULLIVAN:  My mother.

8          PRESIDING COMMISSIONER BIGGERS:  Okay.  And that

9    you were going to request some updated letters and hope

10   to have them prior to your 2006 hearing.  I see that

11   there's one letter from your mother.  Are there any

12   letters that you have since your last hearing?

13         INMATE SULLIVAN:  I should have one from my

14   niece.

15         PRESIDING COMMISSIONER BIGGERS:  Okay.  She -- in

16   the letter dated 1/31/06, she reaffirms the commitment to

17   provide you with whatever you need in the way of shelter,

18   clothes, transportation, and money.  And your niece,

19   Tanya, sent one in -- in '05 and said she would dedicate

20   her time and help him locate a job.  Okay, on the -- so

21   in other words, you would stay with your mother.  You

22   don't have any firm job offers yet, do you?

23         INMATE SULLIVAN:  I have one firm job offer

24   there.

25         ATTORNEY STRINGER:  There should be a letter in

26   the file from '05, Commissioner.

27         PRESIDING COMMISSIONER BIGGERS:  Okay.  Let me

65

1    just go to that and see if I can find that.

2         MALE:  Is that the one from the -- the industrial

3    roofing?

4         INMATE SULLIVAN:  Yes.

5         PRESIDING COMMISSIONER BIGGERS:  Okay.

6         MALE:  Of course that's an undated letter that we

7    have.  And it was never -

8         PRESIDING COMMISSIONER BIGGERS:  It's undated?

9         INMATE SULLIVAN:  That's -- that's the job offer

10   that I received.

11        PRESIDING COMMISSIONER BIGGERS:  Okay.  Let's see

12   if I can find that.  This is one from your mother again

13   in '06, did you find that?

14        DEPUTY COMMISSIONER STAR:  It's right here?

15        PRESIDING COMMISSIONER BIGGERS:  You got the good

16   file there.  From Mike Farrell (phonetic), "I will

17   guarantee a job for Mr. Jerry Sullivan."  Is this the

18   same guy you were working for before?

19        INMATE SULLIVAN:  No, this is another guy.

20        PRESIDING COMMISSIONER BIGGERS:  Indicated it

21   will be $14 an hour and possibly raised to (inaudible)

22   after three months.  But, again, it's not -- that's in

23   Sausalito right down the street here.  But it is un --

24   doesn't have a date on it.  Okay.  Do you recall when you

25   first got that letter?

26        INMATE SULLIVAN:  It might've been last year or

27   the year before.  I'm not sure.

66

1        PRESIDING COMMISSIONER BIGGERS:  So, again,

2    that's what really bothers the Board then if you -- it

3    was 2004, you know, that's -

4        INMATE SULLIVAN:  Yeah, I -- I -- I understand.

5        PRESIDING COMMISSIONER BIGGERS:  You understand

6    that situation?  All right.  Let's go to your mother's

7    letter.  That's -- this is the one January 31st, 2006.

8    Is that correct?

9        INMATE SULLIVAN:  Yes.

10       PRESIDING COMMISSIONER BIGGERS:  And she says

11   she's your mom and that she's confirmed that she'll

12   provide the shelter and a home for you and she loves you

13   very much.  She would give anything to have you home.

14   And she says how much you've changed.  And she talks

15   about your work and what you -- how you plan to do with

16   your time here at -- at the prison.  Then there's one

17   from your niece, Tanya.  And it's dated February the

18   20th, 2005?

19       INMATE SULLIVAN:  Yes.

20       PRESIDING COMMISSIONER BIGGERS:  Okay, you

21   haven't got one from 2006 yet?

22       INMATE SULLIVAN:  Yes.

23       PRESIDING COMMISSIONER BIGGERS:  You have a 2006

24   one in your file?

25       DEPUTY COMMISSIONER STAR:  From who?

26       PRESIDING COMMISSIONER BIGGERS:  Tanya.

27       DEPUTY COMMISSIONER STAR:  Okay.