# EXHIBIT 8
# part 2 of 2

67

1      **PRESIDING COMMISSIONER BIGGERS:** Tanya Sims.  I

2    have a 2005, but not --

3      **DEPUTY COMMISSIONER STAR:**  I don't recall looking

4    at it.  Dorthea Sims.

5      **PRESIDING COMMISSIONER BIGGERS:**  No, that's the

6    mother.

7      **DEPUTY COMMISSIONER STAR:**  Okay.

8      **PRESIDING COMMISSIONER BIGGERS:**  The next letter

9    I got is in 2005.  Do you have a copy of it in your file,

10    sir?  Okay.

11      **DEPUTY COMMISSIONER STAR:**  I do not see it.

12      **PRESIDING COMMISSIONER BIGGERS:**  All right.  So

13    you're sure you didn't get it confused with 2005 letter?

14    Did you get one recently since then?

15      **INMATE SULLIVAN:**  I -- I had one recently.  I put

16    it -- I gave it to my counselor.

17      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Well,

18    we'll take that in advisement then.  But, basically, what

19    she was telling you in '05 is probably the same as that -

20    - that she puts her faith in God and -- and you and

21    undoubtedly it's working, because you haven't had any

22    115's or anything so.

23      **INMATE SULLIVAN:**  Yeah.

24      **PRESIDING COMMISSIONER BIGGERS:**  As you know, we

25    send 3042 notices out to -- this is law enforcement or

26    anyone else in law enforcement that may be interested in

27    -- in the outcome of your case.

68

1       INMATE SULLIVAN:  Yes.

2       PRESIDING COMMISSIONER BIGGERS:  I didn't see any

3   letters of opposition in your file.  However, we do have

4   the District Attorney here who will be speaking to us a

5   little bit later on about their concerns as well.  Did I

6   leave out, counselor, any letters that you may have in

7   your file?

8       ATTORNEY STRINGER:  Well, I notice in the -- in

9   the packet I have, Commissioner, there's at least one

10  letter from a San Quentin -- either correctional officer

11  or a superintendent --

12      PRESIDING COMMISSIONER BIGGERS:  Okay.  And

13  what -

14      DEPUTY COMMISSIONER STAR:  -- in PIA.

15      PRESIDING COMMISSIONER BIGGERS:  All right, what

16  -- when was that --

17      ATTORNEY STRINGER:  That's in November 13th of

18  '04.

19      PRESIDING COMMISSIONER BIGGERS:  Okay.

20      ATTORNEY STRINGER:  I believe the superintendent

21  of the sewing machine --

22      DEPUTY COMMISSIONER STAR:  I have that.

23      PRESIDING COMMISSIONER BIGGERS:  You have that.

24      ATTORNEY STRINGER:  -- industry and also one from

25  Mr. Jenkins who's involved in mattress and bedding.

26      PRESIDING COMMISSIONER BIGGERS:  Yeah, I -- I'm

27  only going back from the last hearing.  So --

69

1        **ATTORNEY STRINGER:**  Well, they were included in

2    the file so I --

3        **PRESIDING COMMISSIONER BIGGERS:**  All right, and,

4    you know, it is a favorable letter from the

5    superintendent of San Quentin -- the mattress.  I have

6    that one, too, which is November 13, 2004.  However, I

7    only went back to the -- the first -- went back from the

8    last hearing, which was 2005 because you should try to

9    get updated letters.

10        **INMATE SULLIVAN:**  2006?

11    **PRESIDING COMMISSIONER BIGGERS:**  Well, this letter that I

12    got from -- from the Lock-Stitch Sewing Machine

13    Superintendent II was November 13, 2004.  Well, here's

14    one from March 8, 2006.  See, I didn't have this.  Do you

15    have this one, counselor?

16        **ATTORNEY STRINGER:**  No.

17        **PRESIDING COMMISSIONER BIGGERS:**  From a

18    Supervisor I Jenkins?

19        **ATTORNEY STRINGER:**  Well, I have Mr. Jenkins'

20    letter.  I can't --

21        **PRESIDING COMMISSIONER BIGGERS:**  This one -- no,

22    this is the one that is probably different.  This is one

23    from 2006.

24        **ATTORNEY STRINGER:**  No.

25        **PRESIDING COMMISSIONER BIGGERS:**  Well --

26        **DEPUTY COMMISSIONER STAR:**  My file does have that

27    one.

1    PRESIDING COMMISSIONER BIGGERS: Okay. I've got

2    to talk to them about these files, you know. All right,

3    I'm going to accept as -- I'll give it back to you there,

4    Mr. -- Mr. Sullivan. But, anyway, there is a letter,

5    March -- dated March the 8th, 2006, from a Mr. I.T.

6    Jenkins, J-E-N-K-I-N-S. And it's a letter of

7    recommendation for inmate Sullivan and he's with the PIA

8    industry. Okay. And it basically says he is the current

9    lead man in the pillow factory and has filled the

10    position admirably for the past year. You were involved

11    in the conception of a new department in -- in PIA

12    complex. And he said before you were transferred to the

13    pillow factory you were employed as a lead man in the

14    finishing department for a year. And that you

15    continually prove yourself to be a reliable,

16    conscientious and hard-working individual. Should be

17    commended for continuing hard work. Definitely an asset

18    to this department. Upon his released would prove --

19    would prove equity value to any company or business

20    venture he might become associated with. This is very

21    favorable. Make sure you get that to your counselor --

22    INMATE SULLIVAN: Okay.

23    PRESIDING COMMISSIONER BIGGERS: -- if you don't

24    get a date today to get into your files.

25    INMATE SULLIVAN: All right.

26    PRESIDING COMMISSIONER BIGGERS: Even if you do,

27    I would still get it to my counselor so I could get it

71

1    into the file.

2         INMATE SULLIVAN:  All right.

3         PRESIDING COMMISSIONER BIGGERS:  Okay, and any

4    other letters that I may have missed?  All right, at this

5    point then, I'm going to ask the District Attorney if he

6    has any questions for the --

7         DEPUTY DISTRICT ATTORNEY WADDELL:  I have no

8    questions.

9         PRESIDING COMMISSIONER BIGGERS:  All right, thank

10   you.  All right, counselor, Mr. Stringer?

11        ATTORNEY STRINGER:  I do, Commissioner, thank

12   you.  Mr. Sullivan, if you were granted a parole date and

13   the Board imposed a number of conditions on you, i.e.,

14   attend AA on a regular basis, do drug tests, you attend

15   an outpatient program, would you comply with each and

16   every one of those conditions?

17        INMATE SULLIVAN:  Yes.

18        ATTORNEY STRINGER:  And as a person that's been

19   in AA, you realize you can never drink again?

20        INMATE SULLIVAN:  Yes.

21        ATTORNEY STRINGER:  If you were given a parole

22   date would you acquire a sponsor?

23        INMATE SULLIVAN:  Yes.

24        ATTORNEY STRINGER:  Would you try to participate

25   in some 12 Step work assisting other people that --

26        INMATE SULLIVAN:  Yes.

27        ATTORNEY STRINGER:  Now, in your self-help and

72

1    therapy activities, do you realize that you've obtained

2    37 separate certificates, including AA, throughout the

3    years?

4            INMATE SULLIVAN:  I know (inaudible).

5            ATTORNEY STRINGER:  What -- what caused you to

6    program so extensively in self-help and therapy area?

7    program so extensively in self-help and therapy?  Why did

8    you do that?

9            INMATE SULLIVAN:  Well, I'm still having problems

10   figuring out how I got in prison, but I know the act that

11   I did put me here.  And being in all these programs

12   really opened me up to understand how I got here and how

13   I got myself involved in this stuff that I shouldn't have

14   got involved in.  But being in all these different

15   programs really helped me see myself and see who I am.  I

16   made a mistake.

17           ATTORNEY STRINGER:  Now, we all know there's

18   drugs all alcohol in prison.  You've resisted the

19   temptation for all these years?

20           INMATE SULLIVAN:  Yes, I -- I don't use drugs and

21   I don't use alcohol anymore.

22           ATTORNEY STRINGER:  How long have you been

23   incarcerated?

24           INMATE SULLIVAN:  I think it's 24 years.

25           ATTORNEY STRINGER:  And how old are you?

26           INMATE SULLIVAN:  Fifty-three.

27           ATTORNEY STRINGER:  You've obtained skills in PIA

73

1  sewing machine --

2      INMATE SULLIVAN:  Yes.

3      ATTORNEY STRINGER:  -- program here in San

4  Quentin?

5      INMATE SULLIVAN:  Yes.

6      ATTORNEY STRINGER:  What does that involve?

7      INMATE SULLIVAN:  That involves process of

8  mattress, pillows.  You start from scratch.  You have to

9  cut it, you have to sew it, and you have to stuff it,

10  it's a process that -- it goes through a complete whole

11  mattress and pillow really.

12      ATTORNEY STRINGER:  So if you were given a date

13  you could obtain employment in that field?  You feel

14  confident you --

15      INMATE SULLIVAN:  Yeah.  I -- I'm sure I can.

16      ATTORNEY STRINGER:  And as a forklift operator,

17  would you be able to get a job say on the docks or at a

18  warehouse or something of that --

19      INMATE SULLIVAN:  I believe I can.  I'm sure I

20  can.

21      ATTORNEY STRINGER:  Can you operate all types

22  of -- [alarm sound]

23      DEPUTY COMMISSIONER STAR:  Would you hang on, Mr.

24  Stringer?

25          [Thereupon, the tape was changed.]

26      ATTORNEY STRINGER:  -- and questioning Mr.

27  Sullivan about job skills.  Do you feel you could operate

74

1   all types of forklifts?

2           **INMATE SULLIVAN:**  Yeah, I believe I can.

3           **ATTORNEY STRINGER:**  Now, supposing you were given

4   a date and you're out on the street and someone comes up

5   to you and says look, Mr. Sullivan, you've been in prison

6   a long time, you don't have any money, let's go out and

7   rob a grocery store.  How -- how have you changed?  How

8   has your thinking changed regarding that?

9           **INMATE SULLIVAN:**  You know, I -- I smile because

10  I still look at how I got into prison.  You know, there's

11  good people out in society.  I know that.  And there

12  still people that will help you.  All you have to do is

13  ask for help.  I -- I don't see myself breaking the law

14  anymore.  I did like a one-time thing that I got myself

15  involved in.  I really didn't understand what it was, but

16  I know this ain't where I want to be and I know that if

17  I'm given an opportunity to go back into society, I won't

18  break the law.  I know that in my heart, you know.  It

19  hasn't been easy me being in prison, but I've learned a

20  lot in prison and it's -- to me it's like there's two

21  ways you can live in society.  You can live honest in

22  society and go out and work hard all your life or you can

23  go out in society and be a crook or thief or a person

24  that's always looking for something -- some angle to beat

25  somebody out of something.  I wasn't that kind of person

26  at first.  But I -- I got involved in something that I

27  got involved in and I'm not that kind of person now.  I

1    do a lot of things in prison for other people and I know

2    that being locked up over these years have confirmed who

3    I am.  I'm a good, caring person.  I made a mistake.  And

4    I don't know what else I could possibly do to get out of

5    prison other than what I'm doing.  And I'm going to

6    continue to do what I'm doing until I get out.  I'm not

7    going to break no laws.  I gave half my life away in

8    prison already and I -- I -- I -- I don't know -- I don't

9    know what to say -- I don't know what else I could

10   possibly say or do.

11        ATTORNEY STRINGER:  Thank you.  Thank you,

12   Commissioners.  That's all I have.

13        PRESIDING COMMISSIONER BIGGERS:  Okay.  Do you

14   know what your TABE score is?

15        INMATE SULLIVAN:  My -- the last time I -- I took

16   the TABE test (inaudible).

17        PRESIDING COMMISSIONER BIGGERS:  Right.

18        INMATE SULLIVAN:  I think it was four minus or

19   something.

20        PRESIDING COMMISSIONER BIGGERS:  Four minus

21   something.  Okay.

22        DEPUTY COMMISSIONER STAR:  I didn't see it in

23   here.

24        PRESIDING COMMISSIONER BIGGERS:  I didn't see it

25   in there.  It wasn't on the - on the 1073.

26        INMATE SULLIVAN:  It was like when they -- I

27   don't know, it was like when I took that test, I didn't

76

1    want to take it, and it was like they was making me do

2    something.

3           PRESIDING COMMISSIONER BIGGERS:  So you just

4    screwed it up?

5           INMATE SULLIVAN:  I just didn't -- I really

6    didn't concentrate on the test.  I just --

7           PRESIDING COMMISSIONER BIGGERS:  You know how

8    important that is?

9           INMATE SULLIVAN:  I understand now but, you know,

10   at the time I had my GED and it was like you got to take

11   this test and I'm saying no, I got a GED, I don't need to

12   take the test.

13          PRESIDING COMMISSIONER BIGGERS:  That helps to

14   classify you.

15          INMATE SULLIVAN:  I understand now that I

16   should've went on and took the test cause I already had a

17   GED anyway, but at the time I was like --

18          DEPUTY COMMISSIONER STAR:  They never tested you

19   after that?  After you first started did they ever test

20   you again?

21          INMATE SULLIVAN:  Well, I -- no, I didn't -- I

22   didn't feel I needed to be tested.

23          PRESIDING COMMISSIONER BIGGERS:  I see.  You said

24   you made one mistake.

25          INMATE SULLIVAN:  Well, you know, it --

26          PRESIDING COMMISSIONER BIGGERS:  Sounds like a

27   couple more.

77

1                **INMATE SULLIVAN:**  -- was like a rebellious thing

2    where why I do need to take a test, I got a GED.

3                **PRESIDING COMMISSIONER BIGGERS:**  Uh-huh.  Some

4    times, you know --

5                **INMATE SULLIVAN:**  But that was back in --

6                **PRESIDING COMMISSIONER BIGGERS:**  It don't matter

7    when.

8                **INMATE SULLIVAN:**  I know, but that was back in --

9    when I first come to prison.

10             **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Well, all

11    right, let's --

12             **ATTORNEY STRINGER:**  Speaking of that,

13    Commissioner, did we establish for the Board that his

14    custody score was 19?

15             **PRESIDING COMMISSIONER BIGGERS:**  Yes.

16             **DEPUTY COMMISSIONER STAR:**  Yes, I got it on the

17    record.

18             **PRESIDING COMMISSIONER BIGGERS:**  Yes, you did.

19    Okay.  All right, I'm going to ask the District Attorney

20    to close at this point, please.

21             **DEPUTY DISTRICT ATTORNEY WADDELL:**  Well, to be

22    truly fair to Mr. Sullivan, he's done reasonably well, I

23    think, as the years have gone on.  However, we're

24    opposing a grant of parole and we ask for another one-

25    year denial for the following reasons.  First of all,

26    regarding the commitment offense.  We have two counts of

27    209, the kidnapping.  They were concurrent sentences.

78

1    Could've been consecutive, but they were concurrent

2    sentences.   In addition to that, in the other -- this was

3    by plea where he came before the court and admitted his

4    guilt, and I think it's significant there was also a plea

5    in there which got him an additional seven years for the

6    attempted murder.   Now, I think you have to reflect on

7    that for a moment given the fact that he has consistently

8    denied any intent -- intent to kill.   But when he was in

9    court he actually entered a plea after one year by the --

10   under the DA that -- being guilty for the attempted

11   murder.   Two victims, Mr. and Mrs. Reily, clearly they

12   were abused and terrorized during the course of this

13   event which lasted over a number of hours, not just a

14   half hour or ten minutes.   I takes longer than that to

15   get to -- it takes more than an hour to get from Tracy to

16   Walnut Creek.   They were threatened with rape and death

17   and held at gunpoint by the inmate.   And, again, there is

18   still some attempt I think here to minimize the -- his

19   role in the offense, in spite of the fact that he claims

20   he's taking responsibility, because in the probation

21   officer's report on page 7, line 5, we find that the

22   victim said that in addition to the tape, the -- they

23   personally threatened the wife with rape and death if

24   there was not compliance.   They also played the tape, but

25   they also made personal threats, which he has now denied.

26   The motive really -- was really trivially in the --

27   trivial in the -- given the consequences that were

79

1    contemplated here and the offense really was rather

2    sophisticated.  Acknowledging that Mr. Davis was the --

3    was the leader and he -- I think he died in prison

4    (inaudible) crazy as a matter of fact not too long ago.

5    He may still be alive.  I thought that he passed away.

6    But, in any event, the three of them, Mr. Sullivan and

7    Buford, and Mr. Davis, all plotted and they devised a

8    rather elaborate scheme tape-recording threats, cars and

9    transportation, and -- and all that to -- to get this

10   money from the victim.  And while perhaps not the

11   mastermind, if you want to use that sent -- term, of this

12   crime, he clearly was a -- a leader.  He had the gun.  He

13   was age 29 when he committed this offense, so this was

14   not a rash act of impetuous youth.  To his credit, he did

15   not have the significant substantial criminal history

16   prior to that.  But other crimes were integral parts of

17   the kidnapping and they've been gone over again and I

18   emphasize the attempted murder, but we have the robbery,

19   the false imprisonment, the auto theft.  All the things

20   that are part and parcel of this crime.  Clearly there

21   were potential for injuries to persons other than the

22   victims.  We recall that Mr. Sullivan attempted to evade

23   the police and went on the reckless drive, crashed the

24   car on the freeway, I think right -- right outside of

25   Caldecott Tunnel.  And, you know, obviously the manner of

26   the chase put the lives of other members of the public,

27   the driving public certainly, at risk, as well as his own

80

1    and Mr. Reily's. Not to mention the fact that he tried

2    to shoot him. And clearly he also declined to take an

3    opportunity to cease or withdraw from the crime. This

4    crime took a substantial period of time to plan and to

5    perform. Again, it was not a rash, impetuous act. It

6    was planned, premeditated, and the inmate had numerous

7    opportunities to back out of this conspiracy and say,

8    hey, enough is enough. I'm not going to do this. So,

9    again, he had these opportunities. It wasn't one of

10   these things that went on and, like a steamroller, he

11   couldn't get out of it. It took a long time to complete

12   and he could've gotten out of this if he'd wanted to. As

13   far as the victim is concerned, I don't know if there was

14   (inaudible) on this, but I'm sure the victim has written

15   the Board constantly over the years opposing parole.

16   There's got to be letters in the file as early as his

17   last hearing. And if there's not one in for this one

18   it's just because after a while, you know, you run out of

19   steam on these things. But clearly the file shows that

20   the victim has continued to write the Board opposing

21   release. They were vulnerable. Business people showing

22   a house, no reason to suspect the pending 209. They were

23   -- there's no way implicit or in no way brought on this

24   conduct by the inmate himself. Also the -- there was a

25   personally use of a handgun involved in the crime. The

26   prior record, to his credit, is -- is insignificant

27   relative to, you know, other people that we've seen.

1    That's a positive thing.  He does have somewhat of an

2    unstable social history.  Raised by his grandmother.  He

3    is a high graduate.  But there's no really significant

4    work history in that the alcohol abuse was admitted at

5    early age.  And that seemed to be the genesis of -- of

6    his problem.  Again, the institutional behavior, quite

7    good.  And he's to be congratulated on that.  He does

8    have a vocation in Upholstery, Forklift Operator.  I

9    would suggest that the jobs he seek should be based on

10   his qualifications that he has obtained in prison.  He's

11   got one undated and outdated letter in the roofing field,

12   but it's got to be tough work for a guy that's getting

13   into his 50s and he's certainly got the credentials and

14   I'd like to see him pursue that eventual work for job

15   offers.  He does have I feel adequate programming in

16   self-help.  Involved in AA.  He's averaged about three

17   programs a year in self-help and that's -- recently and

18   that's -- that's -- that's good.  A little bit of a

19   problem with the psychiatric issues here, which is

20   probably one of the main reasons outside of the just the

21   outrageous nature of the crime we'd be opposing parole.

22   Again, he says he didn't intend to kill anyone but pled

23   guilty to attempted murder.  The gun was loaded.  It was

24   fully loaded.  Whether it was fully loaded or two shells

25   or three shells, we don't know but it was loaded at

26   several points (inaudible) and there was no indication to

27   indicate that it was not capable of operation with or

82

1    without a cylinder pin.  The 2002 psychiatric report
2    talks about a moderate to mild risk.  What we look for
3    where we feel comfortable in moving on with parole is
4    words like negligible, low, minimal, insignificant.  Not
5    moderate or below average.  Psychiatrists and
6    psychologists do use terms like that to designate low-
7    risk people.  In the 2005 assessment while there is no
8    direct answer to the question, I think in all fairness
9    taken as a whole, you can probably say the 2005 report
10   indicates a low-risk, essentially, in view of the writer.
11   However, this is a relatively recent prognosis and we
12   feel that a longer period of time having reached this
13   level of risk in the view of the psychiatrist after
14   rather lengthy road, that we feel a longer period of
15   observation is necessary.  Not real long, but a little
16   longer observation is necessary to insure that this low-
17   risk status is maintained.  Parole plans, I guess the
18   problem would be that, you know, his mother, of course,
19   is quite elderly at this point and there's some question
20   whether or not she has the capability to provide the
21   guidance and support to, you know, help him if he goes
22   live with her or whether, you know, she'll be just a
23   burden on him rather than a -- a support system.  But he
24   does have marketable skills, but hasn't chosen to seek
25   job offers from companies in that particular field.  And
26   the only letter we have now is this undated letter in the
27   roofing industry.  There's been no contact with outside

83

1    agencies for re-entry support, which I think is important

2    for Mr. Sullivan.  There's talk about he will do this, he

3    will do that but, again, there's most -- most -- many

4    people who are in his situation have letters from re-

5    entry programs, assistance groups, living situations who

6    will -- will be identified as persons will -- and groups

7    who will help him in his return to the community.  I

8    think he needs to do this.  He does have manifest support

9    from friends and -- and family members.  So, all in all,

10   while he has done pretty well, particularly in the area

11   of lack of disciplinaries and in the self-help, there are

12   a few areas here as I've indicated that cause us some

13   concern.  Just to reiterate that, we have the crime which

14   is aggravated due to the multiple victims.

15        **PRESIDING COMMISSIONER BIGGERS:**  All right, are

16   you finished, sir?

17        **DEPUTY DISTRICT ATTORNEY WADDELL:**  Almost.

18        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

19        **DEPUTY DISTRICT ATTORNEY WADDELL:**  The attempted

20   187 and the psychiatric reports of recent -- recent

21   vintage which I think is good, but we need to sit on it

22   for another year.  Thank you.

23        **PRESIDING COMMISSIONER BIGGERS:**  Okay, thank you.

24   All right, I'm going to ask your attorney now.  Mr.

25   Stringer, do you have -- close, of course, please?

26        **ATTORNEY STRINGER:**  Thank you.  Commissioner, the

27   relative standard the Board must use in assessing Mr.

84

1     Sullivan for a date is does he present an unreasonable

2     risk of danger to society or a threat to public safety as

3     he sits before you now.    There must be some evidence

4     before the Board, as indicated in the *Powell* and

5     *Rosenkrantz* decisions, that would show Mr. Sullivan is an

6     unreasonable risk of danger to society.    I would submit

7     there is absolutely no evidence before this Board that

8     would comport with that standard.    Certainly, the

9     commitment offense was obviously very difficult for the

10    Reily family.    But to try to suggest that this was the

11    Dalton gang I think flies in the face of the facts.    This

12    certainly was not.    This is Mr. Sullivan being caught up

13    in an event that even he, at this point, struggles with.

14    He had no juvenile record prior to this.    A very, very

15    minimal adult record.    No tendencies at all towards

16    criminal conduct.    His conduct within the institutions

17    has been exemplary.    He comes to you disciplinary-free.

18    That in itself is a remarkable achievement within the

19    California prison system.    So certainly you can

20    characterize Mr. Sullivan's crime as a one-time

21    aberration in his life.    I want to point out that in the

22    probation report, there was first a reference to a -- a

23    police officer examining the weapon in question and

24    saying that it was fully functional.    Now, I don't know

25    where he received his training in weapons at, but on page

26    10 of the probation officer's report, it says at the

27    police station the defendants were strip-searched and a

85

1    small piece of metal resembling a bent piece of coat

2    hanger fell from the underwear of the defendant.  This

3    metal was later determined to be the cylinder pin to the

4    revolver.  And it would -- it is a factual impossibility

5    for a weapon to fire, at least in my experience, without

6    a firing pin.  Mr. Sullivan also indicated further on

7    page 13 of the probation report, that he'd lost some of

8    the bullets.  He went on to explain that when he pulled

9    the gun out from his waste-band the cylinder opened up

10   and he thought he dropped two bullets on the ground.  He

11   further explained he had lost the cylinder pin and that

12   was why it had opened which substantiates what my client

13   has testified to today.  In the current Board report

14   under Factors and Mitigation, the counselor says quote

15   "there is a possibility that Sullivan had no apparent

16   disposition to commit this crime and it was induced by

17   others."  I think his answers support that particular

18   conclusion.  In the area of self-help and therapy he has

19   37 different certificates which is remarkable.  That does

20   include AA.  He has a minimum eligible parole date of

21   5/22/93 which he means he is well over the matrix for

22   this particular crime.  He has many marketable skills

23   within the definition of Title 15 Section 2402 Sub D8.

24   So there is no evidence before the Board that he has any

25   type of escalating pattern of violence.  His social

26   history was relatively stable.  Dr. Inaba and others have

27   indicated that he has spent his time while incarcerated

86

1    changing himself.   And I know there's been some concern

2    about Dr. Inaba's report, but for Dr. Inaba even reaching

3    the conclusions that she did is remarkable for her in my

4    view.   She does indicate under assessments of

5    dangerousness,

6.              "Mr. Sullivan does not have a history

7               of institutional violence.   He

8               demonstrates respect for authority and

9               a mature outlook on his incarceration

10              and life in general.   He identifies

11              himself as a nonviolent person who

12              strives to get along with others."

13   I think that is supported by the letters in the file from

14   the superintendents that have -- of the PIA industry at

15   San Quentin that have worked with Mr. Sullivan.   The

16   doctor also says "other than continuing in AA there would

17   be no recommendation for necessary therapeutic

18   interventions prior to parole.   Now, certainly, if the

19   State of California is concerned about Mr. Sullivan

20   within the parole process they have the ability to

21   investigate all of his parole plans.   They can go to the

22   job that he has and find out if that job is still

23   current.   They can make sure that he goes to AA on a

24   regular basis.   They can test him for alcohol consumption

25   on a regular basis.   For five years they would have

26   complete control of Mr. Sullivan and know exactly where

27   he is.   If he violates any conditions of his parole he

1   could be immediately brought back to prison. So I would

2   submit that under the law, unless there is some evidence

3   before this Board that would show that Mr. Sullivan is an

4   unreasonable, and that's a legal term of art, an

5   unreasonable risk of danger to society that under the law

6   the Board is compelled to grant Mr. Sullivan a date. We

7   would ask and request that date. Thank you.

8        PRESIDING COMMISSIONER BIGGERS:  Okay, thank you.

9   Now, Mr. Sullivan, you have the opportunity to tell this

10  Panel why you feel you are suitable for parole.

11       INMATE SULLIVAN:  I am very sorry. I feel that

12  I'm suitable for parole because I've tried to do

13  everything that I was asked to do in here and I'm truly

14  sorry for what I did. There's nothing that I can

15  actually really say today that could change what I've

16  done. But over the years it hasn't been easy for me and

17  I know it hasn't been easy for the victims that I've -- I

18  -- stuff that I did to them. And I regret that day and I

19  probably will always regret that day. But I know there's

20  nothing that I could say today that could change that

21  other than I done changed myself as far as -- I

22  understand now what it means to be in society, to live

23  right. And I've heard the words above your means and all

24  that but at the time I don't think I was doing that. I

25  was -- I was just working and partying and having fun and

26  drinking and that kind of stuff but this -- this is what

27  I got myself involved in. Way over my head and I

88

1    understand that.  And I'm sorry for it.  And I could say

2    that until I get old and die in here and I'm truly sorry

3    for that and I -- I did every possible thing that I could

4    possibly do to get back to my family.  Now, the pain and

5    suffering that I've created and caused for Mr. and Mrs.

6    Reily, I just don't know what possibly I could do to

7    change that.  I wish it was something actually I could

8    really do for them, for him.  I heard his wife died.  I

9    don't know if that's true or not, but I'm sorry to hear

10   that.  And like I said I made a mistake.  I'm asking for

11   a second chance.  And I know if I get a second chance I

12   will not break any laws, I will not get involved with

13   anybody breaking laws.  You know, I laid in my cell one

14   night and I say, you know, you're going in front of the

15   Board and if you don't tell the Board what they want to

16   hear, they know you -- you on -- you on one side of the -

17   - you got to be on the right side.  If a crime has

18   occurred, would you tell?  And I asked myself that.  I

19   said, you know what, if I didn't tell, it's just as bad

20   as if I'm on the side of the crooks.  And I don't think

21   I'm a crook.  I'm an honest person.  I made a mistake.

22   And I -- I -- and I'd do anything to get back to society.

23   And I will not break any laws.  And even if I seen

24   anybody in society, and maybe I will, that's the wrong

25   way.  I feel like I'm in prison and I can't get out.  And

26   I don't know what else that I could possibly do to get

27   out.  I'm going to keep striving though cause I think

89

1  that day's going to come.  And I'm truly sorry for what I

2  did to Mr. and Mrs. Reily.  I will never forget them.

3  And I don't know what else to say.

4        **PRESIDING COMMISSIONER BIGGERS:**  Okay, sir, thank

5  you.

6        **INMATE SULLIVAN:**  Thank you.

7        **PRESIDING COMMISSIONER BIGGERS:**  Okay, we're

8  going to recess at this -- at this time and go into

9  deliberations.

10                    **R E C E S S**

11                     --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

90

1      CALIFORNIA BOARD OF PAROLE HEARINGS

2            D E C I S I O N

3      DEPUTY COMMISSIONER STAR:  We're back on record.

4      PRESIDING COMMISSIONER BIGGERS:   Okay, let the

5   record reflect that everyone that was in the room prior

6   to us going into deliberations are now back in the room.

7   Before I do the formal decision, Mr. Sullivan, there's a

8   couple things I want to point out to you.  This was a

9   truly difficult situation for us.  And -- but there are

10  some things that we do have some concerns about.  And

11  once go through the entire process, you'll understand why

12  I have some concerns about this.  But I want to make sure

13  that you understand --

14     INMATE SULLIVAN:  Right.

15     PRESIDING COMMISSIONER BIGGERS:   -- and don't get

16  discouraged because you are extremely close to being let

17  go out of here.  But there are some things that just need

18  to be firmed up.  And that would be -- you did -- you did

19  an excellent job of going through everything with us

20  today and that's appreciated because too many times we

21  don't get that.  But you seem to be very sincere.

22  However, we have reviewed all the information received

23  from the public and relied on the following circumstances

24  in concluding that the prisoner is not suitable for

25  parole and would pose an unreasonable risk of danger to

26  society or a threat to public safety if released from

27  J. SULLIVAN C-66878 DECISION PAGE 1    7/21/06

91

1    prison. We looked at the offense. It was calculated.

2    It was especially cruel and it did create human suffering

3    in that you and a co-defendant, Jerry Sullivan [sic],

4    made an appointment with the -- the Reily realtors. You

5    -- at a home that you had no intentions of buying. You

6    led them there for the sole purpose of getting them alone

7    and then at that point you and your crime partners

8    decided -- had already calculated that you were going to

9    kidnap them for the purpose of money, for ransom. After

10   you got them there you -- you and your crime partners

11   elected to take them to their home, that was in Walnut --

12   Walnut Creek, where there were some threats made which --

13   and just to show them by your own admission that you all

14   meant business. And a gun was used which created an

15   especially -- disregard for human suffering. The gun

16   was, in fact, pointed at Mr. Reily's head which, to me,

17   would make an especially callous disregard for human

18   suffering. Can you imagine the -- the trauma that you

19   put these people through the fact that you put a gun to

20   their head. The motive for this crime was very trivial

21   in relation to the offense in that those people are

22   traumatized now because you needed money, because you

23   were living beyond your means. And even though you had a

24   job that really created even -- even more trivial because

25   all you had to do was just back up on your personal

26   living style. And all that information was taken

27   **J. SULLIVAN C-66878 DECISION PAGE 2    7/21/06**

92

1   primarily from the probation officer's report.  The Panel

2   took notice that you had no previous history of -- and

3   this is your -- this offense was your first time being

4   involved.  Although the District Attorney brought out the

5   fact about social history.  I think that -- I don't think

6   your history was that bad.  I don't think it was that

7   unstable because you did have a job and you were able to,

8   you know, maintain up until such time that you met this -

9   - this character and then he -- enticed you with big sums

10  of money to -- to do what you did.  Your institutional

11  behavior has been -- I would say pretty close to being

12  exceptional.  You've had no 115s.  You've had no 128s.

13  And that's remarkable.  You had one 128?

14          **INMATE SULLIVAN:**  Yeah.

15          **PRESIDING COMMISSIONER BIGGERS:**  And that's

16  remarkable in itself.  You know, one 128 over 24 years.

17  Especially in a -- in an institution, you know, any

18  institution.  You have upgraded yourself vocationally in

19  that you have Forklift Driver.  You also have a -- a

20  certificate in Upholstery.  The -- and prior to coming in

21  you had some skills as a roofer.  But I was impressed

22  when your attorney indicated 30 -- 37, sir, 37

23  certificates that you've received over this time which is

24  an indication to us that you are -- you've continued on.

25  You know, you're not just stopping at 37 that you have.

26  That every -- every year you come in here you seem to

27  **J. SULLIVAN C-66878 DECISION PAGE 3 7/21/06**

1    have increased yourself even more and you should be --

2    and you will be commended for that at -- at a later time.

3    You've also had some outstanding work performances which

4    is also good especially in the PIA to the point that

5    you're now a lead man.  And being a lead man in an

6    institution is something in itself that shows your --

7    your capabilities, because a lot of times you got people

8    here don't want to work.  So -- and we -- we recognize

9    that.  Again, with no 115s and only one 128 is

10   remarkable.  Your psychological evaluation, and I'll read

11   that, was favorable and I'll go page 3.  And the

12   psychiatrist, Dr. Inaba, I-N-A-B-A, indicated that one

13   "it is most likely that Mr. Sullivan's abuse of alcohol

14   contributed to the overall lack of judgment and erosion

15   of the values with which he was raised."  Which goes back

16   to why I said I didn't think that you were -- had an

17   unstable social history, because I think that this is --

18   and you've -- the other one is -- another -- I wrote

19   three down here.  It said -- okay, I -- I know what else

20   I can do.  I would work for the man for a year to pay him

21   off.  Back -- I don't think a year's long enough to pay

22   him back.  You may have to work longer.  But the fact

23   that you would want to go and do something like that is

24   an indication to us that you do have remorse.  But -- and

25   the last statement that I want to quote directly from the

26   psychiatrist report, it's also -- and she's stating and I

27   J. SULLIVAN C-66878 DECISION PAGE 4 7/21/06

94

1    said quote "he's also clear about his remorse for his

2    actions and his willingness to continue his participation

3    in self-help and rehabilitation activities."  And bottom-

4    line that's an indication to us that you will be a low

5    risk on the outside.  The area that I really -- that we

6    had some concern about is parole plans.  You actually --

7    you have -- you can go and stay with your mother.  You do

8    have a job offer from an undated letter.  You -- you had

9    -- it would benefit you to identify what NA/AA programs

10   are available in the area that you're going to go to.

11   It's also -- would benefit you to identify a possible

12   sponsor when you come back before the Board next year.

13   It would also benefit you to have a letter of employment

14   up front as much as you -- you've got a niece out there

15   and you've got your mother.  Your mother may be -- would

16   not be able to help you as much, but you've got a young

17   niece out there than can run a little interference for

18   you going out there looking for your position.  Roofing

19   may be a little bit much for you at this point right now,

20   but you do have marketable skills.

21        **INMATE SULLIVAN:**  Yeah.

22        **PRESIDING COMMISSIONER BIGGERS:**  You've got the

23   upholstery, you can drive a forklift.  And as your

24   counselor brought out, there are a lot of jobs around

25   here that you can do that and you need to start looking

26   at that to try to better -- what we don't want to do is

27   **J. SULLIVAN C-66878 DECISION PAGE 5 7/21/06**

95

1    put you back out on the street with the possibility of

2    you having a job and then you go and you find yourself in

3    the same situation that you had prior to coming in.

4         INMATE SULLIVAN:  I understand.

5         PRESIDING COMMISSIONER BIGGERS:  Well, you can say

6    that, but I won't feel comfortable --

7         INMATE SULLIVAN:  I understand.

8         PRESIDING COMMISSIONER BIGGERS:  -- with putting you

9    back out there and you have no money and you look over

10   and you want a doughnut or something and you don't have

11   the money to get it.  So I think you do have some

12   marketable skills that you need to focus on.  And, as I

13   said before, you need to get your sponsor out there.  The

14   parole plans are definitely something that we felt that -

15   - that was lacking here.  On the 3042 letters we did

16   notice a letter from the DA -- not a letter from the DA.

17   The DA did speak of his opposition and then we went back

18   in the file and I know for the record that we stated that

19   there was no confidential information that was going to

20   be used, but we did find that letter which was a mistake

21   on our part.  And it was from the victim.  I also want to

22   tell you I think your attitude's good.  You know, I think

23   that, as I said before, I think you are very genuine with

24   your remorse.  You -- it's obvious that it does bother

25   you and a lot of times we don't see that.  There are a

26   couple of areas that I think you need to really focus

27   J. SULLIVAN C-66878 DECISION PAGE 6 7/21/06

96

1   yourself on prior to next year and that's the incident

2   with the gun.  Now, I may have made a joke about it by

3   the way of the pin falling down in your pants and all the

4   other stuff but, you know, you got to look at it that

5   it's hard to believe that you would even try to use a gun

6   like that that has lost a pin because, I mean, I'm no gun

7   expert, but I know that when you lose the pin that

8   cylinder turns just a little bit and if the firing pin

9   don't hit directly on that bullet and it hits on the side

10  that gun can explode.

11       **INMATE SULLIVAN:**  I didn't know that.

12       **PRESIDING COMMISSIONER BIGGERS:**  Which would create

13  some problem not only for you, but problems for everybody

14  else because that cylinder just don't stay there.  That's

15  what hold it into place for the firing pin to go

16  straight.  That's just something that you need to keep in

17  mind.  The -- I don't want you -- well, we, and I keep

18  saying I because I'm doing this and I -- we don't want

19  you to feel discouraged because of this denial and it's

20  going to be one year.  But that'll give you a chance to

21  firm up your parole plans and get some more letters of

22  support in your file so that the Panel can feel

23  comfortable that you're able to go out there and really

24  get the feet running.  Now, I'm going to ask Deputy

25  Commissioner Star to make some comments and also commend

26  you on the --

27  **J. SULLIVAN C-66878 DECISION PAGE 7 7/21/06**

97

1     **DEPUTY COMMISSIONER STAR:**  Well, I think Mr. --

2    Commissioner Biggers has actually said it.  I -- I -- I

3    appreciated, too, your forthrightness today.  I felt it

4    was honest and sincere.  That's a plus.  Your

5    institutional adjustment's been exceptional.  Commend you

6    for that.  You do need to tighten up the parole plans.

7    And Commissioner's given you, I think -- which we can

8    only give our recommendations, but they're good

9    recommendations.  Hopefully, you take them to heart.  You

10   know, discuss with your attorney prior to a hearing if

11   you're going to discuss the life term, you know, what

12   happened and what's in the record and how to address

13   what's in the record.  And I think that'll continue to

14   help you.  But good luck to you, sir.  Okay?

15    **PRESIDING COMMISSIONER BIGGERS:**  You want to commend

16   him on his -

17    **DEPUTY COMMISSIONER STAR:**  I -- I commended him on

18   his -- your work performance, your supervisors' reports.

19   Outstanding.  Your self-help group performance and

20   participation.  Continue it, don't let it lapse over this

21   year.  Outstanding.  Your disciplinary record,

22   outstanding.

23    **INMATE SULLIVAN:**  Thank you.

24    **PRESIDING COMMISSIONER BIGGERS:**  Okay.  However,

25   again, those positive aspects don't -- do not change the

26   fact -- outweigh the factors of unsuitability.  And this

27   **J. SULLIVAN C-66878 DECISION PAGE 8 7/21/06**

1   is going to be a one-year denial.  And the Panel wants to

2   recommend the following.  That one, you remain -- remain

3   disciplinary-free.  Continue to upgrade yourself, either

4   vocationally or education as best as you can.  Continue

5   to participate in self-help.  And I, like I say, I think

6   you're very, very close.  Just remind you to tighten up a

7   few things.

8        **INMATE SULLIVAN:**  All right.

9        **PRESIDING COMMISSIONER BIGGERS:**  All right, the time

10  is now 11:35.  That concludes the hearing.  Good luck to

11  you, sir.

12       **INMATE SULLIVAN:**  Thank you.

13       **DEPUTY COMMISSIONER STAR:**  Officer, would you hand

14  this to -- thank you.

15                       --oOo--

16

17

18

19

20

21

22

23  **PAROLE DENIED ONE YEAR**

24  **THIS DECISION WILL BE FINAL ON:**_____ NOV 1 8 2006 _____

25  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **J. SULLIVAN C-66878 DECISION PAGE 9  7/21/06**

99

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, TRACY RICHARDSON, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 98, and which recording was duly recorded at SAN QUENTIN STATE PRISON at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JERRY LEE SULLIVAN, CDC No. C-66878, on JULY 21, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 17, 2006, at Sacramento County, California.

TRACY RICHARDSON
Transcriber
**VINE, MCKINNON & HALL**

EXHIBIT    "B"

# LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## JULY 2006 CALENDAR

## I.    COMMITMENT FACTORS:

### A.    Life Crime:

| | |
|---|---|
| *Count one:* | Kidnap to Commit Robbery, PC 209(b) |
| Weapon (s): | Firearm |
| Victim (s): | Patricia Reily, age unknown |
| County, Case#: | Contra Costa, Case #26837 |
| Sentence: | Life, consecutive to Count 5 |

| | |
|---|---|
| *Count two:* | Kidnap to Commit Robbery, PC 209(b) |
| Weapon (s): | Firearm |
| Victim (s): | William Reily, age unknown |
| County, Case#: | Contra Cost, Case #26837 |
| Sentence: | Life, concurrent with Count 1 |

| | |
|---|---|
| Minimum Eligible Parole Date: | 05/22/93 |
| Received in CDC: | 05/31/83 |

### 1.    Summary of Crime:

Jerry Sullivan and co-defendant William Buford made an appointment with William Reily of Reily Reality to be shown a home that Reily had listed. The meeting was to take place at the home, which was located in the town of Tracy, California, on the next day, July 2nd at 10:00 a.m. On the morning of the July 2nd, around 9:00 A.M., an unidentified person called Mr. Reily and cancelled the appointment for 10:00 A.M.; however, the same individual telephoned later the same morning and arranged to view the property at 2:00 P.M., the same afternoon.

Sullivan and a companion arrived for the appointment in a car driven by a third unidentified person.   Mr. and Mrs. Reily met them and showed them the house.   After approximately 20 minutes, Sullivan and his companion left the home and the Reily's began to lock up the house. As they were exiting the back of the house, Sullivan and his companion approached and separated the Reily's. Sullivan companion directed Mrs. Reily into the Reily's car. He told the third person, the unidentified driver of the vehicle in which they arrived, to leave. Sullivan told the Reily's that he had a gun and would use it so as to ensure their compliance.

Sullivan directed Mr. Reily into the car. They drove to the Reily's home in Walnut Creek. Once there, a pre-recorded message demanding that the Reily's give them $150,000.00 was played. The message also included threats to rape and murder Mrs. Reily and then kill Mr. Reily if they did not cooperate. The Reily's explained that they did not have that kind of money and eventually Sullivan and his companion decided to take the Reily's to their bank and withdraw as much money as they could get.

The Reily's were driven to their bank and Mrs. Reily was instructed to enter the bank and make a withdrawal of all the money she could access. Mr. Reily was to be held hostage until she returned with the money. She was to be picked her up in front of the bank when she had finished the transaction. Mrs. Reily went to a teller and withdrew monies from her accounts and was able to give the teller a note explaining what was going on and asked to have the police called. Officers arrived and verified the situation.

As the back-up officers were called Sullivan and his companion made the decision to leave. As they tried to leave, a police unit made an attempt to stop the car and a pursuit ensued. It ended when Sullivan lost control of the car and crashed into a fence. Mr. Reily later stated after the car crashed, Sullivan fell on top of him and a struggle for the gun occurred. Mr. Reily said Sullivan stuck the gun into his ribs and pulled the trigger, but the gun did not fire. Sullivan pulled Reily out of the car at gunpoint and tried to make a getaway. As they went through some bushes, they both fell and were immediately surrounded by police officers and Sullivan was taken under arrest.

(Source of information is Probation Officer's Report (POR) dated 4/20/83)

OFFENSE SUMMARY

2.    **Prisoner's Version:**

Sullivan openly admits his guilt and his participation in the commitment offense as documented in the POR from Contra Costa County dated 4/20/83. He had no money and was desperate. He was not the one who made the tape, did not plan the robbery and did not own the gun that was used in the crime. He states that he never planned that the victims would be killed. "Everything was happening so fast that it all seemed to be a blur." He remembers Mr. Reily grabbing the gun but says he never pulled the trigger because he knew that the gun would not work. He did not want to

die and thought he might have gotten away if he took Mr. Reily with him. He states that he cannot change what has happened but he has spent his time while incarcerated changing himself.

3.    **Aggravating/Mitigating Circumstances:**

Aggravating Factors:
-  The crime involved premeditation.
-  The crime involved the threat of using a weapon (handgun).
-  Although Sullivan did not make a direct threat (made by accomplice on tape), the crime involved the threat of rape, of great bodily injury, or death.
-  The crime involved multiple victims.
-  Sullivan had an opportunity to discontinue his actions of the crime.

Mitigating Circumstances:
-  Sullivan has an insignificant criminal history and the instant offense lacked criminal sophistication.
-  There is a possibility that Sullivan had no apparent disposition to commit this crime and was induced by others.
-  Sullivan voluntarily acknowledges wrongdoing at an early stage in the criminal process.

B.    **MULTIPLE CRIMES(S):**

*Count three:*

| | |
|---|---|
| Weapon (s): | Robbery, PC 211 |
| | Firearm |
| Victim (s): | Patricia Reily, age unknown |
| County, Case#: | Contra Costa, Case #26837 |
| Sentence: | Mid term of 3 years, concurrent with Count 5 |

*Count four:*

| | |
|---|---|
| Weapon (s): | Robbery, PC 211 |
| | Firearm |
| Victim (s): | William Reily, age unknown |
| County, Case#: | Contra Costa, Case #26837 |
| Sentence: | Mid term of 3 years, concurrent with Count 5. |

*Count five:*

| | |
|---|---|
| Weapon (s): | Attempted Murder, PC 187-664 |
| | Firearm |
| Victim (s): | William Reily, age unknown |
| County, Case#: | Contra Costa, Case #26837 |
| Sentence: | 9 years—includes 2 year weapon enhancement |

| *Count six:* | Aggravated Assault, PC 245(a) |
| Weapon (s): | Firearm |
| Victim (s): | William Reily |
| County, Case#: | Contra Cost, Case #26837 |
| Sentence: | Mid term of 3 years, concurrent with Count 5. |

## II.    PRECONVICTION FACTORS:

### A.    Juvenile Record:

None noted.

### B.    Adult Convictions:

Instant offense is the only criminal activity noted. .

### C.    Personal Factors:

Sullivan is the second child of seven born to George Collins and Dorthea Sullivan Sims. He does not know if his parents were married. He was reared principally by his grandmother, Virginia Damus. He traveled between the two homes as he was growing up. Sullivan graduated from Northwood High School in 1971. Sullivan has stated other than an old injury to his eye he received while playing football when he was younger, he's in good heath. Sullivan married Jessie Sullivan in 1983 and they divorced in 1991. He has one child by Ms. Vivian Ferguson. Sullivan has worked as a foreman in a tree clearing business and as a car parking attendant. He denies any substance abuse; however, he claims to have had a heavy drinking problem in the early 80's, but after a drunk driving stop, discontinued drinking alcohol. No mental health issues are noted.

## III.    POSTCONVICTION FACTORS:

### A.    Custody History:

Sullivan was received at California Department of Corrections at Northern Reception Center-California Medical Facility on 5/31/83 and processed through normal channels to Deuel Vocational Institute (DVI). His custody was placed at Medium A. His WG/PG was changed to A1/A on 5/9/84. On 5/30/84, his custody was placed at Medium B. His custody was further reduced to Minimum A on 9/6/84 as per his request, so he could work at the crop farm.. On 11/1/84 his custody was placed at Minimum B and outside dorm placement was granted. His custody remained at Minimum B, WG/PG A1/A until 3/19/86 when court documents previously unavailable were found. His custody was then placed at Close B. On 4/21/86, Sullivan was received at CCI-IV. His

custody and WG/PG remained the same. He was placed on the support services waiting list. His custody was reduced to Medium A on 7/16/87. On 8/19/87, Sullivan was received at CTF Central. His custody remained at Medium A. He was placed on the support services waiting list. He was transferred and received at DVI on 10/26/89. His custody and WG/PG remained the same. His Initial Board of Prison Term (BPT was held 8/13/92. Parole was denied for 2 years. He was received at San Quentin State Prison (SQSP) on 3/29/93. His custody remained at Medium A, WG/PG A1/A. His BPT Subsequent (Sub) Hearing #1 was held 7/8/94. Parole was denied for 1 year. Sub Hearing #2 was held 1/3/86. Parole was denied for 1 year. Sub Hearing #3 was held 5/29/97. Parole was denied 1 year. Sub Hearing #4 was held 6/16/98. Parole was denied 1 year. Sub Hearing #5 was held 9/28/99. Parole was denied 1 year. Sub Hearing #6 was held 8/9/01. Parole was denied 1 year. Sub Hearing # 7 was held 12/4/02. Parole was denied 1 year.

Sullivan's Subsequent Board of Prison Hearings (BPH) #8 was held on 12/17/03. Parole was denied for one year. His subsequent hearing #9 was held on 6/29/05 and parole was denied one year. During each of his subsequent Post Board Review and his yearly Annual his program was not altered. He has continued working in the Prison Industry Authority as a sewing operator. His Supervisor Work Reports continue to reflect exceptional work habits and skill level. He has continued a disciplinary free program.

B.     **Therapy & Self Help Activities:**

| | |
|---|---|
| 03/22/92 to present | Alcoholics Anonymous |
| 12/31/92 | Completion of Vocational Upholstery Program |
| 01/11/93 | Completion of Upholstery class, Deuel Vocational Institute |
| 09/16/93 | Completion of 16 week Stage I Manalive class. |
| 12/31/93 | Participation in 3 day Alternatives to Violence Project workshop |
| 02/24/94 | Participation in 3 day Advanced Alternatives to Violence Project workshop |
| 04/21/94 – 10/31/00 | Participation in the Hooked on Phonics program. |
| 06/15/95 | Completion of Lifeskills Program |
| 05/01/96 | Participation in the annual Walk-A-Thon '96 for the prevention of child abuse. |
| 05/26/95 – 07/16/96 | Narcotics Anonymous |
| 08/08/96 | Certificate of Completion, Toastmasters International, Competent Toastmaster Certificate |
| 03/25/98 | Donated 16 magazines to the CTF-North Library |
| 09/15/94 – 06/30/99 | Member of the San Quentin Speak Easy Gavel Club |

B.    **Therapy & Self Help Activities:** *con't*

| | |
|---|---|
| 10/06/99 | Self Esteem Enhancement Certificate |
| 12/13/99 | Completion of class the cause, prevention, treatment, and management of Sexually Transmitted Disease |
| 10/09/00 | Participated in the 3 day Kairos Men's Retreat |
| 02/17/01 | Participated in the 3 day Kairos Men's Retreat |
| 05/20/02 | Certificate of Achievement, Fork Lift Operator |
| 03/04/03 | Completion of 15 week Parenting course |
| 10/09/03 | Participation in Free to Succeed Literacy class |
| 12/08/03 | Participated in the Insight Meditation Class |
| 03/01/04 | Completed Session One (16 week) Violence Prevention workshop |
| 03/29/04 | Completed Session Two (16 week) Violence Prevention workshop—"Time Outs" |
| 05/10/04 | Completed Session Three (16 week) Violence Prevention workshop—"Body Signals" |
| 06/21/04 | Completed Session Four (16 week) Violence Prevention workshop—"Self Talk" |
| 07/26/04 | Completed Session five (16 week) Violence Prevention workshop—"Conflict Resolution" |
| 01/30/05 | Participated in the "A Life of Peace, Action, And Service to Others" workshop |
| 03/08/05 | Completed a 16 week Non-Violent Communication class |
| 03/21/05 | Certificate of Completion—Module III, Addictions |
| 04/17/05 | Certificate for participating in a workshop/seminar on Working With Anger |
| 05/23/05 | Participated in Session One of Project IMPACT's 16-week workshop on Relationships |
| 06/07/05 | Certificate of Proficiency, Roll-or-Tape-Edge-Machine Operator |
| 06/27/05 | Participated in Session Two of Project IMPACT's 16-week workshop, Relationship Dynamics |
| 08/01/05 | Participated in Session Three of Project IMPACT's 16-week workshop, Cultivating Successful Relationships |
| 09/26/05 | Participated in Project IMPACT's 16-week workshop, Specific Relationships |
| 10/03/05 | Certificate of Completion, Project IMPACT, Module IV—Relationships |
| 02/28/06 | Certificate of Completion, Nonviolent Communication self-help group—32 hours of instruction |

C.    **Disciplinary History:**

Sullivan has remained disciplinary free throughout his entire period of incarceration.

IV:    **FUTURE PLANS:**

A.    **Residence:**

Sullivan said his family support has not changed. He said his family members continue to verbalize their commitment to assist him should he be allowed to parole. There are numerous letters from located in his file indicating their support. Sullivan has requested updated letters and hope to have them prior to his 2006 hearing.

His mother, in a letter dated 1/31/06, re-affirmed her commitment to provide him with what ever he needs to successfully transition back into society—shelter, clothes, transportation, and money. His niece, Tanya Sims, in a letter dated 2/20/05, stated she will provide him money and dedicate her time to helping him locate a job.

Sullivan stated that he intends to continue attendance in Alcoholic Anonymous program should he be released.

B.    **Employment:**

Sullivan does not have any job offers at this time; however, he stated he would work any job, but particularly wants to locate a job working in the upholstery business.

Copies of correspondence offering support are located in Central File

V.    **USINS ISSUES:**

Not applicable.

VI.    **SUMMARY:**

A. Sullivan has continued his unblemished disciplinary profile since his last Board of Prison Hearing.  He has received numerous commendations for his positive programming and has maintained an excellent rapport with both inmates and staff.  Based the absence of a prior criminal history (taking into account his commitment offense), his prison adjustment, the findings in his psychiatric reports, and his family support I believe Sullivan will re-integrate into society without incident.  I did not note any information that would indicate he would not be able to function as a law abiding citizen should he be allowed to parole at this time.

B. Prior to release, Sullivan should continue remaining disciplinary free, utilize support services and activities, upgrading academically and vocationally when possible.

C. This Board report is based on a two part, 2.0 hour interview which included a review of Sullivan's C-file and an in-depth discussion of the commitment offense.

D. Sullivan was afforded an opportunity and chose to examine his central file on 5/18/06. See CDC 128 B dated 5/18/06.

E. Sullivan stated no special accommodations, for the purposes of effective communication, are required per the Armstrong Remedial Plan (ARP).



I. J. Tate
Correctional Counselor I


V. KELLY
Correctional Counselor II


C. Belshaw
C & PR

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

___ DOCUMENTATION HEARING

\  PAROLE CONSIDERATION HEARING

⊐  PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                 ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
| --- | --- | --- | --- |
| YEAR | BPT | PBR | REASONS |
| TO PRESENT (05/18/06) | | | **Placement:** CSP-San Quentin, Level II, General Population. |

**Custody/Classification:** Medium A Custody, Classification Score 19. Sullivan appeared before Unit III Unit Classification Committee (UCC) on 5/5/05 for Annual Review and before the Board of Prison Hearings on 6/29/05 for his subsequent hearing #9. Parole was denied for one year during his subsequent BPH. His program remained unchanged this review period. He has continued working in the Prison Industries Authority.

**Academics:** None noted this review period.

**Work Record:** Sullivan has continued working in the Prison Industries Authority's pillow factory with exceptional work supervisory reports.

**Group Activities:** Sullivan has continued participating in the Alcoholics Anonymous self-help group and he has participated in a Insight Mediation Class, Project IMPACT workshops, , A Life of Peace, Action and Service workshops, and in Non-Violent Communication workshops this review period.

**Psychiatric Treatment:** None noted

**Prisoner Behavior:** No disciplinaries noted

**Other:** None noted in file.

| CORRECTIONAL COUNSELOR SIGNATURE | DATE |
| --- | --- |
| I. TATE, CC-I | 05/18/06 |

ORDER:

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
| --- | --- | --- | --- | --- |

SULLIVAN, JERRY          C-66878          CSP-SQ, BPH SUBSEQUENT HEARING #10          JULY 2006
                                          PAGE 1 OF 1

BPT 1004 (REV. 7/86)

EXHIBIT "C"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF CONTRA COSTA

F I L E D

APR 20 1983

J. R. OLSSON, County Clerk

By _____
                    Deputy

THE PEOPLE OF THE STATE OF CALIFORNIA)
                                     )
                         Plaintiff,  )
                                     )
           vs.                       )      Department No. _____2_____
                                     )
                                     )      Docket No. _____26837_____
JERRY LEE SULLIVAN (29)              )
                                     )
DOB: 3/19/53              Defendant  )

PROBATION OFFICER'S REPORT AND RECOMMENDATION

| | | |
|---|---|---|
| CHARGED WITH: | Counts 1 and 2: | 209(b) PC(Kidnapping to Commit Robbery) with use of a firearm within the meaning of Penal Code Section 12022.5; |
| | Counts 3 and 4: | 211 PC(Robbery) with use of a firearm within the meaning of Penal Code Section 12022.5; |
| | Count      5: | 187-664 PC(Attempted Murder); |
| | Count      6: | 245(a) PC(Aggravated Assault) with use of a firearm within the meaning of Penal Code Section 12022.5; |

GUILTY OF:                           No Conviction - referred pursuant
                                     to 131.3 CCP (pre-plea report)

DATE OF OFFENSE:                     July 2, 1982 (All Counts)
DATE OF ARREST:                      July 2, 1982
CUSTODIAL STATUS:                    Jail(In custody 153 days to Court
                                     date)

DATE REFERRED TO
PROBATION OFFICER:                   November 2, 1982

PROBATION REPORT DUE:                December 2, 1982

ATTORNEY FOR DEFENDANT:              Marcus Peppard, 3615 Bissell Ave.,
                                     Richmond, California

RECOMMENDATION:

It is respectfully recommended that, should guilt be established
in this matter, probation be denied.

JERRY LEE SULLIVAN          -2-

PRIOR RECORD:

CII NUMBER:       06746959

FBI NUMBER:       41794W3

Sources of Information:

Alameda County CIB
Walnut Creek Police Department
California Department of Motor Vehicles
Livermore Police Department
Shreveport(Louisiana)Police Department
Fremont Police Department

Adult Record:

No current CII criminal history has been received on this defendant. According to the Alameda County CIB, where the defendant has resided for the past eleven years, it indicates the following conviction:

| 12/19/81 | CHP | 23102a VC(Drunk driving) | 1/19/82: Pled guilty; $355 fine plus penalty assessment, 12 months Court probation. |

The defendant claims that he still owes money on this particular fine. It is noted that the defendant has failed to pay his fine and his probation is in the revoked status.

Contacts were made with the police departments in the various cities in which the defendant has resided. According to all information available, this is the defendant's only conviction.

Juvenile Record:

No prior juvenile criminal history is reported.

Driving Record:

Driver's license number:  N4558039.

JERRY LEE SULLIVAN          -3-

| | | | |
|---|---|---|---|
| 12/11/79 | Oakland | 4454 VC(Failure to carry registration card in vehicle) | 3/21/80: Forfeit bail $85. |
| 8/8/80 | Oakland | 4454 VC | 8/20/80: Forfeit bail $10. |
| 3/12/82 | Oakland | 22350 VC (Speed) | 4/1/82: Forfeit bail $76. |

No revocations or suspensions are reported.  The defendant's driver's license expires in 1986.

INVESTIGATION:

According to reports from the Walnut Creek Police Department, the following appear to be the circumstances of this offense:

The victims, Mr. and Mrs. Reiley, are partners in Reiley Realty, with a business address at the time of the incident of 6900 Village Parkway in Dublin.

On July 1, 1982 Mr. Reiley made an appointment with the defendant and codefendant, William Buford, to meet at 34779 South Brichetto Court in Tracy which was listed for sale by the Reiley Realtor.  The agreement was to meet at 10:00 a.m. on July 2nd. At approximately 9:00 a.m. on July 2nd Mrs. Reiley received a phone call from one of the defendants indicating that he had a dental appointment he had forgotten and he needed to cancel the 10:00 a.m. appointment.  He would call back later to make another appointment. At approximately ten minutes to one Mrs. Reiley received another phone call from one of the defendants asking to talk to Mr. Reiley. After a brief conversation, Mr. Reiley told Mrs. Reiley that the appointment was now rescheduled for 2:00 p.m. that day.  Mr. and

1   Mrs. Reiley then drove to the residence on Brichetto Court in
2   Tracy.  They arrived at approximately 2:05 p.m.  They waited in
3   the residence until approximately 2:30, at which time Mrs. Reiley
4   looked out the window and saw an older model white Lincoln pull
5   into the driveway of the residence.  She noted that the vehicle was
6   occupied by two persons.  They came into the residence and one
7   person identified himself as "Dennis Turner".  The Reileys showed
8   the residence, and after ten to fifteen minutes the two left.  The
9   Reileys then locked up the residence and left via the rear door.
10  Upon exiting, Mrs. Reiley observed the two standing in a back
11  field area.  They walked toward the Reileys  and the codefendant
12  walked with Mrs. Reiley to her vehicle.  The defendant stayed
13  behind with Mr. Reiley.  Mrs. Reiley became suspicious that something
14  was wrong, and her husband told her to "stay there".  She got into
15  her vehicle and attempted to roll up the window and lock the
16  door when the codefendant stopped her from closing the door.  He
17  then ordered her out of the car.

18      Mr. Reiley then told his wife to do what they said as they had
19  a gun.  They were requested to get into their vehicle, and Mrs.
20  Reiley got into the right rear seat position with the codefendant.
21  Mr. Reiley got into the right front seat with the defendant.
22  The codefendant then went back to the white Continental and brought
23  a large cassette player into the victims' vehicle.  At that time,
24  Mrs. Reiley realized that a third person was in the driver's
25  position of the white Continental.  She then heard the engine of
26  that vehicle start up, and she did not see the white Lincoln again.

1   The defendant and codefendant took Mrs. Reiley's driver's

2   license, apparently to get her home address. They got directions

3   from the victims on how to get to their (the victims') home.

4   While en route to Walnut Creek, they first stopped at a gas

5   station in Livermore. They indicated they wished to use the

6   pay telephone, but someone else was using the phone at that

7   time. They seemed to be noticeably upset because they could not

8   use the phone. They then got off the freeway again in Dublin.

9   They drove a short distance, and asked where a telephone could be

10  located and what time it was. They finally got back onto the

11  freeway.

12  They arrived at the victims' residence, located at 40 Sara

13  Lane in Walnut Creek. The defendant entered the residence with Mr.

14  Reiley. Mrs. Reiley and the codefendant then entered. One of the

15  two brought the tape player into the residence. They were made

16  to listen to the tape recording. They indicated the voice sounded

17  as if it was modified. Basically, the voice made the following

18  statements:

19      "Listen closely. Because, this will not be repeated

20      and your life depends on your full cooperation, as

21      well as your wife's life. Our organization has had

22      you under close surveillance for the past two years.

23      We know who and what you are, who you bank with, and

24      we know when you went to the bathroom last. So, to

25      eliminate any time being wasted, we will not tolerate

26      any excuses or alibis at all.

1    "We want two things today, Mr. Reiley.  We want

2    $150,000 in cash delivered here to your home

3    quick, or our man has orders to first - rape your

4    wife, then kill her, and then kill you.  If you

5    cooperate quickly no one will be harmed.  If you

6    do not cooperate, you both die quickly.  The

7    choice is entirely up to you."

8        The tape went on to indicate that the victims were allowed one

9    phone call to a qualified person who had access to the cash and who

10   could bring it to their home immediately.  The tape suggested

11   several ways which would allow them to obtain the cash and have

12   it delivered.  The tape also cautioned that "their" men were

13   intelligent and would be listening to every word that was spoken,

14   and their lives depended on their full cooperation. The tape

15   indicated that if they were to comply no one would be hurt; the

16   third party bringing the money and Mr. Reiley and his wife would

17   simply be tied up loosely and the men would leave.  It went on to

18   state that they were collecting a total of ten million dollars and

19   that Valley Realty of California had given $300,000 the day before.

20   No one was harmed.  Once again, caution was advised and refusal

21   to cooperate would mean death.

22       The victims attempted to explain that they were in no way

23   able to obtain that amount of money under any circumstances.  The

24   defendants indicated they did not believe the victims despite the

25   fact that the victims continued to explain they could not get that

26   amount of money.  The defendant stayed with the victims, continually

1    displaying a handgun, while the codefendant went to another portion

2    of the house and appeared to be talking on the telephone.    Various

3    telephone conversations followed, in which it appeared that the

4    defendants were taking orders or decisions were being made by

5    another person.    The defendant and codefendant repeated the threats

6    that were made on the tape with regard to raping Mrs. Reiley,

7    killing her and then killing Mr. Reiley.    They indicated they were

8    following orders and that they had to do what they had to do.

9    .    Eventually, the Reileys were able to convince the two that

10   they were unable to get $150,000 cash, but they would try to get

11   whatever money they could at their bank.    Then all four got into

12   the victims' vehicle and drove to the Crocker Bank, Broadway Plaza,

13   Walnut Creek.    The defendant drove the vehicle.    The vehicle was

14   parked in the front parking lot to Capwell's, which was next to

15   the Crocker Bank.    Mrs. Reiley was instructed to go into the bank

16   and withdraw all the money that she could.    She would then be

17   picked up when she came out of the bank.    She walked into the

18   bank, leaving her husband sitting with the two defendants.

19   Inside the bank. Mrs. Reiley asked to cash three paychecks

20   that she had received from the Murray School District totalling

21   $4,000.    She asked to withdraw all the money that she had in

22   savings, which was $354.65.    She also wrote a check for $10,000,

23   which she requested to cash, to be covered by what she called a

24   "prime line account"; an account which allowed her to withdraw

25   that amount of money on demand.    She also wrote a brief note which

26   said, "Please give me the money without hassle, my husband is

1  being held by a gunman; Help me!  Call police".  She handed the

2  note to the teller who, in turn, called police.

3      Officer Soberanes was the first to arrive, and he contacted

4  the bank manager who gave him the handwritten note.  Within a short

5  period of time Officer Perry arrived.  They carefully concealed

6  themselves so any other persons in the area would be unable to

7  tell that they were in the bank.  The bank manager pointed out the

8  victim, and one officer motioned for her to walk over to them.

9  She indicated she did not want to leave the teller's window.  The

10  bank manager contacted her and confirmed what had been stated in

11  the note.  He also received a description of the vehicle, which

12  Officer Soberanes broadcast.  The victim was then moved down to

13  a teller's window which was out of view of the outside windows.

14  Mrs. Reiley again told police that her husband was being held at

15  gunpoint by the defendants who had demanded that they give them

16  $150,000 cash.

17      Meanwhile, the two defendants observed police coming to

18  the area.  They began driving away, and a police unit attempted to

19  stop them.  A pursuit began, during which the two asked Mr.

20  Reiley for directions to the freeway.  During the pursuit, the

21  codefendant asked Mr. Reiley if he was going out the door, and the

22  defendant said "I'll shoot him".  The defendant became very hostile

23  toward Mr. Reiley indicating that he had "blown it" and he was

24  going to shoot him.  The defendant then lost control of the

25  vehicle, and collided with a raised wood framed sidewalk at

26  1335 Treat Boulevard.  The vehicle then slid into a wood fence,

1    finally coming to rest against a tree. The impact caused the

2    defendant to be thrown on top of Mr. Reiley. Mr. Reiley reached

3    for the gun but missed it. The defendant then pushed the gun into

4    Mr. Reiley's ribs and Mr.Reiley heard the distinct sound of the

5    hammer of the gun falling down as if the trigger had been pulled.

6    However, the gun did not discharge. Mr. Reiley opened his door,

7    and he and the defendant tumbled out on the ground beside the

8    vehicle. The defendant then grabbed Mr. Reiley around the neck

9    and put the gun beside his ear. He dragged Mr. Reiley approximately

10   40 to 50 feet away from the vehicle through the bushes. They

11   slipped and fell to the ground, and were immediately surrounded

12   by several police officers who were shouting commands at the

13   defendant. The defendant continued to hold the gun to Mr. Reiley's

14   head and did not comply with the orders to drop it. However, he

15   eventually dropped the gun, which Mr. Reiley grabbed and threw

16   away from them. The defendant was then taken into custody.

17       Mr. Reiley sustained a possible broken nose, moderate abrasions

18   on both elbows and pain in the ankles. He had sustained these

19   injuries during the time that he was being dragged by the

20   defendant into through the bushes.

21       As Mr. Reiley was making his statement to police, he indicated

22   that, when the defendant pulled the revolver from his waistband,

23   the cylinder opened. The defendant inserted one cartridge into

24   the cylinder before closing it.

25       Police noted that neither of the defendants appeared to be

26   under the influence of alcohol or drugs. The victims indicated that

1   both defendants appeared fully aware of their actions throughout

2   the entire incident.  Blood samples were taken from the two which

3   indicated no intoxicants.

4       When the defendant was being handcuffed he stated, "The gun

5   didn't work".  Once again, while being driven to the police

6   station he voluntarily stated that the gun didn't work.  While the

7   defendant was being taken into custody, one officer obtained the

8   chrome plated .32 caliber Smith and Wesson which had been

9   discarded.  He noted that it appeared to be completely intact but

10  there were no cartridges in it.  Later, two .32 caliber Smith and

11  Wesson bullets were found in the general area where the defendant

12  was taken into custody and the gun discarded.

13      At the police station, the defendants were strip-searched, and

14  a small piece of metal, resembling a bent piece of coat hanger,

15  fell from the underwear of the defendant.  This metal was later

16  determined to be the cylinder pin to the revolver.  The defendant's

17  wallet was searched, and a small handwritten note with two phone

18  numbers on it was obtained.  The note read "Call me at 4:30".  In

19  a search of the codefendant, a second note was found in which the

20  victims' name, two phone numbers and the address in Tracy was

21  written.  On the reverse of that note another phone number was

22  written.

23      Police ran a DMV check on the two.  They found that the

24  defendant had a Lincoln Contintental registered to him.  It was

25  registered to the same address which was on his driver's license.

26  The defendant's brother was later contacted at that address and

1    indicated that he had taken the defendant to Tracy, but had no

2    knowledge of what was to happen.

3    The defendant's girlfriend, Ms. Jessie Daniels, was contacted.

4    She was cooperative and indicated that the defendant had called

5    her from jail the previous evening asking her to get his car from

6    his brother, store it at her place and not let anyone else use it.

7    However, before she could comply with these directions, the

8    defendant's brother was arrested by Oakland Police Department.

9    She indicated that the defendant and codefendant had been seeing a

10   white guy in the past three or four weeks. They had been very

11   secretive about meeting with him and what they were doing.

12   In later investigation, police found that four phone calls

13   had been made from the victims' residence during the time that the

14   defendants were at that residence. One phone number was listed to

15   a pay phone near the Orchard Supply in Dublin, and a second phone

16   number was listed to a pay phone near Jim's Texaco in Dublin.

17   A search warrant was prepared on the defendant's home. Within

18   the residence, a 3" x 5" notebook with a spiral ring binding

19   having papers similar in appearance to the note paper found in

20   the two defendants' possession was found. The defendant's

21   vehicle was impounded and searched. Police located a combination

22   address and calendar book. Inside that book two pieces of paper

23   were torn out of a newspaper. One of those pieces of paper had a

24   phone number and Mr. Reiley's name written across it in blue ink.

25   Then there was a message indicating to call at 0900 about

26   0830 have a dentist, make a twelve noon. The other piece of

1  newspaper had an address and street directions to number 14927

2  Corcoran Avenue.  Police also found a brown bag containing four

3  new appearing rubber gloves in the vehicle.  In the trunk of the

4  vehicle they located two packages of rubber gloves which still had

5  the price tags on them.

6     On July 4, 1982 the defendant was interviewed.  He was asked

7  why he had picked the Reileys as opposed to any other persons.

8  He was evasive and indicated that he did not wish to answer the

9  question.  He admitted that his car was used to go to the house

10 in Tracy.  He admitted that his brother had gone with them, but

11 that he had not told his brother anything about what they were

12 going to do.  He and the codefendant went into the house while his

13 brother stayed in the car.  When they came out of the house he asked

14 his brother to drive his car home for him.  He was asked if he

15 intended to have his brother follow him and the defendant indicated

16 that he did, but after they got too far ahead of his brother they

17 did not see him.  He indicated he had no reason for stopping off

18 at the motel in Livermore and wanting to use the telephone.  When

19 asked if he intended to talk to another person on the phone, he

20 indicated that it was only a "front" in an attempt to make the

21 victims believe that there were other people involved.  He was

22 asked if he actually talked to anybody on the telephone, and he

23 stated they did not.  They made several phone calls to make it

24 appear that they were taking orders from someone else.  Police

25 indicated that the phone rang and it appeared that those calls were

26 being answered.  The defendant indicated he did not know who was

1  on the phone those times because the codefendant was handling the

2  calls.  The defendant claimed that he made the cassette recording.

3  He was asked how he disguised his voice, and he became evasive,

4  indicating that he would rather not say.  He was asked who had the

5  idea for committing the crime, and he indicated that it was both

6  their ideas.  He stated there was no one else involved.  He did not

7  wish to say how he got the gun.  He was asked if the gun had been

8  loaded.  Without hesitation he indicated it had been and had five

9  bullets in it.  He indicated he had lost some of the bullets.  He

10  went on to explain that when he pulled the gun out from his

11  waistband the cylinder opened up, and he thought he dropped two

12  bullets on the ground.  He further explained he had lost the

13  cylinder pin, and that was why it had opened.  He indicated the

14  cylinder pin found in his underwear was the one belonging in the

15  gun.  He went on to state that he believed he dropped two more

16  bullets out of the gun while at the Reileys' home.  He was asked

17  if he thought the gun had some bullets in it when he had it at

18  the arrest.  He indicated he thought it had bullets in it.  When

19  asked if he intended to use the gun, the defendant replied that he

20  would not use the gun no matter what happened and had not intended

21  to hurt anybody.  He denied having put the gun against the victim's

22  side and pulling the trigger after they had crashed.  He felt the

23  victim was mistaken in his belief that the trigger had been

24  pulled.  When asked if the two had actually been watching the

25  Reileys as the tape had indicated, the defendant stated they had not.

26  It was explained to the defendant that his brother and a neighbor

1  had seen a white male in a black Continental come to his home

2  earlier that day and bring a tape recorder.  The defendant indicated

3  he did not know what the officer was talking about.

4      Laboratory work was done on the gun.  It was found that the

5  cylinder pin was missing, the side plate screw was missing, the

6  cylinder advance hand and spring was  not in the gun and the stud

7  that the hammer pivots on was broken off but still in its

8  location.  The gun was found to be inoperable.

9      The defendant and codefendant were held to answer out of

10  Walnut Creek-Danville Judicial District on August 5, 1982.  On

11  November 2, 1982 the defendant was referred to the Probation

12  Department for a pre-plea report to be submitted December 2, 1982.

13  On November 23, 1982 the codefendant was referred to the Probation

14  Department.  It has been learned that a third person, Mr. Robert

15  Davison, was held to answer on November 4, 1982.  Court files note

16  that the defendant and codefendant's trial is set for December 6,

17  1982.

18  DEFENDANT'S STATEMENT:

19      The defendant declined to submit a written statement indicating

20  that he would rather discuss the elements of this case personally.

21  He indicates that he did not understand what he was doing.  He

22  knows he will be punished and he reiterates what he indicated

23  to police, in that he did not intend to hurt anyone.  He realizes

24  that he had the gun, and during the course of the chase it wasn't

25  his intention to shoot.  The victim grabbed the gun and it scared

26  him.  He grabbed the victim and began dragging him.  He was not

1    going to shoot him but he figured that he would have been killed

2    (by police) if the victim was not close to him. The defendant did

3    not wish to discuss his initial involvement, and expressed a fear

4    for his life should he discuss many elements of this offense.  He

5    indicates that he cannot change his part in the crime and that that

6    part was wrong.  If he tells anymore he feels he would get a

7    snitch jacket and he does not wish to live with that in prison.  He

8    indicates that he and the codefendant, William Buford, were friends

9    on the street in Oakland.  They used to play ball together.  With

10   regard to the gun, he claims that the pin came out before they

11   left the house. He knew that the pin was not in the gun because the

12   bullets fell out.  He states that he had never heard the tape

13   before.  He didn't know what was wanted until after he himself

14   heard the tape.   He reports that the incident was planned, but he

15   was not the one that planned it.  The gun wasn't his, and he

16   didn't find it as he told police.  He simply had it.  He states

17   that many things that he told police were not true.  He was confused

18   at the time and didn't want to tell on anyone.  He reiterated

19   several times that he was the one that got himself involved, and will

20   have to do the time.  He can't change what he's done.  He knows

21   he will be punished, and then hopes to put his life back together.

22   He reiterates that he is not a violent person, and really didn't

23   try to kill or hurt anyone.  He reports that he was having

24   financial problems, and many things in his life were going wrong

25   at the time.  His baby's mother was hassling him about seeing his

26   child, and he had to fight to see the child, even though he was

1   paying child support for her. He speculates that the incident

2   was planned from three days to a week to his knowledge. He

3   indicates his only qualms about the police report was that he is

4   unsure about the gun having been thrown just prior to his arrest.

5   He felt that he was the one that threw the gun.

6   VICTIMS' STATEMENT:

7       Mr. Reiley was initially contacted by phone. He indicated that

8   he wished to make his statement to the Court. He reports that he

9   received a letter from the defendant on Saturday (November 20th)

10  asking forgiveness. It is Mr. Reiley's feeling that, while the two

11  were with them, it was the defendant who was the ringleader.

12  Initially, he was frightened but when he regained his composure,

13  he seemed willing to go ahead with what he had to do.

14      Mr. and Mrs. Reiley submitted a letter which is quoted here

15  verbatim:

16      "On July 2, 1982, my wife and I were subjected to the criminal

17  activities of William Buford and Jerry Lee Sullivan.

18      "The individuals kidnapped us at gunpoint, held us prisoners

19  in our own home while they robbed us and made ransom demands under

20  threat of immediate death. Their eventual capture came only after

21  a multi-car police chase at very high speeds through downtown

22  Walnut Creek, CA., which terminated when they wrecked our car and

23  tried to shoot me. Their actual surrender came as they had a gun

24  to my head.

25      "Fortunately our physical injuries are apparently minor, however

26  the emotional trauma associated with these terrorists acts will and

1   has had a continuing and far reaching effect on us.

2       "As citizens we want to insure that the responsible individuals

3   are punished to the fullest extent of the law.

4       "As victims we demand that they be imprisoned for as long as

5   possible without any possibility of their being released to resume

6   their terrorism." Signed/William S. Reiley and Patricia C. Reiley.

7   SOCIAL DATA:

8       This defendant currently resides in the Contra Costa County

9   Jail at Martinez.  He lists his residence address as 9418 Birch

10  Street in Oakland where he would live with his mother.

11      He was born on March 19, 1953 to George Collins and Dorthea

12  Sullivan Sims at Shreveport, Louisiana.  He does not know if his

13  parents were married.  He saw his father one time, and they did not

14  get along at that meeting.

15      His mother is employed as a hotel housekeeper.  She married Mr.

16  Cornell Sims when the defendant was quite young.  However, the

17  defendant was reared principally by his maternal grandmother, Jeanie

18  Limas.  He travelled back and forth between her home in Shreveport,

19  Louisiana and his mother's home in Oakland, California.  The

20  defendant is the second of seven children.  He has an older brother

21  whose whereabouts are unknown.  His younger brother resides in

22  Berkeley.  Most of his other siblings reside with his mother or

23  in the Oakland area.  He reports that his older brother had some

24  police contact because of fighting.

25      As was reported earlier, the defendant travelled back and

26  forth between Shreveport, Louisiana and Oakland, California.  He

1  reports that he finally settled in the Oakland area in 1971. He
2  states that he graduated from Norfolk High School in 1971.
3  Verification of the defendant's schooling has been received. It is
4  noted that his grade point average fell generally below the average
5  range. The defendant claims that he has had no further education,
6  and is not interested in future educational endeavors.

7      Generally, the defendant claims that his health is fine. He
8  cut his eye while playing football at a very young age, and cannot
9  see out of that eye.

10     He enjoys drawing, shooting pool, running, fishing and bowling
11 in his leisure time.

12     The defendant claims that in 1971 he began having a heavy
13 drinking problem in which he drank as much beer as he could get.
14 When he was arrested for his drunk driving incident in late 1981 he
15 quit drinking. He denies the use of all other illegal intoxicants.

16 MARITAL STATUS:

17     This defendant has never been married. He has a three year old
18 child by Ms. Muriel Ferguson, who he was helping support.

19 MILITARY RECORD:

20     The defendant has never been involved with the military.

21 EMPLOYMENT RECORD:

22     The defendant worked for Davey Tree from 1979 to his arrest
23 as a foreman clearing trees for power lines. That company verifies
24 the defendant's employment with them from February of 1980 through
25 June of 1982. He was terminated because he did not call for
26 over three consecutive days. He was considered a suitable

JERRY LEE SULLIVAN                -19-

1   employee who they would not now consider for rehire.

2       The defendant worked for Ruppert's Auto Park, parking cars

3   from 1975 through 1979. Prior experience was as selling cars.

4   FINANCIAL STATUS:

5       This defendant has no current source of income. Prior to

6   his arrest he was netting approximately $900 per month. He owns a

7   1972 Lincoln Mark IV. He claims that he sold his 1965 Chrysler,

8   but the papers are in the jail, and he is unsure if the title has

9   changed. His routine monthly expenses were close to $1,000 per

10  month.

11  RESTITUTION:

12      Restitution is not a factor in the disposition of this case.

13  COLLATERAL CONTACTS:

14      The defendant submitted the names of five personal references.

15  However, at least two persons' addresses were incorrect, and have

16  not yet responded to requests for telephone contact.

17      However, Mr. Samuel Tarver responded to inquiries, indicating

18  that he has known the defendant for the past ten years as a good

19  family friend. He describes the defendant as a quiet young man

20  who was never known to be involved in anything illegal. He seemed

21  very family-oriented and would work and keep a job. After he got

22  his own apartment, the defendant would come and take his mother to

23  work in the morning and shopping on Saturdays. Mr. Tarver was

24  shocked by this arrest and the charges. He has never known the

25  defendant to have any problems or run with any gang or group of

26  people. He feels that if he was released it would help because he

1   could go back to work and repay his debts.

2       Mr. James Harris responded by phone. He indicates he has known

3   the defendant for the past seven years in business contacts. He

4   describes the defendant as a respectable, dependable person. The

5   defendant worked for him for a long time in his garage, parking

6   cars. They experienced no problems with him. He feels that the

7   defendant is not the type to get involved in any wrongdoing. He

8   stayed away from trouble when he was working for him. He was

9   surprised about these charges as they do not fit his character.

10      Mr. Jerry George has known the defendant for the past two and

11  a half years as his landlord. He indicates that the defendant should

12  receive one of the highest ratings possible. If the defendant

13  anticipated he would be late with his rent he would contact Mr.

14  George well in advance, showing a high responsibility level. He

15  got along well with the other tenants. He feels that the

16  defendant's biggest problem is that he is in jail. He feels that

17  if released, and after finding housing and a job, the defendant

18  could manage things well.

19      Ms. Thelma Lee has known the defendant since he was in grade

20  school with her sons. He is a responsible young man who is kind

21  and tries to help in any way he can. She has never known him to

22  be in any type of trouble before. Further, she has never heard

23  of anybody saying he took anything from anyone. She indicates that

24  it would be helpful if he could get medical help.

25      Mr. Marcus Peppard, the defendant's attorney, wrote a note to

26  this deputy indicating that the defendant had written an

1   autobiography which he hoped this deputy would get at the

2   interview.  This deputy was unaware of such a document at the time

3   of the interview, and the defendant made no offers of such

4   biographical material.

5   EVALUATION:

6       This defendant is statutorily ineligible for probation by virtue

7   of the charges.  He initially impressed this deputy as being very

8   slow, possibly even retarded.  However, as the interview progressed

9   and the defendant became more relaxed, it became apparent that that

10  initial impression was simply the result of his fear and reticence.

11  This defendant is deeply concerned about his future in prison

12  and the possibility of being killed, should he say too much.  This

13  defendant also impresses this deputy as a person who got himself

14  into a predicament that was far beyond his sophistication.  It is

15  doubtful that Mr. Sullivan had any conception of how far this

16  situation would go when he initially became involved.  Since the

17  defendant is reticent to discuss his initial motivations, little

18  comment can be made as to how he became involved.  The only thing

19  this deputy can base her opinions on are impressions and innuendos,

20  rather than any type of facts.  On the other hand, this defendant

21  was the one that held the gun, and whether out of fear or

22  deliberation, apparently attempted to kill the victim at one point.

23  While he is relatively unsophisticated and less than generally

24  criminally oriented, he commenced his criminal behavior with one

25  of the most serious of crimes.

26      In this deputy's opinion, the criteria affecting concurrent and

1  consecutive sentencing with regard to these charges appears to be:

2      With regard to the two counts of 209(b) PC, those charges

3  were independent of each other. It is felt that there was no

4  necessity for both victims to have been involved in this situation.

5  With regard to the two counts of 211 PC, once again it appears

6  that the crime on the two different victims were independent of

7  each other, and the similar argument is used. On the other hand,

8  it is felt that the charge of 209(b) PC includes the charge of

9  211 PC. With regard to Counts Five and Six, it appears to this

10 deputy that, if the attempted murder centers around the incident

11 in which the gun did not discharge, but does not include the

12 subsequent action just prior to the defendant's arrest, it is,

13 indeed, separate from the aggravated assault. On the other hand,

14 if the attempted murder applies to both incidents it appears to

15 include the aggravated assault. On the other hand, if the

16 aggravated assault refers to the defendant's act of dragging the

17 victim through the bushes at gunpoint, it again is a separate act.

18     In this deputy's opinion, the circumstances in aggravation

19 and mitigation appear to be:

20 Circumstances in Mitigation(Rule 423):

21 A.  Facts relating to the crime:

22         There is a possibility that the

23         defendant had no apparent predisposition

24         to commit this crime and was induced by

25         others.

26 ///

B.  Facts relating to the defendant:

The defendant has an insignificant
prior record.  The defendant voluntarily
acknowledged wrongdoing at an early stage
in the criminal process.

Circumstances in Aggravation(Rule 421):

A.  Facts relating to the crime:

The crime involved the threat of great
bodily harm.  The crime involved multiple
victims.  The crime indicates premeditation.
The crime involved the attempted taking of
great monetary value.

B.  Facts relating to the defendant:

There do not appear to be any factors in
aggravation with regard to the defendant.

Respectfully submitted,

GERALD S. BUCK, COUNTY PROBATION OFFICER

BY:

KAY HLAVKA, DEPUTY PROBATION OFFICER
ADULT DIVISION, MARTINEZ

APPROVED:

RICHARD A. CALICURA, UNIT SUPERVISOR
ADULT DIVISION, MARTINEZ

KH:al
Dictated:11/24/82
Typed:11/30/82

READ AND CONSIDERED:

JUDGE

EXHIBIT     "D"

SULLIVAN, JERRY  C-66878                                                September 23, 2005

# MENTAL HEALTH EVALUATION
# FOR THE BOARD OF PRISON TERMS
# OCTOBER 2005 LIFER HEARING
# SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

I.  <u>Identifying Information:</u> Mr. Sullivan is a 52-year old, African American male who is serving a Life plus 7 year sentence for PC 209 (b) Kidnapping for Robbery, and PC187, Attempted 1st degree Murder, committed July 2, 1982. There is also a non-controlling case for PC209, Kidnapping for Robbery and PC211, Robbery committed on the same date. This report is based on a review of the inmate's central files, medical record and a face to face interview conducted in the North Block offices of San Quentin State Prison. Mr. Sullivan was informed that the information obtained during the interview was not confidential in that it would be included in a report to the Board of Prison Terms. He stated that he understood this and was voluntarily participating in the interview. Mr. Sullivan denied that he needed any assistance to participate in the interview and he appeared to understand the purpose of the interview and the limits of confidentiality. For reasons not limited to the possibility that an inmate may have a mental disability or other mentally handicapping condition, the interview was conducted by a licensed psychologist. It was the conclusion of the examiner that Mr. Sullivan did not require auxiliary aids or assistance to achieve effective communication.

Mr. Sullivan's psychosocial history including developmental history, family history, psychosexual development and sexual orientation, marital history, military history, employment and income history and substance abuse history have been thoroughly reviewed and presented in previous reports to the Board and will not be restated in this report. The reader should refer to earlier evaluations for this information.

II. Psychiatric and Medical History:
Mr. Sullivan has no history of mental disorder and has not undergone psychiatric treatment in the past. He has hypertension and elevated cholesterol and takes medication to control these conditions.

III. Plans if Granted Release:
When asked what his plans for parole were, Mr. Sullivan stated that he planned to "stay out of trouble and help people." When asked for specific details, Mr. Sullivan stated that he plans to stay with his mother at her home. She has made it clear that he is welcome to stay with her for as long as he needs to. Mr. Sullivan believes that his mother is 70 or 71 years old. He describes his relationship with her as being very close. She visits him every other weekend and has done so throughout his incarceration. He has tried to encourage her to stay home and take care of herself, but has not been able to deter her from traveling around the state to visit him. He feels a deep sense of gratitude toward her for her unwavering support. Being able to help his mother is a primary factor in Mr. Smith's desire to be released to the community.

Mr. Sullivan has extended family in many communities in the Bay Area. He has a 26-year-old daughter with whom he is in contact. She visited him about a month ago.

Mr. Sullivan describes himself as a good worker, who would be willing to take any job in the community. He would be most likely to return to his previous employment as a roofer. Mr. Sullivan has done this type of work successfully in the past and believes that he would be hired again. He has also worked as a tree

SULLIVAN, JERRY  C-66878                                      September 23, 2005

trimmer and parking lot attendant with positive evaluations from his previous employers.    While incarcerated, he has gained additional skills and experience as an upholsterer, truck driver, and forklift operator.

Mr. Sullivan would continue his participation in AA as he states that "AA is a part of my life everyday." He would plan to attend meetings as soon as he leaves prison, and has gotten a list of AA meeting locations near his mother's home.  Mr. Sullivan's mother is also active in her church and Mr. Sullivan has promised her that he would regularly attend services with her.

Mr. Sullivan has been married once and is divorced.  He is not presently engaged in a relationship.  He looks forward to develop a positive circle of friends, in the future, as he states "There are a lot of people out there who are doing good things.  I know I made a bad decision and I see my life getting better.  I know I got life left in me.  I still enjoy working."

# CLINICAL ASSESSMENT

IV. Current Mental Status/Treatment Needs:
Mr. Sullivan presented as a pleasant, relaxed, mature African American male. He appeared to be his stated age.  He was well groomed and dressed in standard CDC inmate clothing.  He appeared to be fully alert, and was oriented in all spheres. His thought was coherent, linear and logical with no evidence of thought disorder.  His intellectual functioning appeared to be in the low average range.  His fund of information was within normal limits.  He reported that he reads the newspaper, novels and AA materials.  He was knowledgeable about current events.   Thought was somewhat concrete in that he was not able to conceptually relate how an apple and an orange, or a table and a chair were alike.  Speech, flow of thought and affect were all within normal range.  There was no evidence of mood instability or depressed mood. He denied suicidal or homicidal ideation.  His judgement appeared to be adequate for most situations.  He demonstrated capacity for insight, especially knowledge of the ways he has benefited from incarceration. Mr. Sullivan stated that he has learned from all of the components of the IMPACT program.  He has improved his reading ability through the study of phonics at San Quentin and states that he was a very poor reader before being sent to prison.

### CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| AXIS I: | 305.00  Alcohol Abuse (by history) |
| AXIS II: | V. 71.09 No Diagnosis |
| AXIS III: | Hypertension, Hypercholesterolemia |
| AXIS IV: | Stressors:  Life Sentence |
| AXIS V: | GAF = 85 |

Mr. Sullivan has no current symptoms of a recognized mental disorder.  He is functioning well in most areas of his life in that he is programming well, has supportive family relationships, is positive about his life and his ability to make a contribution to society.  He is aware of the needs of others and actively looks for ways to solve problems by constructive means.  He is not receiving any mental health services at this time and does not have a need for therapeutic intervention.

V: Inmate's Version of the Crime
Mr. Sullivan's version of the crime did not differ from his statements in previous evaluations.  He stated that he had met a guy who made him a proposition that would earn him a lot of money.  Mr. Sullivan was living with his girlfriend at the time and was experiencing financial problems.  Mr. Sullivan stated that he had never owned a gun and used a friend's gun for the intended crime.

Mr. Sullivan and his crime partners held a couple hostage in a home that the couple was showing for sale. The couple was taken to a bank where they had accessible funds.  While the woman was in the bank, she alerted the bank staff to the crime in progress.  Mr. Sullivan attempted to escape with the male victim, and

SULLIVAN, JERRY  C-66878                                                September 23, 2005

engaged in a high-speed chase with the police. The chase ended when Mr. Sullivan crashed the car. Mr. Sullivan attempted to flee on foot with the victim, but was apprehended by the police before he could get away from the area. The victim claimed that Mr. Sullivan attempted to fire the gun at him, at close range. Mr. Sullivan denies this, stating that he had his hand blocking the hammer of the gun while he held it on the victim. He denies that he ever intended to shoot or harm the victims. He contends that the gun was inoperable and was used in the crime in order to intimidate the victims.

Mr. Sullivan is aware that the victim has stated that he heard the gun being fired at him, by Mr. Sullivan. Mr. Sullivan stated that he understands that the victim sincerely believes that he heard this. Mr. Sullivan is equally sure that he did not attempt to shoot the victim. He stated that the gun was inoperable.

Mr. Sullivan is remorseful for his crime. He expresses sincere empathy for Mr. Riley, the victim. He stated that he was informed that Mr. Riley's wife had died and that he feels especially sorry now that Mr. Riley is alone and has been deprived of the company of his wife. Mr. Sullivan stated, "I don't know what to tell you. I wish I could change what I did. ..I don't know what else to do. I would work for the man for a year to pay him back some way. I can understand his pain. He probably hates me. I can understand that, too."

## VI. Assessment of Dangerousness
### A. In a Controlled Environment
Mr. Sullivan does not have a history of institutional violence. He demonstrates respect for authority and a mature outlook on his incarceration and life in general. He identifies himself as a non-violent person who strives to get along well with others.

### B. If Released to the Community
Mr. Sullivan has a good understanding of the factors that led to his commitment offense. He stated that he was raised with good values and did not get into trouble as an adolescent. He was employed at the time of the crime and living independently in the community. He stated that he used to drink on the weekends and got a DUI conviction in prior to the instant offense. He was associating with individuals who were engaged in criminal activity. He yielded to temptation when presented with a scheme to come up with a lot of money. As stated by Mr. Sullivan, "The plan was to take the money and run; there never was any intent to hurt anyone." He acknowledges the harm he did to the victims and expresses sincere regret about his involvement in the crime. He recognizes the victims as individuals who did not deserve to be victimized by criminal actions. Mr. Sullivan takes direct responsibility for his actions in regard to the crime.

While Mr. Sullivan's crime was one that placed his victims at direct risk of harm, everyone was fortunate in that there was no loss of life. Mr. Sullivan has received a very long sentence for his crimes and acknowledges that he did wrong and deserves punishment by the court. His criminal actions did not seem to be the result of an antisocial personality or criminal lifestyle. At the time of the crime, Mr. Sullivan was not supporting himself through criminal activity. He also does not have a criminal record from a young age. These factors would suggest that Mr. Sullivan would be an inmate who could benefit greatly from rehabilitation, in that he has a foundation of socially conforming behavior prior to incarceration.

There is the question of the contribution of alcohol to Mr. Sullivan's crime. Mr. Sullivan admits to inappropriate use of alcohol around the time of his offense. He denies that he was intoxicated at the time of the offense and it would appear that alcohol did not play a direct role in the commission of the crime. It is more likely that Mr. Sullivan's abuse of alcohol contributed to an overall lack of judgement and an erosion of the values with which he was raised. He has clearly stated a commitment to lifelong participation in AA.

Given Mr. Sullivan's lack of an early or extensive history of criminal behavior, and active recovery from alcohol abuse, the greatest risk would be likely to come from any clinical factors associated with violent behavior. Any recognized factors such as lack of insight, negative attitudes, lack of empathy, impulsivity, symptoms of major mental illness, or failure at treatment would be considered as possible sources of

SULLIVAN, JERRY C-66878                                    September 23, 2005

increased risk. Based on review of Mr. Sullivan's present institutional record and the clinical interview conducted for this report, it would appear that none of these risk factors is currently present.

Mr. Sullivan also has a number of protective factors such as a feasible plan for parole and substantial social support. He also is clear about his remorse for his actions and his willingness to continue his participation in self-help and rehabilitation activities. He has reflected on his crime and is willing to do whatever would be appropriate to make amends to those who have been harmed by his actions.

VII. Conclusion and Recommendations:

Other than continuing in AA, there would be no recommendation for necessary therapeutic interventions prior to parole. Mr. Sullivan is an individual whose crime was extreme in its complexity and recklessness. Mr. Sullivan's sentence reflects this. There is not, in my opinion a direct relationship between the extreme actions of the crime and Mr. Sullivan's criminality. He was not known to be a violent person before the crime, and has not engaged in violence subsequent to the crime. His criminal action seemed to reflect a dramatic, but failed attempt to solve his financial problems by criminal means.

Given Mr. Sullivan's history, institutional adjustment, and present clinical presentation there are no psychological factors that would suggest an increased risk for violent behavior, in either the community, or a controlled setting at the present time. While it is not possible to accurately predict future violent behavior, given Mr. Sullivan's age, commitment to ongoing substance abuse treatment, and limited criminal history, he would be expected to be able to continue to live a positive, non-violent life when released to the community.

Michel Lynn Inaba, Ph.D.
Contract Psychologist

Sullivan, Jerry   C-66878           4      San Quentin              September 23, 2005

EXHIBIT "E"



FILED

JUN 0 5 2007

SUPERIOR COURT OF THE STATE OF CALIFORNIA
By_____ (CONTRA COSTA)
                    Deputy Clerk

Superior Court of the State of California

In and For the County of Contra Costa


In re Jerry L. Sullivan,                      No. 070053-4
On Petition for Writ of Habeas Corpus         Order Denying Petition


_____/


   In Contra Costa Superior Court Docket 26837, Petitioner Jerry L. Sullivan was convicted of crimes including kidnap, attempted murder and attempted robbery. In April 1983, Petitioner was sentenced to a term of seven years to life. See Petition, paragraph 3.

   On July 21, 2006, Petitioner was found unsuitable for parole by a two-person panel of the Board of Parole Hearings ("the Panel"). It was a one-year denial. Petitioner contends that the Panel's decision was not supported by the requisite evidence and is otherwise arbitrary and capricious.


**A. The July 2006 Hearing and Decision:**

   The Panel considered the July 2, 1982, commitment offense, as set forth in a Board report. Petitioner's Exhibit A, page 13.

   This report summarized the commitment offense as follows:

"Jerry Sullivan and co-defendant William Buford made an appointment with William Reily of Reily Reality to be shown a home that Reily had listed.[1] The meeting was to take place at the home, which was located in the town of Tracy, California, on the next day, July 2[nd] at 10:00 a.m. On the morning of the July 2[nd], around 9:00 A.M., an unidentified person called Mr. Reily and cancelled the appointment for 10:00 A.M.; however, the same individual telephoned later the same morning and arranged to view the property at 2:00 P.M., the same afternoon.

Sullivan and a companion arrived for the appointment in a car driven by a third identified person. Mr. and Mrs. Reily met them and showed them the house. After approximately 20 minutes, Sullivan and his companion left the home and the Reily's began to lock up the house. As they were exiting the back of the house, Sullivan and his companion approached and separated the Reily's. Sullivan's companion directed Mrs. Reily into the Reily's car. He told the third person, the unidentified driver of the vehicle in which they arrived, to leave. Sullivan told the Reilys that he had a gun and would use it so as to ensure their compliance.

Sullivan directed Mr. Reily into the car. They drove to the Reily's home in Walnut Creek. Once there, a pre-recorded message demanding that the Reily's give them $150,00.00 was played. The message also included threats to rape and murder Mrs. Reily and then kill Mr. Reily if they did not cooperate. The Reily's explained that they did not have that kind of money and eventually Sullivan and his companion decided to take the Reily's to their bank and withdraw as much money as they could get.

The Reily's were driven to their bank and Mrs. Reily was instructed to enter the bank and make a withdrawal of all the money she could access. Mr. Reily was to be held hostage until she returned with the money. She was to be picked up in front of the bank when she had finished the transaction. Mrs. Reily went to a teller and withdrew monies from her accounts and was able to give the teller a note explaining what was going on and asked to have the police called. Officers arrived and verified the situation.

As the back-up officers were called Sullivan and his companion made the decision to leave. As they tried to leave, a police unit made an attempt to

---

[1] The record contains various spellings for "William Reily." For purposes of consistency, the court will use the spelling found in the Petitioner's Exhibit A.

stop the car and a pursuit ensued. It ended when Sullivan lost control of the car and crashed into a fence. Mr. Reily later stated after the car crashed, Sullivan stuck the gun into his ribs and pulled the trigger, but the gun did not fire. Sullivan pulled Reily out of the car at gunpoint and tried to make a getaway. As they went through some bushes, they both fell and were immediately surrounded by police officers and Sullivan was taken under arrest."

See Petitioner's Exhibit B.

The probation report for Petitioner, also before the Panel, provides additional detail about the commitment offense.

For example, the probation report sets forth that the voice on the tape played to the Reilys while the Reilys were captive in their home, made the following statements:

"Listen closely. Because, this will not be repeated and your life depends on your full cooperation, as well as your wife's life. Our organization has had you under close surveillance for the past two years. We know who and what you are, who you bank with, and we know when you went to the bathroom last. So, to eliminate any time being wasted, we will not tolerate any excuses or alibis at all.
We want two things today, Mr. Reily. We want $150,00.00 in cash delivered here to your home quick, or our man has orders to first -rape your wife, then kill her, and then kill you. If you cooperate quickly no one will be harmed. If you do not cooperate, you both die quickly. The choice is entirely up to you."

The voice on the tape set forth that the victims were allowed one phone call to a qualified person who had access to cash and who could bring it to their home immediately. The voice suggested several ways which would allow the Reilys to obtain the cash and have it delivered.

The probation report sets forth that while holding the victims captive in their residence, the Petitioner continually displayed a handgun and repeated the threats to rape Mrs. Reily, kill her, and thereafter to kill Mr. Reily.

Regarding Petitioner's flight from the bank after the police had arrived and the subsequent police pursuit, the probation report states, "The defendant became very hostile toward Mr. Reiley indicating that he had "blown it" and he was going to shoot him. The defendant then lost control over the vehicle and collided with a raised wood framed sidewalk at 1335 Treat Boulevard. The vehicle then slid into a wood fence, finally coming to rest against a tree. The impact caused the defendant to be thrown on top of Mr. Reiley. Mr. Reiley reached for the gun but missed it. The defendant then pushed the gun into Mr. Reiley's ribs and Mr. Reiley heard the distinct sound of the hammer of the gun falling down as if the trigger had been pulled. However, the gun did not discharge. Mr. Reiley opened his door, and he and the defendant tumbled out on the ground beside the vehicle. The defendant then grabbed Mr. Reiley around the neck and put the gun beside his ear. He dragged Mr. Reiley approximately 40 to 50 feet away from the vehicle through some bushes. They slipped and fell to the ground, and were immediately surrounded by several police officers who were shouting commands at the defendant. The defendant continued to hold the gun to Mr. Reiley's head and did not comply with the orders to drop it. However, he eventually dropped the gun, which Mr. Reiley grabbed and threw away from them. The defendant was then taken into custody."[2]

Petitioner told the Panel that he got involved in the commitment offense through somebody he met at a furniture store and that he did so to make some quick money. Exhibit A, pages 22-27. Petitioner told the Panel that although he was making money, he wasn't managing money because he was partying and wrecking cars. Exhibit A, page 34-35.

The Panel addressed Petitioner's social history. The Panel's observations included that Petitioner is a high school graduate and that Petitioner has a daughter who visits him often. Exhibit A, pages 46-48.

The Panel observed that Petitioner had no prior criminal history, other than a drunk driving matter that was resolved by paying a fine. Exhibit A, pages 52-53.

The Panel observed and assessed that Petitioner's post-conviction history was commendable, indeed, virtually disciplinary free. Exhibit A, page 53.

---

[2] See Petitioner's Exhibit C, pages 5-9.

The Panel observed that Petitioner's participation in self-help programs was also exemplary and that Petitioner is an outstanding worker. Exhibit A, pages 53-57.

The Panel considered the positive September 23, 2005 report completed by Dr. Inaba for Petitioner. As the Panel observed, Dr. Inaba opined that Petitioner would be expected to be able to continue to live a positive, nonviolent life when released to the community. Exhibit A, page 63.

The Panel considered Petitioner's parole plans. Although Petitioner's file contained two letters conveying job offers, neither of these letters was dated. Exhibit A, pages 64-66. Regarding when Petitioner received one of the letters, Petitioner stated, "It might have been last year or the year before. I'm not sure." Exhibit A, page 65.

The Panel heard from Contra Costa County Deputy District Attorney Waddell. Mr. Waddell acknowledged that Petitioner has done "reasonably well" but nevertheless opposed a grant of parole. Mr. Waddell observed that Petitioner had pled guilty to attempted murder, that the victims were abused and terrified over a number of hours, threatened with rape and gunpoint and that Petitioner still attempted to minimize his responsibility for the offense.

Mr. Waddell observed that although the 2005 psychiatric report indicated that the Petitioner would present a low risk if released upon a grant of parole, the 2002 psychiatric report assessed that Petitioner would present a moderate to mild risk. Mr. Waddell believed that "a longer period of time having reached this level of risk in the view of the psychiatrist after a rather lengthy road, we feel a longer period of observation is necessary." Exhibit A, page 82.

The Petitioner addressed the Panel and expressed deep remorse for the commitment offense. Exhibit A, pages 87-89.

*The Decision:*

The Panel assessed that Petitioner would pose an unreasonable risk or danger to society or a threat to public safety if released from prison.

The Panel assessed that the commitment offense was calculated and especially cruel, and that the motive for the crime was trivial in that Petitioner needed money because he was living beyond his means.

The Panel also assessed that Petitioner's parole plans were wanting, as he had no documented, current employment offer or an NA/AA sponsor. Presiding Commissioner Biggers explained to Petitioner that "what we don't want to do is put you back on the street with the possibility of you having a job and then you go and find yourself in the same situation that you had prior to coming in." Exhibit A, page 94-95.

The Panel commended Petitioner for his forthrightness, his exceptional institutional adjustment, his work performance and his outstandingly admirable disciplinary record.

The Panel assessed that the aforementioned positive aspects did not outweigh the factors of unsuitability. Exhibit A, page 97.

B. The Statutory Framework and Judicial Review:

Under Penal Code Section 3041(b), the parole authority "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offenses is such that consideration of the public safety requires a more lengthy period of incarceration for this individual...."

Parole considerations applicable to life prisoners such as Petitioner are contained in Title 15 of the California Code of Regulations, section 2281.

Circumstances tending to show unsuitability include that the commitment offense was committed in an especially heinous, atrocious or cruel manner. In assessing whether the crime was committed in an especially heinous, atrocious or cruel manner, the Board is to consider whether multiple victims were attacked, the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder,

whether the victim was abused, defiled or mutilated during the crime, whether the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and whether the motive for the crime was inexplicable or very trivial in relation to the offense. Section 2281(c).

Other circumstances tending to indicate unsuitability are that the inmate possesses a previous record of violence, an unstable social history, committed previous sadistic sexual offenses, has a lengthy history of mental problems related to the offense or has engaged in serious misconduct in prison or jail.

Circumstances tending to show suitability include that the inmate does not have a juvenile record, possesses a stable social history, shows signs of remorse, committed the commitment offense as the result of significant stress, lacks a significant criminal history, is of an age that reduces the probability of recidivism, has realistic parole plans and positive institutional behavior. See Section 2281.

The specified unsuitability and suitability factors are general guidelines only, as the parole authority is to consider all relevant, reliable information. Section 2281.

"Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Section 2281(a).

In the case of In re Rosenkrantz (2002) 29 Cal. 4th 616, the Supreme Court explained that parole release decisions "entail the Board's attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." Such a prediction requires analysis of individualized factors on a case-by-case basis and the Board's discretion is almost unlimited, albeit limited by the California Constitution's requirement of procedural due process. Rosenkrantz at p. 655, citations omitted.

Given the Board's broad discretion, judicial review of the Board's parole decisions is very limited. Specifically, a court may inquire only whether some evidence in the record before the Board supports the decision

to deny parole, based upon the factors specified by statute and regulation. Rosenkrantz at p. 658. Only a modicum of evidence is required. Rosenkrantz at p. 677.

The nature of the prisoner's offense alone, can constitute a sufficient basis for the denying parole. Rosenkrantz at p. 682, citations omitted. However, the Supreme Court cautioned that sole reliance on the commitment offense might, in a particular case, violate Penal Code Section 3041(a)'s provision that a parole date "shall normally be set" and thus might contravene the inmate's constitutionally protected expectation of parole. Rosenkrantz explains that such a violation could occur, "for example [,] where no circumstances of the offense could be considered more aggravated than the minimum necessary to sustain the conviction for that offense." Rosenkrantz at p. 683. The Supreme Court suggested that the commitment offense must be "particularly egregious" to justify the denial of parole. Rosenkrantz at p. 683.

In the case of In re Dannenberg (2005) 34 Cal. 4th 1061, 1095, the Supreme Court clarified that for a commitment offense to be "particularly egregious," thereby warranting a finding of unsuitability, all that is required is that "the violence or the viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." Dannenberg at 1095, emphasis in the original, citing Rosenkrantz at p. 683.

In the case of In re Scott (2005) 133 Cal. App. 4th 573, the Court admonished that the proposition that a commitment offense alone can negate suitability must be properly understood. Scott instructs: "The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." Scott at pp. 594-595.

## C. Some Evidence Supports the Panel's Decision and the Decision Was Not Arbitrary or Capricious:

Petitioner's argument that there is no evidence to support the Panel's determination that nature of the commitment offense supported a finding of unsuitability is not prevailing.

The Panel's finding that the commitment offense was committed in an especially heinous, atrocious or cruel manner within the meaning of Section 2281 is amply supported by the evidence.

There were multiple victims. The motive for the crime, that Petitioner needed money because he was living beyond his means, was trivial. The taped message played to the victims, in which the female victim was threatened with rape, and both victims were threatened with death, demonstrated an exceptionally callous disregard for human suffering. There is also ample reason to believe that the commitment offense was carried out in a dispassionate and calculated manner.

The violence and viciousness of the commitment offense also exceeded that minimally necessary to convict Petitioner. For example, as set forth in the probation report, while holding the victims captive, after subjecting the victims to the chilling tape, the Petitioner reiterated the threats to kill both victims and to rape the female victim. The egregiousness of the commitment offense is exacerbated by Petitioner's flight from Crocker Bank in which the Petitioner, while still holding Mr. Reily hostage, engaged the police in a pursuit, lost control of the victims' vehicle, crashed into a fence, pushed the gun into Mr. Reily's ribs, grabbed Mr. Reily around the neck, put the gun beside Mr. Reily's ear, dragged Mr. Reily 40 to 50 feet, and continued to hold the gun to Mr. Reily's head as the two were surrounded by the police, notwithstanding the police commands to drop the gun.

The court recognizes that some appellate court decisions require "some evidence" that the inmate will present an unreasonable risk to public safety if released from prison whereas other decisions suggest that there need only be "some evidence" of the regulatory factors which contraindicate parole suitability. See In re Lee (2006) 143 Cal. App. 4th 1400.

It is not for this court to resolve this legal uncertainty. Because Petitioner's commitment offense was for financial gain, premeditated, and not committed as the result of significant stress in Petitioner's life, the commitment offense does provide some evidence that the Petitioner would present an unreasonable risk to public safety if released from prison. The Panel could properly assess that Petitioner's uncertain parole plans, with their attendant financial uncertainty, exacerbated the risk to public safety.

The Panel's decision reflects an individualized consideration of the relevant factors. As noted above, the Panel commended the Petitioner on his numerous gains and exemplary institutional record. While the Panel's exercise of its discretion did not favor Petitioner, it did not violate due process.

The Petition is denied.


DATED: 6-5-07

_____
Judge of the Superior Court

cc: Petitioner
Docket 26837