**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   JERRY L SULLIVAN,                      No C-07-4963 VRW (PR)

12              Petitioner,

13         v                               ORDER GRANTING PETITION FOR
                                           WRIT OF HABEAS CORPUS
14   ROBERT L AYERS, Warden

15              Respondent.

16   _____/

17

18        Petitioner Jerry L Sullivan, a state prisoner incarcerated

19   at San Quentin State Prison in San Quentin, California, seeks a writ

20   of habeas corpus under 28 USC § 2254 challenging the California

21   Board of Parole Hearings' ("BPH") July 21, 2006 decision to deny him

22   parole at his eleventh parole suitability hearing.

23        At the time he was denied parole in 2006, fifty-three-

24   year-old petitioner had served twenty-three years on his seven-to-

25   life sentence – over thirteen years past his minimum eligible parole

26   date – during which he had exhibited, in the words of BPH, "pretty

27   close to * * * exceptional" institutional behavior, Doc #9-2 at 95;

28   Doc #9-3 at 4; see also Doc #9-2 at 100 (petitioner's "institutional

adjustment[] [has] been exceptional"; petitioner's disciplinary record has been "outstanding"; id at 56-57 (during the hearing BPH "commend[ed] [petitioner]" for his "remarkable and outstanding record" throughout the duration of his life term).  After recognizing petitioner's "unblemished disciplinary profile," his "positive programming" and "excellent rapport with both inmates and staff," the July 2006 "Life Prisoner Evaluation Report" concluded:

> Based on the absence of a prior criminal history (taking into account his commitment offense), his prison adjustment, the findings in his psychiatric reports, and his family support I believe [petitioner] will re-integrate into society without incident.  I did not note any information that would indicate he would not be able to function as a law-abiding citizen should he be allowed parole at this time.

Doc #9-5 at 49.  And, the doctor who prepared the psychological report specifically for petitioner's parole suitability hearing concluded:  "[g]iven [petitioner's] history, institutional adjustment, and present clinical presentation there are no psychological factors that would suggest an increased risk for violent behavior, in either the community, or a controlled setting at the present time."  Doc #9-3 at 31.

Notwithstanding this evidence, BPH concluded petitioner was not yet worthy of parole.  For the reasons that follow, the court finds there is no evidence to support BPH's decision that petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  The petition will be granted.

//

**2**

I

On April 20, 1983, petitioner was sentenced to an indeterminate term of seven years to life in state prison following his guilty pleas to two counts of kidnap for robbery with the use of a firearm, two counts of robbery, one count of attempted murder and one count of aggravated assault.  Doc #9-1 at 2 & 5.  His minimum eligible parole date was June 1, 1993.  Doc #9-2 at 4.

Petitioner had no history, either as a juvenile or an adult, of violent crime.  Doc #9-2 at 55-56; Doc #9-3 at 5.  Prior to his sentence in 1983, petitioner's only contact with the criminal justice system was when he was arrested in 1981 for driving under the influence, for which he spent a night in jail and paid a fine.  Doc #9-2 at 55-56.

On July 21, 2006, thirteen years after his minimum eligible parole date, and after he had served twenty-three years for his crimes, petitioner appeared before BPH for his eleventh parole suitability hearing.  Doc #9-2 at 16.  At that hearing, BPH found petitioner "was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  Id at 93-94.  In denying parole, BPH cited the "calculated" and "especially" cruel nature of the crime, which showed a "callous disregard for human suffering" and also expressed "concern" over petitioner's parole plans.  Id at 94, 97.  Petitioner's parole was deferred for one year.[1]  Id at 99.

---

[1]      On July 30, 2007, petitioner appeared before BPH for his twelfth parole suitability hearing, at which time he again was denied parole.  Pending before this court is his petition for writ of habeas

1    Petitioner unsuccessfully challenged BPH's decision in the
2    superior and state appellate courts.  Doc #9-8 at 76-85; Doc #9-9 at
3    2.  On September 12, 2007, the California Supreme Court summarily
4    denied petitioner's petition for review.  Doc #9-9 at 23.  This
5    federal petition for a writ of habeas corpus followed.  Doc #1.
6        Per order filed on January 17, 2008, the court found
7    petitioner's claim that BPH violated his due process rights, when
8    liberally construed, colorable under § 2254, and ordered respondent
9    to show cause why a writ of habeas corpus should not be granted.
10   Doc #3.  Respondent has filed an answer and petitioner has filed a
11   traverse.  Doc ## 9 & 10.

13                                    II

14       The Antiterrorism and Effective Death Penalty Act of 1996
15   ("AEDPA"), codified under 28 USC § 2254, provides "the exclusive
16   vehicle for a habeas petition by a state prisoner in custody
17   pursuant to a state court judgment, even when the petitioner is not
18   challenging his underlying state court conviction."  <u>White v</u>
19   <u>Lambert</u>, 370 F3d 1002, 1009-10 (9th Cir 2004).  Under AEDPA, this
20   court may entertain a petition for habeas relief on behalf of a
21   California state inmate "only on the ground that he is in custody in
22   violation of the Constitution or laws or treaties of the United
23   States."  28 USC § 2254(a).

---

26   corpus challenging that denial of parole.  See Case No 08-1837-VRW
     (PR).  Because the court grants the instant petition, the petition in
27   Case No 08-1837-VRW (PR) will be dismissed as moot in a separate
     order.

28                                    4

The writ may not be granted unless the state court's adjudication of any claim on the merits:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 USC § 2254(d).  Under this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Williams v Taylor</u>, 529 US 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 USC § 2254(d) rests in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  <u>Williams</u>, 529 US at 412; <u>Clark v Murphy</u>, 331 F3d 1062, 1069 (9th Cir 2003).


III

A

The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty or property without due process of law.  US Const Amends V & XIV.  It is now

settled that California's parole scheme, codified in California Penal Code section 3041, vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons v Carey, 505 F3d 846, 850 (9th Cir 2007) (citing Sass v Calif Bd of Prison Terms, 461 F3d 1123, 1128 (9th Cir 2006); Biggs v Terhune, 334 F3d 910, 914 (9th Cir 2003); McQuillon v Duncan, 306 F3d 895, 903 (9th Cir 2002)). It matters not that a parole release date has not been set for the inmate because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." Biggs, 334 F3d at 915. Due process accordingly requires that a parole board premise its decision regarding a petitioner's parole suitability on "some evidence in the record" such that the decision is not arbitrary. Sass, 461 F3d at 1128-29 (quoting Superintendent v Hill, 472 US 445, 457 (1985)). The "some evidence" standard is clearly established federal law in the parole context for purposes of § 2254(d). Id at 1129.

        The Supreme Court set forth the "some evidence" standard in Hill, which concerned the revocation of "good time" credits towards parole resulting from inmate misconduct. Hill, 472 US at 455. The Court rested its holding upon the procedural due process foundation it laid in Wolff v McDonnell, 418 US 539, 563-67 (1974). As the Court noted, Wolff required, among other things, that an inmate receive "a written statement by the fact finder of the

6

evidence relied on and the reasons" for the deprivation of his good time credits.  <u>Hill</u>, 472 US at 454 (citing <u>Wolff</u>, 418 US at 565).  The Court then added to the foundation laid in <u>Wolff</u>:  "[R]evocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record."  <u>Hill</u>, 472 US at 455 (quoting <u>Wolff</u>, 418 US at 558).

The "some evidence" standard does not permit the court to "reweigh the evidence."  <u>Powell v Gomez</u>, 33 F3d 39, 42 (9th Cir 1994).  Instead, the inquiry is "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."  <u>Hill</u>, 472 US at 455-56.  While this test is stringent, it must at minimum protect an inmate's "strong interest in assuring that the loss of [parole] is not imposed arbitrarily."  <u>Id</u> at 454.

Due process also requires that the evidence underlying the parole board's decision have some indicium of reliability.  <u>Biggs</u>, 334 F3d at 915; <u>McQuillion</u>, 306 F3d at 904.  Relevant to this inquiry is whether the prisoner was afforded an opportunity to appear before, and present evidence to, the board.  See <u>Pedro v Oregon Parole Bd</u>, 825 F2d 1396, 1399 (9th Cir 1987).  If BPH's determination of parole unsuitability is to satisfy due process, there must be some reliable evidence to support the decision.  <u>Rosas v Nielsen</u>, 428 F3d 1229, 1232 (9th Cir 2005).

//

//

**7**

B

When assessing whether a state parole board's suitability determination was supported by "some evidence" the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state.  <u>Irons</u>, 505 F3d at 850.  Under California law, prisoners serving indeterminate life sentences, like petitioner, become eligible for parole after serving minimum terms of confinement required by statute.  <u>In re Dannenberg</u>, 34 Cal 4th 1061, 1069-70 (2005).  At that point, California's parole scheme provides that BPH "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration."  Cal Penal Code § 3041(b).  Regardless of the length of the time served, "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."  Cal Code Regs tit 15, § 2402(a).  In making this determination, BPH must consider various factors, including the prisoner's social history, past and present mental state, past criminal history, the base and other commitment offenses, including behavior before, during and after the crime, past and present attitude toward the crime and any other information that bears on the prisoner's suitability for release.  See Cal Code Regs tit 15, § 2402(b)-(d).

In considering the commitment offense, BPH must determine

whether "the prisoner committed the offense in an especially heinous, atrocious or cruel manner."  Cal Code Regs tit 15, § 2402(c)(1).  The factors to be considered in making that determination include:  "(A) Multiple victims were attacked, injured or killed in the same or separate incidents; (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) The victim was abused, defiled or mutilated during or after the offense; (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; (E) The motive for the crime is inexplicable or very trivial in relation to the offense."  Id.

Under California law, the "core determination" regarding a prisoner's threat to public safety "involves an assessment of an inmate's *current* dangerousness."  See <u>In re Lawrence</u>, 44 Cal 4th 1181, 1205 (2008) (emphasis in original) (citing <u>In re Rosenkrantz</u>, 29 Cal 4th 616 (2002) and <u>In re Dannenberg</u>, 34 Cal 4th 1061 (2005)).  According to the court:

> to the extent our decisions in <u>Rosenkrantz</u> and <u>Dannenberg</u> have been read to imply that a particularly egregious commitment offense *always* will provide the requisite modicum of evidence supporting the Board's or the Governor's decision, this assumption is inconsistent with the statutory mandate that the Board and the Governor consider all relevant statutory factors when evaluating an inmate's suitability for parole, and inconsistent with the inmate's due process liberty interest in parole that we recognized in <u>Rosenkrantz</u>.

<u>Lawrence</u>, 44 Cal 4th at 1191 (emphasis in original).  The court continued:

**9**

1

2

3

4

5

6

7
>In some cases, such as this one, in which
>evidence of the inmate's rehabilitation and
>suitability for parole under the governing
>statutes and regulations is overwhelming, the
>only evidence related to unsuitability is the
>gravity of the commitment offense, and that
>offense is both temporally remote and mitigated
>by circumstances indicating the conduct is
>unlikely to recur, the immutable circumstance
>that the commitment offense involved aggravated
>conduct does not provide "some evidence"
>*inevitably* supporting the ultimate decision that
>the inmate remains a threat to public safety.

8
Id.

9

10

C

11    A critical issue in parole denial cases concerns BPH's use

12   of evidence about the crime that led to the conviction.  A trio of

13   Ninth Circuit cases guide the application of the <u>Superintendent v</u>

14   <u>Hill</u> "some evidence" standard in determining whether or not a

15   particular prisoner would pose an unreasonable risk of danger to

16   society or a threat to public safety if released from prison, taking

17   into account the circumstances of the commitment offense:  <u>Biggs</u>,

18   334 F3d 910, <u>Sass</u>, 461 F3d 1123 and <u>Irons</u>, 505 F3d 846.  The first

19   case, <u>Biggs</u>, explained that the value of the criminal offense fades

20   over time as a predictor of parole suitability:

21

22

23

24

25
>The Parole Board's decision is one of 'equity'
>and requires a careful balancing and assessment
>of the factors considered.  * * *  A continued
>reliance in the future on an unchanging factor,
>the circumstance of the offense and conduct
>prior to imprisonment, runs contrary to the
>rehabilitative goals espoused by the prison
>system and could result in a due process
>violation.

26
<u>Biggs</u>, 334 F3d at 916-17.  Although the court in <u>Biggs</u> upheld the

27

28
10

initial denial of a parole date based solely on the nature of the crime and the prisoner's conduct before incarceration, it cautioned that "[o]ver time * * *, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  Id at 916.

Next came Sass, which criticized the court's statements in Biggs as improper and beyond the scope of the dispute before the court.  Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability.  See Sass, 461 F3d at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).

The last of the three cases, Irons, determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner sixteen years into his seventeen-to-life sentence.  Irons emphasized, however, that in all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence."  Irons, 505 F3d at 853.  The court, citing Biggs, then expressed

11

"hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes."   Id at 854.

IV

Petitioner seeks federal habeas corpus relief from BPH's July 21, 2006 decision finding him unsuitable for parole and denying him a subsequent hearing for one year on the ground that the decision does not comport with due process.  Specifically, petitioner argues that BPH "made an arbitrary and capricious decision" in denying parole "because the record did not contain any evidence that * * * [p]etitioner presently poses a danger to society."  Doc #1, Memorandum at 1.

A

In rendering its decision to deny petitioner parole, BPH "looked at the offense."  Doc #9-2 at 94.  Below is a summary of the circumstances of the crime, as described during petitioner's parole suitability hearing.

On July 2, 1982, pursuant to a prearranged plan, petitioner met Mr and Mrs Reily, a couple selling real estate, who showed petitioner and two other men a house that was for sale in Tracy, California.  After about twenty minutes, when the Reilys were securing the house, petitioner showed the Reilys a gun he pulled

from his pants and directed them to drive to their home in Walnut Creek.  When petitioner pulled the gun from his pants, the pin holding the gun's cylinder dislodged from the gun and remained stuck in his pants, rendering the gun inoperative.  Petitioner directed one of his two companions to leave, and the other man joined petitioner in the drive to Walnut Creek.  Upon their arrival at the Reilys' home, petitioner played on a tape player the men brought into the home with them a pre-recorded message made by one of petitioner's companions, which demanded $150,000 and threatened the rape and murder of Mrs Reily and the subsequent murder of Mr Reily. The Reilys stated they did not have $150,000, so eventually petitioner and the other man drove the Reilys to their bank so they could withdraw money.  Doc #9-2 at 16-18, 31-32, 35-36 & 42-43; Doc #9-3 at 8.

While petitioner and the other man remained in the car with Mr Reily, Mrs Reily entered the bank to withdraw money.  Mrs Reily alerted the bank teller as to what was happening, and the police were summoned.  Petitioner and the other man fled in the car with Mr Reily, with police giving chase.  Petitioner, who was driving, lost control of the car and crashed into a fence.  Mr Reily told police that after the crash, petitioner stuck a gun he had been carrying in his pants into Mr Reily's ribs and pulled the trigger, but the gun did not fire.  Petitioner then dragged Mr Reily out of the car at gunpoint and attempted to escape but eventually was apprehended and arrested.  After his arrest, petitioner told police he knew the gun would not fire because the pin holding the gun's

13

cylinder had fallen out and remained in his pants.  He also told police that while he and Mr Reily struggled over the gun, petitioner placed his hand over the gun's hammer so that it would not fire accidentally.  Doc #9-2 at 18-19, 33-34, 35-36 & 42-43.

At the police station, petitioner was strip-searched. During the search, "a small piece of metal, resembling a bent piece of coat hanger, fell from" petitioner's underwear.  Doc #9-3 at 13. The piece of metal later was determined to be the cylinder pin of the gun.  Id.  According to the probation report prepared in connection with the offense:

> Laboratory work was done on the gun.  It was found that the cylinder pin was missing, the side plate screw was missing, the cylinder advance hand spring was not in the gun and the stud that the hammer pivots on was broken off but still in its location.  The gun was found to be inoperable.

Id.

**B**

In explaining its reasons for finding petitioner not suitable for parole, BPH relied on the circumstances of the commitment offense, and expressed "concern" regarding petitioner's parole plans, noting that petitioner:  (1) failed to identify any substance abuse treatment options, including a sponsor, that would be available to him upon his release; (2) failed to provide BPH with a dated letter demonstrating he had secured employment; and (3) had insufficient letters of support.  Doc #9-2 at 97, 98, 99 & 100.

Regarding the offense, BPH noted:

14

> It was calculated.  It was especially cruel and
> it did create human suffering * * *  And a gun
> was used which created an especially [sic]
> disregard for human suffering.  The gun was, in
> fact, pointed at [the victim's] head which * * *
> would make [sic] an especially callous disregard
> for human suffering.  Can you imagine the * * *
> trauma that you put these people through the
> fact that you put a gun to their head.  The
> motive for this crime was very trivial in
> relation to the offense in that those people are
> traumatized now because you needed money,
> because you were living beyond your means.

Doc #9-2 at 94.  BPH later emphasized its concern over the use of

the gun, stating:

> you know, you got [sic] to look at it that it's
> hard to believe that you would even try to use a
> gun like that that has lost a pin, because, I
> mean, I'm no gun expert, but I know that when
> you lose the pin that cylinder turns just a
> little bit and if the firing pin don't [sic] hit
> directly on that bullet and it hits on the side
> that gun can explode.
>
> * * * *
>
> Which would create some problem not only for
> you, but problems for everybody else because
> that cylinder just don't [sic] stay there.
> That's what hold[s] it into place for the firing
> pin to go straight.

Doc #9-2 at 99.

BPH also "had some concern" about petitioner's parole

plans.  Doc #9-2 at 97.  Although acknowledging that petitioner had

a place to live (with his mother, a long time resident of Oakland),

a niece who had offered to help him upon his release, several

diverse, marketable job skills and a guaranteed, written (though

undated) job offer, BPH concluded the hearing by advising petitioner

as follows:

15

1
2
3
4
5

                    what we don't want to do is put you back out on
                    the street with the possibility of you having a
                    job and then you go and you find yourself in the
                    same situation that you had prior to coming in
                    * * * putting you back out there and you have no
                    money and you look over and you want a doughnut
                    or something and you don't have the money to get
                    it. * * *  The parole plans are definitely
                    something * * * that was lacking here.

6  Id at 97-98.

7

8                                    C

9      Most of BPH's comments reflected in the eight and one-half

10 page decision, however, were laudatory, as was the evidence

11 submitted to assist BPH in determining petitioner's parole

12 suitability.   Immediately prior to announcing its formal decision,

13 BPH cited what it described as petitioner's "pretty close to * * *

14 exceptional" institutional behavior, Doc #9-2 at 95, noting he had

15 received no Rules Violation Reports under California Department of

16 Corrections and Rehabilitation ("CDCR") form 115A, and had received

17 only one Custodial Counseling Chrono pursuant to CDCR form 128A over

18 the course of his twenty-four years of incarceration.   Doc #9-2 at

19 95; see also id at 100 (petitioner's "institutional adjustment[]

20 [has] been exceptional"; petitioner's disciplinary record has been

21 "outstanding" & id at 56-57 (during the hearing BPH "commend[ed]

22 [petitioner]" for his "remarkable and outstanding record" throughout

23 the duration of his life term); see Cal. Code Regs. tit. 15, §

24 3312(a)(2)-(3).

25      BPH also noted petitioner had upgraded vocationally since

26 the beginning of his life-term by completing vocational upholstery

27

28                                   16

and becoming a forklift operator, presently as the "lead man."  Doc #9-2 at 57-58; see also id at 59-60 (petitioner had been working for Prison Industry Authority for four years, and had been a "lead man" in both sewing and sanding).  BPH read from a March 8, 2006 letter of recommendation from I T Jenkins, the lock-stitch sewing machine superintendent at San Quentin who noted petitioner

> is the current lead man in the pillow factory and has filled the position admirably for the past year.  [Petitioner was] involved in the conception of a new department in [Prison Industry Authority] complex.  And * * * before [petitioner was] transferred to the pillow factory [he] was employed as a lead man in the finishing department for a year.  And * * * [petitioner] continually prove[s] [himself] to be a reliable, conscientious and hard-working individual.  Definitely an asset to this department.  Upon his release would prove * * * equity value to any company or business venture he might become associated with.

Doc #9-2 at 72-73.

BPH further recognized that since petitioner's last parole suitability hearing, he had "completed three different Impact courses.  One in Successful Relationships, one on Specific Relationships, and * * * another one called Module IV."  Doc #9-2 at 58.  BPH observed that petitioner had a "regular pattern since 1992 of self-help group participation," which included thirty-two hours of Nonviolent Communication self-help group participation, the Hooked on Phonics program, a series of Alternatives to Violence workshops, Self-Esteem Group workshops, Chiros [sic] [prison

ministry] participation, "Toastmasters,"[2] Gavel Club[3] participation, and "numerous other * * * violence prevention workshops."  Id at 58-59.  BPH then "commend[ed]" petitioner for his "full and ongoing participation in [his] self-help groups, which included weekly participation in Alcoholics Anonymous ("AA") from 1992 to the present.  Id.

The following is a more comprehensive overview detailing petitioner's "Therapy & Self Help Activities" as set forth in his July 2006 "Life Prisoner Evaluation Report," to which BPH referred during the hearing and in rendering its decision:

| | |
|---|---|
| 03/22/92 to present | Alcoholics Anonymous |
| 12/31/92 | Completion of Vocational Upholstery Program |
| 01/11/93 | Completion of Upholstery class, Deuel Vocational Institute |
| 09/16/93 | Completion of sixteen-week Stage I Manalive class |
| 12/31/93 | Participation in three-day Alternatives to Violence Project workshop |

[2]  According to its website, Toastmasters International, a non-profit organization, began in 1924 at the YMCA in Santa Ana, and "has grown to become a world leader in helping people become more competent and comfortable in front of an audience" * * * "offering a proven – and enjoyable – way to practice and hone communication and leadership skills."  See  Toastmasters,  Inc  online  at http://www.toastmasters.org/MainMenuCategories/WhatisToastmasters.aspx (visited Sept 28, 2009).

[3]  "Gavel Clubs are affiliates of Toastmasters International, the leading movement devoted to making effective oral communication a world-wide reality."  See  Gavel  Club,  online  at http://www.gavelclub.org/ (visited Sept 28, 2009).

18

| Date | Description |
|---|---|
| 02/24/94 | Participation in three-day Advanced Alternatives to Violence Project workshop |
| 04/21/94-10/31/00 | Participation in the Hooked on Phonics program |
| 06/15/95 | Completion of Lifeskills program |
| 05/01/96 | Participation in the annual Walk-A-Thon '96 for the prevention of child abuse |
| 05/26/95-07/16/96 | Narcotics Anonymous |
| 08/08/96 | Certificate of Completion, Toastmasters International, Competent Toastmaster Certificate |
| 03/25/98 | Donated sixteen magazines to the CTF-North Library |
| 09/15/94-06/30/99 | Member of the San Quentin Speak Easy Gavel Club |
| 10/06/99 | Self Esteem Enhancement Certificate |
| 12/13/99 | Completion of class [on] the cause, prevention, treatment, and management of Sexually Transmitted Diseases |
| 10/09/00 | Participated in the three-day Kairos Men's Retreat |
| 02/17/01 | Participated in the three-day Kairos Men's Retreat |
| 05/20/02 | Certificate of Achievement, Forklift Operator |
| 03/04/03 | Completion of fifteen-week Parenting course |
| 10/09/03 | Participation in Free to Succeed Literacy class |
| 12/08/03 | Participated in the Insight Meditation class |

19

| | |
|---|---|
| 03/01/04 | Completed Session One (sixteen-week) Violence Prevention workshop |
| 03/29/04 | Completed Session Two (sixteen-week) Violence Prevention workshop - "Time Outs" |
| 05/10/04 | Completed Session Three (sixteen-week) Violence Prevention workshop - "Body Signals" |
| 06/21/04 | Completed Session Four (sixteen-week) Violence Prevention workshop - "Self Talk" |
| 07/26/04 | Completed Session Five (sixteen-week) Violence Prevention workshop - "Conflict Resolution" |
| 01/30/05 | Participated in the "A Life for Peace, Action, and Service to Others" workshop |
| 03/08/05 | Completed a sixteen-week Non-Violent Communication class |
| 03/21/05 | Certificate of Completion - Module III, Addictions |
| 04/17/05 | Certificate for participating in a workshop/seminar on Working with Anger |
| 05/23/05 | Participated in Session One of Project IMPACT'S sixteen-week workshop on Relationships |
| 06/07/05 | Certificate of Proficiency, Roll-or-Tape-Edge-Machine Operator |
| 06/27/05 | Participated in Session Two of Project IMPACT'S sixteen-week workshop, Relationship Dynamics |
| 08/01/05 | Participated in Session Three of Project IMPACT'S sixteen-week workshop, Cultivating Successful Relationships |

1

2
    09/26/05                     Participated in Session Four of
                                 Project IMPACT'S sixteen-week
                                 workshop, Specific Relationships

3

4
    10/03/05                     Certificate of Completion,
                                 Project IMPACT, Module IV -
                                 Relationships

5

6

7
    02/28/06                     Certificate of Completion,
                                 Nonviolent Communication self-
                                 help group - thirty-two hours of
                                 instruction

8   Doc #9-5 at 42 & 46-47.  The same report noted, in its "Summary"

9   section:

10

11

12

13

14

15

16

17
        [Petitioner] has continued his unblemished
        disciplinary profile since his last [] hearing.
        He has received numerous commendations for his
        positive programming and has maintained an
        excellent rapport with both inmates and staff.
        Based on the absence of a prior criminal history
        (taking into account his commitment offense),
        his prison adjustment, the findings in his
        psychiatric reports, and his family support I
        believe [petitioner] will re-integrate into
        society without incident.  I did not note any
        information that would indicate he would not be
        able to function as a law-abiding citizen should
        he be allowed parole at this time.

18  Doc #9-5 at 49.

19      Equally as positive was the information contained in the

20  psychological evaluation conducted at BPH's request in preparation

21  for his 2006 parole suitability hearing:

22

23

24

25

26

27
        When asked what his plans for parole were,
        [petitioner] stated that he planned to "stay out
        of trouble and help people."  When asked for
        specific details, [petitioner] stated that he
        plans to stay with his mother at her home.  She
        has made it clear that he is welcome to stay
        with her for as long as he needs to.
        [Petitioner] believes that his mother is 70 or
        71 years old.  He describes his relationship
        with her as being very close.  She visits him

28                          21

every other weekend and has done so throughout
his incarceration.  He has tried to encourage
her to stay at home and take care of herself,
but has not been able to deter her from
traveling around the state to visit him.  He
feels a deep sense of gratitude toward her for
her unwavering support.  Being able to help his
mother is a primary factor in [petitioner's]
desire to be released to the community.

[Petitioner] has extended family in many
communities in the Bay Area.  He has a 26-year-
old daughter with whom he is contact.  She
visited him about a month ago.

[Petitioner] describes himself as a good
worker, who would be willing to take any job in
the community.  He would be most likely to
return to his previous employment as a roofer.
[Petitioner] has done this type of work
successfully in the past and believes that he
would be hired again.  He has also worked as a
tree trimmer and parking lot attendant with
positive evaluations from his previous
employers.  While incarcerated, he has gained
additional skills and experience as an
upholsterer, truck driver, and forklift
operator.

[Petitioner] would continue his
participation in [Alcoholics Anonymous ("AA")]
as he states that "AA is a part of my life
everyday."  He would plan to attend meetings as
soon as he leaves prison, and has gotten a list
of AA meeting locations near his mother's home.
[Petitioner's] mother is also active in her
church and [petitioner] has promised her that he
would regularly attend services with her.

[Petitioner] has been married once and is
divorced.  He is not presently engaged in a
relationship.  He looks forward to develop[ing]
a positive circle of friends, in the future, as
he states "there are a lot of people out there
who are doing good things.  I know I made a bad
decision and I see my life getting better.  I
know I got life left in me.  I still enjoy
working."

* * * *

[Petitioner] has no current symptoms of a

22

recognized mental disorder.  He is functioning well in most areas of his life in that he is programming well, has supportive family relationships, is positive about his life and his ability to make a contribution to society. He is aware of the needs of others and actively looks for ways to solve problems by constructive means.  He is not receiving any mental health services at this time and does not have a need for therapeutic intervention.

* * * *

[Petitioner] has a good understanding of the factors that led to his commitment offense. He stated that he was raised with good values and did not get into trouble as an adolescent. He was employed at the time of the crime and living independently in the community.  * * * [Petitioner] acknowledges the harm he did to the victims as individuals who did not deserve to be victimized by criminal actions.  [Petitioner] takes direct responsibility for his actions in regard to the crime.

While [petitioner's] crime was one that placed his victims at direct risk of harm, everyone was fortunate in that there was no loss of life.  [Petitioner] has received a very long sentence for his crimes and acknowledges that he did wrong and deserves punishment by the court. His criminal actions did not seem to be the result of an antisocial personality or criminal lifestyle.  He also does not have a criminal record from a young age.  These factors would suggest that [petitioner] would be an inmate who could benefit greatly from rehabilitation, in that he has a foundation of socially conforming behavior prior to incarceration.

There is the question of the contribution of alcohol to [petitioner's] crime. [Petitioner] admits to inappropriate use of alcohol around the time of his offense.  He denies that he was intoxicated at the time of the offense and it would appear that alcohol did not play a direct role in the commission of the crime.  It is more likely that [petitioner's] abuse of alcohol contributed to an overall lack of judgement [sic] and an erosion of the values with which he was raised.  He has clearly stated a commitment to lifelong participation in AA.

23

> Given [petitioner's] lack of an early or
> extensive history of criminal behavior, and
> active recovery from alcohol abuse, the greatest
> risk would be likely to come from any clinical
> factors associated with violent behavior.  Any
> recognized factors such as lack of insight,
> negative attitudes, lack of empathy,
> impulsivity, symptoms of major mental illness,
> or failure at treatment would be considered as
> possible sources of increased risk.  Based on
> review of [petitioner's] present institutional
> record and the clinical interview conducted for
> this report, it would appear that none of these
> risk factors is currently present.

> [Petitioner] also has a number of
> protective factors such as a feasible plan for
> parole and substantial social support.  He also
> is clear about his remorse for his actions and
> his willingness to continue his participation in
> self-help and rehabilitation activities.  He has
> reflected on his crime and is willing to do
> whatever would be appropriate to make amends to
> those who have been harmed by his actions.

Doc #9-3 at 28-31.  The psychologist's conclusions and

recommendations were are follows:

> Other than continuing in AA, there would be
> no recommendation for necessary therapeutic
> interventions prior to parole.  [Petitioner] is
> an individual whose crime was extreme in its
> complexity and recklessness.  [Petitioner's]
> sentence reflects this.  There is not, in my
> opinion, a direct relationship between the
> extreme actions of the crime and [petitioner's]
> criminality.  He was not known to be a violent
> person before the crime, and has not engaged in
> violence subsequent to the crime.  His criminal
> action seemed to reflect a dramatic, but failed
> attempt to solve his financial problems by
> criminal means.

> Given [petitioner's] history, institutional
> adjustment, and present clinical presentation
> there are no psychological factors that would
> suggest an increased risk for violent behavior,
> in either the community, or a controlled setting
> at the present time.  While it is not possible
> to accurately predict future violent behavior,

24

> given [petitioner's] age, commitment to ongoing
> substance abuse treatment, and limited criminal
> history, he would be expected to be able to
> continue to live a positive, non-violent life
> when released to the community.

Doc #9-3 at 31.

During the hearing, BPH often referred to the
psychological evaluation, initially stating, "[BPH], at the last
hearing, specifically requested a [] new psych report and asked []
that the report address the prisoner's violence potential in the
free community, the significance of alcohol or drugs relative to the
commitment offense, and any need for any further therapy." Doc #9-2
at 61-62. BPH then quoted from the part of the report that
addressed petitioner's remorse for his involvement in the crime, and
asked petitioner regarding "making amends," which petitioner
identified as the ninth step of AA's "Twelve Steps." Id at 62-63.
Petitioner explained "the best amends I can make to [the victims] is
to continue to participate in AA, because what I did I – I can't
take it back and I'm truly sorry for it." Id at 63; see also id at
90-92 (in petitioner's concluding statement to BPH, he states he
accepts responsibility for his role in the crimes and reiterates his
deep feelings of remorse). Petitioner then confirmed that he had
told the doctor conducting his psychological evaluation that he
would work for the victim for a year without pay to make amends and
to show his true remorse for what petitioner had done to the
victims. Id at 63. Petitioner explained he did not know how else
he could demonstrate how sorry he was for what he had done. Id.

Earlier in the hearing, petitioner confirmed his feelings

of remorse for his participation in the crimes as he expressed to

the psychologist, telling BPH:

> I feel really sick about it.  * * *  I take full
> responsibility for the part I played in this,
> because it was like a decision that I made – it
> was a bad one 'cause I never made – I never did
> anything like this in my life and it was a bad
> decision I made that day.  And I take full
> responsibility in the part I played 'cause if it
> weren't for me it wouldn't never [sic] [have]
> happened.  That's – that's the way I look at it.
> If it wasn't for me it would've never happened
> 'cause I wouldn't have been there and it
> would've never happened to these people.

Doc #9-2 at 30-31.

Petitioner also reiterated his close family ties, noting

that his twenty-six year old daughter came to visit him "quite

often."  Doc #9-2 at 51.  Regarding his parole plans, petitioner

stated that he planned to live with his mother, who by letter of

support "reaffirm[ed] [her] commitment to provide [petitioner] with

whatever [he] need[s] in the way of shelter, clothes,

transportation, and money."  Doc #9-2 at 67; see id at 69.

Regarding his prospects for employment, petitioner had an

undated letter from a Mr Mike Farrell who "will guarantee a job for

[petitioner]" in Sausalito in industrial roofing at $14 an hour with

a possible raise after three months.  Doc #9-2 at 67-68.  Petitioner

also reaffirmed his commitment to continue his participation in AA

and stated that if he were given a parole date he would acquire an

AA sponsor.  Id at 74.

//

//

D

Notwithstanding this substantial body of favorable evidence, BPH decided to deny petitioner parole.  In rendering its decision, BPH first told petitioner:

> This was a truly difficult situation for us.
> And – but there are some things that we do have
> some concerns about.  And once [we] go through
> the entire process, you'll understand why I have
> some concerns about this.  But I want to make
> sure that you understand * * * and don't get
> discouraged because you are extremely close to
> being let go out of here.

Doc #9-2 at 93; see also id at 101 (BPH told petitioner he was "very, very close" to being paroled).  BPH then told petitioner he was "not suitable for parole" and that he "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  Id at 92-93.

The state superior court affirmed the decision of BPH to deny petitioner parole, stating "[b]ecause [p]etitioner's commitment offense was for financial gain, premeditated, and not committed as the result of significant stress in [his] life, the commitment offense does provide some evidence that the [p]etitioner would present an unreasonable risk to public safety if released from prison."  Doc #9-8 at 84.  The court added that BPH "could properly assess that [p]etitioner's uncertain parole plans, with their attendant financial uncertainty, exacerbated the risk to public safety."  Id.  The state appellate court summarily denied petitioner's request for habeas corpus relief, Doc #9-9 at 2, and the state supreme court summarily denied his petition for review.

Doc #9-9 at 23.

**E**

In light of the entire record now before the court, it is difficult, if not impossible, to reconcile BPH's decision to deny petitioner parole with the evidence upon which it relied to make that decision.  Indeed, even BPH, in denying petitioner parole, acknowledged how "difficult" the decision was, implying how seemingly easy it would have been to reach the opposite conclusion, ie, that petitioner was suitable for parole.  Doc #9-2 at 93 & 101.  The court finds the record was "so devoid of evidence that the findings of [BPH] were without support or otherwise arbitrary." Hill, 472 US at 457, such that the state court's determination that there was "some evidence" in the record to support BPH's decision to deny petitioner parole was an objectively unreasonable application of Hill.  See 28 USC § 2254(d).  There simply was no reliable evidence to suggest that if released on parole, petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  Cal Code Regs tit 15, § 2402(a).

Rather than accept the solid body of evidence demonstrating petitioner's uncontroverted efforts at rehabilitation and his firmly established commitment to bettering himself, BPH's comments prove that its decision to deny petitioner parole stemmed primarily from speculative fear.  For instance, BPH engaged in sheer conjecture in discussing the circumstances of the crime, with the presiding commissioner claiming that he "kn[ew]" that the gun could

28

have "explode[d]," implying that as a result of his actions, petitioner could have been responsible for maiming or even killing someone.  Doc #9-2 at 99.  But according to petitioner's statement to police when he was arrested, which was confirmed by lab work performed on the gun following petitioner's arrest, the gun was "inoperable," missing at least three pieces.  Doc #9-2 at 33-34, 35-36 & 42-43; Doc #9-3 at 13.

Regarding his parole plans, BPH conjured up a scenario – made out of whole cloth – wherein a recently-paroled petitioner found himself craving a doughnut but without money to buy one, necessarily implying that he would resort to committing a crime to satisfy an impulse.  See Doc #9-2 at 97-98; see also Doc #9-3 at 30-31 (according to petitioner's psychological evaluation, he does not exhibit evidence of "impulsivity").

But the evidence regarding petitioner's parole plans shows that if he were granted parole, petitioner planned on living with and caring for his elderly mother, to whom he expressed his gratitude and indebtedness for not abandoning him during his lengthy incarceration.  See Doc #9-3 at 28-29.  The evidence shows that upon his release petitioner's mother "reaffirm[ed] [her] commitment to provide [petitioner] with whatever [he] need[s] in the way of shelter, clothes, transportation, and money," Doc #9-2 at 67; see id at 69, a commitment which the presiding commissioner summarily dismissed.  See Doc #9-2 at 97 (emphasis added) ("your mother * * * *would* not be able to help you as much").

The evidence shows that some of petitioner's free time

29

would be spent regularly attending religious services with his
mother, who was active in her church.  Doc #9-3 at 29.  Petitioner
also planned to spend some of his time continuing his regular
participation in AA meetings, which he began in 1992.  Doc #9-2 at
62-63.  Although, as BPH noted, petitioner had not yet secured an AA
sponsor outside of prison, petitioner did demonstrate his continuing
commitment to participating in AA even if he were paroled by
obtaining a list of meeting locations close to his mother's home,
Doc #9-3 at 29, something that BPH failed to recognize.  See Doc #9-
2 at 97 (in expressing "concern" regarding petitioner's parole
plans, BPH advised him "to identify what NA/AA programs are
available in the area" he planned on attending if paroled).  There
is no evidence in the record to suggest that petitioner would fail
to obtain an AA sponsor or otherwise lapse in his commitment to his
recovery if he were released on parole.

       In addition to having the support of the church and AA,
the evidence shows petitioner had "extended family in many
communities in the Bay Area," which included a "26-year-old daughter
with whom he is in contact" and with whom he recently had visited,
and a "niece who had offered to help him upon his release."  Doc #9-
2 at 97; Doc #9-3 at 28.

       The evidence also shows that petitioner had deep remorse
for his actions, and an even deeper motivation to make the most of
the remainder of his life if released from prison.  See Doc #9-3 at
29 (petitioner "looks forward to develop[ing] a positive circle of
friends, in the future, [and] states 'there are a lot of people out

there who are doing good things.  I know I made a bad decision and I
see my life getting better.  I know I got life left in me.  I still
enjoy working.'"); id at 28-31; Doc #9-2 at 63 & 90-92.

Petitioner's record of developing various vocational
skills while incarcerated, which included woodworking, sewing,
upholstering and operating a forklift, and establishing himself as a
"lead man" and overall model employee support his self-stated desire
to find gainful employment upon his release from prison.  Doc #9-2
at 57-60 & 72-73.  Petitioner even provided BPH with a guaranteed
offer of employment in roofing, a profession in which he was engaged
prior to his incarceration.  Id at 67-68 (undated letter from Mr
Mike Farrell who "will guarantee a job for [petitioner]" in
Sausalito in industrial roofing at $14 an hour with a possible raise
after three months).

BPH's decision regarding petitioner's parole suitability
lies in stark contrast to that of the psychologist, who concluded
that in light of petitioner's "history, institutional adjustment,
and present clinical presentation there are no psychological factors
that would suggest an increased risk for violent behavior, in either
the community, or a controlled setting at the present time."  Doc
#9-3 at 31.  The July 2006 "Life Prisoner Evaluation Report"
similarly concluded:

> Based on the absence of a prior criminal history
> (taking into account his commitment offense),
> his prison adjustment, the findings in his
> psychiatric reports, and his family support I
> believe [petitioner] will re-integrate into
> society without incident.  I did not note any
> information that would indicate he would not be
> able to function as a law-abiding citizen should

1    he be allowed parole at this time.

2    Doc #9-5 at 49.

3    Petitioner's criminal offense was an isolated aberration

4    in his past, "temporally remote" – committed some twenty-three years

5    earlier – and certainly mitigated by various circumstances

6    indicating the conduct is unlikely to recur.  See <u>Lawrence</u>, 44 Cal

7    4th at 1191.  At the time BPH denied petitioner a parole date for

8    the eleventh time in 2006, he had served twenty-three years on his

9    seven-to-life sentence, over thirteen years past his minimum

10   eligible parole date.  Perhaps in some cases the circumstances of a

11   prisoner's commitment offense may continue to reasonably predict his

12   future, even in spite of a prisoner's dramatic behavioral

13   improvement while in prison.  But, where, as here, petitioner's

14   complete lack of a violent history, his extensive and successful

15   programming in prison, strong family support, realistic parole

16   plans, highly favorable psychological evaluations and model behavior

17   that has been maintained for his entire time spent behind bars, his

18   continued incarceration based on the circumstances of his 1982

19   commitment offense rises to the level of a due process violation the

20   Ninth Circuit envisioned.  See <u>Irons</u>, 505 F3d at 854 ("in some

21   cases, indefinite detention based solely on an inmate's commitment

22   offense, regardless of the extent of his rehabilitation, will at

23   some point violate due process, given the liberty interest in parole

24   that flows from the relevant California statutes").

25   After careful review of the record and pertinent law, the

26   court finds there simply is no evidence that petitioner was not

27

28                                     32

suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  The state court's determination that BPH's reliance on the commitment offense as well as what it termed petitioner's "uncertain parole plans" satisfied the "some evidence" standard was an objectively unreasonable application of Hill.  See 28 USC § 2254(d).  As a result, petitioner is entitled to federal habeas relief on his due process claim.

                                    V

        For the reasons stated above, the petition for writ of habeas corpus is GRANTED.  Within twenty days of the date of this order, BPH must calculate a term for petitioner and set an imminent date for his release in accordance with California Penal Code § 3041(a).  Within ten days of petitioner's release, respondent must file a notice with the court confirming the date on which petitioner was released.


        IT IS SO ORDERED.


                                    _____
                                    VAUGHN R WALKER
                                    United States District Chief Judge


G:\PRO-SE\VRW\HC.07\Sullivan-07-4963-BPH grant.wpd